# Exhibit A

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 1

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO

2

    CASE NO. 13-cv-02469-RM-MJW

3   _____

4   RANDALL J. HATLEE and
    RONALD L. SWIFT,

5

        Plaintiffs,

6

                    vs.

7

    CINDY HARDEY,

8   BOBBIE PRIESTLY,
    MONTE GORE,

9   FRED WEGENER and
    ASHLEIGH OLDS,

10

        Defendants.

11

    ----------------------------------------------------

12

        DEPOSITION OF ASHLEIGH OLDS, DVM, DABVP-Equine

13                    March 25, 2014

14  ----------------------------------------------------

                                Deposition location:

15                              600 17th Street,
                                Suite 600N

16                              Denver, Colorado 80202

17

18

    ALSO PRESENT:  Randall Hatlee

19                 Ronald Swift

20

21

22

23

24

25

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 4

1              ASHLEIGH OLDS, DVM, DABVP-Equine,

2    being first duly sworn to state the truth, the whole

3    truth and nothing but the truth, testified on oath as

4    follows:

5                        EXAMINATION

6    BY MR. TONDRE:

7           Q.   State your name, please.

8           A.   Ashleigh Olds.

9           Q.   And your present occupation?

10          A.   Veterinarian.

11          Q.   When did you graduate from veterinary

12   school?

13          A.   2002.

14          Q.   From where did you graduate?

15          A.    I graduated from the University of

16   California at UC Davis.

17          Q.   And your undergraduate studies were

18   what and where?

19          A.   Equine science in the honor's program

20   at Colorado State University.

21          Q.   What generally did equine science

22   include in its curriculum?

23          A.   At Colorado State University?

24          Q.   Yeah.

25          A.   General horse management, equine

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

1    nutrition, equine reproduction; business management;

2    hard sciences like biology, chemistry, organic

3    chemistry; statistics, a number of other electives.

4              Q.    Did you do any postgraduate studies

5    following graduation from UC Davis?

6              A.    I did.  I did an internship at the

7    University of Illinois at Champaign-Urbana

8    specializing in equine medicine and surgery.

9              Q.    How long of a course was that?

10             A.    One year.

11             Q.    Did you get any sort of degree or

12   certification?

13             A.    That -- did not specifically, no.

14             Q.    Do veterinarians have something akin to

15   certifications?

16             A.    Yes.

17             Q.    What certifications?

18             A.    There is a number of board

19   certifications.

20             Q.    Do you hold any board certifications?

21             A.    I do.

22             Q.    What board certifications?

23             A.    The American Board of Veterinary

24   Practitioners, specifically in equine medicine and

25   surgery.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 6

1          Q.    When were you certified by that board?

2          A.    In December of 2013.

3          Q.    What are the qualifications for being a

4   member of that board?

5          A.    It's a very rigorous process of a

6   number of factors, including a large number of

7   continuing education credits; you have to get written

8   endorsements by other board-certified professional

9   veterinarians endorsing you for it.  You have to do

10  two extensive case reports that get reviewed and

11  approved.  And then you have to pass a two-day

12  written and practical examination.

13         Q.    What did you do after your year at

14  University of Illinois?

15         A.    I went into private practice.

16         Q.    Where?

17         A.    The first practice I worked at was

18  called Range View.  It was an equine-only practice in

19  Colorado Springs.

20         Q.    Range?

21         A.    Range View.

22         Q.    Range View.

23               And how long were you with that

24  practice?

25         A.    I was there for a year.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 7

```
 1              Q.    And after that, what did you do next?
 2              A.    I worked at Golden Animal Hospital.
 3              Q.    What was the nature of that practice?
 4              A.    It was a mixed-animal practice, but I
 5    specifically did equine and large animal.
 6              Q.    How long were you in that practice?
 7              A.    Roughly four years.
 8              Q.    And after that?
 9              A.    I opened my own practice.
10              Q.    What is the name of that practice?
11              A.    Aspen Creek Veterinary Hospital.
12              Q.    What is the nature of the practice?
13              A.    The practice is currently a
14    mixed-animal practice.
15              Q.    What percentage is horses?
16              A.    Percentage of the practice or
17    percentage that I work on?
18              Q.    Percentage of the practice to start
19    with.
20              A.    I would say the percentage of the
21    practice is probably 60 to 70 percent horses.
22              Q.    What about your practice personally?
23              A.    I would say 95 percent horses
24    personally.
25              Q.    What percentage of the work that the
```

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ago.

Q. Do you remember the name of the prosecutor?

A. No.

Q. What is your involvement with animal rights organizations?

A. I don't have any involvement with animal rights organizations.

Q. Aren't you the vet for Harmony HorseWorks?

A. Harmony HorseWorks is a horse sanctuary, and I provide them with veterinary care. That is the extent of our relationship.

Q. Is it an animal rights organization?

A. Not to my knowledge.

Q. What do you call an animal rights organization?

A. I would consider PETA to be an animal rights organization.

Q. How long have you been providing services to Harmony HorseWorks?

A. I have provided veterinary services for, I would guess, ten years.

Q. It's a 501(c)3) charitable organization, right?

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 45

1    I wanted to look up, I'm sure that I would look at

2    the various university publications on -- a lot of

3    the university's vet colleges have extension agencies

4    that publish information about different toxic

5    plants.

6              MR. LEBSACK:   Brice, we have been going

7    for a little over an hour.   Can we take a break when

8    you get to a point?

9              MR. TONDRE:   You bet.

10             MR. LEBSACK:   Not necessarily -- now is

11   okay?

12             MR. TONDRE:   Sure.

13             MR. LEBSACK:   Okay.

14             (Whereupon, a recess was taken from

15   11:04 a.m. to 11:17 a.m.)

16        Q.   (BY MR. TONDRE) Did you form an opinion

17   as to how long it had taken the horses at Echo Valley

18   Ranch to reach the state you complained about?

19             MR. LEBSACK:   Objection to the form.

20             MS. BRONSON:   Join.

21        A.   I didn't -- when you say -- I can

22   comment as to whether I made an assessment as to how

23   long it took the horses to get there, but I didn't

24   complain about anything to anybody.   I was asked to

25   make an opinion by Park County Sheriff's Department

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 46

1    Animal Control.

2              Q.    (BY MR. TONDRE) When did they ask you

3    to make an opinion?

4              A.    At various points in time.

5              Q.    How about on February 16th; did they

6    ask you to make an opinion?

7              A.    Sure.  Yeah.  They said what is your

8    general assessment.

9              Q.    And who asked you?

10             A.    Cindy Hardey.

11             Q.    All right.  And what was your opinion

12   as to how long it took the horses to get there?

13             A.    I don't know if she asked me how long

14   it took them to get there on that day.  I think she

15   just asked me for my general assessment for the

16   horses.

17             Q.    Did you ever form an opinion as to how

18   long it took the horses to reach that condition?

19             A.    I would say that based on my

20   understanding and my reading that you couldn't -- I

21   certainly couldn't pinpoint it, but I would say on

22   average 30 to 90 days minimum.

23             Q.    What do you look at to assess whether

24   there is any neurological problems with a horse?

25             A.    Sure.  There is a lot of things you can

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 54

1    privilege, you can't instruct her not to answer.

2                   MR. LEBSACK:  I certainly can.  There

3    are other grounds under Rule 30, and that's what I'm

4    invoking.

5                   MR. TONDRE:  No, there are not.

6          Q.   (BY MR. TONDRE) Who was the person from

7    your clinic that accompanied you to the Echo Valley

8    Ranch?

9          A.   It was a vet assistant named Troy

10   Murdock.

11         Q.   And I don't think I heard his name.

12         A.   No.  He doesn't currently work for me.

13         Q.   Is he related to Anna Murdock?

14                  MR. LEBSACK:  Amy, you mean?

15                  MR. TONDRE:  Amy Murdock.

16         A.   They were married at the time.

17         Q.   (BY MR. TONDRE) Where is he now?

18         A.   I'm not certain of his current

19   employment.

20         Q.   Well, where was he the last time you

21   knew where he was?

22         A.   My understanding was he was working as

23   a security guard at one of the hospitals in Denver.

24         Q.   Did you attend the April 7th fundraiser

25   in Evergreen?

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 69

1          A.    She wasn't there.   Dawn Smith was never

2    there.

3          Q.    So I misunderstood you.   So Barbara

4    Wright was there when you arrived with Spencer?

5          A.    Correct.

6          Q.    Was she there when you called Cindy

7    Hardey and urged her to seize the remainder of the

8    horses?

9               MS. BRONSON:   Object to form.

10         A.    I didn't ever call Cindy Hardey and

11   urge her to seize the horses, to my knowledge.

12         Q.    (BY MR. TONDRE) Did you send her an

13   email that afternoon at 4 p.m.?

14         A.    I did send her an email.

15         Q.    Did you urge her to seize the horses?

16         A.    I wouldn't say that I urged her to

17   seize the horses.

18              MS. BRONSON:   Object to form.

19         A.    They had asked me for my professional

20   assessment because they wanted to seize the horses,

21   and they -- I believe it said, "Hopefully this will

22   be useful to you if you try to seize the horses," or

23   something to the effect.

24         Q.    (BY MR. TONDRE) When did you learn that

25   they had made the decision to leave the horses where

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 70

1    they were?

2          A.   My understanding when I left the

3    property was that they were going to leave the horses

4    where they were and that they were going to try to

5    obtain a veterinarian, a third opinion veterinarian,

6    to come to the site to make an assessment before they

7    took any further steps.  That was -- so I don't -- I

8    don't know that it ever was clear at any one point in

9    time that for sure they weren't seizing the horses,

10   but I -- when I left on February 16th, I knew that

11   they were not taking them on that day.

12         Q.   You demanded that they seize those

13   horses while you were on the farm, didn't you?

14              MS. BRONSON:  Object to form.

15         Q.   (BY MR. TONDRE) Or on the ranch.

16         A.   I don't know how I could demand that

17   they seize the horses.  They asked me my professional

18   opinion, and I expressed concern about the horses,

19   and I was in support of them if they wanted to seize

20   the horses.

21         Q.   (BY MR. TONDRE) You are not aware that

22   Cindy Hardey said that you demanded that they

23   remove -- seize the horses?

24         A.   I have seen Cindy Hardey's report, and

25   I don't agree with the factual nature of it.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 78

1    where --

2                    MR. LEBSACK:  Hold on.  Let him ask a

3    question.

4                    THE DEPONENT:  Okay.

5           Q.   (BY MR. TONDRE) What were the clinical

6    signs?

7           A.   Well, weight loss.

8           Q.   There were 14 with weight loss?

9           A.   There were 8 horses with weight loss,

10   and we were told -- Mr. Swift told me when we were on

11   the property, and Dr. Burton informed my practice

12   manager, that five to six horses had already died.

13          Q.   When?

14          A.   Which one?

15          Q.   When had five or six horses actually

16   died?

17          A.   When was I told that or when did the

18   horses die?

19          Q.   When did they die?

20          A.   I don't know.  I was told that by

21   Mr. Swift and Burton that five to six horses had

22   already died within the recent several months was my

23   understanding.

24          Q.   Mr. Swift told you that?

25          A.   He did.  That's in my report.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 81

1    12:03 p.m. to 1:04 p.m., and Mr. Schimberg was not

2    present.)

3            Q.    (BY MR. TONDRE) Dr. Olds, at 4 o'clock

4    on February 16, 2012, you sent an email to Cindy

5    Hardey; is that correct?

6            A.    I believe that's correct, yes.

7            Q.    And in that sent email, you -- did you

8    tell Cindy Hardey that you hoped that the information

9    you were providing that afternoon would be useful in

10   obtaining an order to seize the remaining horses and

11   get permission to euthanize the downed mare?

12           A.    If you wouldn't mind, just to refresh

13   my memory, provide me with what you are reading off

14   of, and I would be happy to confirm that.

15           Q.    I'm reading your email --

16           A.    Sure.  That's fine.

17           Q.    -- which is on page 70 of the Park

18   County defendant's disclosures.

19           A.    So I said hopefully this will be useful

20   in obtaining an order to seize the remaining horses

21   and/or permission to euthanize the downed mare.

22   Cindy Hardey had asked me to write that report

23   because she had indicated to me that she did want to

24   seize the horses and that that might be useful for

25   her.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 82

1          Q.    And you say the "remaining horses."
2    What is that in reference to?
3          A.    Maggie the downed horse, and then
4    there's six additional varying underweight horses on
5    the property.
6          Q.    You weren't advocating the taking of
7    all 40 horses, were you?
8          A.    No.
9          Q.    Now, before we broke for lunch, you
10   said that the horses were in imminent danger of
11   death.  Which ones did you have reference to?
12          MR. LEBSACK:  Objection to the form.
13          MS. BRONSON:  Join.
14          MR. LEBSACK:  And I'm not sure -- I
15   don't remember her saying that.
16          MR. TONDRE:  She did.  I was shocked,
17   but...
18          A.    I said my understanding is to get a
19   warrantless seizure in the State of Colorado, you
20   just have to make a case that the animals are in
21   imminent danger of death.
22          MR. LEBSACK:  So I don't care what she
23   said.  The record will show what she said, but when
24   you say that she said that, what horses are you
25   referring to, I think that is not supported by the

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 83

```
 1    record, so...
 2                   THE DEPONENT:  Well, Maggie was.
 3                   MR. LEBSACK:  Ask a different question
 4    if you would, please.
 5                   Q.   (BY MR. TONDRE) Did you believe any of
 6    the horses were in imminent danger of death?
 7                   A.   I did.
 8                   Q.   Which ones did you believe were in
 9    imminent danger of death?
10                   A.   Maggie was certainly in imminent danger
11    of death.
12                   Q.   Any others?
13                   A.   And she did die.  You know, after that
14    point in time, I did not have the opportunity to see
15    the horses again.  I would say based on how -- how
16    severely emaciated they were and how ill Spencer and
17    Maggie were, you know, I had concerns about the other
18    horses.  But I wouldn't have said on 2/16 whether I
19    could make an assessment about that, but certainly
20    Maggie appeared to be in imminent danger of death.
21                   Q.   And what was causing her to be in
22    imminent danger of death?
23                   A.   Well, I think the facts support that.
24    She died so she was in imminent danger of death.  She
25    was recumbent, severely emaciated, and she wasn't
```

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 84

1    receiving any sort of supportive care.  She wasn't

2    receiving any antibiotics or IV fluids or parenteral

3    nutritional support.

4            Q.    You thought she needed to be euthanized

5    right on the spot, didn't you?

6                 MR. LEBSACK:   Objection to the form.

7            A.    To clarify, my statements at the

8    time -- and I will stand by them to this day -- was

9    that I strongly recommended that she get diagnostic

10   testing to try to determine what was wrong with her

11   and transport her to a hospital facility where she

12   could receive appropriate care.  And if that wasn't

13   going to be done, the most humane thing to do would

14   be to euthanize her.  And I offered to help transport

15   her to any facility that Mr. Swift wanted to get

16   appropriate care, which he declined.

17           Q.    Were you aware she was scheduled to go

18   to CSU the next day?

19           A.    I don't believe she ever was

20   transported to CSU other than after she died.

21           Q.    Are you aware she was scheduled to go

22   to CSU the next day?

23           A.    No.  Nobody said anything about

24   transporting her to CSU.

25           Q.    Who were you to be making suggestions

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

1    the horse was on any medications or antibiotics, and

2    she indicated that it was not.  We asked if the horse

3    was receiving or had had any diagnostic testing such

4    as blood tests, fecal tests, or any hay testing done

5    on the property, and she indicated that it had not

6    been done.

7              Q.    From whom did you receive a request to

8    go to Echo Valley Ranch?

9              A.    From Routt County and Harmony

10   HorseWorks.

11             Q.    Who contacted you first?

12             A.    I'm not sure because the contact went

13   through my front office.  I was initially just asked

14   if we would be willing to care for a horse that Routt

15   County was impounding, which I agreed to.

16             Q.    Is it correct that you were -- you

17   assisted in the recovery of a 2-year-old bay gelding

18   from Echo Valley Ranch, Colorado, on behalf of

19   Harmony HorseWorks?

20             MR. LEBSACK:  Objection to the form.

21             MS. BRONSON:  Join.

22             A.    My understanding is we were there on

23   behalf of Routt County, and that Harmony HorseWorks

24   was coordinating the care of the horse because they

25   were going to be the eventual caretakers of the horse

Page 88

```
 1    when he was discharged from the hospital.

 2            Q.    (BY MR. TONDRE) What was your first

 3    contact with anyone regarding -- when was your first

 4    contact with anyone regarding getting involved with

 5    the seizing of the horse?

 6            MR. LEBSACK:  Could you clarify.  You

 7    mean her personally or her office?

 8            MR. TONDRE:  Her personally.

 9            MR. LEBSACK:  Okay.

10            Q.    (BY MR. TONDRE) When did you find out

11    you were going to Echo Valley Ranch?

12            A.    I didn't find out I was going to Echo

13    Valley Ranch specifically until we were en route to

14    Echo Valley Ranch.

15            Q.    Oh, so you just jumped in the car and

16    you didn't know where you were going?

17            MR. LEBSACK:  Don't answer the

18    question.

19            Q.    (BY MR. TONDRE) Maybe to Dairy Queen.

20            MR. LEBSACK:  Don't answer the

21    question.

22            Q.    (BY MR. TONDRE) Come on.  Give me a

23    break.

24            MR. LEBSACK:  Don't answer the

25    question.
```

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 89

1          Ask the next one.

2          Q.   (BY MR. TONDRE) You were sitting in a

3    car and you didn't know where you were going; is that

4    right?

5          A.   Correct.  We were instructed to meet at

6    the Bailey substation, and we were not informed of

7    where we were going.

8          Q.   Who instructed you to go to the Bailey

9    substation?

10             MR. LEBSACK:  Objection to the form.

11             MR. TONDRE:  What's wrong with the

12    form?

13             MR. LEBSACK:  Your connotation of

14    instructed.

15             MR. TONDRE:  Read it back.

16             MR. LEBSACK:  She said -- okay.

17             MR. TONDRE:  Read back her answer.

18             (Whereupon, the answer beginning at

19    page 89, line 5, was read by the reporter.)

20             MR. LEBSACK:  I withdraw the objection.

21          Q.   (BY MR. TONDRE) Who instructed you?

22          A.   Dawn Smith from Routt County instructed

23    me to meet at the Bailey substation.

24          Q.   And when did she instruct you to meet

25    at the Bailey substation?

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 90

1              A.    My understanding and recollection was
2      it was either the afternoon prior to or the morning
3      of the 16th, because prior to that, I was under the
4      impression that Park County was going to bring the
5      horse to me and that we were only going to care for
6      it at our facility, which is what I initially agreed
7      to.  And I did not know where the horse was coming
8      from, and I did not know who had possession of the
9      horse.  At some point between when I agreed to care
10     for the horse and the 16th, we were informed that we
11     needed -- I was informed through my office through
12     Routt County that the Bailey officers wanted me to
13     accompany them to take possession of the horse.  And
14     it was only the morning of the 16th when we -- and I
15     say "we."  I don't remember who in my office.  I
16     don't know if it was me personally or my receptionist
17     called the Bailey substation to confirm the time, and
18     they said, "You are bringing the horse trailer,
19     right?"  And that was the very first that I knew that
20     they expected me to transport the horse.
21             Q.    Did you have any information regarding
22     the condition of the horse?
23             A.    I did.
24             Q.    What information did you have regarding
25     the condition of the horse?

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 91

1        A.    Dawn Smith had sent me pictures of him

2   that she had taken and advised me that she thought he

3   was in very poor shape, and she was very concerned

4   that he would not survive the trip to Steamboat and

5   that she was very concerned that he was going to need

6   significant medical care, and that was all that I

7   knew.

8        Q.    What provisions did you make -- well,

9   let me step back.

10        When you were informed that morning

11   that you needed to trailer the horse to your

12   hospital, who went with you?

13        A.    Troy Murdock.

14        Q.    All right.  Now, what provisions did

15   you make for the safe transport of a very sick horse?

16        A.    We had a fully stocked vet truck with

17   us, and we put a deep bed of shavings into the

18   trailer floor.

19        Q.    What did you do to keep the horse from

20   falling while trailering over a rough road that goes

21   from the ranch to Bailey?

22        A.    Right.  A normal healthy horse

23   shouldn't fall down in a trailer, so there are no

24   provisions that you would make -- need to make to

25   make them stand up.  We have a panel that the horses

Page 95

1    the only way that the colt was going to get medical
2    care was to get him off of that property.  That's
3    what I was tasked with that day.  And the best place
4    for that colt to get care was in a hospital facility,
5    and the only way of transporting him there was in a
6    horse trailer.  I, in my professional opinion,
7    believe it was very reasonable to continue to
8    transport him to the hospital facility because my
9    only other option would have been to leave him there.
10          Q.   (BY MR. TONDRE) And what was wrong with
11   the option of leaving him there?
12          A.   Because --
13               MR. LEBSACK:  Objection to the form.
14               Go ahead.
15          A.   -- there was a warrant to remove him
16   from the property, and I was tasked by Routt County
17   Animal Control with the assistance of Park County
18   Animal Control to remove him from the property, so it
19   was not an option to leave him there.
20          Q.   (BY MR. TONDRE) What -- did you tell
21   Dawn Smith that it was dangerous for him to be
22   transported?
23          A.   I don't believe that the trailer ride
24   from Echo Valley Ranch to my hospital facility was
25   dangerous for him.  Dawn Smith had feared the 5-hour

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 96

1    trailer ride to Steamboat would be dangerous for him.

2    That was her concern.

3          Q.   Why did she feel that it would be

4    dangerous to ride to Steamboat?

5                MR. LEBSACK:  Objection to the form.

6          A.   You would have to ask Dawn Smith why

7    she was concerned.

8          Q.   (BY MR. TONDRE) What did she tell you

9    about why she was worried about transporting the

10   horse to Steamboat?

11         A.   All that I was made aware was that he

12   was extremely thin and suspected that he was

13   suffering from starvation and that he was very weak.

14         Q.   What is your understanding of why -- if

15   you have one, what was your understanding of why the

16   horses were moved from Echo Valley Ranch to the

17   Lebeau facility?

18         A.   All that I could do would be to

19   speculate based on press releases, so I mean I was

20   not involved in that decision-making process

21   whatsoever.

22         Q.   My question is very simple.  What is

23   your understanding -- what was your understanding in

24   February 2012 --

25         A.   Sure.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 98

1          Q.    (BY MR. TONDRE) Do you recall they were

2    moved because they were afraid of violence towards

3    the horses and owners?

4                 MR. LEBSACK:    Don't answer the

5    question.

6                 THE DEPONENT:    Okay.

7          Q.    (BY MR. TONDRE) Did you ever hear that?

8          A.    I don't -- I don't recall specifically

9    hearing that, no.

10         Q.    All right.

11         A.    If it was in the press release, then I

12   read it.    If it wasn't in the press release, then I

13   have no knowledge of that.

14         Q.    Other than your discussions with your

15   veterinarian assistant, Mr. Murdock, and Barbara

16   Wright and Cindy Hardey, did you have any discussions

17   with anyone else regarding Spencer on that day?

18         A.    I certainly discussed him with

19   Dr. Murdock and Dr. Harland, who were both there

20   assisting with his care, and all of the veterinarian

21   technicians and assistants who were there assisting

22   with his care.

23         Q.    How did the horses fare that were --

24   that remained at Echo Valley Ranch?

25         A.    Which horses specifically are you

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 99

1     referring to?

2            Q.    The six horses that you wanted

3     impounded.

4            A.    Are you excluding Maggie then from

5     that?

6            Q.    I'm sorry?

7            A.    You are excluding Maggie?  You are not

8     asking about Maggie?

9            Q.    Maggie died the next day, didn't she?

10           A.    It's my understanding.

11           MR. LEBSACK:  So the question is the

12    six horses that were removed from the ranch later.

13           A.    So my understanding, any knowledge that

14    I have of the remaining -- the other six horses that

15    were removed, is solely based on the press releases

16    and potentially reading through some of Dr. Toll's

17    reports that are already entered into evidence.  I

18    didn't have anything to do with those horses after

19    they -- the 16th.

20           Q.    (BY MR. TONDRE) You testified about

21    them, didn't you?

22           A.    I was asked about their appearance on

23    the day of the 16th.  And my understanding is that

24    those horses gained a significant amount of weight in

25    the care of wherever they were being cared for.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 100

1          Q.   Well, where were they being cared for?

2          A.   My understanding is they were being

3    cared for at the Harmony Center for Horses and that

4    Littleton Equine Medical Center was supervising their

5    care.

6          Q.   And they were also cared for at Echo

7    Valley Ranch, weren't they?

8          A.   I don't have any personal knowledge of

9    that.

10         Q.   Well, they were at Echo Valley Ranch

11   when you were there, right?

12         A.   Correct.

13         Q.   You understand they were moved to

14   Lebeau's place on the 23rd of February, right?

15         A.   Right.

16         Q.   Or the 19th of February.  Then you

17   understand that they were seized and moved to a

18   facility where Littleton was taking care of them,

19   right?

20         A.   Right.

21         Q.   And then you were aware that the judge

22   ordered them brought back to Echo Valley Ranch,

23   right?

24         A.   Correct.

25         Q.   How did they do at Echo Valley Ranch?

Page 104

1    in weight and that the horses for the most part

2    gained a significant amount of weight under the care

3    that they received in that interim before they were

4    returned.

5              Q.    (BY MR. TONDRE) How did they do after

6    they were returned?

7              A.    I don't know.

8              Q.    You haven't read anything about that?

9              MR. LEBSACK:  Hold on.  She just said,

10   "I don't know."  All right?  So can we move on?

11             Q.    (BY MR. TONDRE) The next question is --

12   there is a difference between knowing and reading --

13   have you read anything about how they did?

14             A.    At some point in time I may have read

15   some follow-up reports, but I can't remember any

16   specific details.  I didn't have anything

17   specifically to do with those horses after 2/16/12,

18   so I have no way of knowing the current status of

19   those horses unless it's been released publicly.

20             Q.    Did you have any involvement with the

21   adoption of Spencer by the Ferraros?

22             A.    Involvement in the sense that I cared

23   for Spencer, and I was aware that Shelly Ferraro

24   wanted to adopt Spencer.

25             Q.    How did you become a -- who handled the

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 105

1    adoption?

2           A.    Routt County -- the Routt County brand

3    inspector, Harmony HorseWorks, and the Jefferson

4    County brand inspector.

5           Q.    The what?

6           A.    The Jefferson County brand inspector.

7           Q.    Oh.

8           A.    So the Routt County brand inspector was

9    involved.   The Jefferson County brand inspector was

10   involved.   Dawn Smith in Routt County in my

11   understanding signed the horse over to Shelly

12   Ferraro, but I didn't personally have anything to do

13   with that transaction.

14          Q.    Normally, what is -- what -- does that

15   involve buying the horse?

16          A.    I don't believe any money exchanged

17   hands.   I believe it was considered an adoption.

18          Q.    It seems to me that -- when did you

19   first communicate with her regarding Spencer?

20          A.    I'm not certain which day it was, but I

21   believe it was the 17th or 18th of February, 2012.

22   The Ferraros had a horse being hospitalized in our

23   facility, and she saw Spencer in a stall next to her

24   horse.

25          Q.    At that point in time, did she express

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 110

```
 1          A.   Sure.

 2               MR. LEBSACK:   Objection to the form.

 3          A.   So you are asking me my professional

 4   opinion why some of the horses were more affected

 5   than the other horses?

 6          Q.   (BY MR. TONDRE) Were all of them

 7   affected?

 8          A.   Well, I don't know.  Of the horses that

 9   I was allowed to see, I know eight of them were

10   severely emaciated.

11          Q.   Why were only eight of the 40 -- if

12   that's the number --

13          A.   Sure.  Sure.

14          Q.   Why were only eight of the 40 affected?

15          A.   So...

16               MS. BRONSON:  Form, foundation.

17          A.   So just to clarify, I didn't have the

18   opportunity to examine the rest of the horses, so I

19   can't confidently say they weren't affected.  But if

20   you wanted to say hypothetically they weren't

21   affected, there is a condition called equine winter

22   starvation syndrome where horses fed poor quality hay

23   or whatever, poor quality feed, struggle to maintain

24   their body temperature in the winter, and some horses

25   would be more affected than others.  Typically young,
```