# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.
-----------------------------------------------------------
DEPOSITION OF CINDY HARDEY
June 20, 2014
-----------------------------------------------------------

                              Deposition location:
                              9998 Havekost Road
                              Conifer, Colorado  80433

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226

                              For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202

                              For the Defendant, Olds.

1                     CINDY HARDEY,

2 being first duly sworn to state the truth, the whole

3 truth, and nothing but the truth, testified under oath as

4 follows:

5                     EXAMINATION

6 BY MR. TONDRE:

7          Q    State your name, please.

8          A    Cindy Hardey.

9          Q    And your present occupation?

10         A    Homemaker.

11         Q    What's your educational background?

12         A    Graduated high school.

13         Q    When?

14         A    1999.  And have my diploma in

15 cosmetology, 2001.

16         Q    What have -- what employment have you had

17 between graduation from high school and your present

18 occupation as homemaker?

19         A    Pharmacy technician at Safeway.

20         Q    Anything else?

21         A    Yes, I worked for Park County Animal

22 Control.

23         Q    For what?

24         A    Park County Animal Control.

25         Q    How long did you work for Park County?

1      A    Nine and a half years.

2      Q    Which years were those?

3      A    From 2003 to 2012.

4      Q    When in 2012 did you leave Park County?

5      A    I believe it was June 14th.

6      Q    Why did you leave?

7      A    I was unhappy.

8      Q    What were you unhappy about?

9      A    I just was unhappy.  I didn't feel the
10 love for my job anymore, so I just decided to quit.

11     Q    Any particular thing cause you to fall
12 out of love with your job?

13     A    No.  I just been there almost ten years
14 and it was time for a change.

15     Q    Okay.  How did you get interested in
16 animal control?

17     A    My husband was Park County Sheriff's
18 deputy, and I had friends that were animal control
19 working for the sheriff's office and they suggested I
20 should apply.

21     Q    Your husband was a sheriff's deputy?

22     A    Yes.

23     Q    Is he still?

24     A    No.

25     Q    When did he leave?

1          A    The same year, 2012, I don't know the

2 month.

3          Q    What does your husband do now?

4          A    He is a police officer for Idaho Springs.

5          Q    What training did you receive in

6 connection with becoming an an- -- well, let me -- were

7 you employed by the Park County Sheriff's Office?

8          A    Yes.

9          Q    And when was your first day of

10 employment?

11          A    March 3, 2003.

12          Q    Did you receive any training before March

13 the 3rd, 2003, with respect to animal control?

14          A    No.

15          Q    You're not post-certified, are you?

16          A    No.

17          Q    Do you hold any sort of certification or

18 did you?

19          A    For?

20          Q    For animal control?

21          A    I had cruelty to animals certification,

22 horse handling.

23          Q    And where did you receive that

24 certification?

25          A    Jefferson County Fairgrounds.

1           Now, I'm going to ask you some questions;

2 and any time you feel like you need to refer to your

3 report in order to answer them, feel free to do that.

4           A    Okay.

5           MR. SCHIMBERG:   Thank you.

6           Q    (BY MR. TONDRE) With respect to -- when

7 was the first time you heard anything about a matter

8 involving horses at the Echo Valley Ranch?

9           A    On the 14th.

10          Q    And what did you hear?

11          A    Sergeant Priestly advised me she'd gotten

12 an email saying that there were seven horses that were

13 in poor condition and that I needed to do a welfare

14 check.

15          Q    And when did you do -- or did you do a

16 welfare check?

17          A    Yes.

18          Q    When did you do a welfare check?

19          A    On the 16th.

20          Q    And did anyone accompany you on -- that's

21 February 16th, right?

22          A    Correct.

23          Q    Did anyone accompany you on the

24 February 16th welfare check?

25          A    Deputy Plutt and Deputy Hanning.

1       Q   Are they -- why did they accompany you?

2       A   Because Routt County needed paperwork

3 served.  And I'm not post-certified and so the deputies

4 had to serve that paperwork to Mr. Hatlee, Mr. Swift.

5       Q   They were both post-certified?

6       A   Correct.

7       Q   Who else was present during the course of

8 your visit to the ranch?

9       A   Dr. Olds.

10      Q   Anyone else?

11      A   And her assistant.

12      Q   Do you remember who the assistant was?

13      A   I do not.

14      Q   What was your understanding why Dr. Olds

15 was on the premises?

16      A   She was removing the colt, Bear, from the

17 property for Routt County or as requested by Routt

18 County.

19      Q   What discussions did you have with

20 Dr. Olds regarding the Routt County horse?

21      A   She just --

22      MR. SCHIMBERG:  At what point, that

23 morning, that day?

24      MR. TONDRE:  Yeah.

25      MR. SCHIMBERG:  Sorry.

1          Q    (BY MR. TONDRE) Let me step back.  How

2 long were you on the ranch on that occasion?

3          A    I cannot recall time frame.

4          Q    What's your best estimate?

5          A    An hour.

6          Q    And of that one hour, how long was

7 Dr. Olds there?

8          A    Maybe 45 minutes.  Maybe 30 minutes.  She

9 was not there the whole time.

10          Q    Okay.  What did you do when you arrived?

11          A    When I arrived, I had Deputy Plutt and

12 Deputy Hanning or Corporal Plutt and Deputy Hanning

13 give the paperwork that needed to be given to Swift and

14 Hatlee.  I advised them that the reason why they were

15 there was because Bear was going to be given to

16 Dr. Olds.  And I asked if we could go see the colt, and

17 I was taken to that.

18               And while I was under -- while I was in

19 the stall with Bear, I heard a stomp on the top floor

20 of the barn.  I asked what that noise was, they told me

21 it was their drum mare, Maggie.  I asked if I could go

22 see her.

23               I was taken up to see her, and I noticed

24 that she was not doing well.  I asked what had

25 happened.  And was told that she had fallen in the

1 pasture and they couldn't get her up.  They had also

2 called Dr. Horton in reference to Maggie.

3              I called Dr. Horton, and Dr. Horton said

4 she had been -- she had seen Maggie and given them

5 instructions and how to take care of Maggie.  Within

6 that time, I asked if I could go look at the other

7 horses on the property or the ones that were up in the

8 stalls.  I was given permission.  Dr. Olds accompanied

9 me.  We went around and looked at six more horses and

10 pictures were taken.

11             Within that time, Bear was loaded into

12 Dr. Olds' trailer.  She left.  And I explained to Ron

13 and Randy that I felt the horses were not in good

14 shape.  I informed them I was going to be giving them a

15 state notice of warning; I did, and then they went back

16 to feeding their animals, and then I left.  Reader's

17 Digest version.

18             Q   Did you ask Dr. Olds to accompany you to

19 look at the other horses?

20             A   I don't think I asked her to, but she

21 did.

22             Q   How sure are you you didn't ask her?

23             A   I cannot remember.

24             Q   What do you recall her saying to you, if

25 anything -- well, first of all how, many horses did you

1 go look at?

2        A    I looked at six.

3        Q    Including Maggie or in addition to

4 Maggie?

5        A    In addition to Maggie.

6        Q    And other than Dr. Olds, did anyone

7 accompany you?

8        A    No.

9        Q    Now at some point you had Deputy Pludd or

10 Plutt photograph the six animals.  Was that after you

11 looked at them?

12       A    Yes.

13       Q    Did you give him any instructions as to

14 how you wanted them photographed?

15       A    Her.  Corporal Plutt.

16       Q    Oh her, okay.

17       A    Yes.  No.

18       Q    How long would you estimate you spent

19 looking at those six horses?

20       A    Fifteen minutes.

21       Q    And during that 15 minutes what, if any,

22 statements did Dr. Olds make?

23       A    She told me the horses were very skinny,

24 they looked like they had not been fed and that I

25 needed to remove them.

Page 33

1          Q    And what?

2          A    I needed to remove them.

3          Q    The six horses were Echo, River, Chance,

4   Fiona, Midnight, and Lena; is that correct?

5          A    Correct.

6          Q    And those six horses had heated water,

7   troughs full of water and hay available to them,

8   correct?

9          A    No.

10         Q    Turn to page 82.

11         A    I guess I need to ask, at the time I was

12  there, is that what you're asking?

13         Q    Is it correct that your report says:

14  "The yearling's Echo, River, Chance, and Fiona had a

15  heated water trough full of water and hay in the

16  lean-to."

17              I also observed two mares, Midnight and

18  Lena, in separate corrals with heated water -- heated

19  water trough full of water and hay on the ground; did

20  you write that?

21         A    I did.

22         Q    You wrote that shortly after making your

23  observations at the ranch, correct?

24         A    This search warrant is for the removal of

25  the horses, and that would have been on the 22nd.  So

1        Q   (BY MR. TONDRE) And you're also reporting

2 as of February 16th you observed two mares, Midnight

3 and Lena, in separate corrals with heated water troughs

4 full of water, hay on the ground, you reported that on

5 February 16th, correct?

6              MR. LEBSACK:  Object to the form.

7              MR. SCHIMBERG:  Join.

8        A   Yes.

9        Q   (BY MR. TONDRE) You're saying that's not

10 true?

11       A   Am I saying that's not true?  No.

12       Q   That is true, isn't it?

13       A   Yes.

14       Q   They had water and feed on February 16th,

15 when you were there, correct?

16              MR. SCHIMBERG:  Object to form.  Go

17 ahead.

18       A   The -- yes.

19       Q   (BY MR. TONDRE) And later on -- I want to

20 understand, let me see if I can find it.  Page 69, the

21 third to the last paragraph, the last sentence, you

22 report, "While I was speaking to Swift about his horses

23 I was approached by Dr. Olds and she suggested I remove

24 all the horses from the ranch."

25       A   Yes.

1      Q   Did she have reference to all 40 horses?

2      A   Yes.

3      Q   And what did -- what did she suggest be

4 done with the horses?

5          MR. SCHIMBERG:  Object to form.

6      Q   (BY MR. TONDRE) Be moved to her clinic?

7          MR. SCHIMBERG:  Go ahead.

8          MR. LEBSACK:  Same objection.

9      A   No.

10     Q   (BY MR. TONDRE) What did she suggest?

11     A   She didn't really suggest a location.

12 She just suggested I remove them.

13     Q   Did you tell Bobbi Priestly that Dr. Olds

14 was demanding and insistent that Park County seize all

15 of the horses?

16     A   Yes.

17     Q   And did -- why did you use the word

18 "demanding"?

19     A   In my perception, that's what she was

20 doing.

21     Q   And what did -- what did Bobbi Priestly

22 tell you to do?

23     A   She asked me what I wanted to do.

24     Q   And what did you tell her?

25     A   I had spoken to Dr. Horton, and I was not

Page 37

1 comfortable removing the horses at that time.

2        Q   Did she tell you to tell Dr. Olds to

3 leave?

4        A   No.

5        Q   Turn to page 87.  Specifically the last

6 sentence of the third to the last paragraph, Bobbi

7 Priestly states:  I advised Deputy Hardey to have

8 Dr. Olds leave with the horse they were -- they were

9 asked to remove under court order."

10            Do you deny she told you that?

11        A   I don't remember.

12        Q   Did -- now, when did you talk to

13 Dr. Horton, while you were on the ranch?

14        A   Yes.

15        Q   And what do you recall of that

16 conversation?

17        A   I -- I recall asking her what was going

18 on with Maggie and the horses.  And she said that she

19 had been out a week before, I believe, and that she'd

20 given a plan to Hatlee and Swift as to what they were

21 supposed to do with Maggie and at any point in time

22 that they felt Maggie's condition was not savable, that

23 they would humanely euthanize her.

24        Q   Now during the course of your visit, did

25 you have occasion to have input from any source

1          A    No.

2               MR. TONDRE:   Mark that as the next

3 number.

4               (Whereupon, Deposition Exhibit

5 No. 67 was marked for identification by the

6 reporter.)

7               MR. TONDRE:   What is it?

8               THE COURT REPORTER:   67.

9          Q   (BY MR. TONDRE) I've handed you what has

10 been marked as Exhibit 67.   What is that?

11         A    A state notice of warning.

12         Q    And did you prepare that?

13         A    I did.

14         Q    And was this prepared pursuant to a

15 consensus decision among you, Bobbi Priestly,

16 Dr. Anderson, Dr. Britt, and Mr. Dutcher?

17         A    No.

18         Q    They had nothing to do with it?

19         A    No.

20         Q    They didn't know you were doing it?

21         A    Sergeant Priestly knew I was doing it.

22         Q    Did Mr. Dutcher, Dr. Britt, and

23 Dr. Anderson concur that the horses should be left

24 where they were?

25               MR. SCHIMBERG:   Object to form.   Go

Page 43

1              MR. TONDRE:  Okay.  Exhibit No. -- what

2 is it?

3              THE COURT REPORTER:  It's 69.

4              MR. TONDRE:  69.

5              MR. LEBSACK:  Really?  No.  It's 68.

6              THE COURT REPORTER:  Sorry.  It's 68.

7              THE DEPONENT:  This one?

8              MR. TONDRE:  Yeah.

9              THE DEPONENT:  68.

10         Q   (BY MR. TONDRE) What is Exhibit 68?

11         A   It is -- I'm going to say a contract that

12 Sergeant Priestly drew up really fast, actually

13 not really fast.  She was going to her substation when

14 she drew it up, stating that the horses would be

15 removed to a secure location for safety and that all

16 parties agreed.

17         Q   What was the safety issue that caused

18 Exhibit No. 68?

19         A   I felt the horses -- it was in the best

20 interests of the horses to be removed, diffused (sic)

21 the situation with concerned citizens, and put them in

22 a location that nobody knew.

23         Q   What were you fearful of?

24         A   I was -- I just wanted to diffuse the

25 situation, the threats, the phone calls.  I really

1 wanted the horses just to be in a location where I knew

2 nothing would happen.

3          Q    Who selected the location?

4          A    I was asked by Kirstin LeBeau if it would

5 be all right if she take the horses.  I then called

6 Sergeant Bobbi Priestly and asked if that's something

7 we could do.  Mr. Swift and Mr. Hatlee also agreed

8 Ms. LeBeau's location would be suitable.  And then we

9 all just kind of made that decision, Sergeant Priestly

10 agreed.

11          Q    Were you fearful for the safety of

12 Mr. Swift and Mr. Hatlee?

13          A    Well, of course.  But my main concern was

14 the horses.

15          Q    Were there threats to kill the horses?

16          A    I do not recall.

17          Q    Well, what -- what was it that -- you had

18 a 30-day agreement in place, right?

19          A    Yes.

20          Q    Three days later, you present -- you ask

21 Hatlee and Swift to agree to move the horse to an

22 undisclosed location, right?

23          A    Yes.

24          Q    What was it -- it had to be something

25 pretty serious to result in moving those horses under

1 those circumstances, didn't it?

2          A    Well, the amount of phone calls the

3 sheriff's office was getting, the amount of phone calls

4 Ron Swift was getting, and I just really wanted to

5 diffuse the situation.  There was no one phone call

6 that asked -- you know, that prompted me to move them.

7 I just really wanted them out of Park County or not out

8 of Park County but, you know, in a -- a disclosed

9 location.

10          Q    Were you fearful of criminal violence?

11          A    It crossed my mind.

12          Q    And what caused that to cross your mind?

13 I understand you're saying diffuse the situation.  I

14 want to understand what the situation was you were

15 diffusing.

16          A    The phone calls, the threats.

17          Q    And who was receiving the phone calls and

18 the threats?

19          A    All parties involved.

20          Q    That would be who?

21          A    The Park County Sheriff's Office, Ron

22 Swift at his work.

23          Q    Do you recall going to the Echo Valley

24 Ranch and advising Mr. Swift, Mr. Hatlee, and Helen

25 Cook that the news media had become involved and they

Page 49

1          A    Yes.

2          Q    Did you hear any discussion -- how often

3 did you go to the sheriff's office?

4          A    Every day.

5          Q    Did you hear any discussion about

6 prosecuting these threatening vigilantes?

7               MR. LEBSACK:  Object to form.

8               MR. SCHIMBERG:  Object to form.  Go

9 ahead.

10         A    No.

11         Q    (BY MR. TONDRE) Does Park County kind of

12 like those westerns your husband watches?

13              MR. SCHIMBERG:  Object to form, Brice.

14              MR. LEBSACK:  Object to form.

15         A    I don't have a comment on that.

16         Q    (BY MR. TONDRE) All right.  Did you make

17 any visits to Echo Valley Ranch to check the horses

18 between February 16th and February 19th when they were

19 removed to the LeBeau place?

20         A    No.

21         Q    Did the condition of the horses change

22 between February 16th and February 19th?

23         A    No.

24         Q    Was it safe to transport them?

25         A    Safe to transport them?  Yeah.  Yes.  It

1 was safe to transport them, although Chance was not

2 doing well at that time.

3          Q    And what steps were taken to protect

4 Chance during the transfer?

5          A    I did not transport them.  Mr. Hatlee

6 transported them.  I followed behind them.  Mr. Swift

7 and Mr. Hatlee loaded them into their trailer.  They

8 had full control of the transportation of their animals

9 and the loading of their animals.  I just observed and

10 followed them to the secure location.

11          Q    Did Mr. Hatlee ride in the trailer with

12 Chance?

13          A    I don't remember.

14          Q    On the issue of transport, was -- was

15 Bear fit for transport when Ashleigh Olds transported

16 him?

17                MR. LEBSACK:  Object to form.

18                MR. SCHIMBERG:  Join.  Go ahead.

19          A    My perception, no.

20          Q    (BY MR. TONDRE) You did become aware,

21 didn't you, that the horse fell while being

22 transported?

23          A    Yes.

24          Q    And that Ashleigh Olds took no steps to

25 prevent him from falling?

Page 56

1          A    No.

2          Q    Have you since learned what her

3 reputation is?

4          A    No.

5          Q    While the horses were at LeBeau's place,

6 did you make any visits?

7          A    No.

8          Q    How long were the horses at LeBeau's

9 place, three days?

10         A    Roughly.

11              (Whereupon, Deposition Exhibit

12 Nos. 69 and 70 were marked for identification by

13 the reporter.)

14         Q    (BY MR. TONDRE)  What is Exhibit No. 69?

15         A    A search warrant.

16         Q    And does it have attached to it your

17 affidavit?

18         A    Yes.

19         Q    And what is Exhibit 70?

20         A    A search warrant.

21         Q    And does it have attached to it your

22 affidavit?

23         A    Yes.

24         Q    All right.  Is the affidavit with respect

25 to both warrants identical?

1 operation?

2          A    No.

3          Q    The horses you were raised with, the

4 three, what were they used for?

5          A    Roping, 4H, family use.

6          Q    Sort of pets?

7          A    Yep.

8              MR. SCHIMBERG:   I thought you were a

9 barrel racer all this time.

10             THE DEPONENT:   I tried.

11             MR. SCHIMBERG:   Did you?

12             THE DEPONENT:   I did.

13         Q    (BY MR. TONDRE)  How was it?

14         A    It didn't pan out very well.

15         Q    Wasn't your cup of tea?

16         A    Nope.

17         Q    You prepared the seizure application,

18 correct?

19         A    Yes.

20         Q    And it was approved by Priestly, correct?

21         A    No.

22         Q    You also reviewed -- well, did you review

23 the application for the two warrants with anybody?

24         A    Yes.

25         Q    Who?

Page 67

1          A    Steve Sullivan.

2          Q    Did you testify in the motions hearing

3  held on December 3, 2012, that you reviewed the search

4  warrant with your supervisor, Officer Priestly?

5          A    Yes.

6          Q    Was that false?

7          A    I think the term review is false.

8          Q    It's your word.

9          A    Huh?

10         Q    It's your word.

11         A    Yeah.  She was advised that I was doing

12  the search warrants.  But the actual review of the

13  search warrants before I could give it to a judge was

14  reviewed by Steve Sullivan.  And I can't exactly

15  remember if she looked them over or not.  But I do know

16  Steve Sullivan approved them to go to the judge.

17              So if my testimony says yes, then yes,

18  she did.  But I cannot remember.  Because she pretty

19  much oversees everything I do.

20         Q    Did Steve Sullivan make any suggestions

21  to you?

22         A    If he did, it was probably grammar.

23  Usually, I am sent back to the sheriff's office to fix

24  something and I don't remember what, if any.

25         Q    Now, at the time that you reviewed the

1        Q    Did he ask you any questions?

2        A    No.

3        Q    Did he have a file that he was reviewing

4  in connection with the materials you presented him?

5        A    No.

6        Q    What did you present him, the affidavit?

7        A    Both.  The search warrant and the

8  affidavit.

9        Q    Anything else?

10       A    No.

11       Q    Did the -- were the concerned -- did it

12  come to your attention the concerned citizens were

13  critical of Mr. Sullivan's handling of the case?

14       A    I don't think so, no.

15       Q    Did there come a time when Mr. Sullivan

16  was taken off the case and replaced by Mr. LeDoux?

17       A    I don't know.

18            MR. SCHIMBERG:  Object to form,

19  foundation.

20       Q    (BY MR. TONDRE) What involvement did you

21  have with the case after obtaining the search and

22  seizure warrants?

23       A    What involvement?

24       Q    Yes, ma'am.

25       A    I responded with Sergeant Priestly and

1 Undersheriff Gore to LeDoux's (sic) residence.   I

2 helped load the horses up; myself and Sergeant Priestly

3 took the horses to the facility.   I think it's Harmony

4 HorseWorks, I can't -- I can't remember the name of it.

5 I helped unload.   I helped put the horses in their

6 stalls.   And then after that, we left.

7          Q    And after that, what involvement did you

8 have with the case?

9          A    After I was told to return the horses, I

10 got a trailer; I myself went to that facility, loaded

11 both -- or both -- all of the horses up and returned

12 them back to their owners.   And then after that, I was

13 in charge of welfare checks every Wednesday until I was

14 removed.   And then after that, nothing.

15          Q    Did -- did it come to your attention that

16 the concerned citizens were critical of the fact that

17 your visits were announced rather than unannounced?

18          A    Yes.

19          Q    And who were those concerned citizens

20 that --

21          A    I do not know.

22          Q    Did you find that offensive that they

23 were concerned about you announcing yourself?

24          A    No.

25          Q    Every Wednesday you went to Echo Valley

1          Q    Now, going back to February 16th, did you

2 have contact with Dr. Olds after she left the ranch?

3          A    I requested -- or -- I don't.  I need to

4 refer to my report.

5          Q    Please do.

6          MR. SCHIMBERG:  You bet.

7          Q    (BY MR. TONDRE)  Page 70.

8          A    Thank you.  Yes, she sent me an email on

9 Bear and what she had to do to get him to stand in the

10 trailer.  And her perception of the whole matter.  But

11 I did not verbally speak to her, just an email.

12          Q    In your report on page 70, it says that:

13 "At approximately 4 p.m., I received an email from

14 Dr. Olds."

15          According to Dr. Olds, Bear had fallen

16 down in the trip.  "Dr. Olds' email reads:"

17          MR. SCHIMBERG:  Yeah, you lost me there.

18          THE DEPONENT:  Right here.

19          MR. LEBSACK:  Page 70.

20          MR. SCHIMBERG:  Oh, okay.

21          MR. TONDRE:  Page 70.

22          MR. SCHIMBERG:  Yeah.

23          Q    (BY MR. TONDRE)  Is the complete content of

24 Dr. Olds' email reported in your -- set forth in total

25 in your report?  It says:  See -- "See attached

Page 93

1                           EXAMINATION

2 BY MR. LEBSACK:

3          Q    Ready?   My name is John Lebsack, I

4 represent Dr. Olds.   And the first thing I want to try

5 to do is go through this Exhibit 66 which has the --

6 you know, the sheriff's department documents and try to

7 get some more information about the dates of when you

8 prepared various pages and just the process of how you

9 do this.

10          So the first pages I'd like you to look

11 at in Exhibit 6 -- 66, are pages 66 through 77.   And

12 all of those pages have a date of report in the upper

13 right-hand corner that says 2/16/2012.   Do you see

14 that?

15          A    Yeah.

16          Q    But if you look back at for example, page

17 77, you're talking about events that happened after

18 that because you mention something that happened on

19 March 1st.   So how is -- how are these dated and when

20 do you actually prepare this in terms of, you know, the

21 events you're discussing?

22          A    The time in which I open the report or --

23 the date of the offense is the date of report and I

24 start the report then.   And the reason why there are

25 different dates on different pages is because I'm still

Page 94

1 writing the report.

2              And then at the end of it, it says

3 further action may follow, and that's when I finish the

4 report; but the date of report is 2/16 and that's when

5 I initiated or opened it.

6         Q   Okay.  Is there a date that actually

7 shows when you typed this, or do you type it as you go?

8         A   I type it as I go.

9         Q   All right.  So this is --

10        A   It's like an everyday thing.

11        Q   So this is on a computer?

12        A   Yes.

13        Q   It's a document on your computer?

14        A   Yes.

15        Q   And you from day to day will make --

16        A   I add --

17        Q   -- additions to it --

18        A   Yes.

19        Q   -- until you reach the point you finish

20 it and they you say --

21        A   Further action.

22        Q   -- nothing further -- or further action

23 may follow?

24        A   Yeah, correct.

25        Q   Okay.  So these pages 66 through 77, you

1  would have finished that on March 1, 2012, or some day

2  after that?

3          A    Yes.

4          Q    Okay.  Now, take a look at pages 103

5  through 111.  Are also pages of a report that you

6  prepared?

7          A    Yes.

8          Q    And this has a date of report 2/23/2012.

9  Is there a reason why this is dated that date rather

10 than the original?

11         A    Because it's a supplement.  Where it says

12 Case Report No. 2012000142.5.  The date of that report

13 is the 23rd.  It's when I opened -- I don't even know.

14 This is the -- I think this is the request to amend

15 the -- to add a charge and also bonding.  And that 2/23

16 is the date in which this report started.

17         Q    So you start --

18         A    And everything after that, is -- if

19 there's dates that change, then that's why, but it's a

20 supplemental to the original report.

21         Q    So these pages 103 through 111, these

22 would go through at least April 25, 2012?

23         A    Yeah.

24         Q    And bear with me.  There's another one.

25 Page 94 through 101.

Page 96

1           A    It's the same.

2           Q    This is also a supplemental report?

3           A    Yeah, point 3.

4           Q    What's the point mean?

5           A    Well, the initial report is actually the
6  2012000142.  And every report pulled after that, is
7  point 1, point 2, point 3.  And those are all
8  supplements, because that was the initial case holder.
9  So anybody who has a part in the case has to pull
10  supplement and attach it to that initial report.

11           Q    So if Sergeant Priestly she would add
12  a --

13           A    She did add point 1.

14           Q    And the next one you did?

15           A    The next person would be point 2.

16           Q    We talked over each other, but you said
17  exactly what I was trying to guess -- to ask.  So these
18  pages 94 through 101 would be information that you
19  entered covering the period February 22nd through
20  March 17th?

21           A    Yes.

22           Q    And then at page 114, that is your next
23  report?

24           A    Yes.

25           Q    And that one's called point 6?

1          A    Correct.

2          Q    And your report -- the point 6 report

3 goes from pages 114 through 116, or does it include

4 117?

5          A    It includes 117, but there's nothing on

6 it.

7          Q    Okay.  And then there's one more on page

8 118, that's point 7, that's also a report by you?

9          A    Correct.

10         Q    And to the best of your knowledge, are

11 those all of the reports that you did?

12         A    To the best of my knowledge, yes.

13         Q    Let me ask you some questions as we go

14 through some of these pages.  Look at page 67, please.

15 Right after the name Randall Hatlee in bold, and it

16 says:  "While Hatlee and Dr. Olds were trying to get

17 the colt named Bear a/k/a Little Big Man, bay, dark

18 brown in color, to stand on his feet, I asked Corporal

19 Plutt to take pictures of all the horses on the

20 property."

21              Why did you do that?

22         A    Because I was -- why did I do that?

23 Because I was only person and I needed help's.  So I

24 asked --

25         Q    So you --

Page 100

1        Q    And then you went upstairs to check on

2 Maggie?

3        A    Yes.

4        Q    And Dr. Olds came up there too?

5        A    Yes.

6        Q    And then from upstairs where did you go?

7        A    I don't remember.

8        Q    Did you -- you did look at the horses in

9 the pens outside by the door?

10       A    Yes.

11       Q    And that was after you saw Maggie, right?

12       A    Yes.

13       Q    At what point was there the phone call to

14 Dr. Horton?  It was after you saw Maggie, right?

15       A    Yes, definitely after I saw Maggie, but

16 I'm not sure if it was before I went and looked at the

17 other horses or after.

18       Q    Did you speak personally to Dr. Horton?

19       A    I did.

20       Q    And based on your conversation with her,

21 was it your impression that she was treating all the

22 horses that you looked at?

23       A    Yes.

24       Q    So your decision that day was based on

25 your assumption from talking to Dr. Horton that the

1  horses that you had been looked -- looking at were

2  under the care of Timberline vets?

3          A    It did play a factor, yes.

4          Q    And did you report that -- that fact to

5  Sergeant Priestly?

6          A    I did.

7          Q    And is it fair to say that when you and

8  Priestly talked back and forth that your discussion was

9  you had the -- the vets at Timberline who were

10 treating, and you had a conflicting opinion from

11 Dr. Olds about the welfare of horses?

12         A    Yes.

13         Q    And you didn't know which -- which way

14 you should go because you had two conflicting opinions

15 from vets?

16         A    Yes.

17         Q    And was there discussion about getting --

18 I'm going to use a tie breaker, but what I mean is to

19 get another opinion from a vet in order to decide which

20 way to go?

21         A    Not at that time.

22         Q    Was there a discussion later --

23         A    Yes.

24         Q    -- about that?  When did that happen?

25         A    Not necessarily which way to go.  I

1           Was it your understanding from

2 talking to Dr. Horton that the only horse that she

3 did actually treat at Echo Valley among the ones

4 that you looked at was Maggie?

5           A    At what -- what conversation with

6 Dr. Horton?

7           Q    The phone conversation that day, the 16th

8 of February, while you were there at the scene?

9           A    She --

10          Q    Do you want me to rephrase it?

11          A    Yes, please.

12               MR. SCHIMBERG:   Yeah.

13          Q  (BY MR. LEBSACK) When --

14          A    Please.

15          Q    When you talked on the phone with

16 Dr. Horton from Echo Valley, on the 16th, was it your

17 understanding that the only horse that she'd actually

18 been out to see and treat in person was Maggie?

19          A    No.

20          Q    What was your understanding?

21          A    That she'd been out to see all of them.

22          Q    And was this based on what Dr. Horton

23 told you?

24          A    Yes.

25          Q    Did Mr. Swift say anything along those

1 lines?

2          A    I don't remember.

3          Q    What about Mr. Hatlee?

4          A    I don't remember.

5          Q    Was it your impression that what Dr. Olds

6 was saying about trying to take some action about the

7 horses there at the ranch, Echo Valley on the 16th,

8 that was because of concern for the welfare of the

9 horses?

10              MR. TONDRE:  Objection.  Form.

11         A    Let me see if I understand what you are

12 saying.

13         Q    (BY MR. LEBSACK) Did it appear to you that

14 what she was asking for was because of a concern she

15 had for the horses?

16         A    Yes.

17         Q    And she had told you that it appeared to

18 her that the horses had been mistreated?

19         A    Yes.

20         Q    And that was your belief too, wasn't it?

21         A    I don't know if "mistreated" would be the

22 word I would use.

23         Q    What would you use?

24         A    Neglected.

25         Q    Because of their skinny condition?

1          A    Yes.

2          Q    Anything about their condition that you
3 felt represented neglect?

4          A    No.

5          Q    What about the conditions of the stall
6 that Bear was in?

7               MR. TONDRE:  Objection.  Form.

8          A    Yeah.  There was lots of muck where Bear
9 was.

10         Q    (BY MR. LEBSACK) Did you think that was
11 neglect at that point?

12         A    Well, the fact that he was lying in it
13 and it was caked on him, yes.

14         Q    You were asked some questions about an
15 email, so let me show you a document.  Can we mark that
16 one.

17              (Whereupon, Deposition Exhibit
18 No. 71 was marked for identification by the
19 reporter.)

20              MR. TONDRE:  Is it Exhibit 71?

21              MR. SCHIMBERG:  Sorry, John.  Brice, this
22 is what I was talking about, this is still a part of
23 the report, it just came in a different section.

24              MR. LEBSACK:  This is -- I take it back.
25 I've handed you the wrong one, give me that one back.

1  I've given you the wrong email.  Sorry.  I didn't mean

2  to give you that one.

3              MR. SCHIMBERG:  Which one did you want to

4  give us?

5              MR. LEBSACK:  I wanted to give you the

6  first one.  This one.

7              (Whereupon, Deposition Exhibit

8  No. 71 was re-marked for identification by the

9  reporter.)

10             MR. LEBSACK:  That's the one.

11             MR. SCHIMBERG:  You want to go to court

12  reporting school?

13             THE DEPONENT:  No.

14         Q   (BY MR. LEBSACK) Is Exhibit 71 the email

15  that you quote in your report?

16         A   Yes.

17         Q   And is Exhibit 71, the second and third

18  pages, is that the attached document to the email that

19  you reference in your report?

20         A   Yes.

21         Q   Could you turn back to Exhibit 66.  And

22  turn to page 74.  Toward the bottom of that, you say,

23  like on February -- it's the last paragraph:  "On

24  February 22 at approximately 10 a.m. I called

25  Dr. Horton on the telephone."

1                Do you see that?

2        A   Yes.

3        Q   If you look at page 94, is page 94, 95,

4 and 96 a transcript of that phone call?

5        A   Yes.

6        Q   And according to your note, Dr. Horton

7 told you, this is on the bottom of page 74, Dr. Horton,

8 I'm reading from it, quote, Dr. Horton felt the horses

9 were left out to pasture for too long without being

10 supplemented with other food and that is how they got

11 skinny, end quote.

12               That statement is based on the contents

13 of this phone conversation, right?

14        A   Yes.

15        Q   And then it goes on to say, you say, in

16 your report, quote, at that point, I made the decision

17 to write a warrant to seize the six horses and hay

18 samples from Echo Valley Ranch.  I will be charging

19 Swift and Hatlee with cruelty to animals.  Each party

20 will be charged with three counts based on the three

21 horses that each owned, close quotes.

22               So does that indicate that your decision

23 to issue the warrants and to issue charges was made on

24 February 22nd?

25        A   Yes.

1          Q    And that decision was based on the

2 information that Dr. Horton gave in that phone call?

3          A    Yes.

4               MR. SCHIMBERG:   Object to form by the

5 way.

6          Q    (BY MR. LEBSACK) So it was based in part

7 on what Dr. Horton gave you in that phone conversation?

8          A    Yes.

9          Q    But in your analysis was -- was the key

10 fact that Dr. Horton stated her opinion that the horses

11 had been left too long in the pasture?

12         A    My own feelings were of -- that they were

13 left to pasture too long.   And after a licensed vet

14 concurred with my personal feelings on the situation,

15 that is when I decided to.

16         Q    To issue charges?

17         A    Yes.

18         Q    Is that the right term, issue charges?

19         A    Uh-huh.

20         Q    Yes?

21         A    Yes.

22         Q    And then you wrote up the paperwork to --

23 for the charges; is that right?

24         A    Yes.

25         Q    And if you look at page 75, it looks like

1 you actually delivered the summons to Mr. Swift on

2 February 23rd?

3         A    Yes.

4         Q    And if you look at page 76, it looks like

5 Mr. Hatlee came to the substation and picked up his

6 summons on February 24th?

7         A    Yes.

8         Q    They're -- at that time was only charges

9 for the six animals and not including Bear; is that

10 right?

11        A    Correct.

12        Q    Do you know when the additional charge

13 was added?

14        A    I don't.  I'd have to refer to my report

15 and pray that it's in there.

16        Q    But there was a supplemental --

17        A    Yes.

18        Q    -- summons that was issued to include

19 Bear?

20        A    Yes.  Well, it wasn't a summons because I

21 would have had to rewrite the summons to Swift and

22 Hatlee -- or actually Hatlee.  It was just an amendment

23 to the court that they add it to the summons.

24        Q    Okay.  But the sequence was

25 February 22nd, you make the decision to -- to file

1 charges on the six horses, you actually deliver those

2 summons on the 23rd and the 24th; and then sometime

3 after that, you decide that you had additional

4 information so you are going to add a charge based on

5 Bear?

6          A    Correct.

7          Q    And that additional charge on Bear, that

8 information included information that Dr. Olds gave you

9 about Bear?

10         A    Correct.

11         Q    You were asked a question about Bear and

12 his condition for travel.  And I think you said that

13 you don't think he was ready to travel or fit to

14 travel.  Is that based on information that Dr. Olds

15 gave you about what condition he was in when he arrived

16 at the hospital?

17         A    Yes.

18         Q    When he left, when Bear left, you thought

19 it was okay for him to be transported; didn't you?

20         A    Yes.

21         Q    When he left the ranch, I mean?

22         A    Yes.

23         Q    I think you said that you had one and

24 only one conversation with Dr. Olds; is that right?

25         A    Um --

Page 112

1 later?

2          A    Yes.

3          Q    Okay.  And that's the sum total of all

4 your communication with Dr. Olds with these horses?

5          A    All my communication, yes.

6          Q    Look at page 104 in Exhibit 66, if you

7 would please.  And on this page and several following

8 pages, you quote from the email that Dr. Olds sent

9 you -- sent you which is Exhibit 71 now; is that

10 correct?

11         A    Yes.

12         Q    So the section that reads:  "The Olds

13 statement reads:"  And then you've got a section of

14 bullet points, what that is you've taken the -- the

15 attachment to the email, and you basically broke it

16 down into bullet points?

17         A    Yes.

18         Q    Was that just to clarify --

19         A    Yes.

20         Q    -- each of the points.  Let me ask you

21 about some of these statements that you quoted.  I'll

22 just start with the third bullet, "The gelding," that

23 would refer to Bear, correct?

24         A    Yes.

25         Q    "-- was located at Echo Valley Ranch in

1 Bailey at the time of seizure."  That's correct as far

2 as you know, right?

3          A    Yes.

4          Q    The next statement:  "On arrival, the

5 gelding was laying down in a very dark and filthy

6 stall."

7                Based on your observations, do you agree

8 with that statement?

9          A    Yes.

10          Q    The next statement:  "He did not appear

11 able to rise on his own despite encouragement."  Do you

12 agree based on your own observations with that

13 statement?

14          A    I wasn't present when they tried to stand

15 him up.

16          Q    When you saw Bear, he was down?

17          A    Yes.

18          Q    But nobody was trying to get him up at

19 that point?

20          A    No.

21          Q    So the efforts to get him up occurred

22 after you'd gone up to see Maggie?

23          A    Yes.

24          Q    And the next bullet point says: "The

25 footing in the stall was thick with manure, urine and

1 mud."  Based on your observations, is that correct?

2          A   Yes.

3          Q   The next bullet point: "He was caked in

4 manure and mud."  Based on your observations, is that

5 correct?

6          A   Yes.

7          Q   The next statement is:  "His body

8 condition score was 1, slash, 9 on the Henneke scale."

9 Based on your observations, do you agree with that?

10         A   I would say 1.5, but, yes.

11         Q   Next bullet point is:  "I estimate his

12 weight at 500 pounds."  Based on your observations, is

13 that correct?

14         A   I have no idea.

15         Q   You did not estimate his weight, right?

16         A   No.

17         Q   If you could flip to the next page, which

18 is 105.  About the middle of the way down, it says:  At

19 this time my professional assessment is that the

20 gelding was suffering from extreme malnutrition and

21 starvation.

22             I'm going to ask you a slightly different

23 question.  Was it your observation that -- that Bear

24 was emaciated?

25         A   Yes.

Page 115

1          Q   And that was based on what you saw on

2 February 16th?

3          A   Yes.

4          Q   The next statement is in this bullet

5 point:  "He is not showing any signs of botulism or any

6 neurological disorder."

7               Do you have any observations or -- of

8 your own on that issue?

9          A   I do not.

10              MR. SCHIMBERG:  Object to form.

11         A   I'm not a vet.

12              MR. SCHIMBERG:  Form and foundation.  Go

13 ahead.

14         Q   (BY MR. LEBSACK) Do you have expertise in

15 observing botulism?

16         A   No, no.

17         Q   The next statement is:  "He is extremely

18 small for his age, likely as a result of malnutrition."

19 Based on your observations, do you agree with that?

20              MR. TONDRE:  Object to foundation.

21         A   I don't know what his age was at the time

22 exactly.  I do agree on the small.  But not sure on his

23 age.  Every horse is different, every breed, for size.

24         Q   (BY MR. LEBSACK) Do you agree with the

25 statement that his small size is likely as a result of

1 malnutrition, or do you know?

2            MR. TONDRE:  Object to foundation.

3       A    Define "size," height size or size in

4 general?

5       Q    (BY MR. LEBSACK) Size in general?

6       A    Yes.

7       Q    Skip down several of them, and the next

8 bullet point I want to ask you about says:  "It is

9 worth noting that during the examination."  Do you see

10 that?

11      A    Uh-huh.

12      Q    It says:  "It is worth noting that during

13 the examination of the property, an adult female horse

14 was recumbent in the upper area of the barn."  Was that

15 also your observation?

16      A    What's "recumbent" mean?

17      Q    I think it means lying down.

18      A    Yes.

19      Q    And that is only because I know what a

20 recumbent bicycle is.

21           MR. SCHIMBERG:  That's how I figured it

22 out too, yeah.

23      Q    (BY MR. LEBSACK) The next bullet point

24 says:  "This was a black mare."  Is that what you saw

25 Maggie was?

1         A    Yes.

2         Q    The next one:  "She was roughly a body

3 score condition of a 1, slash, 9."  Based on your

4 observation, is that an accurate body score?

5         A    Yes.

6         Q    The next bullet point says:  "She has

7 been down since Saturday, five days, per the owner."

8 Did you hear that statement made?

9         A    Yes.

10        Q    And who made that statement?

11        A    I don't remember which one.

12        Q    Mr. Hatlee?

13        A    Hatlee -- one of them.  Mr. Hatlee or

14 Mr. Swift.  I do not recall which one.

15        Q    Flip the page to 106.  First bullet point

16 says:  "When we initially arrived, Ron Swift indicated

17 to the Animal Control Officers that the horse was

18 dead."  Did you hear that?

19        A    No.

20        Q    Do you know if anybody else heard that?

21             MR. SCHIMBERG:  Object to form.  Go

22 ahead.

23        A    I don't even know what horse you're

24 talking about.

25        Q    (BY MR. LEBSACK) Let me flip -- flip down

1 about six bullet points where it says:  The mare was

2 covered in sever -- I think that is supposed to mean

3 severe pressure sores on her face, shoulders, and hips.

4          Did you observe any pressure sores --

5     A   Yes.

6     Q   -- on Maggie?

7     A   Yes.

8     Q   In the areas of her face, shoulders, and

9 hip?

10    A   Yes.

11    Q   Next bullet point says:  "She could

12 paddle her legs and struggle to move."  Did you observe

13 Maggie do that?

14    A   Yes.

15    Q   The next bullet point says:  "But could

16 not even get into a sitting position."  Is that what

17 you observed?

18    A   Yes.

19    Q   Next bullet point talks about tail tone

20 and eyelid tone.  Are you qualified to say anything

21 about those findings?

22    A   No.

23    Q   Next bullet point says:  "The owner

24 claimed that she was being treated for either tic

25 paralysis or botulism."  Did you hear the owner say

1 that?

2          A   I don't recall.

3          Q   Next bullet says:  "I asked what the

4 treatment was, and he," I think that refers to the

5 owner, indicated that there was no treatment."

6              Did you hear either Mr. Hatlee or

7 Mr. Swift make that statement?

8          A   I don't recall.

9          Q   Next bullet point is:  "He claimed to be

10 rolling the mare every two hours from side to side."

11 Did you hear either Mr. Hatlee or Mr. Swift say that?

12         A   Yes.

13         Q   Skip down to the last four.  There's one

14 that says:  "There were also two other adult horses on

15 the property that were extremely thin -- extremely

16 thin."  Did you yourself observe two other adult horses

17 that were extremely thin?

18         A   Yes.

19         Q   These would be in the pens outside?

20         A   Yes.

21         Q   And this -- the next bullet point says:

22 "One was a sorrel and a white paint mare."  Is -- were

23 those the horses you saw?  I'm sorry, I said "horses,"

24 plural --

25         A   Yes, yes.

1 the ice?

2          A    I don't remember.

3          Q    Did you hear anybody make any comments

4 about the feeding schedule that day?

5          A    No.   I don't remember.

6          Q    The last bullet point on page 106 says:

7 "I would grade her body condition score as 1.5 out of

8 9."

9          A    Yes.

10          Q    You would agree with that?

11          A    Yes.

12          Q    Keep going on the next page.   Sorry.

13               MR. SCHIMBERG:   You're fine.

14          Q    (BY MR. LEBSACK) It says:   "There was

15 another black mare in another pen that also had frozen

16 water, no food in her pen, and a body condition score

17 of 1.5 out of 9."

18               Let me ask you about that statement.   Do

19 you know which black mare --

20          A    Yes.

21          Q    -- was being referred to?

22          A    Yes.

23          Q    Is that Midnight?

24          A    Yes.

25          Q    And was she in a pen by herself?

1          A    Yes.

2          Q    Do you remember, did she have frozen

3 water?

4          A    I don't remember.

5          Q    Do you remember that she had no food in

6 her pen?

7          A    I don't remember.

8          Q    Do you agree with this body condition

9 score for Midnight of 1.5?

10         A    Yes.

11         Q    Then the next bullet point says:  "In a

12 separate pen there were four yearling foals."  Was that

13 your observation?

14         A    Yes.

15         Q    And the next bullet point says:  "There

16 was a Chestnut, a Grullo; a Bay and a Palomino of

17 unknown sexes."  Was that your observation?

18         A    Yes.

19         Q    The next bullet point says:  "They all

20 ranged from 1.5 to 2 out of 9 body condition score."

21              Do you agree with that?

22         A    Yes.

23         Q    Next bullet point says:  "They did not

24 have any feed in their pen and their water tank was

25 frozen."  Was that your observation?

1          A    I don't recall.

2          Q    Next statement:  "In my opinion these

3 horses all appear to be suffering from starvation and

4 malnutrition."

5               Do you agree with that?

6               MR. TONDRE:  Objection.  Foundation.

7          A    Yes.

8          Q    (BY MR. LEBSACK) Next bullet point says:

9 "The owner did not seem to acknowledge the severity of

10 the problem."  I'm just going to stop right there.  But

11 the bullet point goes on, but I just want to ask you

12 about that, "The owner did not seem to acknowledge the

13 severity of the problem."  Do you agree with that

14 statement?

15         A    No.

16         Q    Who was it that you believe did

17 acknowledge the severity of the problem?

18         A    They both did.  Hatlee and Swift.

19         Q    And is that the reason why you decided to

20 issue the notice of warning to give them another 30

21 days?

22         A    No.

23         Q    Well, did you think they were going to

24 try to improve the condition of the horses during that

25 30 days?

1          A    Did I think they were going to?  Yes.

2          Q    But you later got additional information

3 and decided that you needed to seize the horses?

4          A    Yes.

5               MR. SCHIMBERG:  John, you are entitled to

6 ask questions; but the longer you go, the more homework

7 that Mr. Tondre is doing over there.

8               MR. TONDRE:  He's digging a nice hole,

9 I'll say that.  I'm going to shovel the dirt on top of

10 it.

11              MR. SCHIMBERG:  They're ganging up on us,

12 Cindy.

13              MR. TONDRE:  Seems to be a lot of gangs

14 around.

15              MR. SCHIMBERG:  Especially up here.

16              MR. TONDRE:  Vigilantes.

17              MR. SCHIMBERG:  Are there gangs up here?

18              THE DEPONENT:  I don't know.  I hope not.

19 I think there's teenagers that want to think they are.

20              MR. SCHIMBERG:  Yeah, pull down the

21 trousers do.

22              THE DEPONENT:  Yes.

23          Q    (BY MR. LEBSACK) Let me ask you about your

24 notice of warning, which is Exhibit 67.  You say in

25 there that if the condition of the horses did not

1 improve -- well, strike that.  Let me ask it a

2 different way.

3          Is it correct to read this, that if the

4 horses' conditions stayed the same, that you would

5 charge them?

6     A    Yes.

7     Q    So these horses as of the 16th were in an

8 unacceptable condition to you?

9     A    Yes.

10    Q    Maggie and the six that are referenced?

11    A    Yes.

12    Q    The hay samples that you took, you said

13 the hay was on a trailer?

14    A    Yes.

15    Q    And --

16          MR. SCHIMBERG:  Let me object to the

17 characterization, but go right ahead.

18 Characterization.

19    Q    (BY MR. LEBSACK) You said the trailer was

20 parked next to a house?

21    A    Uh-huh.  Yes.

22    Q    And I think you said there were square

23 bales?

24    A    Yes.

25    Q    And you talked about size, but I'd like