# Exhibit C

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.

---

DEPOSITION OF BOBBI PRIESTLY
June 24, 2014

---

Deposition location:
825 Clark Street Road
Fairplay, Colorado

APPEARANCES:

   Brice A. Tondre, Esq.
   BRICE A. TONDRE, P.C.
   215 South Wadsworth Boulevard, #500
   Lakewood, Colorado  80226

                                    For the Plaintiffs.

   John Lebsack, Esq.
   WHITE and STEELE, P.C.
   Dominion Towers
   600 17th Street, Suite 600N
   Denver, Colorado  80202

                                    For the Defendant, Olds.

```
                                                              Page 4
 1                      BOBBI JO PRIESTLY,
 2  being first duly sworn to state the truth, the whole
 3  truth, and nothing but the truth, testified under oath as
 4  follows:
 5                        EXAMINATION
 6  BY MR. TONDRE:
 7           Q    State your name, please, ma'am.
 8           A    Bobbi Jo Priestly.
 9           Q    And your occupation?
10           A    I'm the sergeant of the Animal Control
11  Division for Park County --
12           Q    And how long -- I'm sorry.
13           A    I'm sorry.  -- for the Park County
14  Sheriff's Office.
15           Q    How long have you held that position now?
16           A    It will be 13 years in January, so about
17  12 and a half years.
18           Q    What's your educational background?
19           A    Just high school.  I don't have any
20  college education, sir.
21           Q    And where did you graduate from high
22  school?
23           A    South Park High School here in Fairplay.
24           Q    And when did you graduate?
25           A    1983.
```

1  A I'm sorry?

2    (Phone ringing.)

3    MR. SCHIMBERG: It's a good reminder, 4 isn't it? Just for the record, Mr. Swift's phone is 5 going off; and now we're all fixing our phones.

6  Q (BY MR. TONDRE) In 2012, who were the 7 animal control officers in addition to yourself?

8  A That would be Rebecca Bramlett and Cindy 9 Hardey.

10  Q Okay. Now, when you applied for the job, 11 was there a sergeant in charge of animal control?

12  A No.

13  Q So was that -- were you the first person 14 to hold that position?

15  A Yes, sir.

16  Q And when did you -- when did you achieve 17 the position of sergeant?

18  A You're testing my memory.

19  Q Well, close enough.

20  A I'm going -- I'm going to say I believe 21 that was in 2009, thereabouts, somewhere in 2009. I 22 can't give you a month.

23  Q All right. And did your duties change 24 when you became sergeant?

25  A No. Because I was corporal prior to

Page 8

```
 1 that; but my duties have pretty much always been the
 2 senior animal control officer, duties didn't really
 3 change that much other than I just -- they just gave me
 4 stripes basically.  It -- so nothing really changed.
 5           Q    When you say -- when did you become
 6 senior animal control agent?
 7           A    That would have been -- okay.  Let me
 8 think.  That would have been in 2006, I believe.  2006.
 9           Q    Was that a position you were appointed
10 to, or did it just happen that you were the senior --
11           A    That's exactly what happened.
12           Q    Okay.  And when were you appointed
13 corporal?  Just roughly.
14           A    I believe -- I believe that was in 2008.
15           Q    Okay.  Now, what training did you
16 receive -- well, first of all, let me ask you this:
17 What did you under- -- let me go -- when you applied
18 for the position, what -- what were the qualifications
19 that were required?
20           A    There wasn't really any qualifications to
21 become an animal control officer.  I did go to a school
22 and I -- I went to a 40-hour class with the National
23 Animal Control Association and got my accreditation --
24 my -- my credit -- my accredited certificate from the
25 National Animal Control Association and that was in
```

```
1       A    Yes, I made a call to Dr. Anderson.
2       Q    Who is Dr. Anderson?
3       A    She is the veterin- -- she's one of the
4  veterinarians for the State of Colorado and she is the
5  head of PACFA.
6       Q    Head of what?
7       A    PACFA.
8       Q    What is that?
9       A    Pet Animal Care Facilities Act.
10      Q    Why did you call Dr. Anderson -- well,
11 wait a minute, did you call Dr. Anderson?
12      A    I did.
13      Q    Why did you call her?
14      A    I called to get -- to get her advice and
15 see what she thought as a veterinarian we should do.
16      Q    And you explained to her the facts as you
17 understood them, right?
18      A    I explained that we were told that the
19 horses on the Echo Valley Ranch were under veterinary
20 care, that's what I was told by Mr. Swift when I spoke
21 with him, and asked her what she thought we should do
22 involving the six horses on the property and on Maggie.
23           MR. SCHIMBERG:  Listen to his question.
24      A    Okay.
25      Q    (BY MR. TONDRE) My question is:  You
```

```
                                                          Page 48
 1          Q    Once in your lifetime?
 2          A    Yes.
 3          Q    Did you try and call her on February the
 4  16th?
 5          A    No.
 6               MR. SCHIMBERG:  Mr. Tondre, would it be
 7  appropriate if we allowed Ms. Priestly to have the
 8  exhibit that you're reading from so she can refresh if
 9  she needs to.
10               MR. TONDRE:  Yeah, sure.
11               MR. SCHIMBERG:  Okay.  And you're
12  entitled to ask your questions the way you want but --
13               MR. TONDRE:  I think it's Exhibit 65.
14               MR. LEBSACK:  66.
15               MR. TONDRE:  66.  Yeah, it may be
16  helpful.
17          A    Thank you.
18          Q    (BY MR. TONDRE) What did you understand
19  your role to be in this whole scenario that was
20  enveloping or -- or developing in -- on February 16th?
21          A    What was my role?
22          Q    Yes.
23          A    I'm an animal control officer for the
24  Park County Sheriff's Office and Cindy's supervisor.
25          Q    Okay.  And she was looking to you for
```

Page 49

```
 1 advice as to what to do with the situation, correct?
 2              MR. SCHIMBERG:  Object to form.
 3         A    She was telling me what the situation
 4 was.
 5         Q    (BY MR. TONDRE) Was she asking your
 6 advice?
 7         A    In some situations.
 8         Q    All right.  Now, did you ask for any
 9 advice from Ashleigh Olds?
10         A    I did not speak with Ashleigh Olds.
11         Q    Do you know -- did you know Ashleigh Olds
12 at that point in time?
13         A    No.
14         Q    Had you ever called Dr. Anderson before
15 during a wellness check?
16         A    In which case?
17         Q    Any case.
18         A    Oh, yes, absolutely.
19         Q    Is this a common thing you do, call
20 Dr. Anderson and say what do you think, Doc?
21         A    Absolutely.
22         Q    And why do you do that?
23         A    Because we always have a veterinarian's
24 opinion on cases before we do anything.
25         Q    What -- who made the decision to issue a
```

Page 50

1 warning as opposed to seize the horses?

2       A   Cindy.

3       Q   Did you concur in that decision?

4       A   I supported her, yes.

5       Q   It's fair to say it was a consensus

6 decision of all -- all people consulted except

7 Dr. Olds?

8            MR. LEBSACK: Object to form.

9            MR. SCHIMBERG: Object to form.

10      A   Based on the information we had, yes.

11      Q   (BY MR. TONDRE) Now you also contacted

12 Scott Dutcher; is that correct?

13      A   Yes.

14      Q   He's a chief investigator with the Bureau

15 of Animal Protection, correct?

16      A   Yes.

17      Q   And what did you -- what's his

18 background? Do you have any idea? It's page 80 -- 87

19 if you want to follow along.

20           MR. SCHIMBERG: Thank you, Counsel.

21      A   Thank you.

22      Q   (BY MR. TONDRE) What information -- well,

23 let me ask: What -- what do you understand

24 Mr. Dutcher's background to be?

25      A   Well, I don't know what his schooling is.

Page 90

1  horse was having a neurological problem?
2       A    No.  No.
3       Q    Who made the decision to seize the
4  horses?
5       A    Who made the decision to seize them?
6       Q    Yes, ma'am.
7       A    That would have been Cindy Hardey.
8       Q    Did she consult you?
9       A    Of course.
10      Q    But you relied on her to make the
11 decision?
12      A    Yes.
13      Q    Did you participate in the seizure of the
14 horses?
15      A    Yes.
16      Q    Who was present during the seizure?
17      A    Myself, Cindy Hardey, Undersheriff Go- --
18 Gore, sorry; Kirstin LeBeau, Marteen Van Poolen; and
19 one of their daughters, I don't remember which one of
20 their daughters, the oldest daughter.
21      Q    Why was Mr. Gore there?
22      A    To serve --
23           MR. SCHIMBERG:  Object to form.  Go
24 ahead.
25      A    To serve the search warrant.

Page 119

1        MR. SCHIMBERG: Is that cool with you,
2  Linda?
3        Q  (BY MR. LEBSACK) The first thing I want to
4  do is make sure I understand how your reports were
5  prepared.
6        A  Okay.
7        Q  Why don't you flip to page 86 in
8  Exhibit 66.
9        A  All right.
10       Q  Is this a page of one of the reports that
11 you personally prepared?
12       A  Yes.
13       Q  And it's got your name typed in in the
14 lower left corner?
15       A  Correct.
16       Q  So in any of the pages in this exhibit
17 where that name -- where your name is in the lower
18 left-hand corner, that would mean something that you
19 personally prepared?
20       A  Correct.
21       Q  So do you actually sit down at the
22 computer and type this up yourself?
23       A  Yes.
24       Q  And I notice that some of the reports
25 discuss events that happened on different days. So can

1 you tell when you actually prepared this if there's --
2 like, for example, page 86, discusses February 13th,
3 and then in the middle of the page, you -- you talk
4 about events the next day, the 14th, and then, you
5 know, there's different days.
6              Do you prepare this as you go through
7 like you did something on the 13th, you type that up;
8 and then on the 14th, you type more up; or how does
9 that work?
10         A   I take notes, tedious notes; and then I
11 sit down, and we complete it after the original event
12 occurs.  And then we do supplementals.  So this report
13 would have gone -- I would have started typing it on
14 the last -- you know, like, the last day -- I would
15 have started it, and then I would have gone like
16 maybe -- started it after the initial case started and
17 then left it open and then gone back.
18              When I submitted it, when you get the
19 first part of the report, this part here, of mine, it
20 will tell you when it's submitted to the DA's office,
21 that's the date I actually turned it in.  So it's kind
22 of -- it's a work in progress if that makes sense.
23         Q   I see.  So this is typed from handwritten
24 notes that you keep as you go through the events?
25         A   Correct.

1      Q   Look at -- hold on a second. I got to
2 find it. I had the wrong page in my notes, and now I
3 need to --
4      MR. SCHIMBERG: It happens.
5      Q   (BY MR. LEBSACK) Well let me ask you
6 without the reference to the page: You testified about
7 the decision to seize the horses and to file charges
8 against Mr. Hatlee and Mr. Swift.
9      Do you recall that?
10     A   Yes.
11     Q   And I think you said that was Officer
12 Hardey's decision?
13     A   Correct.
14     Q   But she consulted with you about making
15 that decision?
16     A   Yes.
17     Q   And did you support her decision?
18     A   Yes.
19     Q   And was it your understanding that she
20 had -- she made that decision based on some new
21 information that you received in talking to Dr. Horton?
22     A   Yes.
23     Q   And in talking to her about making that
24 decision, did you also consider information that you
25 had received in a phone call with Dr. Horton?

Page 122

1    A    Yes.

2    Q    So it was your understanding that the
3 decision was prompted by some recent information that
4 Dr. Horton had provided?

5    A    Correct.

6    MR. GORE: There is some strong coffee if
7 anybody wants some.

8    MR. SCHIMBERG: You might want to sit
9 over there.

10    Q    (BY MR. LEBSACK) On page 89, could you
11 turn to that page in Exhibit 66.

12    A    Yes.

13    Q    This is your report, right?

14    A    That's correct.

15    Q    And down in the last paragraph you talk
16 about February 21st getting a call from Dr. Horton. Do
17 you see that paragraph?

18    A    I do.

19    Q    And this starts a discussion that
20 continues on to the next page about the results of the
21 necropsy. Do you see that?

22    A    I do.

23    Q    Now if you flip back to page 89, in the
24 last paragraph of that, it says, second sentence:
25 "Dr. Horton called and stated that she had some