# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.
-----------------------------------------------------------
        VIDEOTAPE DEPOSITION OF RONALD L. SWIFT
            VOLUME I/PORTIONS CONFIDENTIAL
                    June 30, 2014
-----------------------------------------------------------
                        Deposition location:
                        9998 Havekost Road
                        Conifer, Colorado  80433
APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226


                        For the Plaintiffs.
    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202

                        For the Defendant, Olds.

```
 1                    EXAMINATION

 2 BY MR. SCHIMBERG:

 3          Q   Here's an easy one for you.  Your name,

 4 please.

 5          A   Ronald Lee Swift.

 6          Q   Have you ever gone by any other names

 7 other that Ronald Lee Swift?

 8          A   Ron.

 9          Q   Okay.  And your date of birth, sir?

10          A   7/7/42.

11          Q   And your current residence address?

12          A   1469 County Road 70, Bailey.

13          Q   And how long have you resided at 1469

14 County Road 70?

15          A   Six years, I believe.

16          Q   And with whom do you reside at the County

17 Road 70 property?

18          A   Right now myself; Helen Cook; her son,

19 Christopher Cook.

20          Q   And how old is Christopher?

21          A   22.

22          Q   How long has Christopher lived at that

23 address?

24          A   About four months, five months.

25          Q   Okay.  Is that seen as a temporary?
```

1 speaking with Mr. Hatlee.  When -- when the owner comes

2 back, is there a separate residence where he --

3          A   There are three houses on the property.

4          Q   Okay.  And does he stay in a separate one

5 from --

6          A   Yes, he does.

7          Q   -- from where you reside?

8          A   Yes.

9          Q   Okay.

10             Mr. Swift, if you would be kind enough to

11 turn to Exhibit 51, and that's the satellite map

12 overview of -- of the ranch at Echo Valley.  Okay.

13         A   Okay.

14         Q   And if it works on this, you can see

15 where Mr. Hatlee had identified the main house.  Do you

16 see that?

17         A   I do.

18         Q   And is that where you reside?

19         A   No, sir.

20         Q   That's where the owner would reside when

21 he's present?

22         A   That is the owner's house, yes.

23         Q   Okay.  And then across the driveway

24 there, what appears to be a drive, is another building,

25 what is that?

1      A    That is a smaller house.

2      Q    And is that where you reside?

3      A    No, sir.  It is not.

4      Q    Okay.  And then in the upper right-hand

5 corner is another structure, and I believe Mr. Hatlee

6 identified that as "Ron house"; would that be correct?

7      A    That's correct.

8      Q    Okay.  Thanks.  Now do you own that

9 residence?

10     A    No, sir, I lease it.

11     Q    All right.  From whom?

12     A    The owner of the ranch.

13     Q    And just so we have it for the record?

14     A    Mr. Colwell.

15     Q    All right.  His first name?

16     A    Robert.

17     Q    Okay.  Does -- has Robert indicated to

18 you how long he plans to be in Colorado this summer?

19     A    Until sometime mid-August, I believe,

20 they come and go.

21     Q    Okay.  And when you say "they," does he

22 have -- bring a family with him usually?

23          MR. SCHIMBERG:  My phone.  Sorry about

24 that.

25     A    Well, wait a minute, I'll turn mind off

1  in with her.

2          Q    Okay.  What was the next horse that you

3  recall in the -- as the days went on, where you had a

4  concern with their condition?

5          A    I'm thinking we brought Bear in next.

6          Q    And what was -- what did you see in Bear

7  that you thought needed to get --

8          A    Bear couldn't get up.

9          Q    Was recumbent out in the pasture?

10          A    That's what he was.

11          Q    Okay.  Who found Bear in that position?

12          A    Bill.

13          Q    Bill M., I can't think of his last name?

14          A    Bill M.

15          Q    What's his last name?

16          A    Mullen.

17          Q    Mullen.  And tell me the process of how

18  you found out?

19          A    The telephone.

20          Q    Okay.  Were you at the ranch at the time.

21          A    Oh, I was at the ranch.

22          Q    Okay.

23          A    Bill just beat me out.  He had been out

24  hunting, he came back up.  He got down there when I was

25  about out the back door going down to do the morning

1        A    -- seemed to be doing well.  So we just

2 left him there with them.

3        Q    Okay.  Did you change anything about

4 feeding Bear?

5        A    At that time, we did not other than his

6 hay, he would have gone on grain that night.  Because

7 we already, I think, fed most of them that -- in the

8 morning.

9        Q    Tell me what you observed as days went on

10 with Bear.

11       A    No.  That day about 3:30, 4:00 in the

12 afternoon, went back out to check on him, he was down

13 in the hay.  But I couldn't get him to get up.  So I

14 made a phone call and got Randy out there, we got him

15 up, moved him inside the barn.

16       Q    And what happened next, as you recall?

17       A    He walked to the barn, walked in the

18 barn.

19       Q    Uh-huh.

20       A    Got him some food, gave him his -- I gave

21 him some grain.  He picked at the grain, that concerned

22 us a little bit.  But we watched it, he -- he found

23 finally did eat all of it, it just took him what I

24 would have thought to be too long a period of time to

25 do it.  Apparently, was fine.  And that's where he

1 spent the night.

2        Q   Okay.

3        A   I went back down about 11:00.  He was

4 still up munching on his hay.

5        Q   And what was the next event that caused

6 you some concern with Bear after that first day?

7        A   Couldn't get up the next morning either.

8        Q   Okay.  To a horseman, what's that mean,

9 if anything?

10       A   Considering I hadn't had to deal with the

11 problem before, it was a little confusing.  So I called

12 Timberline and talked to them, told them what was going

13 on, what he was doing.  They gave us some ideas.

14       Q   What do you recall in terms of the ideas

15 they gave you?

16       A   You know, well, keep him up, keep him

17 eating.

18       Q   Anything else?

19       A   That was about it, watch him for 24

20 hours.

21       Q   Over the next 24 hours, anything

22 significant happen with Bear?

23       A   No.  The problem he seemed to have was

24 that he was fine as long as he was standing up or

25 moving around.

1        Q    Uh-huh.

2        A    Once he laid down, he couldn't get up.

3 We started questioning something neurological from the

4 standpoint that if you sit and watch him, when he tried

5 to get up, he could come up on his front end, back end

6 wouldn't get -- wouldn't move.  And he'd lay back

7 down -- not lay down, he would stay up in a sternal

8 position, and he would sit there and look at his rear

9 legs specifically like somebody who has some kind of a

10 muscular dystrophy.  And if you watch them they'll be

11 walking around, their leg stops, and if they don't go

12 flat on their face, the first thing they instinctively

13 look down at that leg like I told you to move, you

14 didn't move, what the hell is going on.

15             So that was kind of a -- just a

16 supposition thing.

17        Q    And the time period was that -- when in

18 January or February did you start noticing this?

19        A    Probably about the 3rd we started looking

20 for a reason why, because any kind of a nerve thing

21 that he had had, you know, that was temporary should

22 have started wearing off.

23        Q    And what did you do as -- in response?

24        A    Discussed it with the my vets.

25        Q    What vet?

1 will be fine.

2          Q    Was this the first time you had heard of

3 any potential involving botulism?

4          A    With these specific horses?

5          Q    Yeah.

6          A    Yes.

7          Q    Okay.

8          A    I had heard of botulism.

9          Q    Yeah.

10         A    I had never dealt with it.  So...

11         Q    You -- you read my question correctly.  I

12 meant in terms of your horses, this is the first time

13 you heard anybody suggest botulism as a potential?

14         A    Yes.

15         Q    All right.  Let's keep walking through

16 Bear's history through January of 2012 then.  What's

17 the next significant event that you recall?

18         A    He kept losing weight.

19         Q    Okay.  Had Bear, to your observation,

20 lost weight when you observed Bear for the first time

21 out in the pasture?

22         A    Pens on him; yes, he had.  I would not

23 say it was a dangerous loss of weight at that point.

24         Q    But he had lost some?

25         A    He had lost some.

1          A    Let's go to periodically because a

2 direct exam- -- memory of exactly what happened when,

3 is -- is probably not going to be quite right.  But --

4          Q    Okay.  Let's do the best we can.

5          A    I know we went down to see Bear.

6          Q    All right.  Here's an example what I'll

7 do to you.  The con- -- the initial conversation with

8 Hardey was up at her vehicle?

9          A    Yes.

10          Q    All right.  And then you recall being

11 with whom when you went down to see Bear?

12          A    Well, I know at some point Cindy was down

13 there, and I was down there, Cindy was down there,

14 Dr. Olds was there, I can't remember whether Randy was

15 there at that particular time or not.

16          Q    Okay.  And what do you recall about that?

17          A    They couldn't get him up.

18          Q    Did you assist?

19          A    No.  I just let them try.

20          MR. LEBSACK:  I'm sorry?

21          THE DEPONENT:  I said no, I did not

22 assist, I just let them try.

23          MR. LEBSACK:  Thank you.

24          Q    (BY MR. SCHIMBERG)  Is there a reason you

25 didn't assist?

1        A   I wasn't asked.

2        Q   Was that the only reason?

3        A   Yep.

4        Q   Okay.  And by the "they," who do you

5   recall, Dr. Olds, Cindy Hardey, anyone else?

6        A   I don't recall.

7        Q   Okay.  What do you recall happening next?

8        A   Well, we went out to look at the other

9   horses, Randy told them he'd get Bear up, which he did,

10  walked him out of the barn, tied him to the back of my

11  truck, gave him his morning grain.

12       Q   Okay.  When you say went out to look at

13  the other horses --

14       A   I told Cindy, I said, we've got skinny

15  horses, but they're up at the barn, I'd be glad to show

16  them to you.

17       Q   Okay.  That's all I meant as opposed to

18  horses out in the pasture.  It's the ones that you had

19  brought in --

20       A   Okay.

21       Q   -- is that correct?

22       A   Yes.

23       Q   Okay.  I want to make sure I get this.

24  So at some point, you asked Mr. Hatlee to tend to Bear?

25       A   No.  I did not.

1       Q  All right.  How did it work?

2       A  Mr. Hatlee just said I'll get Bear up and

3 bring him out.

4       Q  Oh, he was there by that time; is that

5 correct?

6       A  Yes.

7       Q  All right.  Was anybody with Mr. Hatlee

8 or stay back there with him?

9       A  He didn't need any help.

10       Q  That may be true.  But --

11       A  No.

12       Q  -- did you notice anybody staying back

13 with him?

14       A  I did not.

15       Q  And you and Cindy and who else went up to

16 look at the horses in the pens -- in the -- yeah, pens.

17       A  You know, I don't know.  I just don't

18 know.  Cindy was the one that asked me about it, I told

19 her, I said, come on, I'll show you.  Now whether

20 Dr. Olds was following along there, I don't know at

21 that particular time.

22       Q  Fair enough.  How about Mr. Murdock?

23       A  I have no idea what he was doing.

24       Q  Okay.  And so you and Cindy anyway walk

25 up in-between the pens?

1         A    Yep.

2         Q    All right.   And tell me about your

3 conversation as you're walking, looking at the pens.

4         A    I told her exactly what we were doing

5 with them, that I had contacted the vet, that we were

6 doing what we were told to do.   And that we were sure

7 they were sick, we just weren't sure what it was.

8         Q    And what do you recall her saying?

9         A    She made notes.

10         Q    Do you remember her saying to you at the

11 pens anything like Ron, you just can't have horses in

12 this condition?

13         A    I seriously doubt that.

14         Q    You don't recall a statement, anything

15 like that?

16         A    No.

17         Q    All right.

18         A    No.   I'm sure we discussed the fact they

19 were -- they were skinny and -- and -- but it must be a

20 lawyer thing because I'm not able to remember exact

21 conversations three or four years ago.

22         Q    It's not a lawyer thing other than to

23 ask.

24         A    Oh, okay.

25         Q    That part I would agree with.   And I

Page 227

1          Q    On the 17th?

2          A    Yep.

3          Q    Okay.  And what was going on the 17th, or

4 what happened on the 17th?  I didn't mean to get

5 sloppy.

6          A    She merely told us that she understood

7 the media had gotten ahold of it.

8          Q    Okay.

9          A    And that we should make no comment.

10         Q    All right.  And did you consider that as

11 a friendly suggestion or -- or how did you take that,

12 if you had a reaction at all?

13         A    Well, at the time, I think we took it as

14 an okay, we're not going to make any comments from

15 either side.  We found out later that since the

16 sheriff's office couldn't keep from commenting we

17 better.

18         Q    Okay.  And that resulted in this

19 interview with TheFlume?

20         A    Yes, it did.

21         Q    Okay.  Let me point your direction about

22 halfway down in the left-hand side.  And there's a

23 quote attributed to you, sir:  "I've never" -- "I've

24 never ever seen anything that made a horse lose weight

25 this quick and not be able to put weight back on."

1          Did you make that comment?

2      A   He says I did.

3      Q   Well, do you remember making a comment?

4      A   I think Mr. Hatlee and I both made that

5  comment to several people prior to animal control ever

6  showing up.  Some of the other horse people, we were

7  looking through some answers and we -- something --

8  something to that nature.

9      Q   Okay.

10     A   The exact word-for-word, I couldn't swear

11 to.

12     Q   Yeah, but substantively --

13     A   Yes, the substance is fine.

14     Q   -- it's accurate.

15         All right.  Now did you have any

16 particular horse in mind when you made this comment

17 because it says:  "that made a horse lose weight," or

18 did you --

19     A   No --

20     Q   You kind of --

21     A   -- we were talking as a general group of

22 them.

23     Q   Okay.  There's one I wanted to ask you

24 about, I had it highlighted, but I can't remember where

25 it is.  Oh, it's the paragraph right above, Mr. Swift,

Page 241

```
 1          A    Nellie.

 2          Q    Nellie still with you?

 3          A    Yes, sir.  She's a lifer.

 4          Q    Do you keep a file on vet bills?

 5          A    No.

 6          Q    In terms of medical records, veterinary

 7 records, would you keep them or would you just rely

 8 upon Timberline to have a set?

 9          A    I would rely on Timberline if I needed

10 them.

11          Q    Yeah.

12          A    If I couldn't rely on Timberline, I would

13 be looking for a new vet.

14          Q    Are you?

15          A    No, sir.

16          Q    There came a time, I think it was the

17 17th, is that when she passed?  That's what my little

18 time line shows.

19          A    I think that would be true.

20          Q    Okay.  And Hardey has it in her report.

21 You guys got her up on all fours, correct?

22          A    She was standing.

23          Q    Okay.  With the assistance of a sling?

24          A    An Anderson lift.

25          Q    Lift?
```

1          A    Lift.

2          Q    All right.  And where did you get that

3 lift?

4          A    Rocky Mountain Horse Rescue.

5          Q    Okay.  I have no idea, is that a real

6 chore, is that hard to get a horse up using an Anderson

7 lift?

8          A    Well, after you get the app- -- the --

9 excuse me -- the apparatus assembled and the -- and I

10 don't know whether you would even call it a sling, but

11 I guess it's kind a term that they use.  It's kind of a

12 canvas frame, underneath the horse --

13         Q    Uh-huh.

14         A    -- which was probably the hardest thing

15 to do with a horse of that size; no, it's all done

16 mechanically.

17         Q    Hydraulic or something you turn?

18         A    No.  It's something you turn.

19         Q    All right.

20         A    It's with something called a chain pull,

21 if I remember.

22         Q    So you get her up.  About what time of

23 day is she up?

24         A    If I recall right, it was about 2 a.m.

25         Q    Really?  Okay.  So 2 a.m. who's there,

1 who's getting her up?

2          A    Mr. Hatlee, Maarten Van Poolen,

3 Ms. LeBeau was there.

4          Q    Here's a dumb one for you.  Why would you

5 get her up at 2 in the morning as opposed to the

6 evening before or the next -- when the sun came up?

7          A    Because we had the lift available at that

8 time.

9          Q    Okay.

10          A    That's when we got it up there was about

11 midnight.

12          Q    I see.

13          A    Made no difference because we were going

14 to 7 to 24, 24, 24 hours, and nobody slept for a week.

15 I will say -- I'm not going to say nobody slept.  But

16 we did it; pieces here and there, but somebody was with

17 that mare --

18          Q    And did that --

19          A    -- constantly.

20          Q    And did that include Mr. Van Poolen and

21 Ms. LeBeau?

22          A    Actually, they came specifically to help

23 us.  They went -- Maarten went down and got the lift

24 with his truck, brought it up, and they helped get her

25 up.  We had more than ample help as far as watching and

1 working with the mare most of the time, so they lived

2 further away than anybody else.

3          Q    Did you have any experience with having

4 to go through this process before?

5          A    With an Anderson lift?

6          Q    Yes.

7          A    No, sir.

8          Q    Okay.

9          A    Had not needed one before.

10          Q    First time?

11          A    Yep.

12          Q    All right.  Now where I'm a little

13 confused in reading my client's report is were you able

14 to get her up and was she able to walk on her own at

15 any time during that day?

16          A    Was she able to walk?

17          Q    Did she walk?

18          A    She did not walk.

19          Q    Okay.

20          A    But -- we had her up.  She was supporting

21 her own weight on her legs which would indicate to me

22 that she could have walked.  She stomped her front

23 feet, her back feet, so she had movement in all of her

24 feet.

25                But from the time she was up, you just

1 released the pressure on the sling enough so that it's

2 underneath them, if she wants to relax into it, because

3 she can't stand on her legs, she can.  If you take it

4 off from her, then, if she has that problem, she's

5 going to be down and you're back to stressing --

6 stressing her and a hell of a lot of work to get her

7 up.  So we did not take the sling away from her in

8 that -- actually, it was less than a 24-hour period.

9 So...

10         Q   So you got her up, she's self-supporting

11 to the degree you've just described.  But she's

12 stationary in one spot?

13         A   Yep.

14         Q   All right.  Got the picture.

15         A   Right in front of the door so she could

16 look outside.

17         Q   On the upper barn?

18         A   In the upper barn.  And then she had this

19 nice table that we set up so she could have her grain

20 and her hay and water right there on it.

21         Q   Okay.

22         A   And drink and eat at her convenience,

23 which she did.

24         Q   Did she seem to enjoy it?  Not just the

25 food but being up?

Page 255

1 is, Mr. Swift.  I don't have my numbering up to that.

2          A   I think this is 66.  Okay.

3          Q   (BY MR. SCHIMBERG) Let's see if I can

4 direct you.  Because they're a lot of different numbers

5 here in these exhibits.

6          All right.  In the lower right-hand

7 corner if you get into the substance of the report

8 itself, you'll see a series of numbers.  Believe me

9 if -- if you turn about ten pages into that exhibit.

10          A   Oh, about ten pages.

11          Q   Yeah.

12          A   Okay.

13          Q   Go -- go 15 or so, it doesn't matter, I'm

14 going to direct you -- it's easy to direct you after

15 that.  Okay.  Stop right there.  You see in the lower

16 right?

17          A   78.

18          Q   All right.  Go back 10 now to 68, if you

19 would.

20          A   Okey-doke.  We're on 68.

21          Q   All right.  Thanks.

22          Now, this is my client, Cindy Hardey's

23 report.  Okay.  And I'm going to ask you if you agree

24 or disagree with her assessment of the horses that were

25 brought up.  And if you look down to the second

Page 256

1 paragraph from the bottom, it starts with:  "I observed

2 a horse named Lena."

3          Are you with me?

4     A   I am.

5     Q   All right.  It says:  "I observed a horse

6 named Lena, Lena was very emaciated."

7          Let me stop right there.  Do you agree

8 with that assessment?

9     A   Do I agree with it?

10    Q   Yeah, as of February 16, 2012.

11    A   I don't know that I agree with it, but...

12 it's kind of an indefinitive (sic) sentence, isn't it?

13    Q   Well, how would you describe --

14    A   She was thin.

15    Q   All right.  Thin works for you.

16         You think very emaciated is too strong?

17    A   Well, I think since -- since we have no

18 indication of what Cindy would think would be emaciated

19 versus very emaciated versus thin versus -- I don't

20 know that I can say.

21    Q   Well --

22    A   To her obviously it was.

23    Q   All right.

24    A   Okay.  That's -- the only thing that

25 sentence means.

Page 257

1          Q    All right.  I'm just asking you if you

2 agree or disagree.

3          A    I think the horse was thin.

4          Q    It goes on to say:  "her bones were

5 protruding on her Withers Loin, Point of hip, and Tail

6 head."  Do you agree with that?

7          A    Well, I think her hips were protruding,

8 yes.

9          Q    Do you disagree with her assessment that

10 bones were protruding -- protruding from the other

11 areas?

12         A    You have trouble with that word, don't

13 you?

14         Q    Yes.

15         A    Yeah, I don't know that her bones were

16 protruding that badly.

17         Q    Okay.  We've heard a lot from a lot of

18 witnesses thus far on this Henneke Body Score or body

19 conditioning scoring system?

20         A    Uh-huh.

21         Q    All right.  Do you profess to have any

22 ability to body score a horse pursuant to the Henneke?

23         A    Let me say -- let me say I read the

24 Henneke system --

25         Q    Okay.

1          A    -- cover to cover.  Okay.

2          Q    Yes.

3          A    Cannot be done visually.

4          Q    Okay.  Hardey admits that her scoring was

5   visual.  Do you see that?

6          A    I'm well aware of that.

7          Q    Okay.  Well, read along with me.  "I

8   visually scored Lena to 2 to a 2.5."  Would you agree

9   with a visual score of 2 to 2.5?

10         A    I would not.

11         Q    All right.  What would -- what would you

12  score Lena at?

13         A    Visually?

14         Q    Yes.

15         A    I wouldn't do it.  It's not the way the

16  system was designed.

17         Q    All right.  The next paragraph, the

18  second sentence starts with:  "The horse's name was

19  Midnight."  Are you with me?

20         A    Yes, sir, I can read quite well.

21         Q    All right.  Well, I just want to make

22  sure we're reading the same place.  "Midnight was very

23  emaciated."  Do you agree with that?

24         A    No.  I agree she was thin.

25         Q    All right.  Do you think "very emaciated"

1 is too strong?

2          A   I think if you can define "very

3 emaciated" in words that have a definite meaning, I

4 will answer that question.

5          Q   Well, okay.  Let's go on to her

6 description of what led her to say it was "very

7 emaciated."  Her bones were protruding -- protruding on

8 her Withers, Loins, Point of hip and Tail head.

9              Do you agree with that?

10         A   I don't know, could you read it again?  I

11 think her hips were visible.

12         Q   Okay.  Do you disagree with the other

13 portions of the body?

14         A   She was thin.  Okay.  There was too much

15 backbone showing, I never dis- -- we've never denied

16 any of this, okay.  Okay.  They were thin.  The

17 question is why they were thin, that we've denied, not

18 whether they were.

19         Q   Bear with me.  And you would -- I take it

20 respond the same, that because you're not supposed to

21 visually score under Henneke, that you wouldn't venture

22 a score yourself?

23         A   I would question why you use a system

24 that you don't use properly that you don't do anything

25 with.

Page 260

1          Q    All right.   But am I correct you would

2  not venture a score?

3          A    You're right.   I would not.

4          Q    All right.   I'm going to ask you the same

5  thing, so we can just move right along.   The next page,

6  lower right-hand corner, it says 69.

7          A    You will get the same response on all

8  four horses on that same page.

9          Q    And those four horses are Fiona, Echo,

10 River, and Chance, correct?

11         A    That is right.

12         Q    And in each one of those horses, Hardey

13 assesses as very emaciated, correct?

14         A    Yep.

15         Q    And she points to bones that were

16 protruding on each of those horses as the basis for her

17 comment, correct?

18         A    That's what she does.

19         Q    Okay.   And your answer, if I ask you if

20 you agree or disagree, would be exactly the same that

21 you gave?

22         A    Pretty much.

23         Q    Well, is there any difference?

24         A    Oh, I don't think that Fiona was anywhere

25 close to protruding nearly as bad as she thinks she

Page 261

1 was.

2          Q    Okay.  Anything else?

3          A    No.

4               MR. SCHIMBERG:  I didn't know if you were

5 done reading?

6               Gentlemen, I just got an urgent message

7 that I had to call my office.  Could you give me that

8 accommodation, I will be very quick.

9               THE VIDEOGRAPHER:  The time is

10 approximately 4:29 p.m., and we're now off the record.

11               (Recess was taken from 4:29 p.m. to

12 4:44 p.m.)

13               THE VIDEOGRAPHER:  Stand by.  And the

14 time is approximately 4:44 p.m., and we're back on the

15 record.

16               MR. SCHIMBERG:  We are back on the

17 record, Mr. Swift.  And we have talked during the

18 break, and we have all decided to conclude the

19 deposition for today.  We thank you for your patience

20 and endurance today, and we will get back together for

21 another half day.

22               THE DEPONENT:  Okay.

23               MR. SCHIMBERG:  Okay.

24               THE VIDEOGRAPHER:  This concludes the

25 June the 30th, 2004 video deposition of Ronald Swift.

Page 286

1          Q    Okay.  Tell me what you do recall, if

2 anything, about the conversation that actually led up

3 to being given a notice of warning.

4          A    As I recall there wasn't a lot of

5 conversation.  What she told me was that since she had

6 come out on a complaint she was required to leave that

7 notice and what the notice said.

8          Q    And was there any discussion about

9 whether you agreed with that or didn't agree with that?

10          A    I don't know whether there was a

11 discussion about agreeing or disagreeing, I just told

12 her she was welcome to come out whenever she felt she

13 needed to come out.

14          Q    What do you recall the notice of warning

15 obligating you to do?

16          A    Continue doing what we were told or we

17 were doing.

18          Q    Which was?

19          A    Taking care of the animals, working to

20 solve the problem we had with them, and get weight back

21 on them.

22          Q    At some point, you signed off on an

23 agreement to have the horses removed from Echo Valley

24 Ranch and down to Ms. LeBeau and Mr. Poolen's (sic)

25 facility; is that correct?

Page 287

1        A    No.

2        Q    Okay.  What's your recollection?

3        A    We signed a protective custody agreement.

4   It had nothing to do with moving them, we moved them.

5        Q    All right.

6        A    We signed that agreement at the location

7   in Jefferson.

8        Q    At the --

9        A    So it was an after-they-had-been-moved

10  fact.

11       Q    Okay.

12       A    Okay.

13       Q    And that's -- good point.  And -- and

14  what I just want to make sure I leave here today is to

15  get everything you recall about what led up to that and

16  how -- how it concluded, okay.  So let's start with do

17  you recall the conversation and where it occurred that

18  eventually led to the horses being moved down to

19  LeBeau/Poolen's (sic) place?

20       A    As I recall, it started with a phone

21  call.

22       Q    From?

23       A    Cindy.

24       Q    To?

25       A    Me.

1          A    I believe I agreed to meet with her in

2 Bailey --

3          Q    Bless you.

4          A    -- at the feed store.

5          Q    Okay.  To discuss further or what?

6          A    To discuss it.  My original answer was we

7 won't move them.

8          Q    Fair enough.  And so did you meet at the

9 Bailey feed store -- Depot Feed Store?

10          A    We did.

11          Q    Bless you.  And who was there?

12          A    I was there, Cindy was there, Mr. Hatlee,

13 Ms. Cook was there, I believe Cheryl Otto was there.

14          Q    And tell me what you recall, start to

15 finish of that conversation at the feed store.

16          A    All of it, I couldn't tell you.  Bottom

17 line was we agreed to move them.

18          Q    Okay.  Do you recall however, any

19 specifics of any new information or more specific

20 information that Cindy had provided to you?

21          A    Concerning what?

22          Q    Well, you had earlier indicated when you

23 got the initial phone call that she had expressed that

24 there was some concern with some of the folks that had

25 been posting information on the internet.  Do I have

1 something different at trial.   Okay?

2          A   Okay.

3          Q   So if I keep after you, it's not to be

4 rude; it's to do my job.   Got it?

5          A   I will let you know when you get rude.

6          Q   All right.   Well, I will try not to.

7 Okay.   I think Mr. Tondre will probably take care of

8 that for you.   All right.

9               So we're at the feed store.   Let's get

10 the context.

11         A   Okay.

12         Q   And it's you and the rest of the folks

13 that you've told me about.   While you're there, do you

14 recall who said what?

15         A   See, here you go with these exact things

16 three years after the fact.

17               At some point --

18               MR. HATLEE:   Sometimes it's a bit much.

19               THE DEPONENT:   Isn't it?

20               We had other people come into the feed

21 store because we were open for business and left.

22         Q   (BY MR. SCHIMBERG) Yeah.

23         A   I believe Ms. Van Poolen had stopped to

24 pick up something.   And I believe her and Ms. Cook were

25 talking, and Ms. Van Poolen said I have a place we can

Page 296

1 put those horses and quarantine them and I will take

2 them.

3          Q    We have not referred to Ms. Van Poolen by

4 that name before, so let me make sure --

5          A    No.  Ms. LeBeau.

6          Q    -- were -- yeah, okay.

7               What's her nickname, I forget already?

8               MR. HATLEE:  Kirt.

9          A    Kirt.

10          Q    (BY MR. SCHIMBERG) Kirt.  All right.  And

11 tell me what happens next.

12          A    We agreed to move the horses to her

13 facility.  I believe she had a discussion with Cindy,

14 Cindy agreed to let her take them.  And I really can't

15 tell you whether Cindy cleared that with Bobbi or not,

16 I assume she did.

17          Q    You don't know for a fact one way or the

18 other?

19          A    No.

20          Q    Okay.  The picture I'm getting is -- is

21 the Pueblo facility respectfully declines when Cindy

22 calls them and at or about the same time there at the

23 feed store, Ms. Van Poolen says, hey, I've got a

24 facility that I can quarantine the animals, why not use

25 my place; is that generally the gist?  Or is that fair?

1 pay for that, and how'd that work, if at all?  Was

2 there a discussion, number one?

3          A    Was there a discussion?

4          Q    There at the feed store?

5          A    No.  I don't think so.

6          Q    Okay.  Was there at some point that day

7 when you delivered the horses?

8          A    No.  I don't think so.

9          Q    Okay.

10         A    There wasn't much of a discussion.

11 Mr. Hatlee loaded food into her truck from the feed

12 store, told her what we were feeding -- she wanted to

13 know what we were feeding.  I told her, made sure she

14 had it.  And I believe her comment was I have plenty of

15 hay, not to worry about it.

16         Q    Okay.  Very good.  So when you get down

17 to the Van Poolen property, tell me what you recall

18 about that.

19         A    It was in the evening.

20         Q    Yeah.

21         A    I'm going to guess 5, 6:00.  Because it

22 was dark.  Cindy had followed us over, Bobbi Priestly

23 met us at the facility with her teenaged daughter.  And

24 Bobbi had a protective order -- a protective agreement

25 that she had formulated.

1          The trailers went into the inside arena,

2 barn, whatever makes it sound good to you.  And the

3 horses were unloaded.

4          Q    Anyone else there other than you,

5 Mr. Hatlee, Priestly, and Hardey?

6          A    Ms. Cook was there, Ms. Otto was there,

7 Cindy's daughter -- or Priestly's daughter was there.

8 And -- I'm going to guess that Kirt's daughter, Hanna,

9 was there; but I wouldn't swear to it.

10         Q    Okay.

11              MR. HATLEE:  And Peggy.

12         A    Yeah, and Peggy.

13         Q    (BY MR. SCHIMBERG) How old was Kirt's

14 daughter?

15         A    At that time, 13, 14.

16         Q    Okay.  Are you critical that Bobbi

17 Priestly had her teenage daughter with her there?

18         A    Am I?

19         Q    Yeah.

20         A    Well, yes.

21         Q    In what way?

22         A    Well, let's see.  Gee, would you guys

23 please move your horses to some place where -- out of

24 here because we're really afraid these people are going

25 to come out and threaten you and cause a lot of

1       A   No.

2       Q   When you brought the horses from the
3 pasture into the barn for Bear and into the pens for
4 the others, at the time you brought them in, they were
5 too skinny in your opinion?

6       A   In my opinion.

7       Q   And did they at that point -- from that
8 point on, did they continue to lose more weight?

9       A   Yes, they did.

10       Q   So they became even skinnier than the
11 point where you thought they were too skinny?

12       A   Yes, that's why we were so concerned
13 about them.  They were getting what we considered to be
14 very ample or more than ample food and losing weight.

15       Q   There was -- you testified about the
16 Routt County bills, and I don't think you answered this
17 question:  Did you ever contact Routt County about the
18 outstanding bill for the vet treatment?

19       A   Why?

20       Q   I'm --

21       A   I mean, that was between them and
22 Timberline.  It had nothing to do with me.

23       Q   So I guess the answer is no, you --

24       A   That would be the answer.

25       Q   On the 16th of February, inside the

1 this level because you were planning to clean them?

2          A    That quite possibly could be a reason.

3 The other reason could be that we broke ice the night

4 before and pulled it out of those tanks; and therefore,

5 they needed to be filled the next morning.

6               You almost have to fill water tanks on

7 morning feeding in the wintertime, because we fill them

8 out of a hose.  If you try running water when it's

9 below zero outside, you know what happens.

10         Q    Okay.

11         A    Your hoses freeze up.  In the daytime

12 when you got the sunlight out there, it's a lot easier

13 to do.

14         Q    Do these tanks, Exhibit 95 and

15 Exhibit 94, the water level -- the -- the contents of

16 this is not a suitable amount of water for horses to be

17 kept -- for horses to drink, right?  Was that a bad

18 question?  I think it was.

19         A    It sure was.

20         Q    Let me rephrase it.

21         A    Okay.

22         Q    Exhibit 94 and 95, this doesn't show

23 adequate water for a horse, does it?

24               MR. TONDRE:  Objection.  Foundation.

25         A    Are you asking me if those tanks should

1 have been filled up that morning?

2          Q   (BY MR. LEBSACK)  In other words, yes.

3          A   Yes, they would have been filled up that

4 morning.

5          Q   So this is not --

6          A   As a matter of fact, they were probably

7 filled up closer to noon because by the time we got rid

8 of animal control and everybody else and could go back

9 to doing what we normally do, they got filled.

10          Q   Okay.  These -- these tanks that you see

11 in these two pictures needed --

12          A   I don't know about those two tanks,

13 because we're not -- I told you, I can't tell you where

14 those two tanks were at.  If there was a tank on the

15 ranch on any morning that had that amount of water in

16 it, it would get filled.

17          Q   Okay.  But these pictures show water

18 tanks that were too low for horses to use, they needed

19 to be filled, right?

20          A   No.  That's not -- now which question do

21 you want me to answer?

22          Q   These tanks, these pictures show water

23 tanks with too little water in them?

24          A   For what?

25          Q   For horses.

1        A   Can a -- are you asking me can a horse

2 get a drink out of a tank with that much water in it?

3        Q   I don't want to play games.

4        A   I don't either.

5        Q   So these needed to be filled, right?

6        A   They needed to be filled, that I will

7 agree with.

8        Q   Okay.  So these pictures show water tanks

9 that were not suitable for horses, correct?

10          MR. TONDRE:  I'm going to object to the

11 form of the question.

12          MR. HATLEE:  Don't do it.  I'm telling

13 you right now, don't do it.

14        Q   (BY MR. LEBSACK) Well --

15        A   Try it one more time.  Are they suitable

16 for a horse to drink out of?  Yes.  Are they -- do they

17 need to be left that way and not filled in the morning

18 feeding?  No.  They do need to be filled.  Okay?

19          A horse can drink out of that much water

20 (motioning).

21          MR. SCHIMBERG:  Even though we're

22 videoing could you tell us for our court reporter --

23          THE DEPONENT:  If there's 2 inches of

24 water --

25          MR. SCHIMBERG:  2 inches.