# EXHIBIT O

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

    Plaintiffs,

         vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

    Defendants.

--------------------------------------------------------

DEPOSITION OF ALLYSON RENÉ HORTON, DVM
March 27, 2014

--------------------------------------------------------

                        Deposition location:
                        9998 Havekost Road,
                        Conifer, Colorado 80433

ALSO PRESENT:   Jennifer R. Edwards, Esq.
               (For Dr. Horton)
               Randall Hatlee
               Ronald Swift
               Ashleigh Olds, DVM

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 36

1          A.    Correct.

2          Q.    Had you ever provided veterinarian

3    services for any of these horses prior to

4    February 20th of 2012?

5          A.    Yes.

6          Q.    Which ones?

7          A.    As these records that we have been

8    going over indicate, we had seen Echo.  We had seen

9    Midnight.  We had seen River and Chance.  Some of

10   those horses were patients that day we did four

11   castrations.

12         Q.    You left out Fiona and Lena.  So does

13   that mean that prior to February 20, 2012, you had

14   not provided any veterinarian services for Fiona or

15   Lena?

16         A.    To the best of my recollection, that is

17   true.

18         Q.    And that is true for Timberline Equine,

19   both of you?

20         A.    Yes.

21         Q.    When was the last time before

22   February 20, 2012, that you, Timberline, had provided

23   any veterinarian services for Chance?

24         A.    I couldn't say off the top of my head.

25         Q.    Would that be the castration?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 37

1           A.    I couldn't say off the top of my head.
2    I would have to go search all the records to find
3    that day.
4           Q.    Okay.  I have them in chronological
5    order, so they would be somewhere between -- based on
6    all the documents that have been produced --
7           A.    Uh-huh.
8           Q.    -- so between pages 1 and page 16.
9    Would you review those and tell me when was the last
10   time shown by those records that Timberline had
11   provided any veterinary services for Chance?  And
12   let's -- I'll try to be efficient about it.
13              There's four horses that you saw on
14   February 20th that you had seen before.  You just
15   mentioned Chance, Echo, River, and Midnight.  So as
16   you are going through there, if you see a treatment
17   for any of those horses, let me know.
18          A.    That, I can tell you off the top of my
19   head the most recent for any of those would have been
20   Midnight for dental issues.  I don't recall the date.
21          Q.    Okay.  Can you go to the page for that.
22          A.    If I could find it.
23          Q.    Okay.  How about page 11?
24          A.    That is the dental visit for Midnight
25   dated 9/24/2010.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 38

1      Q.    So was there any veterinary service

2   that Timberline provided to Midnight between

3   September 24, 2010, and February 20, 2012?

4      A.    Not that I recall.

5      Q.    Okay.  Now, the treatment that

6   Timberline provided for Chance, Echo, and River would

7   have been sometime before September 24th of 2012 --

8   2010, excuse me, September 24, 2010; is that right?

9      A.    Well, like I just said, other than the

10  castration, I don't recall.

11     Q.    Look at page 12.

12     A.    Okay.

13     Q.    And page 13.  Those pages show the

14  castrations that were done in October of 2010.

15     A.    Yes.

16     Q.    And those castrations include Chance

17  and River?

18     A.    Yes.

19     Q.    So between October of 2010 and going up

20  to the Jefferson facility in February -- on

21  February 20th of 2012, did Timberline provide any

22  veterinary services for Chance or River?

23     A.    It does not appear that we did.

24     Q.    Now, there's one other horse that's

25  listed on page 16 at the February 20, 2012, that is

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 39

1    not shown on either the Midnight eating problem or

2    these castrations, and that's Echo.  See on page 16

3    where it has Echo?

4           A.    Uh-huh.

5           Q.    Had you seen Echo or had Timberline

6    provided veterinary services for Echo before

7    February 20, 2012?  I think you said before that you

8    did, but I just want to follow up because we haven't

9    seen that in the records.

10          A.    Yes, you have.  We did a surgical

11   procedure on Echo for a mandibular fracture.

12          Q.    Okay.

13                MS. EDWARDS:  Page 9.

14                MR. SCHIMBERG:  9.

15          A.    Apparently page 9.

16          Q.    (BY MR. LEBSACK) I'm sorry.  Yes.

17   Page 9, August 2, 2010, is that the treatment for

18   Echo?

19          A.    One of them, yes.

20          Q.    So between that date August 2, 2010,

21   and the blood work that you did or the blood testing

22   samples -- excuse me, the blood samples that you took

23   on February 20, 2012, did Timberline provide any

24   veterinary services for Echo?

25          A.    Not that I recall.

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 40

1          Q.    Let's get back to page 16.   Does this
2     have some notes of your exam?
3          A.    Yes.
4          Q.    On that date -- so in addition to
5     taking some blood samples, you did do a physical
6     exam?
7          A.    I did.
8          Q.    And this has notes of that?
9          A.    It does.
10         Q.    Were those horses severely emaciated as
11    of that date?
12         A.    Body conditions scores indicated horses
13    that were extremely thin, some of them more than
14    others.
15         Q.    And let's just go through each horse
16    and read into the record what your body condition
17    score was for each of the horses on February 20,
18    2012.
19         A.    All right.   We can -- do you want the
20    entire exam findings or just the body condition
21    scores?
22         Q.    The findings that would relate to --
23         A.    Thank you.
24         Q.    -- the skinniness of the horses.   So if
25    there is something besides body score that relates to

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 41

1    that, tell me that, but if it's just the body score,

2    just give me that.

3           A.    Chance was body scored using the

4    Henneke body conditions scoring system not modified.

5    I scored him a one out of nine.  I also found that he

6    evidenced neurologic signs.

7           Q.    What are those signs?

8           A.    I have noted here he had decreased tail

9    tone and decreased peroneal reflex, prolonged placing

10   of his hind limbs, weakness in the hind end on tail

11   pull, and he was suffering from tachycardia and a

12   holodiastolic crescendo murmur.

13          Q.    Okay.  Is that all the findings on

14   Chance that would relate to his body condition?

15          A.    I think those are pertinent to his body

16   condition, yes.

17          Q.    What about Echo; what are the findings

18   there on body condition?

19          A.    I have noted here a heart rate of 60,

20   which is tachycardic for a horse at rest, also a four

21   out of six holodiastolic musical murmur localized

22   over the heart base, body condition two out of nine.

23          Q.    You mentioned some neurologic issues

24   with Chance.  Did you note any as to Echo?

25          A.    No.

Page 42

1          Q.   I see right there it says no neural

2     deficit noted for Echo.

3          A.   Yes.

4          Q.   Okay.  Fiona, what were the body

5     condition reports there?

6          A.   Her body condition score is noted to be

7     a two out of nine.

8          Q.   Any other findings about her

9     skinniness?

10         A.   She also evidenced a diastolic murmur.

11         Q.   Did she have any neural deficits?

12         A.   It is noted that she did not.

13         Q.   Okay.  What are the findings on River?

14         A.   River was scored between a one and a

15     two out of nine on the Henneke scale.

16         Q.   Any neural deficit?

17         A.   None noted.

18         Q.   Any other findings as to her

19     skinniness?

20         A.   The only other possible abnormality

21     observed was frequent urination.  Whether that

22     related or not is unclear.

23         Q.   Is River male or female?

24         A.   River is male.  He was castrated along

25     with Chance and Echo -- or not Echo, excuse me.  Echo

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 43

1    was not boarded.

2              Q.    Flip the page to Lena.   What were the

3    body score findings on Lena?

4              A.    Lena's body condition score I put as a

5    one to two out of nine.

6              Q.    Any other findings about her

7    skinniness?

8              A.    She also was tachycardic with a heart

9    rate of 72, a resting heart rate of 72.

10             Q.    And what's normal?

11             A.    It varies, but in general anywhere from

12   the mid to high 30s to the mid to high 40s in beats

13   per minute.

14             Q.    And then Lena also had no neurological

15   abnormalities?

16             A.    She is marked as neuro within normal

17   limit.

18             Q.    What were the findings about Midnight?

19             A.    Midnight scored as a three out of nine.

20             Q.    Any other findings about Midnight's

21   skinniness?

22             A.    No, nothing relevant.

23             Q.    And Midnight's neurological findings

24   were within normal limits?

25             A.    Within normal limit.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 44

1          Q.    So that score of three out of nine,
2    that is still below the acceptable number for a
3    horse; is that correct?
4          A.    It is thin.
5          Q.    And is one the lowest that you go?
6          A.    Yes.  The scale is from one to nine.
7          Q.    Okay.  Let's keep going, and I promise
8    we will try to move faster through these documents.
9                Is 18 the bill for that work that you
10   did on February 20th?
11         A.    Yes, it appears to be.
12         Q.    What about page 19, is that the same
13   thing.
14         A.    It appears to be.
15         Q.    So you billed Mr. Hatlee for the horses
16   that he owned, and you billed Ms. Swift and Ms. Cook
17   for the horses they owned?
18         A.    Yes.
19         Q.    Okay.  Pages 20 through 27, are those
20   lab results?
21         A.    Not exactly.
22         Q.    What are they?
23         A.    These are forms from IDEXX Laboratories
24   indicating transport of the blood samples after being
25   picked up at our office to the D-lab at Colorado

Page 74

1    records.  I can't imagine what it would be, but I

2    just want to be inclusive.

3            A.    No.   These are our records.

4            Q.    Okay.

5                  (Whereupon, Deposition Exhibit No. 3

6    was marked for identification by the reporter.)

7            Q.    (BY MR. LEBSACK) Look at Exhibit 3.   Is

8    that a CV for you?

9            A.    No.   It's a resumé.

10           Q.    I'm sorry.  And is this up to date?

11   And if it's not up to date, if you could just explain

12   what information needs to be added to make it up to

13   date.

14           A.    It is not up to date.

15           Q.    Okay.   Did you happen to bring with you

16   a current resumé?

17           A.    No.

18           Q.    What --

19           A.    This is relatively current.

20           Q.    So is there anything specific that

21   needs to be changed on this to make it up to date?

22           A.    At present, I am not president of

23   Timberline Equine Veterinary Services.   I am vice

24   president.

25           Q.    And is Dr. Burton the president?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 75

1        A.    Yes, she is.

2        Q.    Any other changes that you see on that

3    that we need to make in order to make it up to date?

4        A.    I have been reaccredited by USDA as of

5    the end of November of last year.

6        Q.    So that says August of 2012, so that

7    should now say November 2013?

8        A.    Yes.

9        Q.    Any other changes to make it up to

10   date?

11       A.    I don't believe so.

12       Q.    Is Timberline still exclusively a

13   mobile veterinary practice?

14       A.    Yes.

15       Q.    And the practice consists of you and

16   Dr. Horton?

17       A.    I'm Dr. Horton.

18       Q.    I'm sorry, Dr. Burton.

19       A.    Yes.

20       Q.    I misspoke.

21             Are you still a member of the American

22   Veterinary Association?

23       A.    I don't know.  I don't know if I have

24   paid my dues to be current at the moment or not.

25   They may be a bit tardy.

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 77

1    that day?

2            A.   I would have to peruse the record to

3    say with certainty whether I had seen any of those

4    horses belonging to any of those owners because those

5    are not the only owners.

6            Q.   All right.  Let me modify the question.

7    Any horses at Echo Valley Ranch owned by Mr. Hatlee

8    or Mr. Swift?

9            A.   I would still have to peruse the record

10   and see if I had seen them within the previous

11   12 months.

12           Q.   We just did that, didn't we, through

13   Exhibit 1?

14           A.   Uh-huh.

15           Q.   So --

16                MR. SCHIMBERG:  Is that a yes?

17           Q.   (BY MR. LEBSACK) Didn't we just peruse

18   the records in Exhibit 1 relating to those horses?

19                MS. EDWARDS:  Objection to the form.

20   The question is a little bit confusing.

21           Q.   (BY MR. LEBSACK) What I'm getting at is

22   I'm asking you about whether you had a

23   veterinarian-client-patient relationship.  If I use

24   the abbreviation VCPR, you know what that means?

25           A.   Yes.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 78

1          Q.    Did you have a VCPR with any of the

2     horses owned by Mr. Hatlee or Mr. Swift at Echo

3     Valley Ranch as of February 16, 2012?

4          A.    Yes.

5          Q.    Which ones?

6          A.    We had previously seen Chance, River,

7     Echo, Midnight, just to name a few.  There are

8     oftentimes when we see horses casually, so it can be

9     difficult to differentiate between a professional...

10         Q.    So is it your testimony that of the six

11    horses that were involved in the -- taking the blood

12    work that you did have a VCPR on those horses as of

13    February 2012?

14         A.    We had previously had that.

15    Technically that requires seeing the horse every

16    12 months.  That time period was longer than

17    12 months.

18         Q.    Okay.  So as of February 2012, you did

19    not have a VCPR with the horses -- I forget the

20    names, Echo, Midnight, River, Chance, Fiona, and

21    Lena?

22         A.    Not in the strictest technical sense of

23    the phrase.

24         Q.    Not in the sense of the veterinary

25    medical ethics of the American Veterinary Medical

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 79

1    Association, correct?

2           A.    Not to the letter.

3                 (Whereupon, Deposition Exhibit No. 4

4    was marked for identification by the reporter.)

5           Q.    (BY MR. LEBSACK) Exhibit 4.  Is that a

6    copy of the statement of ethics regarding VCPRs from

7    the American Veterinary Medical Association, to the

8    best of your knowledge?

9           A.    It is one, yes.

10          Q.    This is the one that pertains to the

11   VCPR, right?

12          A.    Apparently this is the one available on

13   AVMA.  It is not the only professional organization

14   in the world.

15          Q.    But that's the association you belong

16   to?

17          A.    I also belong to AAEP.

18          Q.    Okay.  But this appears to be the

19   ethics principles for the VCPR at least based on the

20   American Veterinary Medical Association, correct?

21          A.    Yes.

22          Q.    Okay.  In your veterinary education,

23   did you ever hear the phrase, "When you hear hoof

24   beats, you should look for horses and not zebras"?

25          A.    I have heard that in and outside of

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 85

1              MS. EDWARDS:  Objection, form.

2              MR. TONDRE:  Foundation.

3         Q.   (BY MR. LEBSACK) Go ahead.

4         A.   That these horses would have benefitted

5    from intensive attempts to correct their weight loss

6    sooner either through medical attention or extra feed

7    or at least investigation.

8         Q.   So you believe that regardless of what

9    was going on with these horses, the owners waited too

10   long before seeking assistance from a vet?

11             MR. TONDRE:  Objection, form and

12   foundation.

13             MS. EDWARDS:  Objection.

14             THE DEPONENT:  I never know if that

15   means I should answer or not.

16             MS. EDWARDS:  You can go ahead and

17   answer.

18        A.   Yes.  I believe that the horses had

19   deteriorated past a point where assistance should

20   have been sought.

21        Q.   (BY MR. LEBSACK) Don't you agree that

22   the horses showed signs that were at least consistent

23   with starvation or malnutrition?

24        A.   You are equating starvation and

25   malnutrition.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 86

1          Q.    Okay.  Let me separate them out.  What
2   is the difference, from your standpoint, between the
3   terms so I phrase my question right?
4          A.    At least in my understanding,
5   starvation has an implication that food is being
6   denied.  Malnutrition can be a medical condition.
7   You can provide all the food you want and the animal
8   still would not thrive.
9          Q.    Do you agree that those horses showed
10  signs that were consistent with starvation as you
11  just defined it?
12               MR. TONDRE:  Objection, foundation.
13         A.    As I indicated, I would not be able to
14  conclude definitively that it was the denial of food
15  versus a medical condition.
16         Q.    (BY MR. LEBSACK) That was not my
17  question.  My question was whether you saw signs that
18  were consistent with starvation?
19               MR. TONDRE:  Objection, foundation.
20         A.    I saw signs that the horses were too
21  thin.  I did not see signs that told me that I could
22  say it was because of A, B, or C.
23         Q.    (BY MR. LEBSACK) But weren't those
24  signs that the horses were too thin, isn't that
25  consistent with starvation?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 87

1           MR. TONDRE:  Objection, form,

2     foundation, argumentative, and asked and answered.

3           A.    Starved horses are too thin.  That is

4     all I can tell you.  These horses were too thin.

5     That is -- that is a sign of starvation.

6           Q.    (BY MR. LEBSACK) Have you ever

7     encountered any other horses that you diagnosed as

8     having a bracken fern problem?

9           A.    No.

10          Q.    Did you learn about bracken fern when

11    you were -- well, let me ask this:  Your background

12    and knowledge about bracken fern, where does that

13    come from?

14          A.    That comes from toxicology education as

15    part of professional school.  It was taught by a

16    Dr. Anthony Knight.

17          Q.    At CSU?

18          A.    The author of this book.

19          Q.    So you are holding up a book.  Can I

20    just read the edition into the record.  So this is "A

21    Guide to Plant Poisoning of Animals in North

22    America," by Anthony T. Knight and Dr. Richard G.

23    Walter.  And it's an edition -- copyright 2001.  So

24    you had this -- you've gained some information from

25    that book?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 101

1    nerves are not functioning.

2         Q.    (BY MR. LEBSACK) So if -- you can have

3    paralysis of one limb and not the others, right?

4         A.    Yes.

5         Q.    Right.  So you could have paralysis of

6    the hindquarters but not the front legs, right?

7         A.    Correct.

8         Q.    But when you use the term paralysis,

9    that means an inability to move that limb at all,

10   right?

11        A.    Yes.

12        Q.    So did you at any time on any of the

13   horses that you can talk about, did you ever observe

14   paralysis?

15        A.    I observed -- paralysis is one end of

16   the spectrum.  I observed a different portion of the

17   spectrum.

18        Q.    What spectrum did you observe?

19        A.    Paresis.

20        Q.    So you never actual observed any of

21   those horses that had a condition as extreme as

22   paralysis, but you did observe horses that had

23   paresis?

24        A.    Yes.

25        Q.    And paresis means what?

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 102

1          A.    Weakness.

2          Q.    And which horses and when did you

3    observe have signs of paresis?

4          A.    That would be Chance on 2/20.  I think

5    it was 2012.

6          Q.    Up at the Lebeau?

7          A.    Yes.

8          Q.    Okay.  You noted -- I think you noted

9    when we were talking about the records that -- let me

10   start from scratch.  Did any of those horses show

11   signs of anemia?

12         A.    Grossly, yes.

13         Q.    What do you mean grossly?

14               THE DEPONENT:  Can I have the original

15   records?

16               MR. TONDRE:  Signs of what?

17               MR. LEBSACK:  Anemia.

18               MR. TONDRE:  Anemia.

19         A.    See if I can find it.  Blood tests that

20   were ordered by Dr. Heckendorf did reveal that these

21   horses were suffering from significant anemia.

22   However, there was evidence at the time that

23   suggested that that was the case in a subjective way.

24               Here we go.  Blood -- there were blood

25   drops on the page of my original notes that contained

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

Page 103

1    so few blood cells that they are hard to recognize as

2    blood.

3           Q.    Okay.  So you are holding up -- what is

4    the date of that?

5           A.    2/20/12.

6           Q.    Let me just find the page in this

7    Exhibit 1 that relates to that.  Is it this page?

8           A.    Yes.

9           Q.    Okay.  So you are looking at your

10   original copy of Deposition Exhibit 1, page 16?

11          A.    Uh-huh.

12          Q.    And your original had a couple of blood

13   spots on it?

14          A.    Yes.

15          Q.    And did you take those samples at the

16   time or -- I mean, those drops on there, how did that

17   happen?

18          A.    That happened when I was transferring

19   the blood from the syringe to the red-top tube.

20          Q.    Is that part of the test to put it on

21   the paper like that?

22          A.    No.

23          Q.    It's just inadvertent?

24          A.    Just dripped there.

25          Q.    And you are drawing a conclusion from

Page 104

1    the blood spots on the paper?

2              A.    It's not a normal appearance for blood.

3              Q.    Did you notice that at the time?

4              A.    (Nodding.)

5              Q.    You are nodding your head?

6              A.    Yes.  Yes.  I did notice that it

7    seemed, for lack of a better term, anemic.

8              Q.    So your impression was -- from what you

9    saw of the animals on the 20th when you saw their

10   blood that you could tell from that that they were

11   anemic?

12             A.    I suspected.

13             Q.    Okay.  And then the lab test confirmed

14   it?

15             A.    Yes.

16             Q.    So let's go to the lab test.  I think

17   if you could -- Exhibit 1 there in front of you.  I

18   think they are starting with page 30.  Is this the

19   lab report from those blood samples that you took on

20   February 20th?

21             A.    That -- that's a chem.  That is not a

22   CBC.

23             Q.    Is the CBC in here someplace?

24             A.    Let me look.

25             Q.    How about page 36?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 106

1       A.    Hemoglobin is a component of red cells,
2  so if the red cells -- if there aren't enough red
3  cells, then the hemoglobin will be low.
4       Q.    So anemia was a problem with all of
5  these horses, correct?
6       A.    I believe that they -- I would have to
7  peruse the record, but I believe --
8       Q.    Let's just go through it.  Page 36,
9  that's Echo, and she had a problem with anemia,
10 right?
11      A.    Lena also is flagged as low.
12      Q.    Well, Echo first, page 36, she had
13 anemia, right?
14      A.    Yes.
15      Q.    And Lena on page 37, she had anemia?
16      A.    Yes.
17      Q.    Page 37, Midnight, she had anemia?
18      A.    Yes.
19      Q.    Page 39, River, he had anemia?
20      A.    Borderline, equivocal, yes or no.
21      Q.    But right on the borderline of having
22 anemia?
23      A.    Yes.
24      Q.    And page 40, Chance, he had anemia?
25      A.    Yes.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 107

1   Q.   And page 41, Fiona, she had anemia?

2   A.   Yes.

3   Q.   Can anemia be caused by starvation?

4        MR. TONDRE:  Objection, foundation.

5   A.   I would surmise that prolonged

6   malnutrition will result in anemia.

7   Q.   (BY MR. LEBSACK) Are you aware of any

8   horses that died at Echo Valley Ranch?

9   A.   Yes.

10  Q.   Tell me what you know about those

11  horses.

12  A.   There was a horse named Twister that

13  was found injured with a broken humerus, had to be

14  euthanized.  There were also too extremely geriatric

15  geldings that passed away, and another horse

16  belonging to an associate of Mr. Swift's that was

17  found down and was only conscious for a few more

18  moments.  I was called out.  He was already dead.  We

19  ascertained that he had slipped on ice and suffered a

20  skull fracture.

21  Q.   Did any of these happen in the year

22  before February of 2012?

23  A.   I don't recall the exact dates.

24  Q.   Are those the only horse deaths that

25  you can recall at Echo Valley?

Page 109

1          A.     I believe we discussed it and primarily
2    because there is a known association between a higher
3    risk of botulinum toxicity and the use of big bales,
4    and people were interested in the vaccine, so...
5          Q.     So would the vaccine do anything for
6    the horses that were already having problems?
7          A.     Unlikely.
8          Q.     It would be for the horses who were not
9    yet having problems?
10          A.     Correct.
11          Q.     Like you'd take a smallpox vaccination
12    in order not to get it rather than to treat you if
13    you have smallpox, right?
14          A.     Correct.
15          Q.     Same type of thing.  So the vaccination
16    is not any part of a treatment for some horse who's
17    already having problems with botulism?
18          A.     Vaccines by and large are preventative.
19          Q.     Okay.  Have you ever ruled out
20    starvation as a potential cause for the skinny
21    condition of these horses?
22          A.     I have never ruled it out as a
23    contributor.
24          Q.     I was asking questions about those lab
25    tests, and I want to go back to those for a second.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 112

1        A.    That is correct.

2              MR. LEBSACK:  You know, I'm going to go

3    ahead and mark my own copy of this page from the Park

4    County records.  I know that I asked her to look at

5    it, and I don't want to have an incomplete record

6    here.  So let me go back and mark that one.

7              (Whereupon, Deposition Exhibit No. 5

8    was marked for identification by the reporter.)

9              MR. TONDRE:  Is that Exhibit 5?

10             MR. LEBSACK:  It is.

11             MR. TONDRE:  Does it have a trial

12   number?

13             MR. LEBSACK:  (Handing.)

14             MR. TONDRE:  68.

15       Q.    (BY MR. LEBSACK) So is Exhibit 5 that

16   page from the Cindy Hardey records that you looked at

17   before in regard to that phone call?

18       A.    Yes, it is.

19       Q.    Okay.  That's my only copy, so I'll put

20   that one into the record.

21             Do you agree that the bottom line truth

22   is that these horses were let go far too long?

23             MR. TONDRE:  Objection, foundation.

24       A.    I believe these horses would have

25   benefitted from veterinary intervention much sooner.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 113

1          Q.    (BY MR. LEBSACK) Do you remember ever
2     telling anybody that the bottom line truth is that
3     these horses were let go far too long?
4                MR. TONDRE:   Objection, foundation.
5          A.    I believe I said that to Officer
6     Hardey.
7          Q.    (BY MR. LEBSACK) And that was your
8     opinion at the time?
9          A.    It was.
10         Q.    And it's still your opinion today?
11         A.    It is.
12         Q.    Were you aware of any plans to take any
13    horses from Echo Valley Ranch to CSU for treatment,
14    live animals, not necropsies or anything like that?
15         A.    Not technically from Echo Valley Ranch,
16    from the Van Pullen residence.
17         Q.    What do you know about that?
18         A.    We -- upon discovery of the diastolic
19    heart murmurs, we had spoken to the cardiology
20    service at CSU and had made tentative arrangements to
21    send at least one animal up for thorough examination,
22    including an echocardiogram.
23         Q.    Which animal was that; do you know?
24         A.    Chance.
25         Q.    Because he was in the worst shape?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 149

1          A.    You mean about this or just in general?

2          Q.    No.   Maybe afterward we can talk in

3     general.

4               Does your practice -- do you have any

5     staff or is it only you and Dr. Burton?

6          A.    It is only Dr. Burton and myself.

7          Q.    Okay.   I want to go back and talk about

8     the exam that you did of the six horses at issue on

9     February 20th.

10         A.    Okay.

11         Q.    And that was out at Lebeau's ranch?

12         A.    I know it as the Van Pullen residence,

13    but it appears that it is the same location.

14         Q.    I think it is the same.   And you did an

15    exam of all six of the horses that day?

16         A.    Yes.

17         Q.    And you scored them with some type of

18    score system?

19         A.    Henneke score, yes.

20         Q.    Will you just explain what is the

21    Henneke scoring system, and what it is you do to

22    reach the score?

23         A.    The Henneke scoring system is an

24    attempt to quantify a subjective assessment of a

25    horse's body mass condition, in other words, its

Page 150

1    state of nourishment by evaluating the amount of

2    flesh over certain points of the frame, the crest of

3    the neck, the ribs, at the tail head, the rump.  It

4    is a numerical score from one to nine; one being

5    extremely thin, five being ideal, and nine being

6    extremely obese.  Each numeric score in the scoring

7    system according to research done by Purina

8    represents about 45 pounds of bodyweight in the

9    average sized riding horse, which is approximately

10   1,000 pounds, 1,100 pounds normal body weight.

11              Ideal is five out of nine.  Acceptable

12   is a broader range, generally four to seven.

13              Q.   And how do you reach the number?  What

14   do you do?

15              A.   That is a bit variable.  When horses

16   are in summer coat, the degree of flesh overlying the

17   skeletal structure is readily apparent.  When horses

18   are in winter coat, the winter coat can be deceiving.

19   It can hide a degree of, for lack of a better term,

20   emaciation.  So you would visually inspect the horse

21   and note whether flesh over these key points is

22   present at all, present in moderation, present in

23   excess.  And if the horse has a thick hair coat, it's

24   recommended to actually put your hands on the horse

25   and feel for flesh over the bony prominences.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 151

1          Q.    With these horses, do you think that
2    the winter coat as you have described had any effect
3    on being able to score them?
4          A.    I feel confident that my score was
5    accurate despite the fact that they had winter coats.
6          Q.    Okay.  And do you recall what you
7    scored each of those horses -- you know, I think
8    that's actually page 16.  It may be --
9          A.    I can look.
10          MR. SCHIMBERG:  Page 16, I think.
11          A.    This would be more than sufficient.
12          Q.    (BY MS. BRONSON) It's Exhibit 1 on page
13    16.
14          A.    And I'm assuming you want me to go
15    ahead and list them.
16          Q.    Yeah.  That would be -- yes.
17          A.    Chance was scored at one out of nine.
18    Echo was scored at two out of nine.  Fiona at two out
19    of nine.  River, one to two out of nine.  Lena, one
20    to two out of nine.  And Midnight, three out of nine.
21          Q.    And this, I'm assuming, is not the
22    first time you had scored horses?
23          A.    No.
24          Q.    And do you always follow the Henneke
25    score --

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 160

1          Q.     (BY MS. BRONSON) It was not -- it
2    didn't necessarily have anything to do with the
3    treatment of the horses except to check for botulism?
4          A.    It was my understanding that he was
5    acting in his official capacity to -- for the state
6    veterinarian's office to go through all the motions
7    that it should.
8          Q.    Okay.  And you received the results
9    after the horses were already seized?
10         A.    We did.
11         Q.    Okay.
12         A.    The university seemed to be confused
13   about whose results they were.
14         Q.    Okay.
15         A.    They actually belonged to the state
16   veterinarian's office.  They sent them to us.  They
17   billed us for them.
18         Q.    Did you have to pay them or did you
19   send it on?
20         A.    No.
21         Q.    And you discussed earlier that on
22   February 22, 2012, you had a phone conversation with
23   Cindy Hardey, a second conversation.
24         A.    Thereabouts.
25         Q.    And you recall speaking with her that

me

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 162

1          Q.    Okay.  And this was quoted earlier, but
2     I'll put it in again for the record, that you said to
3     Cindy Hardey, "My professional opinion is that
4     regardless of what's causing those horses to be thin,
5     someone should have noticed and sought assistance for
6     them."
7          A.    Yes.
8          Q.    And that is still your opinion?
9          A.    Yes, it is.
10         Q.    Someone should have noticed their
11    condition and called you up far before they did?
12         A.    Us, someone else.  The horses were
13    needing attention.
14         Q.    Okay.  And it's true that Cindy
15    Hardey's not a vet.  She doesn't have a doctorate in
16    veterinarian medicine.
17         A.    That is true.
18         Q.    And you knew that in --
19         A.    Yes.
20         Q.    But you knew that it was part of her
21    job to contact you for your professional opinion?
22         A.    Yes.
23         Q.    As the vet who had recently examined
24    these animals, these six horses.
25         A.    Okay.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 192

1              THE DEPONENT:   No.   I quack.

2              (Whereupon, a brief discussion was had

3    off the record.)

4              Q.   (BY MR. TONDRE) You may have answered

5    this and I just have forgotten the answer.   How long

6    have you provided veterinary services to Mr. Hatlee

7    and Mr. Swift?

8              A.   I don't recall the date of the first

9    time that we treated any horses out there, but I

10   believe it was sometime in 2009.

11             Q.   So you had two or three years'

12   experience with them prior to the incident that

13   brings us here today, correct?

14             A.   Correct.

15             Q.   Now, in your practice, can you give me

16   an estimate as to what percentage of your clients

17   have operations similar to Mr. Hatlee and Mr. Swift?

18             MS. BRONSON:   Object to form,

19   foundation.

20             A.   Less than 1 percent.

21             Q.   (BY MR. TONDRE) How would you

22   characterize the other 99 percent?

23             A.   They typically are folks who have a

24   fairly limited number of horses, maybe one, two,

25   three horses, for a couple, for a family.   They

Page 194

1    have contact with the Routt County people?  Was that

2    2010 or 2011?

3              A.    I would have to look.

4              Q.    Please do.

5              A.    Let's see if that is in these exhibits

6    or the other.  The first dated invoice that I have

7    for those two horses is dated 3/1/11.

8              Q.    Now, prior to first providing services

9    to those two Routt County horses, what discussions

10   were you involved in regarding the request for

11   services.  What were you requested to do?

12             A.    By Routt County?

13             Q.    Yes, ma'am.

14             A.    Routt County's stipulation for the case

15   was that Bear be castrated.  A veterinarian in

16   Steamboat Springs had declined to do the surgery.

17   Then they wanted routine wellness checks to monitor

18   that the horses were in good condition.  As I recall,

19   they wanted them checked about every 90 days.

20             Q.    Did you ever provide a 90-day report?

21             A.    We did do the exams and did provide

22   that information to Routt County.

23             Q.    How many times did you provide a 90-day

24   report?

25             A.    I don't recall.

Page 248

1          A    No.

2          Q    Okay.  Have you had any meetings or

3  discussions with anybody about Maggie or any of the

4  other horses involved in this case?

5          A    No.  I have not.

6          Q    Okay.  Let me just try to get to the

7  issues.

8              In front of you is a package of documents

9  that we have marked as Deposition Exhibit No. 17.  Is

10  that a complete copy of all the records of Timberline

11  Equine regarding Maggie?  And just for your background,

12  this is a complete copy of everything that your

13  attorney sent to me.

14          A    To the best of my knowledge, it is as

15  complete as -- as we can achieve.

16          Q    Okay.  In the lower right-hand corner, I

17  put a number and a circle around it to indicate the

18  page number of that exhibit.  That's only on the

19  original; so if counsel want to add that, you can

20  follow that along.  I didn't have a chance to copy that

21  with the numbers on it.

22              So I wanted to ask you first about

23  something that was in a previous exhibit that we looked

24  at.  I'm going to show you Exhibit 6 that we looked at

25  at your first deposition.  Do you remember this

Page 249

1 exhibit?

2          A    Yes.

3          Q    And this exhibit is an email that you

4 wrote; is that right?

5          A    Yes.

6          Q    And in the first few paragraphs, it talks

7 about events of February 11, 2012, involving Maggie.

8 Do you see that?

9          A    Uh-huh.  Yes.

10         Q    And I don't see any notes in

11 Exhibit 17 --

12         A    No.

13         Q    -- from February 11th, is that --

14         A    Those have been lost or misplaced.  This

15 email constitutes our medical record for that visit.

16         Q    Okay.  So there's nothing else about your

17 visit on February 11th except for this Exhibit 6?

18         A    No.  The invoice somehow did not survive,

19 but the information that's contained is in this email.

20         Q    All right.  Let's go back to Exhibit 17.

21 Is page 1 of that exhibit, is that the only

22 contemporaneous notes of your visit to see Maggie on

23 February 13th?

24         A    Yes.

25         Q    What are the other pages behind this,

Page 274

1        Q    I know you've talked about phone calls

2 before; but just to kind of see if it jogs your memory,

3 do you recall any phone calls after the 13th until you

4 learned that she had died?

5        A    Numerous, numerous phone calls.  Too

6 numerous to distinguish.

7        Q    Regarding Maggie?

8        A    Regarding Maggie, and in both directions.

9 We called them and they called us.

10        Q    Can you kind of give me the gist of what

11 the phone calls were?

12        A    Just how she's doing or, you know, she's

13 basically -- people report she's eating really well

14 this meal or she's eating better than she did last

15 time, last time we fed her, or she's starting to move,

16 she's starting to look like she wants to stand up.

17             We discussed at length actually the

18 appropriateness of a sling for her situation.  And

19 although Helen and Mr. Swift and the group of people

20 who were involved in her care were very eager to get a

21 sling for her, we advised against it at that point.

22        Q    So throughout the whole time of these

23 phone calls, she was still laying down and could not

24 stand up?

25        A    Correct.

Page 275

1          Q    Why did you not recommend a sling?

2          A    Because a sling is appropriate for a

3 horse that can support at least part of their own

4 weight.  Slings are problematic, and a horse that

5 cannot stand at least partially on their own is better

6 off being managed down.

7          Q    What's your recollection of whether

8 Maggie's overall condition changed after the 13th?

9          A    She continued to improve; and after a few

10 days with the assistance of a sling, she was able to

11 stand and support her own weight.

12         Q    But then she died, right?

13         A    She died very suddenly.

14         Q    So she was -- as far as you recall, she

15 was getting better, getting better, getting better, and

16 then died suddenly?

17         A    Yes.

18         Q    Did you become aware that her condition

19 had taken a turn for the worst before she died?

20         A    She did not take a turn for the worst

21 before she died.  She was standing on her feet and

22 eating when she died.  She had what we describe as --

23 or would appear to be a sudden cardiac death.

24         Q    And where's -- what's the course of this

25 information you were just saying that she was standing

Page 276

1 and eating and --

2            A    I was called on that Friday night and

3 this information was related to me, and I went out to

4 the ranch and looked at her.  And she was in the sling

5 right in front of where her food had been placed at an

6 appropriate height for her and she was dead as a door

7 nail.

8            Q    Hm.  So let me just recap.  You had

9 numerous phone calls with Mr. Swift and Mr. Hatlee

10 between the 13th and that --

11           A    I don't believe we ever spoke with Randy

12 on the phone about Maggie.

13           Q    So it was just Mr. Swift?

14           A    Sometimes Helen.

15           Q    Okay.  So Mr. Swift and Ms. Cook?

16           A    Yes.

17           Q    Numerous phone calls between the 13th and

18 the following Friday?

19           A    Correct.

20           Q    Friday's the date of death.

21           A    Correct.

22           Q    As far as you understood, Maggie is

23 getting better throughout that whole course; and then

24 suddenly on Friday, you got a call that she was dead?

25           A    Correct.

Page 277

1          Q    Was the postdeath visit the first time

2  you had been at Echo Valley Ranch since the 13th?

3          A    Yes.

4          Q    Did you know that she was up in a sling

5  before you went out there?

6          A    Yes.

7          Q    You'd been consulted about that?

8          A    Yes.

9          Q    So who gave you the information that

10 that -- about the circumstances of her death?

11         A    Mr. Swift.

12         Q    And what exactly did he tell you?

13         A    He told me that he was on -- he was on

14 watch, he was with her, keeping an eye on her.  She was

15 being watched, pretty much continually, around the

16 clock she had someone attending her.  He had gone to

17 get a cup of coffee, came back; she was dead.

18         Q    I've got this mental picture of what a

19 sling is but I have no idea whether it's right.  So

20 could you please describe what a horse sling is like?

21         A    There are several different brands.  If

22 I'm not mistaken, she was in an Anderson sling which

23 consists of a large metal tripod that is assembled to

24 provide a hoist point above the horse.  And a -- the

25 actual sling is a very heavy -- heavy-duty material