1  leadership, law enforcement as a PIO, management,
2  strategic planning, leadership.  Pretty much the whole
3  gamut.
4        Q    What -- what was involved in -- did you
5  have to -- did you have to attend any sort of course of
6  study in order to obtain your post certification?
7        A    Yes.
8        Q    What -- what did you attend?
9        A    The law enforcement training academy in
10 Golden.
11       Q    When did you do that?
12       A    1992.
13       Q    And that was what, nine months, six
14 months?
15       A    Something along those lines.
16       Q    And when did you become undersheriff?
17       A    Towards the end of 2005.
18       Q    Until you became post certified, you were
19 involved with jail facilities?
20       A    Correct.  And I also went to a detention
21 officer academy, I think in 1991 or 1981.
22       Q    What involvement did you have in the
23 decision to file animal cruelty charges against
24 Mr. Hatlee and Mr. Swift?
25       A    I don't think I had any involvement of --

EXHIBIT B

1    in the filing of the charges.
2           Q    What, if any, involvement did you have in
3    the drafting of the affidavit that Cindy Hardey did in
4    order to obtain a -- a seizure and search warrant?
5           A    None.
6           Q    As you know, there was some testimony
7    this morning about a telephone call you made to Bobbi
8    Priestly on February the 19th.  We're going to hand you
9    an exhibit that has been marked Exhibit 66, you can
10   look at this if it makes any difference to you or not.
11          But on page 89 of that exhibit, it says:
12   "On February 19, 2012 I received a telephone call from
13   Under sheriff Gore at my residence.  The Under sheriff
14   advised me that he had received several -- several
15   telephone calls from the Public Information Officer for
16   the State of Colorado's Department of Agriculture
17   Office."
18          It's the -- the fourth paragraph on that
19   page.
20          MR. SCHIMBERG:  Yeah, just so you know,
21   Brice, because you were reading, we were getting our
22   way to 89.
23          A    Yeah, if you can start over again.
24          MR. TONDRE:  Sure.
25          MR. SCHIMBERG:  Or just focus us.

1      Q   So who made the decision that it was safe
2   to move that horse?
3      A   That decision was made by Sergeant
4   Priestly, and I supported that decision.
5      Q   And what was your basis that supported
6   that -- for supporting that decision?
7      A   I have faith in Sergeant Priestly based
8   on my experience with her.  She knows what she's doing,
9   she's competent, and I trust her.
10     Q   Who's in charge in the sheriff's
11  department of handling disciplinary matters with
12  respect to employees of the sheriff's department?
13     A   Well, that would depend on the employee
14  of the sheriff's office.
15     Q   I'm speaking specifically with respect to
16  Cindy Hardey, who would be responsible for disciplining
17  for misconduct?
18         MR. SCHIMBERG:  Let me object to form.
19  Go ahead and answer.
20     A   That would be her immediate supervisor in
21  this case.
22     Q   (BY MR. TONDRE) That would be Bobbi
23  Priestly?
24     A   Sergeant Priestly, that's correct.
25     Q   And she's the person designated by the