# EXHIBIT  21

## WRITTEN DECLARATION

Date:  April 28, 2012
Name:  Barbara Wright
Address:  13639 Elsie Road
          Conifer, CO 80433
          (303) 816-0766

I, Barbara Wright, hereby make the following statement of my own free will.  No threats or promises have been made to me to induce me to make this statement and if called upon as a witness in any criminal or civil proceeding, I will testify honestly and competently to the matters stated herein.

On February 18, 2012 I wrote the attached email to Drs. Horton and Burton at Timberline vets, regarding the Bailey horses in the Ron Swift case, and Dr. Burton called me that day in response to it.

I asked her if she and Dr. Horton would be willing to come out to the Aspen Creek Veterinary Hospital in Conifer where Little Big Man, the impounded Routt County colt, was being treated by Dr. Ashleigh Olds and her staff. This way, they could see for themselves that no neurological conditions existed in him and he was responding to a sound refeeding program and that he was starved. I said the same invitation had been extended to her by Brian Diedrich, manager of the clinic in another telephone conversation with Dr. Horton, and I was extending it again.  They would be able to see first-hand his improvement and confirm that it was starvation and not a neurological condition.  She declined saying they could not do that.

I then asked her to consider going to their client, Swift, and ask him to surrender the horses to us or allow us to purchase them outright with no questions asked, avoiding legal proceedings.  I said we had money and trailers available. Again, she said, "We cannot do that." I said it was really worth a try but she again said no.

My next question was why they had not reported the condition of the horses to the appropriate human and animal health agencies since the horses were obviously seriously compromised, especially since they believed it was a neurological or wasting disease condition.  I mentioned that Dr. Horton had told Brian Diedrich that back in August 2011, he had been told by them to water and feed his horses.  She said that they did not interfere with their client and asked him to self-correct and self-police caretaking of his animals.  It was not their policy to interfere.

I then asked her why they thought the seriously deteriorated, in some cases near-death, condition of the horses was due to neurological conditions since Little Big Man did not manifest any.  She stated they had ruled out botulism at that point but were considering tick worm paralysis or some kind of wasting disease transmitted by other animal life in the environment. She said they had seen this wasting disease in the area. She said they were consulting with other vets and had come to the conclusion that the disease was neurological.  I asked her if tests had been done on the horses but she did not say.

333

# EXHIBIT  22

Condensed Transcript

### In the Matter Of:

## HATLEE vs. HARDEY

13-cv-02469-RM-MJW

## FAY E. BURTON, D.V.M.

*April 16, 2014*



800.211.DEPO (3376)
*EsquireSolutions.com*

FAY E. BURTON, D.V.M.
HATLEE vs. HARDEY

April 16, 2014
129–132

Page 129

1  to be telling you by its mannerisms?
2      A.  It's -- I guess you could say it's the
3  evaluation of the horse that you can't put a number
4  on such as a temperature.
5      Q.  Then you get to the objective approach.
6  What is that?
7      A.  That would be your data, like the pulse
8  rate, the temperature, the respiration rate.
9      Q.  And then the next thing you do is make
10  an assessment, and that's -- that includes the
11  differential diagnosis, correct?
12      A.  Often, yes.
13      Q.  Now I want you to look in the exhibit
14  book at Exhibit 6.  This is an email from Dr. Horton
15  to Cindy Hardey.  Does that reflect the standard
16  practice of you and Dr. Horton in the analysis of the
17  problems that's presented?
18      MR. SCHIMBERG:  I'm not sure I
19  understand what you are getting at.
20      Q.  (BY MR. TONDRE)  Well, what I'm getting
21  at is does that in black and white show how you
22  approach a problem from a reasonable veterinary
23  standard?
24      MR. LEBSACK:  Object to the form.
25      MS. BRONSON:  Join.

Page 130

1      A.  It looks to be that.
2      Q.  (BY MR. TONDRE)  And in this note,
3  you're specifically -- or Dr. Horton is specifically
4  evaluating Maggie; is that correct?
5      A.  Yes.
6      Q.  Now, Dr. Olds, without evaluating
7  Maggie, without getting any sort of subjective
8  history, jumped to the conclusion that she should be
9  killed.  Is there a reasonable veterinary basis to do
10  that without conducting any sort of examination?
11      MR. LEBSACK:  Object to the form.
12      MS. BRONSON:  Object to the form of the
13  question.
14      A.  Well, it's practice before making
15  recommendations to do anything, generally collect a
16  history, and then at that point typically a
17  discussion with the owner is held.  You might give
18  them some options, discuss any questions they might
19  have about the findings, and then the owner usually
20  tells you what they want to do based on that.
21      MR. LEBSACK:  I need to move to strike
22  the question as contrary to rule 30, and it should
23  not be part of the record.
24      MR. TONDRE:  That's a new one.

Page 131

1  took place on February 16th -- or no.
2      When did the analysis of Maggie take
3  place that's reported in this note?  Is it
4  February 11, 2012?
5      A.  It looks like February 11th is the
6  first part.  Then I think this next visit is probably
7  the 13th of February.
8      Q.  Now, is there any mention anywhere in
9  this Exhibit 6 of the prospect of euthanizing Maggie?
10      A.  I don't believe we considered that on
11  this visit.
12      Q.  What's the difference between
13  malnourishment and starvation?
14      A.  Starvation would really be an end
15  point.  Malnourishment is simply less than an ideal
16  amount of nutrients.
17      Q.  When you say "starvation is an end
18  point," what do you mean by that?
19      A.  Well, I think it could be used to refer
20  to that the horse died from starvation.  It could
21  also mean that the horse is actually not eating
22  anything at all.
23      Q.  Well, do you believe it was reasonable
24  to say that the horses at Echo Valley Ranch were
25  starved?

Page 132

1      A.  Well, I'm not there on a day-to-day
2  basis, so I can't tell you what was fed and when, but
3  I did not have suspicion that they were not being
4  fed.
5      Q.  What was it that caused you and
6  Dr. Horton to contact Dr. Knight?
7      A.  The clinical signs that we had noted,
8  and I -- not necessarily just for Maggie, but in
9  general, did not seem -- well, let me back up.
10      I'd been involved in many, many animal
11  control cases over the years.  And I had not seen
12  this constellation of signs or heard them described
13  by another veterinarian, and so because this was not
14  just a simple case; that these signs were not really
15  explained by just malnourishment, I wanted to look
16  for potential either contributing or other causes.
17      Q.  What is the constellation that you saw
18  and you considered unique?
19      A.  Well --
20      MR. LEBSACK:  Objection to the form.
21      A.  -- for example, the report that Bear
22  was not able to stand without assistance, the
23  evaluated heart rates, the heart murmurs that were
24  diastolic.  There had been a report that the horses

FAY E. BURTON, D.V.M.
HATLEE vs. HARDEY

April 16, 2014
133–136

Page 133

1  Curt, and that there were deficits in conscious
2  proprioception. I believe that was Chance. He had
3  hind limb weakness. He had a cranial nerve
4  abnormality. Those things just -- I had never
5  observed them in another group of horses that were
6  malnourished, and they seemed quite odd to me.
7      Q.  It was a complex problem that needed
8  in-depth analysis to come to a conclusion; is that a
9  correct statement?
10      MS. BRONSON:  Object to form.
11      MR. LEBSACK:  Objection to form.
12      A.  I think that's a fair statement.
13      Q.  (BY MR. TONDRE) Now, you had occasion
14  to review some statements -- written statements by
15  Dr. Olds; is that correct?
16      A.  Yes.
17      Q.  And in those written statements, there
18  were comments about the condition of Maggie; is that
19  correct?
20      A.  Yes.
21      Q.  Now, you had an opportunity to observe
22  Maggie just a few days before the only time Dr. Olds
23  saw Maggie, which was February 16, 2012. How did
24  what she reported in her written reports compare to
25  what you saw in your examination of Maggie? Were

Page 134

1  there any contradictions?
2      A.  She gave her body condition score of
3  one. She was scored by myself, Dr. Horton, and the
4  folks up at CSU as a two. She commented on the sores
5  being very severe, the sores from being down, the
6  sores on her skin. And as I recall in the necropsy
7  report, they felt they were -- I think they called
8  them erosions, or the language was that they were
9  fairly superficial.
10      Q.  What was the cause of death of Maggie
11  as reported in the necropsy?
12      A.  She had an aneurysm in the aorta.
13  It -- I believe it had some bacteria within it, but
14  my understanding is that the primary cause of death
15  was an aneurysm.
16      Q.  Is there any relationship between
17  malnutrition and aneurysm of the heart?
18      A.  No, not that I'm aware of.
19      Q.  You said that bracken fern was a good
20  fit for the condition that was observed in the horses
21  at Echo Valley. What was it about the bracken fern
22  symptoms that were similar to what you saw at Echo
23  Valley?
24      MR. LEBSACK:  Objection to form.
25      A.  Well, weight loss is mentioned by

Page 135

1  Dr. Knight. He mentions also a decreased appetite.
2  Neurologic symptoms are possible because thiamin is
3  required for energy metabolism. Tachycardia and
4  anemia I believe are also mentioned.
5      Q.  (BY MR. TONDRE) Is there a treatment
6  for it?
7      A.  Parenteral vitamin B injections,
8  meaning not oral, either intramuscular or intravenous
9  and changing the feed source to one that is certain
10  not to contain bracken fern.
11      Q.  Is vitamin B an appetite enhancer?
12      A.  I think that's what a lot of
13  veterinarians would tell you. Whether it's for sure
14  or not, I'm not certain. I know a lot of
15  veterinarians use it that way.
16      Q.  Was there any indication that vitamin B
17  was being used at -- by Littleton Equine while the
18  horses were at that facility?
19      A.  As I recall, Chance got some vitamin B
20  in a parenteral fashion. I don't know how much.
21      Q.  Was there also some evidence that the
22  horses at -- when they were in the care of Littleton
23  Equine were being given antibiotics?
24      A.  As I recall, at least one of them had
25  gotten some antibiotics.

Page 136

1      Q.  Do you have any understanding as to
2  what that was for?
3      A.  I believe Chance had an elevation in
4  his white cell count.
5      Q.  Now, there's been a suggestion through
6  an oblique question that bracken fern doesn't grow in
7  Colorado. And what I want to ask you is does all hay
8  come from Colorado?
9      A.  Well, no, of course not.
10      Q.  Is there a potential for bracken fern
11  to be included in bales of hay?
12      A.  Yes. It is known to be sometimes dried
13  and baled with hay.
14      Q.  And is it toxic after it's dried?
15      A.  Yes.
16      Q.  You said you've been involved in animal
17  cases. Approximately how many?
18      A.  It would be hard to put a number on it.
19      Q.  Were those in Colorado or in Oregon or
20  where?
21      A.  California and Colorado. I don't
22  recall any from Oregon.
23      Q.  What -- what was the nature of your
24  involvement in the California cases?
25      A.  The animal control agency would call me



ⓘ You replied on 2/16/2012 4:24 PM.

**Cindy Hardey**

| | | | |
|---|---|---|---|
| **From:** | F BURTON [horseydoc@msn.com] | **Sent:** | Thu 2/16/2012 3:04 PM |
| **To:** | Cindy Hardey | | |
| **Cc:** | | | |
| **Subject:** | 4 yr old Blk Drum mare Echo Valley Ranch | | |
| **Attachments:** | | | |

Dear Officer Hardey,

Ron Swift is a regular client of Timberline Equine Veterinary Services. We were first summoned to examine Maggie, a 3 to 4 year old black Shire cross mare, for this condition on Saturday afternoon, 2/11/12. Dr. Burton was unavailable for this call, so I responded solo. Approaching the ranch, I saw Maggie down in the pasture amidst a group of people and vehicles. Maggie was attempting to rise but was unable to succeed. On exam, I found Maggie alternating between right lateral and sternal recumbency. Heart rate was noted to be within normal limits, but irregular in rhythm, suggesting a marked sinus arrythmia and potentially second degree AV block. Respiratory rate was initially elevated at approximately 40, but later slowed significantly to 12 to 18. Mucous membranes were pale pink and moist and CRT was less than 2 seconds. Temperature was 98.0. Her mentation alternated between BAR (bright, alert, responsive) and somnolent. When not exhibiting sommnolence, she demonstrated a vigorous appetite and normal cranial nerve function, including tongue retraction. Maggie demonstrated some motor function of her forelimbs, but with a flaccid character that was clearly abnormal. Hypotonia was noted in all four limbs. Tail tone, anal tone and perineal reflex were all noted to be present, but decreased. Muscle tremors were noted in the right brachium and left thigh. Body condition score was noted to be 2/9. No signs of external trauma were noted. The owner and several others were attempting to lift Maggie with the aid of a small tractor, which I stopped immediately, owing to the risk of an improper lift resulting in injury to the patient. During my observations, Maggie ceased attempting to rise and came to prefer right lateral recumbency.

At this point, my presumptive diagnosis was botulinum toxicity, predicated primarily on the flaccid paresis/paralysis and the relatively normal mentation. Underlying my assessment of my exam findings and observations was knowledge of two other strikingly similar cases in the near vicinity in recent weeks and the fact that two of these animals were fed hay from big round and/or square bales, which are known to present an increased risk of botulinum contamination. Horses are exquisitely sensitive to botulinum toxin making it all but impossible to definitively confirm due to low levels of the toxin in blood and GI contents. The only treatment for botulism is nursing care, time and hope. Antitoxin is available, but without a definitive diagnosis, the risks may exceed any potential benefits. On my advice and with my assistance, Maggie was moved onto a sled and into the barn on a sled. Owner was advised to place Maggie on deep bedding and to turn her every 2 hours. He was advised to provide alfalfa hay and water ad libitum. Owner asked repeatedly about lifting Maggie in a sling, which I discouraged owing to not only the logistical difficulty of properly and safely operating a sling, but also serious complications associated with pressure points created by the sling. Maggie's size exacerbates these complications. Furthermore, slings are only appropriate when an animal is able to support some of their own weight, and this was not the situation with Maggie. I advised that it would be best to attempt to manage her "down".

Other differential diagnosis included, in no particular order; 1. mosquito bourne encephalitides (WEE, EEE, WNV) 2. tick paralysis 3 . EHV 4. Rabies 5. trauma 6. malnutrition 7. myopathies 8. Wobbler syndrome 9. hypocalcemia 10. Toxic plant ingestion. None were an obvious or convincing match to the clinical picture Maggie presented.

Owner called frequently with updates on Maggie's condition, indicating improvement in alertness and the ability to urinate and defecate. He reported that she was resting in sternal recumbency at least half of the time.

The above summarizes events of Saturday, February 11, 2012.

A. R. Horton, DVM, MS

Subsequent to this, attempts were made to gather further information from colleagues at the State Veterinarian's office, Colorado State University and Littleton Equine Medical Center as well as references.

Consideration was given to testing, but due to a combination of the costly nature of testing and the lack of sensitive and specific tests available for many of the conditions on the list of differentials, none has been performed as yet.

Mr. Swift called on Monday, describing Maggie moving her limbs while laying on her side. On further questioning, she was alert and seemed oriented to Mr. Swift after these episodes, but there was some concern that he could have observed seizure activity. Because of this concern, both of us went to the ranch to re-examine Maggie.

Maggie was on deep wood shavings with bales of hay placed around her and a heat lamp overhead. She had a temperature of 100.8 , a pulse of 48 with pronounced sinus arrhthmia and a respiratory rate of approximately 20. Gut sounds were normally present. Mucous membranes were pink and moist with a normal CRT. She could still retract her tongue. Her attitude was quiet and she was somewhat somnolent, but she has been eating and drinking. Her anal tone was decreased to absent. She had passed a normal



PARK CTY DEFS_000931

quantity of soft manure. The soft character of the stool was attributed to the change in her diet to alfalfa hay. A single spot of normal-colored urine was present in the bedding, and she was not dribbling urine. We did observe the limb motion described by the owner and concluded that it was not pathologic, but simply an attempt to get comfortable, and probably indicated a need to be turned. We also discussed the inevitability of bedsores and made some suggestions to mitigate that eventuality.

Consultations with colleagues did not yield any new avenues to pursue, as the general assessment was that the signs did not fit particularly well with any one diagnosis. Tick paralysis, however, was not mentioned by any of our colleagues.
Interestingly, consultation of a toxicology reference did confirm that tick paralysis does occur in horses and the clinical signs were quite consistent with Maggie's. It was also noted by Mr. Swift that Bear, another horse on the ranch that had shown similar signs, had begun to improve after being coincidentally dewormed with ivermectin, which would have affected any parasite taking a blood meal.

Given these circumstances, the decision was made to treat for tick paralysis with ivermectin and Equi-Spot, a topical permethrin product.

In the meantime, Maggie has shown more inclination to move her limbs. Given this change, attempts were made to arrange for a sling to be brought to the property with the intent of determining if Maggie could support even a portion of her weight. If she can, the sling can be used to intermittently. If not, she must continue to be managed down. Euthanasia has not been recommended at this point due to the fair prognosis of tick paralysis. The appearance of bed sores is not unexpected, nor are they evidence of abuse or neglect, and steps are being taken to treat this problem.

A.R. Horton DVM, MS

Fay Burton, DVM

PARK CTY DEFS_000932

# EXHIBIT  23

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

     Plaintiffs,

           vs.



CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

     Defendants.

-----------------------------------------------------

DEPOSITION OF ALLYSON RENÉ HORTON, DVM
March 27, 2014

-----------------------------------------------------

                        Deposition location:
                        9998 Havekost Road,
                        Conifer, Colorado 80433


ALSO PRESENT:   Jennifer R. Edwards, Esq.
                (For Dr. Horton)
                Randall Hatlee
                Ronald Swift
                Ashleigh Olds, DVM



# AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

**Page 202**

1    MS. BRONSON: Object to form.
2        A.   A variety of explanations. It would be
3    that these horses were lower in the hierarchy and
4    were -- only got whatever hay that the others didn't
5    want, the poor quality hay that may have toxic weeds
6    in it. It could be that they just happened to get
7    the parts of the hay that had the toxic weeds in it.
8    I don't have a definitive explanation. I have
9    possibilities.
10       Q.   (BY MR. TONDRE) Did you make an
11   assessment with respect to the 30-plus unaffected
12   horses?
13       A.   I'm not sure I understand what you are
14   asking for.
15       Q.   Well, did you assess any horses other
16   than these six?
17       A.   I assessed a horse on February 11th
18   that I'm not at liberty to discuss. At that time out
19   in the pasture, I noticed the horses that were around
20   us. Most were in acceptable body condition score.
21       Q.   Just visually?
22       A.   Just visually.
23       Q.   When did Chance first exhibit any signs
24   of losing weight?
25       A.   I don't know.

**Page 203**

1        Q.   When did Echo first exhibit any signs
2    of losing weight?
3        A.   I don't know.
4        Q.   When did Fiona first exhibit any signs
5    of losing weight?
6        A.   I don't know.
7        Q.   When did River first exhibit any signs
8    of losing weight?
9        A.   I don't know.
10       Q.   When did Lena first exhibit any signs
11   of losing weight?
12       A.   I don't know.
13       Q.   When did Midnight first exhibit any
14   signs of losing weight?
15       A.   Midnight had exhibited a previous
16   episode of weight loss that was resolved with
17   extracting a tooth. That was approximately a year
18   before.
19       Q.   When?
20       A.   It was in the preceding year.
21       Q.   Okay. And that was being caused by
22   teeth?
23       A.   She was unwilling to eat because of
24   pain from a loose incisor.
25       Q.   Did you have to call a dentist?

**Page 204**

1        A.   I am the dentist.
2        MR. SCHIMBERG: You are looking at her.
3        Q.   (BY MR. TONDRE) I'm curious, what did
4    you do to her teeth? Fit her with dentures?
5        A.   No. She simply -- she had one incisor
6    that was loose and painful, and we pulled it. And I
7    don't recall if on that date we floated her teeth or
8    not. Horses' teeth are somewhat different than
9    people's teeth. They can develop sharp points that
10   are irritating to the cheek on the uppers and the
11   tongue on the lowers, and they will often interfere
12   with the horse being able to eat comfortably. I
13   don't recall if we did that procedure or not on that
14   day, but we did pull a loose and painful incisor, and
15   when she recovered from the sedation, she ate.
16       Q.   Had she lost a considerable amount of
17   weight before you performed that procedure?
18       A.   A noticeable amount.
19       Q.   What was her body score?
20       A.   I don't recall.
21       Q.   Got a guess?
22       A.   A guess?
23       Q.   I don't -- don't guess. If you --
24       MS. EDWARDS: Object to form.
25       A.   Yeah, not less than four.

**Page 205**

1        Q.   (BY MR. TONDRE) All right. How long
2    had she had that condition with her tooth before you
3    were called out to look at it.
4        A.   The owners reported a few days.
5        Q.   She lost considerable weight in a few
6    days?
7        A.   She did.
8        MS. BRONSON: Object to form.
9        Q.   (BY MR. TONDRE) One of the things I
10   think I heard in responses with respect to -- is that
11   tests were negative for botulism. Did I hear that
12   wrong?
13       A.   You did not.
14       Q.   How do you know whether -- what test is
15   there for botulism?
16       A.   You can -- the test for the toxin --
17   I'm not really well versed on the intricacies of what
18   tests are available. I, after speaking with
19   Dr. Heckendorf, Dr. Gehring, and Dr. Toppin, it was
20   the consensus that the test is not particularly
21   useful because horses are so exquisitely sensitive to
22   the toxin that they can be fatally effected by nearly
23   undetectable levels.
24       Q.   So the test is by no means absolute,
25   correct?

52 (Pages 202 to 205)

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 206

1    A.  That's correct.
2    Q.  So you can't say that it's negative;
3  you can just say that it's not positive, right?
4    A.  That would be for the lab to answer.
5    Q.  In any event, it's not 100 percent
6  sure; is that correct?
7    A.  Not in my mind.
8    Q.  If I wanted to ask somebody from a lab
9  how reliable this test is, who would you suggest I
10  talk to?
11    A.  The botulinum toxin laboratory that CSU
12  sent the samples to.
13    Q.  Okay.  One word I haven't heard
14  mentioned today is malabsorption.  What is that?
15    A.  Malabsorption is a disorder where
16  nutrients are present in the digestive tract, but due
17  to disease, damage, other problems, the gut is not
18  able to take up the nutrients in the ingesta.
19    Q.  Is malabsorption a potential result of
20  ingestion of toxins?
21    MS. BRONSON:  Object to form.
22    A.  There are -- there are toxins that
23  through a variety of actions on the gut will result
24  in nutrients not being absorbed.
25    Q.  (BY MR. TONDRE) What's the difference

Page 207

1  between starvation and malnutrition?
2    MR. LEBSACK:  Objection to the form.
3    MS. BRONSON:  Asked and answered.
4    A.  Starvation has negative connotations
5  that nutrition is being denied; the animal is not
6  being given food.  Malnutrition can result from
7  improper food or an inability to utilize the food.
8    Q.  (BY MR. TONDRE) What was your
9  impression of the feeding program when you analyzed
10  the horses on February 20, 2012.
11    MR. LEBSACK:  Objection to the form.
12    MS. BRONSON:  Join.
13    A.  What I observed --
14    Q.  (BY MR. TONDRE) Yes, ma'am.
15    A.  -- when I did that exam is that the
16  horses were being given unfettered access to
17  free-choice hay of good quality, and I was satisfied
18  that that was an acceptable feeding program at the
19  time.  That was a good transition program for them.
20    Q.  Do you know what the feeding program
21  was at Echo Valley Ranch on February 15, 2012?
22    A.  Roughly.  I don't know specifics.
23    Q.  What do you understand -- and what is
24  the basis of your knowledge?
25    A.  I was told by Mr. Swift that horses --

Page 208

1  these horses had been brought in separated from the
2  herd because they had been noticed to have lost
3  weight; that they had been given extra feed in the
4  manner of hay and concentrates like grain.
5    Q.  Was that appropriate?
6    A.  It wasn't inappropriate.  It was a good
7  place to start.
8    Q.  If a horse has ingested toxins, how
9  long does it take those toxins generally to clear the
10  system?
11    MS. BRONSON:  Object to form,
12  foundation.
13    A.  Depends on the toxin.
14    Q.  (BY MR. TONDRE) Is there a range of
15  expectations.
16    A.  It's extremely variable.
17    Q.  Is there any medication you can give to
18  treat toxins?
19    A.  Depends on the toxin.
20    Q.  Will they ultimately clear?
21    A.  Depends on the toxin.  Some will.  Some
22  won't.
23    Q.  You mentioned Anthony P. Knight and his
24  book on weeds.
25    A.  Yes.

Page 209

1    Q.  Did I understand you to say you talked
2  to him?
3    A.  Yes.
4    Q.  Well --
5    A.  Well, I should clarify the "we."  The
6  practice talked to him.  I believe it was actually
7  Dr. Burton personally who spoke to him.
8    Q.  Do you know -- do you have an
9  understanding as to what they discussed, or should I
10  defer that question to Dr. Burton?
11    A.  She did relate to me their
12  conversation, but perhaps it would be best if you
13  asked her directly.
14    Q.  Well, since we are not going to talk to
15  her today, tell me generally what you recall.
16    A.  We inquired as to whether he had any
17  idea what toxins might be at play.  He suggested
18  sage.  He agreed with us that hoary alyssum was not a
19  good fit.  He suggested that we go out and walk the
20  pasture and look for what's out there, but that if --
21  if whatever toxic weed was in the hay, that it was
22  long gone and we would never find it.
23    Q.  So if, for example, bracken fern was in
24  the hay, it wouldn't lose its potency because it is
25  no longer growing?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

## Page 210

1      A. It does not lose its potency when it's
2 dried.
3      Q. Maybe you answered this and I just
4 don't remember. Do you have any knowledge of any
5 testing that was done on the hay at --
6      A. I don't.
7      Q. You said that the horses might have
8 benefitted if you had been called earlier. How much
9 earlier?
10      A. I don't know that I could give a time
11 frame. But I think it would have been prudent once
12 horses started to drop below a body condition score
13 of three that that probably should have been a red
14 flag.
15      Q. And what would you have recommended?
16      A. I don't know.
17      Q. And you don't know when they started
18 dropping their weight?
19      A. No.
20      Q. So you really can't comment on that,
21 can you?
22      MR. LEBSACK: Objection to the form.
23      A. No.
24      Q. (BY MR. TONDRE) Is it professionally
25 reasonable to -- or let me rephrase it.

## Page 211

1      In your opinion, would it have been
2 professionally reasonable to, without doing any
3 testing or creating differential diagnosis, to reach
4 the conclusion that the cause of the condition was
5 starvation?
6      MR. LEBSACK: Objection to the form.
7      MS. BRONSON: Object to form.
8      A. I -- I would have trouble answering the
9 question in that form.
10      Q. (BY MR. TONDRE) Okay. Well, let me ask
11 it this way: Confronted with six horses that had
12 diminished body weight, is it professionally
13 reasonable to reach a conclusion without considering
14 all the possibilities for the condition?
15      MR. LEBSACK: Objection to the form.
16      MS. BRONSON: Object to form.
17      A. No. You have a duty to the horses to
18 establish that there is not a medical reason for
19 their weight loss.
20      Q. (BY MR. TONDRE) Now, I have here an
21 email which you sent to Officer Hardey. It's Park
22 City -- or Park County defendants document
23 No. 000300.
24      MR. LEBSACK: What is the date of it?
25      MR. TONDRE: Dated February 16, 2012.

## Page 212

1      MR. LEBSACK: It's Exhibit 6.
2      MR. TONDRE: Oh, thank you.
3      Q. (BY MR. TONDRE) This email is based
4 upon your visit to the farm on -- what was it,
5 January something or other?
6      A. February 11, 2012.
7      Q. February 11, five days before the visit
8 by Dr. Olds and Dawn Smith?
9      A. Yes.
10      MS. BRONSON: Object to form.
11      Q. (BY MR. TONDRE) And you had the
12 opportunity to evaluate the horse at that point in
13 time, correct?
14      A. The horse we evaluated was not one of
15 the six that was later removed.
16      Q. I understand. But in your analysis of
17 that horse, you came to a differential diagnosis,
18 correct?
19      MS. EDWARDS: Object. Privileged.
20      A. Yeah. I'm afraid --
21      MR. TONDRE: It's not privileged
22 anymore.
23      MS. EDWARDS: I'll instruct you not to
24 to answer.
25      Q. (BY MR. TONDRE) Get Exhibit 6 before

## Page 213

1 you.
2      A. I have it.
3      Q. Did you write that?
4      A. Yes.
5      Q. And you sent it to Cindy Hardey?
6      A. Yes.
7      Q. And at Cindy Hardey's request?
8      A. Yes.
9      Q. And you sent it on the day of the visit
10 to -- the date that Dr. Olds visited?
11      A. That's the date on the exhibit.
12      Q. All right. You state in this email,
13 "Horses are exquisitely sensitive to botulism or --
14      MS. EDWARDS: I wish I had a copy of
15 it.
16      MR. SCHIMBERG: Here.
17      Q. (BY MR. TONDRE) -- "making it all but
18 impossible to definitely confirm due to low levels of
19 toxin in the blood and GI contents. The only
20 treatment for botulism is nursing care, time, and
21 hope."
22      What did you base that statement on?
23      MR. LEBSACK: Well, I'm going to wonder
24 why I wanted to ask about this, but I couldn't.
25      MS. EDWARDS: No. Absolutely. No. I

54 (Pages 210 to 213)

Page 218

foundation.

A. Widely accepted as a neurologic sign. There are other conditions that can produce quivering and trembling. That's certainly not exclusive.

Q. (BY MR. TONDRE) Did you think that drawing blood from the six horses was an important diagnostic thing to do?

A. For botulinum testing?

Q. For anything, just to diagnose the condition that the horses were in.

A. I think that the complete blood count and the chemistry panels were useful. I did not think that the botulinum testing was useful at all.

Q. You were in no hurry to jump to a conclusion regarding the six horses, were you?

A. I try never to rush to a conclusion, but in that case, I could not even if I wanted to. My experience told me that the signs that I was seeing in some of those horses could not be explained simply by inadequate food intake.

Q. You believed that at that juncture the case of those six horses was at a fork in the road, correct?

MR. LEBSACK: Objection to form.

MS. EDWARDS: Objection.

Page 219

A. I'm not sure...

Q. (BY MR. TONDRE) You believed that those six horses needed to have further diagnostic testing before reaching a conclusion, correct?

A. I believe further investigation was needed.

Q. Is it your practice to do visual body scoring?

A. That is part of how we body score a horse.

Q. Just part?

A. It depends on whether they have a winter coat or not.

Q. You said you received a call from Mr. Swift in which he informed you that Bear was having difficulty rising?

A. Yes.

Q. Do you recall approximately when that was?

A. That was in the fall that preceded February of 2012, so the fall of 2011.

Q. Can you pinpoint it any better than that?

A. I'm afraid I can't.

Q. What was the weather like?

Page 220

A. It was clear, bright, sunny day.

Q. What was that winter like?

A. I don't recall.

Q. Did you get any information from Mr. Swift other than that Bear was having difficulty rising?

A. No.

Q. Was it at that point you said you wouldn't provide any services because you hadn't been paid by Routt County?

A. No. No. At first he did not identify the horse as Bear. But later in the conversation, it came up, and we did not refuse treatment. I believe I said something to the effect that he needs to be seen by someone, and it was not requested of us that we come examine him.

Q. Look at Exhibit No. 12. You say in the one, two, three -- fifth paragraph, "We have worked with many animal control offices in many states, and we have never experienced such lack of professionalism. It is a disappointment that your office is willing to sacrifice what could be a solid working relationship that could benefit not just the Hatlee horses but others as well."

How many different jurisdictions have

Page 221

you worked with regarding animal control?

A. I have been licensed in good standing in three states: California, Oregon, and Colorado. In California, I worked with Stanislaus County Animal Control and Lassen County Animal Control. In Oregon, I worked primarily with Deschutes County Animal Control, and in Colorado, I have worked primarily with Jefferson County Animal Control.

Q. And what is it about the animal control in Routt County that caused you to say it lacked professionalism?

A. They reneged on their commitment to us.

Q. You think that placed the horses in danger?

A. Well --

MS. BRONSON: Object to form.

A. -- I think it means that we are unwilling to work with them in the future. They also failed to respond to any of our communications regarding that.

Q. (BY MR. TONDRE) Is it any excuse that Dawn Smith was on medical leave?

A. No. She should have made some other officer aware of her caseload, and somebody should have been picking up the slack.

# EXHIBIT  24

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
and RONALD L. SWIFT,

Plaintiffs,

 **COPY**

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
and ASHLEIGH OLDS,

Defendants.
------------------------------------------------------------
DEPOSITION OF FRED WEGENER
July 24, 2014
------------------------------------------------------------

Deposition location:
9998 Havekost Road
Conifer, Colorado  80433

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226

                            For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202

                            For the Defendant, Olds.

# AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

FRED WEGENER - JULY 24, 2014

Page 6

1    Q  When did you become post certified?
2    A  1988.
3    Q  Now directing your attention to the year
4  2012, what was -- what were involved with your duties
5  as sheriff?
6    A  Keep the peace, run the jail, I was
7  also -- I'm also the -- by default, the fire marshal
8  for any unincorporated area of the county not covered
9  by fire protection district, civil service, code
10  enforcement.  That's pretty much it probably.
11    Q  Whom did you supervise?
12    A  The undersheriff.
13    Q  Anyone else?
14    A  No.
15    Q  Who was in charge of training at Park
16  County in 2012?
17    A  Training, just training in general or --
18    Q  Well, let me -- let me -- yeah, it's a
19  broad question.
20        What sort of training does the
21  sheriff's -- did the sheriff's office provide to its
22  employees during the year 2011, 2012, that area?
23    A  Oh.  Well, they get -- you know,
24  firearms, they get arrest control, they get
25  Intoxilyzer, I think I had Tasers at 2012, so they

Page 7

1  would have gotten Taser, those that want to be
2  certified.  They get any legal updates from the
3  district attorney's office, they'll come in and do
4  that, and I think that was in 2012, they did a class,
5  it was '11 or '12.
6        Then they get whatever specialized
7  training they'll get through their sergeants, they may
8  apply for -- oh, if they are going to an armor school
9  or they're going to go to a -- nonlethal shotgun course
10  or weapon course or baton school or something like
11  that, they may apply and they may do that, but that
12  would be out of county.
13    Q  Is the training provided to animal
14  control officers different than the training provided
15  to other deputies?
16    A  Yes.  The deputies probably only get --
17  you know, they'll get, you know, your criminal code
18  and -- and that sort of training.  The code enforcement
19  officers get that; but then they also go to the state,
20  they become animal protection agents; so they'll get
21  training there, and they will get specialized training
22  through their supervisor.  Sergeant Priestly, she has
23  been through various courses.  So they'll get training
24  through her.  So --
25        But they'll still get the arrest control

Page 8

1  and the firearms through the department.
2    Q  Now, was Cindy Hardey in 2011 and 2012 an
3  employee of the sheriff's office?
4    A  Yes.
5    Q  Who was responsible for training her in
6  the preparation of search warrant affidavits?
7    A  Her supervisor would have covered that
8  during her FTO.
9    Q  And that would be Sergeant Priestly?
10    A  Correct.
11    Q  Does -- did the sheriff's office in 2012
12  have an internal affairs section?
13    A  Yes.
14    Q  And who was involved in that?
15    A  It would -- well, it depends on what
16  subdivision the complaint is out of.  So it's like --
17  I'll have either Captain Bonnelycke or Captain Muldoon
18  will take care of those -- like I said, depending upon
19  what division they come from.
20    Q  Who would be responsible for conducting
21  an internal affairs investigation of an animal control
22  officer?
23    A  It would either have been Captain Muldoon
24  or Captain Bonnelycke.
25    Q  All right.  And what precipitates an

Page 9

1  investigation by internal affairs?
2    A  Some sort of complaint about a violation
3  of policy.
4    Q  What was your involvement during the
5  months of February and March of 2012 in the
6  investigation leading up to the seizure of horses from
7  Mr. Hatlee and Mr. Swift?
8    A  Probably minimal.  I got the -- Sheriff
9  Wiggins sent me the email about an issue regarding some
10  horses that were being kept out at Echo Valley Ranch.
11  And so I just directed Bobbi to look into it, whatever
12  help they needed.
13    Q  Do you remember any other involvement?
14    A  I remember we had some issues with the
15  folks that were getting a little excited about us
16  making sure we're doing a proper investigation.  So the
17  undersheriff took care of doing media releases and
18  whatnot, trying to work on appeasing those folks.
19    Q  What's the policy or what was the policy
20  in 2012 in the Park County office in -- regarding any
21  disclosure of investigative materials to third parties?
22    A  When they do their press release --
23  especially if there's an active investigation going on,
24  they are supposed to run that by the DA's office so we
25  don't run into issues of something's disclosed that's

3  (Pages 6 to 9)

## Page 10

1  going to be used in preparation for prosecution.

2      Q  Now, when do you first recall -- well,

3  let me -- do you recall there being a concern for the

4  safety of the horses of Mr. Hatlee and Mr. Swift at

5  some point in the investigation?

6      A  Concern for the safety of the horses?

7  Yeah, and I'm trying to remember; it had something to

8  do with a threat that somebody had made.  So they were

9  a little worried about that.  I'm trying to remember,

10  it was an email that they had got from somebody.

11          But the tone of it was such that it -- I

12  guess, that it raised folks' concern about somebody

13  doing something stupid.

14      Q  Did you become aware that the horses were

15  moved because of the fear of criminal conduct from some

16  of these so-called concerned citizens?

17      A  Yeah, that's correct.

18      Q  What investigation was made into the

19  threats that were being made?

20      A  I think they -- well, I think they took

21  precautions just to make sure that it doesn't -- that

22  it didn't materialize.

23      Q  Well, isn't it a crime to threaten bodily

24  harm or injury to property?

25      A  Well, if -- yes, it would be menacing,

## Page 11

1  correct.

2      Q  What investigation was made into making a

3  case of menacing against the threatening, concerned

4  citizens?

5      A  You know, I -- I don't know.  I mean I

6  don't know if it ever rose to the level that they could

7  actually get a case to the DA.  That's about all I

8  could say about that.

9      Q  Are you aware that -- that one of your

10  deputies did recommend prosecution?

11      A  Yeah, if there was something to

12  prosecute, I'm sure he could have, yes.

13      Q  All right.

14      A  But do I have personal knowledge?  No, I

15  don't remember if they did that, no.

16      Q  All right.  Now during 2012, was there

17  any sort of controversy between your office and the

18  district attorney's office?

19          MR. SCHIMBERG:  Object to form.  Go

20  ahead.

21      A  I'm trying to remember, that was after

22  the election, there was -- yeah, there probably was.  I

23  had sent a letter to the DA trying to -- I don't know,

24  offer him an olive branch of peace after the election

25  was over because we had supported another candidate in

## Page 12

1  the election.  He won, so it's pretty much all over,

2  so...

3      Q  (BY MR. TONDRE) Wasn't there public

4  accusations by you or someone in your office that the

5  DA was not adequately prosecuting cases that your

6  department made?

7      A  Well, I think there was -- yeah, there

8  were accusations made that we had seen a lot of cases

9  that we couldn't figure out why they didn't -- or at

10  least an attempt to prosecute them.  But that's all you

11  can do.

12      Q  Who was making those accusations?

13          MR. SCHIMBERG:  Object to form.  Go

14  ahead.

15      A  Well, I think the undersheriff had made

16  some accusations to -- from -- from our office.

17      Q  (BY MR. TONDRE) How about you?

18      A  No.  I -- I wouldn't make them in the

19  public, I'd just call him up and ask him.

20      Q  Did you privately complain to the

21  district attorney's office?

22      A  Yes.

23      Q  Do you recall approximately when that

24  was?

25      A  2012.  I couldn't give you -- I don't

## Page 13

1  know exactly when.

2      Q  2012 was an election year for the

3  district attorney, correct?

4      A  Correct.

5      Q  And the election would have been in

6  November 2012, right?

7      A  Yes.  Correct.

8      Q  So the accusations, if you want to call

9  them that, were occurring in the year 2012, correct?

10      A  Correct.

11      Q  Had they been occurring before that?

12      A  Yes.

13      Q  And did this dissatisfaction by the

14  sheriff's office reach the public media?

15      A  Well, in our community, probably.

16      Q  Were you involved in any respect in the

17  decision to seize the horses?

18      A  No.  Huh-uh.  Not to -- not to seize

19  them.  I usually leave all the animal control stuff to

20  that division there.  They're very good at what they

21  do.

22      Q  So that would be left to Sergeant

23  Priestly?

24      A  Sergeant Priestly and her supervisors,

25  uh-huh.

Page 14

1    Q  Who is her supervisor?
2    A  At that time, I'm trying to remember if
3  it was Kevin Hancock or if it was Captain Bonnelycke,
4  one of the two would have been her supervisor.
5    Q  If memory serves me, I think it was
6  Captain Bonnelycke.
7    A  Bonnelycke.  That sounds about right.
8        MR. SCHIMBERG:  I think that's right.
9    A  I had to change at one point, and I can't
10  remember when that was.
11    Q  (BY MR. TONDRE) At some point, a decision
12  was made to take Cindy Hardey off the case as lead
13  investigator, did you have any involvement in that
14  decision?
15    A  You know, it could have been.  I know
16  when the case reached a certain complexity, it was
17  decided to bring in a more seasoned investigator, and I
18  think that could have been the time when Bobbi was
19  brought in.
20    Q  Well, the testimony to date has been that
21  Hardey was replaced because of accusations that she was
22  too friendly to Swift.  Do you remember that?
23        MR. SCHIMBERG:  Object to form.
24        MR. LEBSACK:  Form.
25    A  Too friendly?

Page 15

1    Q  (BY MR. TONDRE) Yeah.
2    A  I don't think that would be grounds to
3  remove somebody.  I think if they could be objective --
4  I've known Ron for years.  But I mean, I don't -- I
5  don't think about somebody being too friendly.
6        But I think the objectivity, I think you
7  have to look at -- you know, look at that.  But I
8  think -- I think our biggest thing was probably getting
9  somebody with all the rigmarole that was on the
10  internet and all that, that we really wanted to get
11  somebody in there that had a lot more -- like I say,
12  was a little more seasoned about dealing with such big
13  events.  And Bobbi had done -- we'd done the buffalo
14  deal and we'd done the Vern Wagner deal, so she had a
15  lot of knowledge.
16    Q  Now do you expect a person who's -- well,
17  first of all, let me ask you this:  Have you had
18  experience in seeking warrants for search and seizure?
19    A  Oh, yeah.
20    Q  Where did you receive your training?
21    A  Well, it would have been either -- either
22  through CLETA which is the Colorado Law Enforcement
23  Training Academy, through the various DAs, that I've
24  had over the years.  Dave Thorson who is now the
25  District Court judge.  Steve Rich who is a deputy DA.

Page 16

1  Ray Slaughter, the federal magistrate.  Stuff like
2  that.  I would have gotten -- we would have gone over
3  the -- how to prepare a warrant.
4        MR. TONDRE:  What is that noise?
5        MR. SCHIMBERG:  I think it's his phone.
6        THE DEPONENT:  My phone vibrates.
7        MR. SCHIMBERG:  I was feeling it, not
8  seeing it.
9    Q  (BY MR. TONDRE) Do you have any knowledge
10  as to what training Cindy Hardey had in obtaining
11  search and seizure warrants?
12    A  She would have gotten some from her
13  supervisor.  I believe they would have gotten some from
14  the district attorney's office.  As to who, I -- I
15  don't know right off the top of my head that would have
16  been; but usually they either prepare warrants, go over
17  there and -- and get on-the-job training when they're
18  turned down or -- and you know, then the DA talks to
19  them about what needs to be included in it.  But
20  they -- they do get some experience writing those
21  warrants.
22    Q  What's the legal definition of probable
23  cause?
24        MR. SCHIMBERG:  Object to form.  Go
25  ahead.  Based on what you know, Sheriff.

Page 17

1    A  Probable cause to -- for a warrant or
2  probable cause for an arrest.
3    Q  (BY MR. TONDRE) Probable cause for an
4  arrest warrant which leads to a written arrest?
5    A  Sure, I mean if you have, you know,
6  reasonable suspicion that individuals were engaged in
7  some sort of conduct that constitute a violation of
8  law, that you're looking at evidence that you need
9  to -- in order to prove the case, or in some cases,
10  disprove the case, you're going to apply for a warrant
11  to go in and obtain that evidence.
12        I think one of the biggies about our
13  system is that as soon as the investigator or the
14  deputy draws up the warrant, then they are going to go
15  by the DA's office and have a review there before they
16  actually go out and serve it.
17    Q  How's the DA expected to know -- or let
18  me ask it a different way.
19        Is there any way for the DA to know what
20  the officer who's seeking a warrant is leaving out of
21  the warrant?
22        MR. SCHIMBERG:  Object to form.  Go
23  ahead.
24    A  Well, hopefully, they're not leaving
25  anything out of the warrant.  And by looking at the

FRED WEGENER - JULY 24, 2014

Page 22

1    A  To her not knowing those things?
2    Q  (BY MR. TONDRE) Yeah, whose responsibility
3  is it for her not knowing the definition of probable
4  cause?
5    A  Well, I -- first of all, I would be
6  surprised that she didn't know what probable cause is.
7    Q  Let me tell you this, she testified to it
8  under oath that she didn't know the definition of
9  probable cause.
10    A  Did she?
11       MR. SCHIMBERG:  Object to the form.  Go
12  ahead.
13    A  Well, that would be disappointing.
14    Q  (BY MR. TONDRE) And she also testified
15  under oath that she did not know it was a violation of
16  the fourth amendment to fail to disclose -- fail to
17  include material facts.
18       MR. SCHIMBERG:  Object to form,
19  characterization.  Go ahead.
20    A  So would be the question?
21    Q  (BY MR. TONDRE) The question is:  Who is
22  responsible for that?
23    A  Well, she received training in how to do
24  that.  Now, whether or not she applied that training, I
25  have no idea.

Page 23

1    Q  Well, was any investigation made into her
2  training and experience and state of mind after the
3  judge ruled that evidence would not be admissible
4  because of the bad faith of Cindy Hardey in obtaining a
5  warrant without fully disclosing the facts?
6       MR. SCHIMBERG:  Object to form.  Go
7  ahead.
8    A  Yeah, I think they went back and looked
9  and said you know what, how come you left this out.  I
10  asked her why she left it out.  And hopefully --
11    Q  (BY MR. TONDRE) Who did that?
12    A  -- correct it.
13       Her supervisor did.  I think her
14  supervisors did.
15    Q  Well, Bobbi Priestly testified she didn't
16  question her.  Who else would have questioned her?
17    A  Captain Bonnelycke.
18    Q  Would there be a report with respect
19  to the investigation --
20    A  To question --
21    Q  -- of why she did the warrant in the way
22  she did?
23    A  No.  There would have been just a
24  sit-down and a review of what transpired.
25    Q  Do you recall any criticism being made by

Page 24

1  anyone in the department of her conduct?
2    A  Yeah.  I mean, there was criticism about
3  the fact that the warrant had -- didn't have
4  information in it.  So -- and then of course, how to
5  remedy that problem.
6    Q  This is a deputy who had been in your
7  employ for eight years, right?
8    A  Correct.
9    Q  Wasn't this a pretty gross situation?
10       MR. SCHIMBERG:  Object to form.
11    A  No.  It was a mistake.
12    Q  (BY MR. TONDRE) What do you mean "it was a
13  mistake"?
14    A  She didn't put that in.  And she should
15  have and she realized that later.
16    Q  Well, what was her excuse for not putting
17  it in?
18    A  She -- at the time, she just did not put
19  it in.  And I don't -- I don't know.
20    Q  Well, how do you explain her testimony
21  that she didn't know it was a violation not to put it
22  in?
23       MR. SCHIMBERG:  Object to form.
24       MR. LEBSACK:  Same.
25       MR. SCHIMBERG:  Foundation.

Page 25

1    A  I don't know.
2    Q  (BY MR. TONDRE) Are you aware that Monte
3  Gore, Bobbi Priestly, Captain Bonnelycke, and Cindy
4  Hardey attended a fundraiser for the people who were
5  advocating -- fund-raiser being sponsored by the people
6  who were advocating the prosecution and conviction of
7  Mr. Hatlee and Mr. Swift?
8       MR. SCHIMBERG:  Object to form.
9  Foundation, characterization.  Go ahead.
10    A  I knew they attended a fund-raiser.
11    Q  (BY MR. TONDRE) Did you know what the
12  fund-raiser involved?
13    A  Something about raising money for vet
14  bills for one of the horses.
15    Q  Do you know who the people were that were
16  sponsoring the fund-raiser?
17    A  No.  Not off the top of my head.
18    Q  Do you know that Monte Gore supplied
19  investigative materials for their use at the
20  fund-raiser?
21       MR. SCHIMBERG:  Object to form.  Go
22  ahead.
23    A  No.
24    Q  (BY MR. TONDRE) Is that proper conduct?
25       MR. SCHIMBERG:  Object to form.  Go

FRED WEGENER - JULY 24, 2014

Page 26

1   ahead.
2        A   No.
3        Q   (BY MR. TONDRE) Why is it not proper
4   conduct?
5        A   Well, he shouldn't be --
6        MR. SCHIMBERG: Same objection. Go
7   ahead.
8        A   Sorry.
9        MR. SCHIMBERG: Not a problem.
10       A   You should have -- I mean, if there was
11  anything provided, it should have gone through the DA's
12  office to make sure it wasn't going to be used in the
13  prosecution.
14       Q   (BY MR. TONDRE) What I'm interested in is
15  what was the policy of the sheriff's office as a
16  result -- what was the policy of the sheriff's office
17  regarding disclosing investigative materials that were
18  being -- that were part of an ongoing investigation?
19       MR. SCHIMBERG: Asked and answered, go
20  ahead.
21       A   Yeah.  I was going to say I think I
22  already asked -- answered it.  But they are not
23  supposed to.  It's supposed to be information that goes
24  through the district attorney's office before it's
25  released.

Page 27

1        Q   (BY MR. TONDRE) Are you aware that Monte
2   Gore participated in a propaganda film regarding --
3   there was quite the -- that was quite defamatory of
4   Hatlee and Swift that was distributed throughout the
5   world --
6        MR. LEBSACK: Form.
7        MR. SCHIMBERG: Join.
8        Q   (BY MR. TONDRE) -- during the course of
9   the investigation?
10       MR. SCHIMBERG: Form, foundation. Go
11  ahead.
12       A   No.
13       Q   (BY MR. TONDRE) Is that proper conduct by
14  a member of your department?
15       MR. LEBSACK: Same.
16       MR. SCHIMBERG: Object to form,
17  foundation. Go ahead.
18       A   No.
19       Q   (BY MR. TONDRE) Are there written policies
20  regarding the release of investigative information by
21  the department?
22       A   Yes.
23       Q   Where would that written policy be found?
24       A   In the policy manual.
25       Q   And as best you can recall, Sheriff

Page 28

1   Wegener, what -- what does that policy prohibit?
2        A   Well, just like I said before, it would
3   prohibit you releasing information that could be
4   detrimental to the prosecution of a case.  It would
5   require that you contact the district attorney's office
6   before releasing anything to the media, just so that
7   we're not doing that.
8        Q   Can you think of any valid reason for
9   releasing investigative materials to the so-called
10  concerned citizens who were crying out for the heads of
11  Hatlee and Swift?
12       MR. SCHIMBERG: Object to form. Go
13  ahead.
14       MR. LEBSACK: Same.
15       A   No.  I --
16       Q   (BY MR. TONDRE) Did you have any contact
17  with the so-called, quote, air quotes, concerned
18  citizens?
19       A   No.
20       Q   Were you aware of the extent of the
21  publicity that was being devoted to this case?
22       MR. SCHIMBERG: Object to form.
23       A   I knew it was on the -- the internet.
24  But that's about all I knew.
25       Q   (BY MR. TONDRE) Do you have a name on

Page 29

1   Pinecam?
2        A   Do I have a name on Pinecam?
3        Q   Yeah.  Or whatever you call it, a
4   posting, I don't know what you call those things.
5        A   Well, I think the sheriff's office might
6   have a deal.  But nay, I don't -- I don't get on
7   Pinecam.
8        MR. SCHIMBERG: Don't know what you are
9   missing, Sheriff.
10       MR. TONDRE: He's going to run right out
11  and get one.
12       THE DEPONENT: I stay off of those
13  things.
14       Q   (BY MR. TONDRE) Now, I'm stepping back a
15  minute.  You said that Captain Bonnelycke probably
16  talked to Cindy Hardey about this.  Would that have
17  been considered an internal affairs investigation?
18       A   I don't think at that time, I don't
19  think -- no.  I don't believe it was.
20       Q   All right.  Now do you know for a fact
21  that that occurred?
22       A   If there was an issue with the warrant,
23  which I do know there was, then they would have talked
24  about it, yes.
25       Q   All right.  Would that have included --

8  (Pages 26 to 29)

FRED WEGENER - JULY 24, 2014

Page 30

1  would anyone had been included in the discussion other
2  than Ms. Hardey and Captain Bonnelycke?
3       A  He could have brought her supervisor in
4  or he could have talked to her directly.
5       Q  Do you have any sort of regular periodic
6  meetings in your -- in your office in which the overall
7  operation of the sheriff's department is -- is
8  discussed?
9       A  Back in 2012, I think we would have had
10 probably monthly staff meetings.
11      Q  Who would that include?
12      A  Anybody from the rank of sergeant on up.
13      Q  Are there written minutes kept of those
14 meetings?
15      A  No.
16      Q  Are they recorded in any fashion?
17      A  No.
18      Q  What -- what subjects are discussed
19 generally?
20      A  The day-to-day operations of the
21 sheriff's office.
22      Q  If the undersheriff was concerned about
23 the safety of Mr. Swift, Mr. Hatlee, and their horses,
24 would that be a subject as a result of that, quote,
25 concerned citizens?  Would that be a subject you would

Page 31

1  expect to be discussed at the monthly staff meetings?
2       A  No.
3       Q  Why not?
4       A  Because that would be something that if
5  it was going on, would -- they would come right to me
6  on, wouldn't wait for me to --
7       Q  Did they come to you and say we're
8  concerned about the safety of Mr. Hatlee -- Mr. Hardey
9  (sic), Mr. Swift, and their horses?
10      A  Boy -- I'm sorry.  Were they concerned
11 about the horses and something getting at the horses,
12 yes, they did come to me about that.
13      Q  All right.  And what was your solution?
14      A  They were going to move the horses.
15      Q  Why not just arrest the people that
16 are -- who were menacing?
17      MR. SCHIMBERG:  Object to form.
18 Foundation.
19      A  At the time, we didn't have a -- an
20 individual that I think that they directly said was
21 going to do something.  More along the lines of they
22 had kind of a feeling given the attitude of the
23 individuals that something might transpire.
24      Q  (BY MR. TONDRE)  Well, they had direct
25 threats on the internet.  You didn't know that?

Page 32

1       A  Direct -- you mean direct threats to
2  Mr. Swift or Mr. Hatlee?
3       Q  No.  Direct threats to the sheriff's
4  department and hey, if you guys don't do something,
5  we're going to take it into our hands.  That was the
6  nature of the threat.
7       MR. SCHIMBERG:  I missed the question
8  though, Brice, I'm sorry.
9       Q  (BY MR. TONDRE)  Are you in the business of
10 just protecting animals and not people?
11      MR. SCHIMBERG:  Object to form.
12 Argumentative, go ahead.
13      A  No.  We protect people too.
14      Q  (BY MR. TONDRE)  All right.  Why didn't you
15 investigate threats of bodily and property injury when
16 they -- when they were brought to the -- directly to
17 the attention of the sheriff's office.
18      A  Well, we did do an investigation.
19      Q  And who did you investigate?
20      A  That's what I am trying to figure out.  I
21 mean, did an investigation on -- on the horses, I
22 guess, I don't know what the threat is that you're
23 talking about.
24      Q  On February the 19th, 2012, this is
25 page 89 of the sheriff's office discovery.

Page 33

1       MR. SCHIMBERG:  Should we take just a
2  second to grab it so we can see it?  What exhibit is
3  that, Mr. Tondre?
4       MR. LEBSACK:  66.
5       MR. SCHIMBERG:  That sounds right to me.
6  Let's just see how good my -- page what?
7       MR. TONDRE:  Page 89.
8       MR. SCHIMBERG:  Thanks.  See you needed
9  your glasses.
10      THE DEPONENT:  I thought I was going to
11 need them.
12      Q  (BY MR. TONDRE)  What I'm referring to
13 Sheriff Wegener, is paragraph No. 4 which says:  "On
14 February 19, 2012, I received a telephone call from
15 Undersheriff Gore at my residence."  This is Bobbi
16 Priestly speaking.  "The undersheriff advised me that
17 he had received several telephone calls from the Public
18 Information Officer for the State of Colorado
19 Department of Agriculture's office.  He was very
20 concerned for the safety of the owners of horses and
21 the horses themselves.  The undersheriff stated he had
22 been on the telephone all morning and the emails and
23 telephone calls were very concerning to him."
24      Were you aware that Undersheriff
25 Gore was concerned about the safety of the owners

FRED WEGENER - JULY 24, 2014

Page 34

1  and the horses?
2          MR. LEBSACK: Object to the form.
3          MR. SCHIMBERG: Join.
4      A  That's what it says.
5      Q  (BY MR. TONDRE) No. But is this something
6  you as sheriff in February 19, 2012, was aware of?
7      A  That they said yeah, they were concerned.
8  That's why they -- in the next paragraph why they
9  agreed to move the horses.
10     Q  That's an unhealthy atmosphere to have
11  going on in your jurisdiction, isn't it, people --
12  people have to be in fear of their lives because of
13  some threats?
14         MR. SCHIMBERG: Object to form.
15  Argumentative.
16     A  Yeah, I don't -- I don't see that, I'm
17  sorry.
18     Q  (BY MR. TONDRE) You don't see that it's
19  something you should be concerned about?
20     A  No. I'm sorry. Where does it say that
21  there was a threat? I guess I'm missing that.
22     Q  Well, I don't know how else you can read
23  it. He was concerned for the safety of the owners and
24  the horses themselves.
25     A  Okay.

Page 35

1      Q  That doesn't tell you there's a threat
2  going on?
3      A  Well, it says -- then it says in the next
4  paragraph they acted upon it and moved the horses.
5      Q  So you moved the -- you moved the victim,
6  you don't -- you don't go after the perpetrator, is
7  that the practice in Park County?
8          MR. SCHIMBERG: Object to form.
9      A  No. I mean, if there had been a threat
10  against somebody, if you're going to go shoot them or
11  you are going to go punch them out or whatever, then we
12  acted upon it.
13     Q  (BY MR. TONDRE) Did you check and see
14  what -- what the nature of the communications were that
15  led Undersheriff Gore to be concerned?
16     A  I'm sure if -- if there was some sort of
17  a specific threat, they would have acted upon it.
18     Q  How specific does it have to be, you have
19  to fire a shot?
20     A  No. I mean you have to make a threat
21  against somebody.
22     Q  Well, are you -- are you aware that they
23  made a threat -- that Shelley Ferraro made a threat
24  against Dr. Horton?
25     A  No. I'm not.

Page 36

1      Q  So -- look at -- you can't look at it. I
2  got it.
3          I want you to take a look at Exhibit 67
4  and 68. First of all -- take a look at them. Familiar
5  yourself -- familiarize yourself with them, and my
6  question to you is: Were you aware of those as they
7  were being entered in to?
8      A  I have been handed what I believe is the
9  notice of warning.
10     Q  Right.
11         MR. SCHIMBERG: That's 67.
12     A  And then 68 is the last page with the
13  signatures.
14         MR. LEBSACK: Actually --
15         MR. SCHIMBERG: Actually 68, take a look,
16  Sheriff. It's -- it's not related to 67. Excuse me,
17  Mr. Tondre. If you don't want me telling him that.
18     Q  (BY MR. TONDRE) No. 67 and 68 --
19     A  Are different?
20         MR. SCHIMBERG: Yeah.
21     Q  (BY MR. TONDRE) Yeah.
22     A  Oh, okay.
23     Q  One is the notice of warning and 68 is
24  the agreement to move the horses.
25     A  Okay. Okay.

Page 37

1      Q  And did you -- are you aware -- were you
2  aware of Exhibit No. 67 before it was done?
3      A  No.
4      Q  When did you become aware of it?
5      A  Right now.
6      Q  Okay. And were you aware of Exhibit
7  No. 68 at the point in time when it was done?
8      A  Only -- I've never seen it. I just
9  remember them telling me that there was an agreement.
10     Q  Okay.
11     A  That must be it.
12     Q  Now, Exhibit No. 67, purports to be
13  signed on behalf of PCSO, which I assume is the Park
14  County Sheriff's Office. Did Cindy Hardey have
15  authority to enter -- or to issue that notice of
16  warning?
17     A  Well, she is an agent for the state. Now
18  where do you see that she signed it on behalf of the
19  Park County Sheriff's Office?
20     Q  Down under signature box.
21         MR. SCHIMBERG: Issuing agency.
22     A  Yeah.
23     Q  (BY MR. TONDRE) Is that a warning that was
24  issued on behalf of the Park County Sheriff's Office?
25     A  Yes. They do.

10  (Pages 34 to 37)

FRED WEGENER - JULY 24, 2014

Page 38

1    Q  All right.  And she had the authority of
2  the Park County Sheriff's Office to enter into that
3  notice of warning?
4    A  Yes.
5    Q  Now --
6    A  It would have been from training she
7  received.
8    Q  Exhibit No. 68.  It says this is an
9  agreement between Ronald Swift, Kirsten LeBeau, and the
10  Park County Sheriff's Office regarding six horses that
11  were involved in a current case.  And it is signed by
12  Deputy Hardey and Mr. Hatlee and Mr. Swift.
13       Did Cindy Hardey have the authority to
14  enter into that agreement?
15    A  Yes.
16    Q  How many conversations did you
17  participate in which Dr. Horton was a party?
18    A  All right.  I give.  Who's Dr. -- what
19  was it?
20    Q  Horton?
21    A  Who's Dr. Horton?
22    Q  Dr. Horton is a veterinarian who provided
23  veterinary services to Mr. Hatlee and Mr. Swift.
24    A  None that I recall.
25    Q  Let me show you page 78 out of your

Page 39

1  discovery.  Is it that book?
2       MR. SCHIMBERG:  Yeah, it's part of
3  Exhibit 66.
4    Q  (BY MR. TONDRE) Okay.  The last paragraph.
5  "On February 21, 2012, at approximately 10:30 a.m., I
6  received a call from Dr. Horton, DMV.  Dr. Horton
7  called and stated she had some preliminary results on
8  the necropsy that was done on 'Maggie.'  I recorded a
9  portion of the conversation, see attached audio disk,
10  Undersheriff Monte Gore and Sheriff Fred Wegener were
11  both in the office for the conversation with
12  Dr. Horton."
13    A  Okay.
14    Q  Do you remember that?
15    A  No.  I don't.
16    Q  So you -- you can't testify that you were
17  there for that, can you?
18    A  I can remember -- and I just --
19  apparently, I don't remember Dr. Horton.  If she says I
20  was there, I guess I was there.  So...
21    Q  Well, just keep in mind that's --
22  question whether she's telling the truth or not.
23       MR. SCHIMBERG:  Object.  Object to form.
24    Q  (BY MR. TONDRE) Do you ever remember -- do
25  you ever remember asking Dr. Horton or any veterinarian

Page 40

1  any questions about Mr. Swift?
2    A  No.  I -- I don't recall.
3    Q  Now, you -- you stated earlier that
4  you've known Mr. Swift for quite some time; is that
5  right?
6    A  Yes.
7    Q  And how have you known him?
8    A  Just casual acquaintance, he used to own
9  Pizza Et Cetera on top of the hill.
10    Q  Do you know anything about his
11  capabilities as a horse rancher?
12    A  No.  I don't.
13    Q  Did you ever have a question in your mind
14  as to whether Mr. Swift had not called a veterinarian
15  because he had a high opinion of his ability to deal
16  with problems in horses?
17       MR. SCHIMBERG:  Object to form.
18    A  Boy, repeat that question again.
19    Q  (BY MR. TONDRE) My question:  Did the
20  thought ever cross your mind during the course of this
21  investigation early on that Mr. Swift felt he didn't
22  need to call a vet because of his high ability in
23  dealing with problems in horses?
24    A  So you're asking me to speculate on his
25  ability to deal with horses?

Page 41

1    Q  No.  No.  What I'm -- what I'm asking you
2  is whether you had in your mind a thought that maybe
3  Mr. Swift didn't call a veterinarian with respect to
4  the horses because he had a high ability of his -- his
5  qualifications to take care of the issue?
6    A  No.
7    Q  Does the sheriff's office have a website
8  where if someone wants to send you an email they could
9  send it directly to you?
10    A  Yes.
11    Q  Do you recall receiving in mail -- emails
12  directed to you during the course of the Hatlee and
13  Swift matter?
14    A  Directed -- who.  No.  I don't -- I don't
15  recall.
16    Q  All right.  What -- I realize it's been a
17  while, but what's -- what's your sense as you sit here
18  today as to what was going on publicity wise in
19  connection with this case?  Was it heated?  What -- how
20  would you characterize it?
21    A  You know, I've -- we've had the -- we had
22  the buffalo case where they -- folks went down and shot
23  all the buffalo on this guy's property.  And
24  everybody -- there's outcry on cruelty to animals.
25       This rose to that same level, where I had

11 (Pages 38 to 41)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

Page 42

1　a lot of people from all over the place that were --
2　kind of zeroing in on the fact that these horses, they
3　thought, had been mistreated and weren't taken care of
4　properly; and they wanted somebody to take care of it.
5　　　Q　Were you aware what precipitated the
6　removal of the horses was a specific set of threats
7　that said if you don't take those horses away from
8　Hatlee and Hardey -- Hatlee and Swift, we're going to
9　do it?
10　　　A　Yeah, that's the reason why we had the
11　horses moved.
12　　　Q　Isn't that a prosecutable offense to make
13　that kind of threat?
14　　　MR. SCHIMBERG:　Asked and answered.　Go
15　ahead.
16　　　A　A prosecutable offense?
17　　　Q　(BY MR. TONDRE)　Yeah.
18　　　A　I'm not a prosecutor, I don't know.
19　　　Q　Well, is it a chargeable offense by a
20　fair-minded law enforcement officer to charge somebody
21　with a crime for making a threat that if the -- if the
22　sheriff doesn't take the horses, we will?
23　　　A　Well, I don't think -- if it had been put
24　that way, probably, yes.　But it wasn't put that way.
25　　　Q　Well, let's assume it was put that way.

Page 43

1　Is that something that should have been charged?
2　　　MR. SCHIMBERG:　Object to form.
3　　　A　If the sheriff doesn't take them, we
4　will?
5　　　Q　(BY MR. TONDRE)　Right.　The outcry was --
6　let me put it in perspective.　The outcry from early
7　on, starting with Dr. Olds, was get the horses off of
8　the Echo Valley Ranch.
9　　　And when Cindy Hardey entered into the
10　warning agreement and left the horses at Echo Valley
11　that's when the outcry started, get the horses off the
12　ranch or we'll take them ourselves.　Is that something
13　that should have been investigated by your department
14　if somebody in your department knew about it?
15　　　MR. LEBSACK:　Form.
16　　　MR. SCHIMBERG:　Object to form,
17　foundation, go ahead.
18　　　A　Sure.
19　　　Q　(BY MR. TONDRE)　Why?
20　　　A　Well, I mean, first of all, yeah, I mean
21　did they have the opportunity?　Could they actually do
22　it?　I'm sure all of that is looked at.　I mean, if
23　somebody's making that threat and live in California,
24　do they really have the opportunity to do it in
25　Colorado?

Page 44

1　　　Q　How about if they are making that threat
2　and they're in Park County?
3　　　A　If they are in the Park County, yeah,
4　they would have -- then they'd be in the proximity, so
5　they would probably carry out that threat.
6　　　Q　And if they are making that threat in --
7　if it's coming from Jefferson County, what would you
8　do?
9　　　MR. SCHIMBERG:　Object to form.
10　　　A　Same thing, I mean, you want to get ahold
11　of them, you find out.
12　　　Q　(BY MR. TONDRE)　Would that be something
13　you could investigate, or would you have to refer to
14　Jefferson County sheriff?
15　　　A　Oh, no, we could investigate it.
16　　　Q　You could investigate it?
17　　　A　Sure.
18　　　Q　Since the threat is being made in --
19　　　A　My county.
20　　　Q　-- Park County, they've fired across the
21　line?
22　　　A　But would it be a threat?　I don't know.
23　　　Q　Is it a threat that if you don't do
24　something, we will?
25　　　A　I think it's a -- a concern.

Page 45

1　　　MR. TONDRE:　Why don't we take a break.
2　　　MR. SCHIMBERG:　Sure.
3　　　(Recess was taken from 10:55 a.m. to
4　11:10 a.m.)
5　　　Q　(BY MR. TONDRE)　Okay.　Sheriff Wegener, is
6　it fair to say that the sheriff's office bowed to
7　public pressure in this matter?
8　　　A　Oh, I don't think so.
9　　　Q　Let me read to you from page 119 of
10　Exhibit 66.　I think it's Exhibit 66.　What happened to
11　the book?
12　　　MR. SCHIMBERG:　I have it.
13　　　MR. TONDRE:　Sheriff, that's -- he
14　stiffed the exhibits, take him in.
15　　　MR. SCHIMBERG:　This is Jeffco.　What
16　page?
17　　　MR. HATLEE:　I can solve that problem
18　too.
19　　　MR. TONDRE:　I think it's exhibit -- oh,
20　119.
21　　　THE DEPONENT:　Oh, right there.　You
22　opened up right to it.
23　　　MR. SCHIMBERG:　There you go.
24　　　Q　(BY MR. TONDRE)　First paragraph of
25　Exhibit 19 reads: "On May 16, 2012, I was notified by

Page 50

1 obtain a search or arrest warrant?
2          MR. SCHIMBERG: Object to form. Go
3 ahead.
4          A   The legal basis?
5          Q   (BY MR. TONDRE) Yes.
6          A   Well, they're still a peace officer by
7 definition if they're acting in their scope of their
8 duties. So if I appoint them as a deputy sheriff, then
9 they can obtain -- they would have the same rights as
10 any other deputy sheriff.
11         Q   Was Cindy Hardey a deputy sheriff?
12         A   Yes.
13         Q   Did she have -- did she have the legal
14 right to execute a warrant?
15         A   Yes.
16         Q   Did you ever read Cindy Hardey's
17 testimony which led to the judge holding she acted in
18 bad faith?
19         MR. SCHIMBERG: Object to form. Go
20 ahead.
21         A   Yeah, I may have looked at it. I -- I
22 can't recall it all, but...
23         Q   (BY MR. TONDRE) When did you look at it?
24         A   A year ago, maybe, two years ago.
25 Whenever the case -- the decision came out. I looked

Page 51

1 at the Judge's ruling and how that was worded.
2          Q   Does the name Eugene Ferraro mean
3 anything to you?
4          A   That was one of the emails that the
5 undersheriff had received.
6          Q   Who else do you remember the undersheriff
7 receiving emails from?
8          A   I can't recall those -- the names. I --
9 I know there was a vet that he had talked with. Yeah,
10 and I can't remember specific names.
11         Q   Was the vet Dr. Olds?
12         A   Like I, say I can't remember the
13 specifics of it.
14         Q   How about the name Barbara Wright, does
15 that mean anything to you?
16         A   No. I don't recall -- remember that
17 name.
18         Q   How about the name Monika Courtney?
19         A   I remember that name.
20         Q   What do you remember about that name?
21         A   I just remember that -- somebody saying
22 that name.
23         Q   In the buffalo case, what were the
24 charges?
25         A   I think cruelty to animals. Various -- I

Page 52

1 mean, I don't remember every charge.
2          Q   If I go out here and shoot an elk, is
3 that cruelty to an animal?
4          A   Actually, if you shoot an elk that would
5 be hunting out of season.
6          Q   How about if I am shooting in the season?
7          A   That would depend if your license is in
8 the area.
9          Q   What I'm struggling with is -- isn't
10 shooting somebody's buffalo more of a crime of injury
11 to their property rather than animal cruelty?
12         MR. SCHIMBERG: Object to form. Go
13 ahead.
14         A   Yeah. Like I say, I don't recall
15 exactly.
16         Q   (BY MR. TONDRE) Okay. Fair enough. Does
17 the name Harmony HorseWorks mean anything to you?
18         A   I think -- yes. I think there was
19 something about Harmony HorseWorks.
20         Q   Was it your impression that Undersheriff
21 Gore was attempting to appease the persons' responsible
22 for the public outcry?
23         MR. SCHIMBERG: Object to form. Go
24 ahead.
25         A   I guess what do you mean by -- he was

Page 53

1 attempting to appease them?
2          Q   (BY MR. TONDRE) Yeah.
3          A   I think that he was trying to, you know,
4 help get information out to them that we were, in fact,
5 prosecuting the case -- or excuse me, investigating the
6 case and that we were trying to get the DA's office a
7 prosecutable case.
8          Q   And just how would you be doing that? By
9 going to a fund-raiser?
10         MR. SCHIMBERG: Object to form.
11         Q   (BY MR. TONDRE) Or giving them
12 investigative materials?
13         MR. SCHIMBERG: Same objection.
14         A   Like I say, he shouldn't be giving them
15 investigative materials.
16         Q   (BY MR. TONDRE) You have no recall of ever
17 talking to Dr. Horton or Dr. Burton; is that correct?
18         A   Well, I've -- when you showed me that
19 thing, I guess -- I do recall Dr. Horton, I guess was
20 the one that I was in a conference call that we had
21 actually listened to at the office.
22         Q   Oh, so you do remember?
23         A   Well, I can recall that we had a
24 conference call, yes.
25         Q   Do you remember anything you said during

14 (Pages 50 to 53)

FRED WEGENER - JULY 24, 2014

Page 54

1  that conversation?
2      A  I -- I think I answered something --
3  question about Mr. Swift, but I -- as far as being a
4  rancher, that's...
5      Q  What do you know about Mr. Swift's
6  experience as a rancher?
7      A  This -- just that he has been a rancher
8  for a while.  He has had horses for a while.
9      Q  What's his reputation before he was
10 prosecuted by your office?
11     A  Gosh.  Just that he had horses, I mean, I
12 don't know as far as reputation.  I'm not -- like I
13 said, I'm not in those circles or talk to all those
14 people about horses; so I don't know.
15         I think when he lived on Quackie, I know
16 they had horses there.
17     Q  Now Sergeant Priestly said in her report
18 on page 91 which we talked about before that you asked
19 if Dr. Horton thought Swift did not call a vet sooner
20 because he was an older rancher and he thought he could
21 take care of things himself.  Do you remember asking
22 that question?
23     A  Yeah, I could have.
24     Q  What caused -- what would -- if you did,
25 what caused you to ask it?  What were you searching

Page 55

1  for?
2      A  Because I've had other individuals do the
3  same thing.
4      Q  Well, did you direct that they make an
5  investigation as to what his qualifications were to do
6  so?
7      A  Whose qualifications, I'm sorry?
8      Q  Mr. Swift.
9      A  No.  I just know that, you know, we have
10 individuals that have -- if they have been doing it a
11 long time.  I know we had the Vern Wagner case; Vern
12 Wagner was the same thing.  Somebody who has been doing
13 it a long time, so more apt to try older methods or
14 whatnot.
15     Q  You lost that case too didn't you?
16     A  I -- well, yeah.  Recently overturned, I
17 guess.
18     Q  Well, the jury threw out everything but
19 one count, the judge threw out the last count, right?
20     A  On the appeal, the judge threw it out,
21 you're correct.
22     Q  Did you direct anybody to make an
23 investigation into Mr. Swift's qualifications to handle
24 the situation out at Echo Valley?
25     A  No.

Page 56

1      Q  Are you familiar with the Tenth Circuit
2  authority that requires an investigation into all
3  aspects of the case before obtaining an arrest warrant?
4      MR. SCHIMBERG:  Object to form.
5      Q  (BY MR. TONDRE) Or a seizure warrant?
6      MR. SCHIMBERG:  Object to form.
7  Foundation.  Go ahead.
8      Q  (BY MR. TONDRE) Cortez versus Cauley
9  (phonetic)?
10     MR. SCHIMBERG:  Thank you.
11     A  Cortez versus Caley, no.  I'm not.
12     Q  (BY MR. TONDRE) Aren't you charged with --
13 you and -- and all of the deputies in your office are
14 charged with knowledge of the legal opinions of the
15 United States Court of Appeals for the Tenth Circuit;
16 is that right, sir?
17     MR. SCHIMBERG:  Object to form.  Go
18 ahead.
19     A  Well, I think, you know, you try and get
20 information, yes.
21     Q  (BY MR. TONDRE) A seizure without adequate
22 investigation is a violation of the fourth amendment;
23 do you understand that?
24     MR. SCHIMBERG:  Object to form.
25     A  Yes.

Page 57

1      MR. SCHIMBERG:  Legal conclusion.
2      Q  (BY MR. TONDRE) Do you recall during the
3  course of that conversation, telephone conference that
4  you participated in, that Dr. Horton expressed the
5  opinion that the case was at a fork in the road with
6  respect to determination of the cause of the condition
7  of the horses and that much more analysis needed to be
8  done?
9      MR. LEBSACK:  And -- form.
10     MR. SCHIMBERG:  Join.
11     A  No.
12     Q  (BY MR. TONDRE) If that sort of
13 information had been stated by Dr. Horton, it should
14 have been investigated, correct, sir?
15     A  Well, I think there was additional
16 investigation done, yes.
17     Q  That investigation wasn't done before the
18 seizure was undertaken, was it?
19     MR. SCHIMBERG:  Foundation.  Go ahead.
20     A  I think there was -- there was some done
21 but I think there was some done afterwards.
22     Q  (BY MR. TONDRE) Yeah.  What's the
23 difference between starvation and malnutrition?
24     MR. SCHIMBERG:  Object to form.
25 Foundation.

15  (Pages 54 to 57)

# EXHIBIT  25

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

 **COPY**

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER,
and ASHLEIGH OLDS,

Defendants.
------------------------------------------------------------
DEPOSITION OF MONTE GORE
June 24, 2014
------------------------------------------------------------

Deposition location:
825 Clark Street Road
Fairplay, Colorado

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226


                                For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202

                                For the Defendant, Olds.


**AVERY WOODS REPORTING**
455 Sherman Street, Suite 250 · Denver, Colorado 80203
303-825-6119 · 1-800-962-3345 · FAX 303-893-8305
www.averywoods.net

Page 2

```
 1    APPEARANCES (CONTINUED):
 2    Timothy P. Schimberg, Esq.
      FOWLER, SCHIMBERG  & FLANAGAN, P.C.
 3    1640 Grant Street, Suite 300
      Denver, Colorado  80203
 4              For Park County.
 5
 6    Also present: Ronald L. Swift; Randy Hatlee; and Bobbi
      Priestly
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        The deposition of MONTE GORE, called
 2    for examination by the Plaintiffs, was taken in
 3    the offices of Park County, 825 Clark Street,
 4    Fairplay, Colorado, commencing at 3:31 p.m., on
 5    the 24th day of June, 2014, before Linda L.
 6    Frizzell of Avery/Woods Reporting Service, Inc.,
 7    455 Sherman Street, Suite 250, Denver, Colorado
 8    80203, Registered Professional Reporter, Certified
 9    Shorthand Reporter, and Notary Public in and for
10    the State of Colorado, pursuant to the Federal
11    Rules of Civil Procedure.
12            I N D E X
13    EXAMINATION OF MONTE GORE            PAGE
14    BY MR. TONDRE                         4
15            INITIAL
      PREVIOUSLY MARKED EXHIBITS:        REFERENCE
16
      66  Park County Records            8
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              MONTE GORE,
 2    being first sworn to state the truth, the whole
 3    truth, and nothing but the truth, testified under oath as
 4    follows:
 5            EXAMINATION
 6    BY MR. TONDRE:
 7        Q  State your name, please, sir.
 8        A  Monte Kevin Gore.
 9        Q  And your occupation, Mr. Gore?
10        A  I'm the undersheriff of the Park County
11    Sheriff's Office.
12        Q  What are the duties of the undersheriff?
13        A  Basically, I'm second in command, and I
14    supervise all the divisions under -- in the Park County
15    Sheriff's Office.
16        Q  What -- what is involved in your
17    supervision of the animal cruelty division?
18        A  That's one of the divisions under my
19    command, but primarily I leave the animal control
20    issues to Captain Bonnelycke and Sergeant Priestly.
21        Q  What's your educational background?
22        A  Excuse me?
23        Q  What's your educational background?
24        A  I graduated with honors from St. John's
25    University with a 4.0 GPA.  I graduated from the
```

Page 5

```
 1    Colorado Law Enforcement Officer -- or Law Enforcement
 2    Academy with a GPA of 4.0.  I'm a graduate of the US
 3    Department of Justice National Institute of Corrections
 4    Academy.  I'm a graduate of the County Sheriffs' of
 5    Colorado Command School.  Let me see.
 6        I'm graduate of Basics SWAT school.  I'm
 7    a graduate of advanced SWAT school.  I'm a graduate of
 8    the FBI National Academy out of Quantico and graduated
 9    with a 4.0 GPA.  I have --
10        Q  How long have you been with the Park
11    County Sheriff's office?
12        A  Since September 1st of 2000.
13        Q  St. John's, is that in New York?
14        A  No.  Louisiana.
15        Q  Oh, okay.  Has your entire career been in
16    law enforcement?
17        A  It has.
18        Q  What was your first law enforcement job?
19        A  Detention deputy sheriff for the Otero
20    County Sheriff in La Junta.
21        Q  And how long were you in that position?
22        A  From 1981 to I believe May of 1984.
23        Q  And what was next?
24        A  I tested for and placed number one for
25    the Weld County Sheriff's office and worked there from
```

Page 6

```
 1    1984 until I think 1988.
 2         Q   19 what?
 3         A   '8.
 4         Q   '88.  What was your position at Weld
 5    County?
 6         A   I was hired into the jail, and I think I
 7    was promoted several times to the rank of proficient
 8    correctional officer 2.
 9         Q   What was your next position?
10         A   Moved to the mountains and got a job for
11    the Summit County Sheriff's Office in Breckenridge,
12    Colorado, in 1988 -- excuse me, 19- -- hold on.  '84.
13         Q   '88?
14         A   Hold on.  Otero, 1981-'84.  '84 to '88.
15    Yeah, 1988, moved up through the ranks to captain.  And
16    was recruited by the Park County Sheriff's Office in
17    2000, they were starting a jail; and tested for the
18    position of jail administrator, captain; was selected
19    in that testing procedure; and have been with Park
20    County since September 2001 to present.
21         Q   Are you post certified?
22         A   I am.
23         Q   When did you become post certified?
24         A   1992.  I also have probably thousands of
25    hours in training as far as an incident management,
```

Page 7

```
 1    leadership, law enforcement as a PIO, management,
 2    strategic planning, leadership.  Pretty much the whole
 3    gamut.
 4         Q   What -- what was involved in -- did you
 5    have to -- did you have to attend any sort of course of
 6    study in order to obtain your post certification?
 7         A   Yes.
 8         Q   What -- what did you attend?
 9         A   The law enforcement training academy in
10    Golden.
11         Q   When did you do that?
12         A   1992.
13         Q   And that was what, nine months, six
14    months?
15         A   Something along those lines.
16         Q   And when did you become undersheriff?
17         A   Towards the end of 2005.
18         Q   Until you became post certified, you were
19    involved with jail facilities?
20         A   Correct.  And I also went to a detention
21    officer academy, I think in 1991 or 1981.
22         Q   What involvement did you have in the
23    decision to file animal cruelty charges against
24    Mr. Hatlee and Mr. Swift?
25         A   I don't think I had any involvement of --
```

Page 8

```
 1    in the filing of the charges.
 2         Q   What, if any, involvement did you have in
 3    the drafting of the affidavit that Cindy Hardey did in
 4    order to obtain a -- a seizure and search warrant?
 5         A   None.
 6         Q   As you know, there was some testimony
 7    this morning about a telephone call you made to Bobbi
 8    Priestly on February the 19th.  We're going to hand you
 9    an exhibit that has been marked Exhibit 66, you can
10    look at this if it makes any difference to you or not.
11         But on page 89 of that exhibit, it says:
12    "On February 19, 2012 I received a telephone call from
13    Under sheriff Gore at my residence.  The Under sheriff
14    advised me that he had received several -- several
15    telephone calls from the Public Information Officer for
16    the State of Colorado's Department of Agriculture
17    Office."
18         It's the -- the fourth paragraph on that
19    page.
20         MR. SCHIMBERG:  Yeah, just so you know,
21    Brice, because you were reading, we were getting our
22    way to 89.
23         A   Yeah, if you can start over again.
24         MR. TONDRE:  Sure.
25         MR. SCHIMBERG:  Or just focus us.
```

Page 9

```
 1         Q   (BY MR. TONDRE) Read -- read that
 2    paragraph to yourself, and then I'll ask you some
 3    questions about it.
 4         MR. SCHIMBERG:  Where were you reading?
 5         A   Beginning:  "On February 19th"?
 6         Q   (BY MR. TONDRE) "On February 19th, 2012 I
 7    received a telephone call."
 8         MR. SCHIMBERG:  Thanks.
 9         A   Okay.
10         Q   (BY MR. TONDRE) Do you recall making
11    that -- or did you make the telephone call referenced
12    there?
13         A   Yes.
14         Q   And do you recall from whom you received
15    telephone calls that promoted you to make this call?
16         A   I was inundated with telephone calls.
17    I'm not specifically sure who all called me.
18         Q   How about emails, were you receiving
19    emails also?
20         A   I was.
21         Q   Did you have -- would they come to the
22    general sheriff's number or was there an animal control
23    number; do you know?
24         A   As I recall, Sergeant Priestly informed
25    me that the animal control folks were being inundated
```

**Page 10**

1 with calls. And were -- were for the most part
2 dysfunctional dealing with the amount of telephone
3 calls that they were receiving. So I took that as the
4 PIO for the department, I took -- started taking those
5 calls.
6    Q  What's a PIO?
7    A  Public information officer.
8    Q  Oh, okay. Now, you say you were
9 inundated. You got any estimate as to how many emails
10 and telephone calls you received?
11    A  A bunch. More than I've ever received on
12 any other case.
13    Q  Did you get any sense of what the -- I
14 take it the callers and the writers weren't calling to
15 thank you for anything, were they?
16    A  You know, I ended up listening to a lot
17 of folks. People were very upset over the situation.
18 I diffused a lot of the folks and talked to them, spent
19 hours on the phone. And as a result of some of that
20 communication, I did become concerned -- as I recall,
21 the most significant thing that I became concerned
22 about was that there was talk or information or
23 statements that there might -- that there was possibly
24 going to be a -- an attempt at horse rescue at the Echo
25 Valley Ranch.

**Page 11**

1    Q  Did you make any effort to identify the
2 makers of those calls?
3    A  A lot of the folks made anonymous calls
4 and left messages. A lot of the information that I
5 received, I didn't -- as I recall, I didn't get a
6 serious-type threat. It was more concern that we
7 needed to avoid a potential problem.
8        That's when I contacted Sergeant Priestly
9 and suggested that she contact Mr. Swift and Hatlee and
10 see if we could move the horses to an undisclosed
11 location. And I thought that that would diffuse the
12 situation.
13    Q  Did it?
14    A  It did. Most certainly.
15    Q  Wasn't there an outcry about moving the
16 horses rather than seizing them?
17        MR. SCHIMBERG: You know, let me object
18 to form. Go ahead and answer.
19    A  I'm not sure I understand your question,
20 Mr. Tondre.
21    Q  (BY MR. TONDRE) Well, what I'm searching
22 for is did -- did you receive any complaints that --
23 complaints about the fact that the horses had been
24 moved to a secret location rather than seized by the
25 county?

**Page 12**

1    A  I believe that's correct. I think, I --
2    Q  Now, when did you first -- well, let me
3 ask this: Do you have any knowledge of how the word
4 got out regarding the incident -- the incident that
5 occurred on February 16th, particularly the welfare
6 check, the well-being check of -- made by Officer
7 Hardey? .
8    A  As I recall, I think that there was a --
9 a news story on Channel 7.
10    Q  To your knowledge, did anybody in the
11 sheriff's office contact the Channel 7 folks?
12    A  No.
13    Q  Did you ask Cindy Hardey to tell
14 Mr. Hatlee and Mr. Swift if the news people contact
15 them to just say no comment?
16    A  No.
17    Q  Do you have any impression as to how the
18 newspeople got ahold of the information that there had
19 been a warning given to Hatlee and Swift?
20    A  Not that I recall.
21    Q  Is it fair to say the only people that
22 had knowledge of what went on out there were Hatlee,
23 Swift, the sheriff's people and -- and Ashleigh Olds?
24        MR. LEBSACK: Objection to form.
25    A  In what -- the new one went -- what

**Page 13**

1 happened -- what happened when?
2    Q  (BY MR. TONDRE) On February 16th, the
3 visit when it was decided to give a warning to Hatlee
4 and Swift?
5    A  So Hatlee and Swift were given a warning
6 and why -- do I have any recollection how that
7 occurred?
8    Q  No, no, no. What I'm searching for is:
9 Do you know of any person who had knowledge of what
10 occurred out on Echo Valley Ranch that day other than
11 Mr. Swift, Mr. Hatlee, the sheriff's department people,
12 and Ashleigh Olds?
13    A  I don't believe so.
14    Q  All right. At some point in time, you
15 issued a press release. Do you recall that?
16    A  I do.
17    Q  Do you recall why you issued the press
18 release?
19    A  Well, I think we were being inundated
20 with -- with calls from media, and I think we responded
21 to -- to that. That's typically what we do.
22    Q  Now were you concerned for the safety of
23 Mr. Hatlee and Mr. Swift?
24    A  I was concerned about the safety for
25 everybody involved. And when I say that, that would be

4  (Pages 10 to 13)

MONTE GORE - JUNE 24, 2014



Page 14

1    Hatlee, Swift, and any would-be horse rescuer.
2       Q   To your knowledge, was there ever a -- an
3    investigation made with respect to any of the
4    threatened conduct?
5       A   As I recall, the information that I
6    received was more along the lines of people being
7    upset. People wanting to do a horse rescue, people
8    were upset with -- with the sheriff's office. I don't
9    think that there was a serious enough threat that would
10   have reached the threshold of menacing.
11      Q   Do you have a deputy by the name of Jeff
12   DeBerry?
13      A   I do.
14      Q   Do you know if he investigated a menacing
15   claim?
16      A   To my knowledge, Jeff DeBerry
17   investigated a harassment report and this was sometime
18   later. One of the attendees at -- at one of the
19   hearings, I think after the hearing, had stopped by
20   Mr. Swift's door and made some disparaging comments.
21           I think a call was made wanting this
22   person -- I think her name was Mary Ellen Irvine,
23   investigated for harassment; and I think Jeff DeBerry
24   investigated that case.
25      Q   Do you know what the result of the

Page 15

1    investigation was?
2       A   I was informed that Steve Sullivan, the
3    deputy DA, felt that this was more tit for tat going on
4    and didn't want to look at the -- or didn't want to
5    pursue the case after it was presented to him by Jeff
6    DeBerry.
7       Q   The district attorney was running for
8    election at that time, wasn't he?
9       A   That's correct.
10      Q   Do you know if there were any other
11   investigations for harassment or menacing in connection
12   with this matter?
13      A   At the same court hearing, I know I was
14   contacted by Mr. Kerrigan. Him and I had somewhat of a
15   heated conversation. This was an emotionally charged
16   situation on both sides. And I think he had pointed to
17   a vehicle that had come to court, it was driven by Gene
18   Ferraro, and it was missing a front license plate.
19           And he wanted to have that investigated.
20   And I called local authorities, and I believe
21   Mr. Ferraro was given a summons.
22      Q   This was over not having a front license
23   plate?
24      A   That's correct.
25      Q   Let me make sure I understand.

Page 16

1    Somebody -- somebody reported Gene Ferraro for not
2    having a front license plate?
3       A   Mr. Kerrigan who is a friend of
4    Mr. Hatlee and Swift.
5       Q   I see. How much contact did you have
6    with Gene Ferraro during the course of this matter?
7       A   You know, I had -- I think they met at my
8    office on one occasion. And I think that there were a
9    lot of emails that went back and forth over the course
10   of time with Mr. Ferraro. And I think I talked to him
11   at the horse function in Evergreen.
12      Q   The fundraiser?
13      A   The fundraiser.
14      Q   I'll come to that in a minute.
15          MR. SCHIMBERG: Figured. I think we know
16   each other's outlines now.
17      A   You come to that on a lot of occasions.
18      Q   (BY MR. TONDRE) Did -- how would you
19   characterize Mr. Ferraro's demeanor in connection with
20   this matter?
21      A   As we went through this process, people
22   were initially angry, they were frustrated; and I think
23   that they kind of lashed out. They did not trust the
24   sheriff's office. As I communicated with these folks,
25   eventually, I think we gained some credibility with

Page 17

1    them. And I would characterize them and everybody
2    pretty much as -- I see them as stakeholders. They
3    were on opposite sides, they were very passionate about
4    this case. And they were very interested in this case.
5       Q   In an email, sent -- well, first of all,
6    do you know Barbara Wright?
7       A   Yes.
8       Q   And how do you know her?
9       A   She is one of the horse advocates.
10      Q   Did you know of her before this Hatlee
11   and Swift case?
12      A   I did not.
13      Q   In an email she said the Ferraros are
14   helping with lobbying officialdom to move on this
15   travesty. Would you characterize the Ferraros as
16   "lobbying officialdom"?
17      A   As I recall at the onset, I think the
18   Ferraros were very upset. They felt there was a
19   travesty going on here. They didn't trust the
20   sheriff's office.
21          As we continued to move forward, and I
22   think, eventually, we were able to communicate on a --
23   on a better basis.
24          MR. SCHIMBERG: Listen to the question,
25   would you.

5 (Pages 14 to 17)

Page 22

1  A  I believe -- well, I'll let you finish.
2  (Mr. Tondre conferring with
3  Mr. Hatlee outside hearing of reporter.)
4  Q  (BY MR. TONDRE) Who was the warrant served
5  on?
6  A  I think we gave -- or I gave the
7  paperwork to Kirstin and talked to her for some time.
8  Q  What involvement did you have with
9  loading the animals?
10  A  As they were loading the animals, I know
11  I think the small one appeared pretty weak; and I think
12  I ended up --
13  Q  Was that Chance?
14  A  I'm not sure which one it was.
15  Q  But it was the one that was in the worse
16  shape?
17  A  It was one that was in very bad shape.
18  And I think I ended up helping push him into the
19  trailer.
20  Q  Did you have any discussions with
21  Mr. Hatlee regarding moving that horse?
22  A  No.
23  Q  Did you have a veterinarian look at that
24  horse to see whether it was safe to move him?
25  A  No.

Page 23

1  Q  So who made the decision that it was safe
2  to move that horse?
3  A  That decision was made by Sergeant
4  Priestly, and I supported that decision.
5  Q  And what was your basis that supported
6  that -- for supporting that decision?
7  A  I have faith in Sergeant Priestly based
8  on my experience with her.  She knows what she's doing,
9  she's competent, and I trust her.
10  Q  Who's in charge in the sheriff's
11  department of handling disciplinary matters with
12  respect to employees of the sheriff's department?
13  A  Well, that would depend on the employee
14  of the sheriff's office.
15  Q  I'm speaking specifically with respect to
16  Cindy Hardey, who would be responsible for disciplining
17  for misconduct?
18  MR. SCHIMBERG:  Let me object to form.
19  Go ahead and answer.
20  A  That would be her immediate supervisor in
21  this case.
22  Q  (BY MR. TONDRE) That would be Bobbi
23  Priestly?
24  A  Sergeant Priestly, that's correct.
25  Q  And she's the person designated by the

Page 24

1  sheriff to handle discipline with respect to animal
2  cases?
3  A  She would be the person designated by the
4  sheriff to discipline or commend folks under her direct
5  supervision.
6  Q  And what's the disciplinary process in
7  the sheriff's department?
8  MR. SCHIMBERG:  Object to form.  Go
9  ahead.
10  A  We have a policy and procedure manuals
11  which lay out disciplinary procedures depending on the
12  type of discipline that needs to be meted out to a
13  person.  A lot of times discipline can take the course
14  of a simple -- even a verbal talking to or written
15  counseling or written reprimand up to suspension and
16  termination.
17  Q  (BY MR. TONDRE) Is filing a bad faith
18  affidavit a disciplinary matter?
19  MR. SCHIMBERG:  Object to form.
20  Foundation.  Go ahead.
21  A  I don't consider this to be a bad faith
22  on the part of Cindy Hardey.  I feel that the bad faith
23  decision made by Judge Green is speculation on his
24  part.
25  MR. TONDRE:  As a civil rights lawyer,

Page 25

1  let me tell you I'm thankful the cops don't decide
2  what's good faith.
3  MR. SCHIMBERG:  That's inappropriate,
4  Brice.
5  MR. TONDRE:  It may be inappropriate but
6  I'll make my statement.
7  MR. SCHIMBERG:  Well, you've made it.
8  There's nothing we can do about that.  Questions and
9  answers, please.
10  Q  (BY MR. TONDRE) Now you were disappointed
11  by the verdict, weren't you?
12  A  I was.
13  Q  You stated that for all the world to hear
14  in the media, right?
15  MR. SCHIMBERG:  Object to form.
16  Foundation.
17  A  I -- I might have.  I might have made a
18  statement.
19  Q  (BY MR. TONDRE) Why were you disappointed?
20  A  I felt and feel that your clients abused
21  and neglected those horses.
22  MR. TONDRE:  And as a civil rights
23  lawyer, I'm thankful you don't decide those matters,
24  the juries do.
25  MR. SCHIMBERG:  Oh, come on.  Strike the

7  (Pages 22 to 25)

MONTE GORE - JUNE 24, 2014

Page 26

1  editorial comment.
2      Q  (BY MR. TONDRE)  Now why did you attend and
3  ask three members of the sheriff's department to attend
4  with you a fundraiser for people who were advocating
5  taking of Hatlee and Swift's horses?
6      MR. LEBSACK:  Objection to the form.
7      MR. TONDRE:  Form and foundation.  Go
8  ahead.
9      A  We were invited to the fundraiser.  And I
10 actually felt that the fundraiser was a positive
11 endeavor by the horse advocates simply because that
12 diverted their attention from other issues and caused
13 their attention to be focused on a fundraiser project
14 in another county with very limited attendance.
15     Q  (BY MR. TONDRE)  The fundraiser was
16 dedicated to the Bailey horses; wasn't it?
17     A  The fundraiser was a fundraiser to, I
18 think, pay vet bills.
19     Q  How much time did you spend at the
20 fundraiser?
21     A  I would estimate 45 minutes to an hour.
22     Q  Now, did you provide Barbara Wright with
23 investigative materials developed in the Hatlee and
24 Swift case?
25     A  Can you be more specific?

Page 27

1      Q  Did Barbara Wright ask you for
2  information about the investigative materials in the
3  Hatlee and Swift case?
4      A  Can you be more specific as to what the
5  materials were?
6      Q  Well -- well, let me just ask it this
7  way:  Did you provide any materials to Barbara Wright
8  for use at the fundraiser?
9      A  I'm trying to think, so give me a minute.
10     MR. SCHIMBERG:  You know, for my own
11 good, would you read the question back, please.  I
12 don't think I have an objection, but I want to hear it
13 again.
14     (Whereupon, the question at page 27,
15 line 6, was read by the reporter.)
16     MR. SCHIMBERG:  Are you waiting for
17 Mr. Tondre?
18     A  I am.
19     MR. SCHIMBERG:  Or do you have an answer?
20 I think we're waiting for your answer, but I shouldn't
21 speak for others.
22     A  I think what you are referring to is
23 horse pictures.  And I did release some horse pictures.
24 I'm not sure if it was for the fundraiser or to -- I
25 know my goal was to alleviate concerns with the public

Page 28

1  and with the horse advocates that the horses were being
2  taken care of.
3      Q  (BY MR. TONDRE)  Well, did you happen to
4  see those pictures when you went to the fundraiser?
5      A  I'm not sure.
6      Q  Did you see a slide show that was
7  presented at the fundraiser?
8      A  I did not observe a -- a slide show, but
9  I did see the slides I think were being shown at one
10 end of the fundraiser.
11     Q  Did you hear any presentations that were
12 made by anyone?
13     A  No.
14     Q  Did you see any poster boards that were
15 around discussing the Bailey starving horses?
16     A  No.
17     Q  Did you stand up in front of the gathered
18 crowd and be introduced?
19     A  I wouldn't call it being introduced to a
20 crowd.
21     Q  What would you call it?
22     A  I think I was introduced to individuals.
23     Q  By whom were you introduced?
24     A  I don't recall.
25     Q  Who handles open records and requests in

Page 29

1  the sheriff's office here?
2      A  Typically, if we get a -- an open records
3  request, that will go through the administration; and
4  typically we'll consult with our county attorney.
5      Q  Isn't the typical response and the policy
6  of the sheriff's department not to disclose information
7  regarding an ongoing -- ongoing investigation and cite
8  the Criminal Justice Act in support for that?
9      A  Can you repeat the question?
10     Q  Sure.  Isn't it the standard procedure of
11 the sheriff's office, the Park County Sheriff's office
12 in response to an Open Records Act and Criminal Justice
13 Act Request for Information, to respond we will not
14 release information from an ongoing investigation and
15 cite the Criminal Justice Act?
16     A  That can be our response.
17     Q  Before sending those pictures out to
18 Barbara Wright, did you consult with the county
19 attorney?
20     A  I believe I consulted with Steve
21 Sullivan.
22     Q  And what did Mr. Sullivan tell you?
23     A  That that was okay.
24     Q  Did it cross your mind that in 2012 his
25 boss was up for election?

8  (Pages 26 to 29)

MONTE GORE - JUNE 24, 2014

Page 30

1     A  I was aware that his boss was up for
2  election.
3     Q  Now, is it your usual practice to consult
4  with the district attorney's office on -- well, first
5  of all, was this a followup records act request?
6     MR. SCHIMBERG:  You've lost me, Brice,
7  I'm sorry.  What's the -- what's --
8     Q  (BY MR. TONDRE)  Was Barbara Wright's
9  request for photographs --
10     MR. SCHIMBERG:  All right.  Got you,
11  thanks.
12     Q  (BY MR. TONDRE)  Was Barbara Wright's
13  request for photographs a formal Open Records Act,
14  Criminal Justice request?
15     A  I don't think so.
16     Q  Are you aware that Barbara Wright used
17  those pictures to raise money at the horse expo?
18     A  I believe -- yeah, I'm aware of that.
19     Q  Did you -- how did you learn about that?
20     A  I believe through emails and
21  communication with the district attorney's office.
22     Q  What's your veterinary background?
23     A  Very limited.
24     Q  Have you talked with Mr. Hatlee and
25  Mr. Swift -- well, first of all, do you have any

Page 31

1  knowledge of Mr. Swift's and Mr. Hatlee's handling of
2  the developing problems with those horses?
3     MR. LEBSACK:  Object to the form.
4     MR. SCHIMBERG:  Join.
5     A  The information that I received about
6  Hatlee and Swift was reported to me by animal control.
7     Q  (BY MR. TONDRE)  By who?
8     A  By animal control.
9     Q  Yeah.  So you got to rely on basically
10  Cindy Hardey, right?
11     A  Well, Cindy Hardey and Sergeant Priestly.
12     Q  First time Sergeant Priestly was to the
13  facility or saw any of the animals is when you seized
14  them, right?
15     A  I'm sorry, can you repeat the question?
16     Q  Sure.  Isn't it true that the first time
17  Bobbi Priestly saw those animals was when they were
18  seized on February 23rd?
19     A  I'm not sure if that is a true statement.
20     Q  How many other instances can you think of
21  where you gave investigative materials to some outside
22  interests?
23     A  Off the top of my head, I can't remember.
24  But I would restate that I did it with the permission
25  and authorization of Steve Sullivan, the deputy DA.

Page 32

1     Q  There was a lot of criticism of Steve
2  Sullivan also, wasn't there?
3     A  There was criticism.
4     Q  He was replaced by Mr. LeDoux because of
5  the criticism that was leveled at him for losing the
6  suppression hearing; isn't that right -- or the bond
7  hearing, I should say --
8     MR. SCHIMBERG:  Object to form and
9  foundation.
10     Q  (BY MR. TONDRE) -- or did the horses
11  return?
12     MR. SCHIMBERG:  Excuse me, sorry, same
13  objection.
14     A  I don't know if your statement is true or
15  not or why the district attorney took over the case.
16     Q  (BY MR. TONDRE)  Why -- did you have any
17  involvement in the decision to remove Cindy Hardey as
18  the lead investigator in the Hatlee and Swift case?
19     A  I did.
20     Q  What was -- what was your reason for
21  being involved in that?
22     A  As I recall, we did get criticism that
23  there was a relationship with Cindy, and I think this
24  was -- that she had -- that she had known Mr. Swift for
25  several years.  And that she was perhaps not being

Page 33

1  objective.
2     The second reason that I decided to have
3  Sergeant Priestly take over the case as she has more
4  experience in dealing with these kind of cases than
5  Cindy had.
6     Q  Let me see if I understand.  It's okay to
7  placate one side, but you don't want anybody favoring
8  the other side; is that the picture you're painting,
9  Mr. Gore?
10     MR. SCHIMBERG:  Object to form.
11     MR. LEBSACK:  Same.
12     MR. SCHIMBERG:  Argumentative.  Go ahead.
13     MR. TONDRE:  You bet and it's a closing
14  argument.
15     A  I'm not sure.  Well, actually I don't
16  agree with your statement.
17     MR. TONDRE:  Oh, good.  That's all I
18  have, thank you.
19     MR. SCHIMBERG:  Thank you, guys.  John?
20     MR. LEBSACK:  I have no questions.
21     (Whereupon, at 4:17 p.m. the
22  deposition was concluded.)
23
24
25

9 (Pages 30 to 33)