EXHIBIT  29

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

 **COPY**

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.

---------------------------------------------------------

DEPOSITION OF CINDY HARDEY
June 20, 2014

---------------------------------------------------------

                          Deposition location:
                          9998 Havekost Road
                          Conifer, Colorado  80433

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226

                                    For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202

                                    For the Defendant, Olds.



# AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

**Page 10**

```
1        A  Major ones, three.
2        Q  What were they?
3        A  The Walker case.  There was one before
4   that, but I can't remember its name.  And then the
5   Swift and Hatlee.
6        Q  Did the Walker case involve horses?
7        A  No.
8        Q  Did the other case that you can't
9   remember the name involve horses?
10       A  No.
11       Q  Did you ever investigate a case involving
12  horses?
13       A  Yes.
14       Q  How many?
15       A  I don't know.
16       Q  Did any investigation you conducted with
17  respect to horses result in prosecution other than the
18  Hatlee and Swift matter?
19       A  Yes.
20       Q  How many?
21       A  "Prosecution" meaning like we went to
22  court and jury trial?
23       Q  Yeah.
24       A  No.  It did not.
25       Q  How about pleas?
```

**Page 11**

```
1        A  No.
2        Q  Did you receive any sort of commission or
3   certification from the Department of Agriculture?
4        A  Yes.
5        Q  What did you receive?
6        A  My horse-handling certificate --
7        Q  All right.
8        A  -- that I obtained at the fairgrounds in
9   Jefferson County.
10       Q  That was it, eight hours?
11       A  Uh-huh.
12       Q  Does the term "code enforcement officer,"
13  mean anything to you?
14       A  Yes.
15       Q  What is that?
16       A  For Park County at the time that I worked
17  there, code enforcement meant that we went around and
18  checked MMJ houses.
19       Q  What's an MMJ?
20       A  Marijuana house to make sure that they
21  were legal and paying their taxes.
22       Q  Did that have anything to do with
23  animals?
24       A  No.
25       Q  What training did you receive with
```

**Page 12**

```
1   respect to obtaining search and seizure warrants?
2        A  My sergeant trained me throughout the
3   nine and a half years on how to --
4        Q  Your sergeant being whom?
5        A  Bobbi Priestly.
6        Q  And what -- do you remember any --
7   attending any formal courses of -- any formal courses
8   of instruction with respect to the requirements under
9   the fourth amendment to the United States Constitution?
10       A  No.
11       Q  Are you familiar with the case of Franks
12  versus Delaware?
13       A  No.
14       Q  You -- you familiar with any search and
15  seizure cases?
16       A  No.
17       Q  How many search warrants or seizure
18  warrants have you sought and obtained during your nine
19  years?
20       A  I don't know.
21       Q  More than two?
22       A  Yes.
23       Q  By what authority did you have -- were
24  you -- were you a commissioned peace officer?
25       A  No.
```

**Page 13**

```
1        Q  Were you familiar with the provision of
2   the criminal procedures guidelines?
3        A  No.
4        Q  Were you provided a Colorado peace
5   officer's handbook for use in connection with your
6   duties?
7        A  I had one available, yes.
8        Q  Did you review it carefully?
9        A  No.
10       Q  Were you aware that it's a violation of
11  law to omit material information from a search warrant
12  affidavit?
13           MR. SCHIMBERG:  Object to form.  Go
14  ahead.
15       A  I don't understand what you are asking.
16       Q  (BY MR. TONDRE) Let me see if I can make
17  it clear.
18           (Mr. Hatlee arrives.)
19       Q  (BY MR. TONDRE) Were you ever told as to
20  what the requirements were for an affidavit in support
21  of issuance of a seizure warrant?
22       A  Yes.
23       Q  And who told you that?
24       A  Sergeant Bobbi Priestly.
25       Q  Did Sergeant Bobbi Priestly instruct you
```

4  (Pages 10 to 13)

CINDY HARDEY - JUNE 20, 2014

**Page 14**

1  that it is a violation of constitutional law to omit
2  material facts from an affidavit in support of the
3  search warrant?
4      A  No.
5      Q  Did Bobbi Priestly inform you that it was
6  a violation of constitutional law to make a false
7  statement in an affidavit in support of a seizure
8  warrant?
9      A  No.
10     MR. SCHIMBERG:  Object to form.
11     Q  (BY MR. TONDRE) What did Bobbi Priestly
12 tell you about -- excuse me.
13     MR. HATLEE:  Gentlemen, excuse me, I have
14 to go to the morgue to take care of it.
15     MR. SCHIMBERG:  Blessings to your family.
16     MR. LEBSACK:  Yeah.
17     (Mr. Hatlee leaves.)
18     Q  (BY MR. TONDRE) What instructions did
19 Bobbi Priestly give you with respect to the
20 requirements for an affidavit in support of a seizure
21 warrant?
22     MR. SCHIMBERG:  Object to form.
23     A  To be honest, it's been a couple years.
24 I don't remember exactly because she taught me seven
25 years ago how to do it.

**Page 15**

1      Q  (BY MR. TONDRE) Did she use any written
2  materials in connection with her teaching of you?
3      A  She used her search and seizure warrant
4  as my guideline.  And I apologize again, that was
5  several years ago.
6      Q  I'm -- you say "she used her search and
7  seizure"?
8      A  Yeah.
9      Q  What do you mean?
10     A  As an example, she -- for when I had to
11 do mine a long time ago, she would pull up one of her
12 old ones and show me -- it showed me exactly how to do
13 it minus the narrative within the search and seizure
14 warrant.
15     Q  What do you mean "minus the narrative"?
16     A  Well, because the narrative changes with
17 every search and seizure warrant.
18     Q  But did she give you any guidance as to
19 what the requirements were under the law with respect
20 to an affidavit in support of a seizure warrant?
21     A  I'm sure she did.  But I can't quote or
22 remember what it was.
23     Q  Did Bobbi Priestly review the affidavit
24 that you submitted in support of a search and -- search
25 warrant and a seizure warrant in the Hatlee and Swift

**Page 16**

1  matter?
2      A  No.
3      Q  Did she know you were doing it?
4      A  Yes.
5      Q  In connection with the Hatlee and Swift
6  matter, how many times have you testified?
7      A  Three.
8      Q  Have you reviewed anything in preparation
9  for your deposition?
10     A  Yes.
11     Q  What have you reviewed?
12     A  My report.
13     Q  Have you reviewed your prior testimony?
14     A  I attempted to.  But it was a lot.
15     Q  It is a lot.
16     A  I just reviewed my report mostly, yes.
17     Q  Okay.
18     MR. SCHIMBERG:  I'm really glad I told
19 you to review it and you don't listen to your attorney.
20 That's okay.  No one does.
21     A  I'm sorry.
22     Q  (BY MR. TONDRE) Let me ask you:  Since you
23 did review your report, did you find anything in that
24 report that you felt was incorrect?
25     A  No.

**Page 17**

1      MR. SCHIMBERG:  I'm teasing you.
2      Q  (BY MR. TONDRE) How long have you known
3  Ron Swift?
4      A  Since grade school.  15, 20 -- 20 years
5  maybe.
6      Q  And how long have you known Randy Hatlee?
7      A  I met him the first time in 2012.
8      Q  When you went to --
9      A  Yeah.
10     Q  -- Echo Valley Ranch?
11     A  Yeah.
12     Q  In your experience as an animal -- well,
13 first of all, what were your -- let me make sure I
14 understand your duties.  What were you duties as an
15 animal control officer?
16     A  Catching lost animals, loose animals,
17 animals like dogs, cats.  Sometimes cattle would get
18 out on the highway, and we'd have to go to that
19 location and put them back into their fence.  Welfare
20 of the animals.  Cruelty cases, fires, we'd have to
21 evacuate subdivisions.  Report writing.
22     Q  Did anybody supervise you other than
23 Bobbi Priestly?
24     A  There's -- we had a supervisor above her.
25     Q  And who was that?

5 (Pages 14 to 17)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

Page 38

1  regarding what to do with the horses?
2       A  Can you rephrase that question, please?
3       Q  Sure.  On February the 16th, 2012, did
4  you have input from Dr. Anderson, Dr. Britt, and
5  Mr. Dutcher regarding what should be done with the six
6  horses?
7       A  I did not.
8       Q  Who did?
9       A  Sergeant Priestly.
10      Q  And what was your understanding of the
11  input that came from Dr. Anderson?
12      A  My understanding was that if there was a
13  vet involved that I needed to leave the horses at that
14  time, sorry; and speak to the vet, get all my ducks in
15  a row, and go from there.
16      Q  What was your understanding of
17  Dr. Britt's input?
18      A  I don't recall getting input -- I don't
19  remember getting input from Dr. Britt on the 16th.
20      Q  Were you ever advised that Dr. Britt
21  offered to come to evaluate the horses if you asked him
22  to?
23      A  Yes.
24      Q  Did you ask him to come evaluate the
25  horses?

Page 39

1       A  No.
2       Q  Who is Dr. Britt?
3       A  In -- I've never met the gentleman, but I
4  believe he's a vet located south of Fairplay.
5       Q  How did you learn that he offered to come
6  evaluate the horses?
7       A  Sergeant Bobbi Priestly.
8       Q  And what was your understanding of the
9  input that came from Mr. Dutcher?
10      A  Dutcher.
11      Q  Dutcher?
12      A  He had the same input as Anderson.
13      Q  Now, do you know what information was
14  supplied to Dr. -- to Anderson, Dr. Britt, and
15  Mr. Dutcher?
16      A  I do not.
17      Q  Who is Mr. Dutcher?
18      A  He is the chief cruelty investigator.
19      Q  For the Department of Agriculture?
20      A  Yes, Bureau of Animal Protection League.
21      Q  Did you have any veterinarian go evaluate
22  the six horses?
23      A  At any time?
24      Q  At any time between February 16th and
25  February 22nd?

Page 40

1       A  No.
2       MR. TONDRE:  Mark that as the next
3  number.
4       (Whereupon, Deposition Exhibit
5  No. 67 was marked for identification by the
6  reporter.)
7       MR. TONDRE:  What is it?
8       THE COURT REPORTER:  67.
9       Q  (BY MR. TONDRE) I've handed you what has
10  been marked as Exhibit 67.  What is that?
11      A  A state notice of warning.
12      Q  And did you prepare that?
13      A  I did.
14      Q  And was this prepared pursuant to a
15  consensus decision among you, Bobbi Priestly,
16  Dr. Anderson, Dr. Britt, and Mr. Dutcher?
17      A  No.
18      Q  They had nothing to do with it?
19      A  No.
20      Q  They didn't know you were doing it?
21      A  Sergeant Priestly knew I was doing it.
22      Q  Did Mr. Dutcher, Dr. Britt, and
23  Dr. Anderson concur that the horses should be left
24  where they were?
25      MR. SCHIMBERG:  Object to form.  Go

Page 41

1  ahead.
2       A  Dr. -- or Anderson and Dutcher are very
3  confident in our abilities to handle cruelty cases.  So
4  they stand by our decisions and did not concur or agree
5  or say anything towards my decision to write the state
6  notice of warning.
7       Q  (BY MR. TONDRE) Okay.  Why did you
8  decide -- well, first of all, let me ask you another
9  question.  If -- if the horses were in danger in that
10  location, you had an obligation to impound them, didn't
11  you?
12      A  Yes.
13      Q  So it follows, does it not, that you did
14  not consider them to be endangered?
15      A  No.
16      MR. SCHIMBERG:  Object to form.
17      Q  (BY MR. TONDRE) It doesn't follow?
18      A  I guess reword the question, please.
19      Q  I'm sorry?
20      A  Can you reword --
21      Q  Did you believe the horses were
22  endangered if left on the premises of Echo Valley?
23      A  No.
24      Q  Had you ever issued a notice of warning
25  before?

11  (Pages 38 to 41)

CINDY HARDEY - JUNE 20, 2014

Page 46

1    should say no comment?
2        A  I do not remember.
3        Q  Do you remember going out to Echo Valley
4    Ranch at any time after February 16th?
5        A  Any time after February 16th?
6        Q  Yes.
7        A  Yes.
8        Q  When was the first time?
9        A  I don't know.
10       Q  Do you recall becoming aware that
11   Channel 7 News was nosing about?
12       A  Yes.
13       Q  How did you learn that?
14       A  I believe Sergeant Priestly or Ron Swift,
15   one of the two.
16       Q  What was your understanding of what kind
17   of threats were being received at the Bailey Food --
18   Feed Store?
19       A  Don't quote me on this.
20       MR. SCHIMBERG:  He's going to.
21       A  He's going to.  I know you're going to
22   write it down.
23       Q  (BY MR. TONDRE)  No.  The court reporter is
24   going to write it down.
25       A  I don't remember verbatim.  But my

Page 47

1    perception on that was they, you know, they were
2    accusing Ron of his hay being bad.  You know, I
3    actually, honestly don't remember what Ron Swift told
4    me about the threats being made at his house or at his
5    workplace.  It's been two years.  I don't remember.
6        Q  Well, I guess what I'm searching for is
7    it seems to me to be a major concern to cause you to
8    transport six horses to a hidden location.  What was
9    the nature of the threats that you were told about?
10       A  I am -- well, to be honest, I would not
11   have removed the horses if they weren't bad.  But I
12   don't remember the nature of the threats.
13       Q  When you say "if they weren't bad," you
14   are talking about the threats --
15       A  Yeah.
16       Q  -- being bad?
17          During the course of this case, did the
18   names of Gene and Shelley Ferraro come to your
19   attention?
20       A  Yes.
21       Q  And where did you learn about them?
22       A  They were concerned citizens.  I believe
23   Ferraro is the one that now owns Bear, Spencer.  She
24   was present, I believe, at the time that Bear was taken
25   to Dr. Olds' facility.

Page 48

1        Q  Now, were you informed by Dr. Horton or
2    Dr. Burton --
3        A  Horton.
4        Q  -- that Shelley Ferraro had threatened
5    her?
6        A  I don't remember.
7        Q  Well, do you remember Dr. Horton or
8    Dr. Burton telling you they had been threatened?
9        A  They had received phone calls, yes.
10       Q  Did they tell you what the nature of the
11   phone calls were?
12       A  I don't remember.
13       Q  In Park County, can you get away with
14   just going around and threatening people?
15       A  No.  Well, actually, I mean, I don't
16   know.
17       Q  Was -- was a single one of these people
18   prosecuted for threatening?
19       A  No.
20       Q  Is that a crime?
21       MR. SCHIMBERG:  Object to form.
22   Foundation.  Go ahead.
23       Q  (BY MR. TONDRE)  Is threatening a crime?
24       A  I don't know.
25       Q  Did you perceive it might be a crime?

Page 49

1        A  Yes.
2        Q  Did you hear any discussion -- how often
3    did you go to the sheriff's office?
4        A  Every day.
5        Q  Did you hear any discussion about
6    prosecuting these threatening vigilantes?
7        MR. LEBSACK:  Object to form.
8        MR. SCHIMBERG:  Object to form.  Go
9    ahead.
10       A  No.
11       Q  (BY MR. TONDRE)  Does Park County kind of
12   like those westerns your husband watches?
13       MR. SCHIMBERG:  Object to form, Brice.
14       MR. LEBSACK:  Object to form.
15       A  I don't have a comment on that.
16       Q  (BY MR. TONDRE)  All right.  Did you make
17   any visits to Echo Valley Ranch to check the horses
18   between February 16th and February 19th when they were
19   removed to the LeBeau place?
20       A  No.
21       Q  Did the condition of the horses change
22   between February 16th and February 19th?
23       A  No.
24       Q  Was it safe to transport them?
25       A  Safe to transport them?  Yeah.  Yes.  It

Page 50

1    was safe to transport them, although Chance was not
2    doing well at that time.
3         Q   And what steps were taken to protect
4    Chance during the transfer?
5         A   I did not transport them.  Mr. Hatlee
6    transported them.  I followed behind them.  Mr. Swift
7    and Mr. Hatlee loaded them into their trailer.  They
8    had full control of the transportation of their animals
9    and the loading of their animals.  I just observed and
10   followed them to the secure location.
11        Q   Did Mr. Hatlee ride in the trailer with
12   Chance?
13        A   I don't remember.
14        Q   On the issue of transport, was -- was
15   Bear fit for transport when Ashleigh Olds transported
16   him?
17        MR. LEBSACK:  Object to form.
18        MR. SCHIMBERG:  Join.  Go ahead.
19        A   My perception, no.
20        Q   (BY MR. TONDRE) You did become aware,
21   didn't you, that the horse fell while being
22   transported?
23        A   Yes.
24        Q   And that Ashleigh Olds took no steps to
25   prevent him from falling?

Page 51

1         MR. LEBSACK:  Object to the form.
2         A   I have no idea.
3         Q   (BY MR. TONDRE) Well, how would he fall if
4    she took steps to prevent it?
5         MR. LEBSACK:  Object to form.
6         A   I don't know.  I was not present when she
7    transported.
8         Q   (BY MR. TONDRE) Why did you believe that
9    he wasn't fit for transport?
10        MR. SCHIMBERG:  Object to form.
11        MR. LEBSACK:  Same.
12        A   Can you reword that, please?
13        Q   (BY MR. TONDRE) Sorry?
14        A   Can you reword that?
15        Q   Yeah.  Why do you believe he wasn't fit
16   for transport?
17        MR. SCHIMBERG:  Object to form.
18        MR. LEBSACK:  Same.
19        MR. SCHIMBERG:  Go ahead.
20        A   I was not present when they were
21   attempting to get him to stand.  I did hear from
22   Corporal Plutt that they had to take some steps to get
23   him to stand.  He did not -- he looked malnourished to
24   me.  He looked like he had been lying in a stall of
25   muck.  When I saw him and took pictures of him, he was

Page 52

1    tied to -- or tethered to one of the fence posts.
2         I watched Dr. Olds and her assistant walk
3    him to the trailer.  I did not see them load him into
4    the trailer.  And when Dr. Olds got to her facility and
5    told me that it took an I.V. and several forms of
6    medication in that I.V. to get him to stand, that's why
7    I made my decision on I don't think he was fit for
8    travel.
9         Q   (BY MR. TONDRE) Well, that's kind of
10   interesting.  She wasn't -- here's a trained
11   veterinarian wasn't able to get a horse to stand up.
12   How did -- how did the folks at Echo Valley Ranch get
13   the horse to stand up?
14        A   I don't know.
15        MR. LEBSACK:  Objection.
16        A   I wasn't present for that.
17        Q   (BY MR. TONDRE) We did see photographs
18   yesterday during Mr. Hatlee's deposition of Bear
19   standing behind the truck eating.  Do you have any
20   indication that that photograph isn't a true depiction
21   of what was occurring?
22        MR. LEBSACK:  Object to form.
23        MR. SCHIMBERG:  Object to form.
24   Characterization.  Go ahead.
25        A   Do I -- do I believe that picture does --

Page 53

1    is not real, is that what you are asking me?
2         Q   (BY MR. TONDRE) Yep.  That's a good
3    question.
4         A   Well, if that's what you are asking me, I
5    believe that picture is real.
6         Q   All right.  Let's look at it rather than
7    argue about it.  If I can figure out where it is.  Got
8    it.  Exhibit No. 56.
9         You say he was tied to a fencepost.
10   First of all, let me ask you if the first photograph in
11   Exhibit No. 56 is a picture of Bear?
12        A   Yes.
13        Q   And is he tied to a truck?
14        A   Yes.
15        Q   What is he doing?
16        A   Looking at the camera.
17        Q   Is there any feed available to him?
18        A   If that's feed (motioning) then, yes.
19        Q   The third picture in Exhibit No. --
20        MR. SCHIMBERG:  56.
21        Q   (BY MR. TONDRE) 56, what is he doing?  Is
22   that Bear again?
23        A   Yes.
24        Q   What is he doing?
25        A   Eating.

14  (Pages 50 to 53)

Page 66

1  operation?
2      A  No.
3      Q  The horses you were raised with, the
4  three, what were they used for?
5      A  Roping, 4H, family use.
6      Q  Sort of pets?
7      A  Yep.
8          MR. SCHIMBERG:  I thought you were a
9  barrel racer all this time.
10         THE DEPONENT:  I tried.
11         MR. SCHIMBERG:  Did you?
12         THE DEPONENT:  I did.
13     Q  (BY MR. TONDRE) How was it?
14     A  It didn't pan out very well.
15     Q  Wasn't your cup of tea?
16     A  Nope.
17     Q  You prepared the seizure application,
18  correct?
19     A  Yes.
20     Q  And it was approved by Priestly, correct?
21     A  No.
22     Q  You also reviewed -- well, did you review
23  the application for the two warrants with anybody?
24     A  Yes.
25     Q  Who?

Page 67

1      A  Steve Sullivan.
2      Q  Did you testify in the motions hearing
3  held on December 3, 2012, that you reviewed the search
4  warrant with your supervisor, Officer Priestly?
5      A  Yes.
6      Q  Was that false?
7      A  I think the term review is false.
8      Q  It's your word.
9      A  Huh?
10     Q  It's your word.
11     A  Yeah.  She was advised that I was doing
12  the search warrants.  But the actual review of the
13  search warrants before I could give it to a judge was
14  reviewed by Steve Sullivan.  And I can't exactly
15  remember if she looked them over or not.  But I do know
16  Steve Sullivan approved them to go to the judge.
17         So if my testimony says yes, then yes,
18  she did.  But I cannot remember.  Because she pretty
19  much oversees everything I do.
20     Q  Did Steve Sullivan make any suggestions
21  to you?
22     A  If he did, it was probably grammar.
23  Usually, I am sent back to the sheriff's office to fix
24  something and I don't remember what, if any.
25     Q  Now, at the time that you reviewed the

Page 68

1  search warrant with Mr. Sullivan, did he have a file on
2  the matter?
3      A  Did he have a what?
4      Q  A file, an investigatory file?
5      A  Yes.
6      Q  How much time would you estimate he spent
7  reviewing the matter before talking with you about the
8  search warrant?
9      A  I have no idea.
10     Q  How far in advance did you schedule a
11  meeting with him?
12     A  I called him and asked him if he was
13  available.
14     Q  And when was that?
15     A  After I was done writing the search
16  warrant.
17     Q  And how much time did he spend with you?
18     A  He -- enough time to read both search
19  warrants.  And he's an attorney, so I guess it depends
20  on how fast he can read.
21     Q  You're assuming an attorney can read?
22     A  I hope so.
23     Q  Do you have an estimate of how much time
24  he spent with you?
25     A  No.

Page 69

1      Q  Did he ask you any questions?
2      A  No.
3      Q  Did he have a file that he was reviewing
4  in connection with the materials you presented him?
5      A  No.
6      Q  What did you present him, the affidavit?
7      A  Both.  The search warrant and the
8  affidavit.
9      Q  Anything else?
10     A  No.
11     Q  Did the -- were the concerned -- did it
12  come to your attention the concerned citizens were
13  critical of Mr. Sullivan's handling of the case?
14     A  I don't think so, no.
15     Q  Did there come a time when Mr. Sullivan
16  was taken off the case and replaced by Mr. LeDoux?
17     A  I don't know.
18         MR. SCHIMBERG:  Object to form,
19  foundation.
20     Q  (BY MR. TONDRE) What involvement did you
21  have with the case after obtaining the search and
22  seizure warrants?
23     A  What involvement?
24     Q  Yes, ma'am.
25     A  I responded with Sergeant Priestly and

18  (Pages 66 to 69)

CINDY HARDEY - JUNE 20, 2014

**Page 74**

1 asked to stand up?
2     MR. SCHIMBERG: Object to form.
3     Q (BY MR. TONDRE) What purpose was that
4 supposed to serve?
5     MR. SCHIMBERG: Object to form.
6     A I don't know.
7     Q (BY MR. TONDRE) You knew at the time you
8 attended that fundraiser on April the 7th, 2012, that
9 there was a hearing scheduled to question the validity
10 of your obtaining seizure warrants; didn't you?
11     A No.
12     Q You were scheduled to testify on April
13 the 10th, 2012, weren't you?
14     A If that's what it says, yes. I don't
15 remember the dates of all the things I was asked to go
16 to.
17     Q What do you think -- do you think you
18 wouldn't --
19     MR. LEBSACK: It's passed.
20     MR. TONDRE: It's gone.
21     MR. GORE: Okay.
22     MR. TONDRE: We can tolerate a little
23 noise.
24     Q (BY MR. TONDRE) You think you would have
25 known that that hearing was going to take place three

**Page 75**

1 days later when you stood up in front of the crowd?
2     A Well, if I was asked to go to a hearing,
3 yes.
4     Q Well, do you remember testifying at the
5 hearing where the judge ordered return of the horses?
6     A That I do remember.
7     Q Do you remember the judge finding that
8 your affidavit was not made in good faith?
9     A Yes.
10     Q Were you disciplined --
11     MR. SCHIMBERG: I'm going to object to
12 form -- to that, I'm sorry, thank you. Go ahead.
13     Q (BY MR. TONDRE) Were you disciplined by
14 the sheriff's office for preparing an affidavit that
15 was deemed to be not in good faith?
16     MR. SCHIMBERG: Object to form.
17     A No.
18     MR. SCHIMBERG: Go ahead.
19     Q (BY MR. TONDRE) Were you criticized by
20 anyone?
21     A Not that I'm aware of, no.
22     Q What's your understanding of the term
23 probable cause?
24     MR. SCHIMBERG: I'll object to form. Go
25 ahead.

**Page 76**

1     A My understanding of probable cause?
2     Q (BY MR. TONDRE) Right.
3     A I have to have probable cause to go onto
4 Mr. Swift's property and look at his animals.
5     Q What's the legal definition of probable
6 cause?
7     A I do not know.
8     Q Didn't you disclose in the warrant
9 affidavit that you had entered into a 30-day warning
10 agreement with Swift and Hatlee?
11     A I don't know.
12     Q Why didn't you state in the warrant
13 affidavit that the horses were in protective custody?
14     A I don't know. I think it's because I was
15 just putting a Reader's Digest version of when, where,
16 and why instead of a whole narrative.
17     Q Why didn't you put in the warrant
18 affidavit the fact that the move of the horses to
19 protective custody was driven by threats?
20     MR. SCHIMBERG: Object to form.
21     A Because it wasn't my report, it was just
22 a brief synopsis.
23     Q (BY MR. TONDRE) Why didn't you put in your
24 warrant affidavit that Dr. Britt wanted testing done
25 before any action was taken?

**Page 77**

1     A Again, it was a brief synopsis, not my
2 report.
3     Q Why didn't you put in your affidavit that
4 the horses were under the care of a veterinarian?
5     A Same as stated before.
6     Q Why didn't you put in your affidavit that
7 the condition of the horses didn't change from
8 February 16th to February 23rd?
9     A Because it was a brief synopsis not my
10 report.
11     Q Why didn't you -- it is correct, is it
12 not, that you did not put in your report that the
13 horses were in danger, I'm sorry, in your affidavit?
14     A Endangered?
15     Q Yes.
16     A Or in danger?
17     Q Did you put in your report that they were
18 in danger?
19     A In danger. I did not use those words.
20     Q Why didn't you put in your report that
21 the blood tests were not indicative of malnutrition?
22     MR. LEBSACK: Object to form.
23     MR. SCHIMBERG: Join.
24     A Why did -- in my report?
25     Q (BY MR. TONDRE) On your affidavit?

EXHIBIT  30

Thank you,
Thom LeDoux
District Attorney 11th JD

**From:** Gene Ferraro [mailto:eferraro@businesscontrols.com]
**Sent:** Tuesday, April 24, 2012 5:13 PM
**To:** Steve Sullivan; tcourt5096@aol.com; Barbara Wright
**Subject:** Bailey Horses
**Importance:** High

Mr. Sullivan,

We were the people that stopped by your office today and delivered a letter to you. I ask that you look at this slide show of these poor horses under the care of Ron Swift. The community wants you to do the right thing and set aside your differences with the Sheriff's department and defend these poor defenseless horses. If you can look at these pictures and think this is ok, then there is something seriously wrong with you. We intend to go public with all this information and more. We intend to contact the media and officials much higher up on the food chain. We have only just begun. My husband, Eugene Ferraro will be in contact with you as soon as he returns from business travel and will set an appointment for a meeting with you. Hopefully you'll be available the next time we stop by. Please watch the slide show below!!

Respectfully

Shelley Ferraro


http://pix.kg/p/767597054214%3A1023164567/scl
Eugene F. Ferraro, CPP, CFE, PCI, SPHR
Chairman/Founder

Business Controls, Inc.
5995 Greenwood Plaza Boulevard, Suite 110
Greenwood Village, Colorado 80111
Office: 303.526.7600 | Toll-free: 800.650.7005
Check out our new website: www.BusinessControls.com
Follow us: Facebook | Twitter | LinkedIn | YouTube

*"Insight in an Instant"*


CONFIDENTIALITY WARNING: This e-mail is for the confidential use of the intended recipients only, and may be protected by the attorney work-product privilege. Any unauthorized review, access, copying, dissemination, distribution, or use of the content of this message/information is strictly prohibited by Federal Law. Attempts to intercept this message or distribute it without authorization are in violation of 18 U.S.C. 2511(1) of the Electronic Communications Privacy Act (ECPA). Fines, imprisonment, and/or civil damages may be imposed for violations. Licensed in California, Florida and Illinois. Insured where necessary. PI 21470

1126

4

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1126

EX 23

## Bobbi Jo Priestly

| | |
|---|---|
| **From:** | Shelley Ferraro [shelley@shelleysdesigns.com] |
| **Sent:** | Monday, June 04, 2012 11:25 PM |
| **To:** | 'Gia McNerney'; Monte Gore; aolds@aspencreeklac.com; 'Ashleigh Olds, DVM'; Harmonyhorsewrks@aol.com; 'joan mcneill'; 'Joe and Ingrid'; 'Landrock, Takeshi'; 'Thom LeDoux'; TCourt5096@aol.com; 'MARY HELEN IRVINE'; 'Mary J. Sosnowski'; 'Dagna Van Der Jagt, Esq.'; Bobbi Jo Priestly; Cindy Hardey |
| **Cc:** | Bobbi Gore; 'mclimans, debra' |
| **Subject:** | RE: Ron Swift Trial and Bailey Horse Update |

Gia, I think you should post your concerns that Mr. LeDoux won't answer your numerous e-mails on pinecam, Facebook, 285bound and Evergreen bound. Do you think that could possibly get his attention or someone in his office to reply.

It is more than obvious that the DA and his office don't return calls or e-mails, even though Mr. LeDoux won't admit to that. Mr. LeDoux is handing the case over on a silver platter to the defense attorney. The fact that LeDoux coached Cindy Hardey in what to say on the stand was more than despicable.

I also believe that Officer Hardy is in the bag for Swift and has been for years and she is an absolute conflict of interest. I also believe that Mr. LeDoux is sadly mistaken when he states at different debates tin Park County that the horse community thinks he's doing a good job. Mr. LeDoux is obviously very confused with reality.

---

**From:** Gia McNerney [mailto:spamrestricted@yahoo.com]
**Sent:** Monday, June 04, 2012 8:26 PM
**To:** Monte Gore; Shelley Ferraro; aolds@aspencreeklac.com; Ashleigh Olds, DVM; Harmonyhorsewrks@aol.com; joan mcneill; Joe and Ingrid; Landrock, Takeshi; Thom LeDoux; TCourt5096@aol.com; MARY HELEN IRVINE; Mary J. Sosnowski; Dagna Van Der Jagt, Esq.; Bobbi Jo Priestly
**Cc:** Bobbi Gore; mclimans, debra
**Subject:** Re: Ron Swift Trial and Bailey Horse Update

Dear Mr. LeDoux,

Is there someone else that can answer the questions and concerns I have below? I'm still very confused as to why you handled the case the way you did and concerned about this going forward.

This is the second email I've sent and would appreciate a response specific to my questions and concerns below.

Gia McNerney

---

**From:** Gia McNerney <spamrestricted@yahoo.com>
**To:** Monte Gore <MGore@parkco.us>; Shelley Ferraro <shelley@shelleysdesigns.com>; "aolds@aspencreeklac.com" <aolds@aspencreeklac.com>; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; "Harmonyhorsewrks@aol.com" <Harmonyhorsewrks@aol.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; "TCourt5096@aol.com" <TCourt5096@aol.com>; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly

1103

6/5/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1103

<BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Thursday, May 17, 2012 1:11 PM
**Subject:** Re: Ron Swift Trial and Bailey Horse Update

I wanted to comment on Monte's #2 as I completely agree on this matter.

Dear Mr. LeDoux,
I'm also not certain why you did this, I actually had to walk out of the court room toward the end of her testimony. This really appeared to have hurt the prosecution as her testimony was not questioned or made evident.

Mr. LeDoux, why did you not question Officer Hardey on two matters?

1) Why did she do scheduled visits for a criminal case, why weren't they random/unannounced visits?
2) How was she was able to give explicit details on each day she monitored without a notepad in front of her, I find it hard to believe that she could remember such detail within the nature of her job, especially almost a month ago - that is very questionable. She also mentioned she used a weight tape, but stated no numbers and again no notes, does this mean she did not record these weights.

For this critical case, could we please have pictures taken of each of the 6 horses and the place they are being kept (especially the ground they are standing on & hooves) during each visit by the Officer? I think weights should still be taken, but these numbers should be recorded going forward and brought out in court along with the pictures. I think this would be acceptable evidence as to status of the horses.

Thanks,
Gia McNerney

**From:** Monte Gore <MGore@parkco.us>
**To:** Shelley Ferraro <shelley@shelleysdesigns.com>; aolds@aspencreeklac.com; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; Harmonyhorsewrks@aol.com; Gia McNerney <spamrestricted@yahoo.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; TCourt5096@aol.com; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Wednesday, May 16, 2012 10:30 AM
**Subject:** RE: Ron Swift Trial and Bailey Horse Update

A couple of things that need to be addressed in your summation:

1. Judge Green had an excellent explanation as to why the horses were returned to the owners at the previous bond hearing, there was no compelling evidence presented on behalf of the people.

2. Officer Hardey answered specific questions she was asked by the DA. My question would be if he knew what her testimony was going to be, and it would be detrimental to the case, why would you present it?

Monte

1104

6/5/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1104

## Bobbi Jo Priestly

**From:** Gia McNerney [spamrestricted@yahoo.com]

**Sent:** Monday, June 04, 2012 8:26 PM

**To:** Monte Gore; Shelley Ferraro; aolds@aspencreeklac.com; Ashleigh Olds, DVM; Harmonyhorsewrks@aol.com; joan mcneill; Joe and Ingrid; Landrock, Takeshi; Thom LeDoux; TCourt5096@aol.com; MARY HELEN IRVINE; Mary J. Sosnowski; Dagna Van Der Jagt, Esq.; Bobbi Jo Priestly

**Cc:** Bobbi Gore; mclimans, debra

**Subject:** Re: Ron Swift Trial and Bailey Horse Update

Dear Mr. LeDoux,

Is there someone else that can answer the questions and concerns I have below? I'm still very confused as to why you handled the case the way you did and concerned about this going forward.

This is the second email I've sent and would appreciate a response specific to my questions and concerns below.

Gia McNerney

**From:** Gia McNerney <spamrestricted@yahoo.com>
**To:** Monte Gore <MGore@parkco.us>; Shelley Ferraro <shelley@shelleysdesigns.com>; "aolds@aspencreeklac.com" <aolds@aspencreeklac.com>; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; "Harmonyhorsewrks@aol.com" <Harmonyhorsewrks@aol.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; "TCourt5096@aol.com" <TCourt5096@aol.com>; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Thursday, May 17, 2012 1:11 PM
**Subject:** Re: Ron Swift Trial and Bailey Horse Update

I wanted to comment on Monte's #2 as I completely agree on this matter.

Dear Mr. LeDoux,
I'm also not certain why you did this, I actually had to walk out of the court room toward the end of her testimony. This really appeared to have hurt the prosecution as her testimony was not questioned or made evident.

Mr. LeDoux, why did you not question Officer Hardey on two matters?

1) Why did she do scheduled visits for a criminal case, why weren't they random/unannounced visits?
2) How was she was able to give explicit details on each day she monitored without a notepad in front of her, I find it hard to believe that she could remember such detail within the nature of her job, especially almost a month ago - that is very questionable. She also mentioned she used a weight tape, but stated no numbers and again no notes, does this mean she did not record these weights.

1090

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1090

## Bobbi Jo Priestly

**From:** Thom LeDoux [tledoux@da11thjd.org]
**Sent:** Monday, June 11, 2012 3:51 PM
**To:** Gia McNerney
**Cc:** Shelley Ferraro; aolds@aspencreeklac.com; Ashleigh Olds, DVM; Harmonyhorsewrks@aol.com; joan mcneill; Joe and Ingrid; TCourt5096@aol.com; MARY HELEN IRVINE; Mary J. Sosnowski; Bobbi Jo Priestly

**Subject:** Re: Ron Swift Trial and Bailey Horse Update

Ms. McNerney,

I put Ofc. Hardy on the stand to explain to the public what the status of the horses was. Again, it wasn't to hurt or help our case in any way. Given the public's interest in the case I felt it was important to get the information out to the public regardless of what that information was. I would think that it would put the public at ease knowing that the horses are doing better now. It certainly makes me feel better. And as I explained below, if anything that arguably helps the case.

I warned you about the motion to dismiss because I didn't want it to upset anyone when it came out without any forewarning. I am not saying that the case will be dismissed or that I think that it should be. I was just trying to warn you about how things would progress. We will fight the motion to dismiss the case and I THINK that we will prevail, but I am not in a position to offer any guarantees.

The criminal justice system is what it is. I didn't invent it and I am not in charge of it. You may not like it, there are parts that I don't like, but that is the system that we are dealing with. If you have complaints about the system please keep those separate from your opinion of the district attorney's office or the way we are working within that system.

Thom LeDoux


Sent from my iPad

On Jun 6, 2012, at 12:05 PM, "Gia McNerney" <spamrestricted@yahoo.com> wrote:

> Mr DeLoux,
>
> Thanks for finally responding, but I still have no idea why you put Officer Hardy on the stand. In your response to Undersherriff Gore - copy/pasted below...
>
> ***
> 2. The testimony that Officer Hardey gave at the last hearing was the truth. It doesn't matter whether or not that testimony is "detrimental to the case" or good for the case. We have an obligation to present the truth to the Court. So it is what it is. The hearing was simply a pre-trial conference. As you heard the Judge say, it was highly irregular to hear any testimony at all at that stage of case. We are not trying to "win" the case at this point. That comes much later when we are in front of a jury. And even then it isn't about "winning" or "losing" the case, it is about presenting the facts to the jury and then arguing to them that those facts constitute the commission of a crime.

1078

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1078

\*\*\*

So, again, why did you put Hardy on the stand? As you quoted above it was highly irrefular to hear any testimony, so why?

You only hurt the case as it never discussed the cruelty the animals endured for so long prior to the seizure. In the transcript of the April 10, 2012 case, Officer Hardy's testimony was completely opposite to the testimony that you had her give at this last court date. Was this only to get it on public record --- that Hardy has now changed her tune? There is something very much not right about this and therefore, since I still have not received justification as to why you allowed her testimony for the defense, I need to reach out elsewhere for help.

Another reason why I will be looking elsewhere for support in this case, is because you are stating they may actually get to dismiss this case, based again on unjustifiable reasons. This is America which has freedom of speech and freedom to make public injustice being done to animals without a voice. If this court is stating that factual pictures and documentary on the deployable conditions of the horses should have been hidden from the public, I think this will become a much bigger issue.

Gia

**From:** Thom LeDoux <tledoux@da11thjd.org>
**To:** Gia McNerney <spamrestricted@yahoo.com>; Shelley Ferraro <shelley@shelleysdesigns.com>; aolds@aspencreeklac.com; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; Harmonyhorsewrks@aol.com; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; TCourt5096@aol.com; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Sent:** Monday, June 4, 2012 9:59 PM
**Subject:** RE: Ron Swift Trial and Bailey Horse Update

Ms. McNerney, et al.,

I will do my best to answer the various questions from the e-mails and to provide some additional follow up information:

1. I don't know why Officer Hardey did scheduled visits as opposed to random/unannounced visits. I didn't ask about this because it was obvious that she had not done random/unannounced visits and I didn't think that the reason(s) behind that approach were relevant. I don't know how her answer to the "why" question would have had any meaningful impact on the case or the issues before the court, so I didn't ask it.

2. Officer Hardey and I had reviewed her testimony immediately before the hearing. Therefore, she was aware of the questions that I was going to ask and she had given me the answers just prior to the hearing. I assume that this is how she was able to give the details without referring to her notes. I would also guess that under the circumstances she was acutely focused on this case and her testimony. I would point out that witnesses are generally not allowed by evidentiary rule to read their testimony from notes in any event.

3. It is up to the Park County Sheriff's Office to determine how to appropriately monitor the horses in question. Given the nature of the testimony (at a court hearing, on a non-trial issue, etc.) photographic evidence and/or measurements is not required. I have no reason to think that the Court has anything but the utmost respect for the credibility of the

1079

Park County Sheriff's Animal Control Officers. Therefore, the testimony of the Park County Sheriff's Office Animal Control Officers is sufficient under these circumstances.

As to the Undersheriff's concerns:

1. As you have seen from the transcript, DDA Sullivan did present the testimony of the lead PCSO Animal Control officer about the state of the horses and the conditions at the ranch. Judge Green explained that he did not find that evidence to be compelling as to the issue of whether or not the horses would continue to be abused if returned to the care of the defendants. Judge Green further explained that the evidence presented regarding the measures taken by the defendants to bring the horses in from the pasture and the effort to obtain veterinary care for the horses outweighed in his mind the inference that could have been drawn from the prior treatment of the horses, i.e. that they would continue to be abused in the future by the defendants. Whether you agree with that decision or not (as you know I do not, and I asked the judge to reconsider that decision), that was the explanation the Judge gave for his decision. DDA Sullivan presented the evidence, that the Judge did not find it "compelling" is within the prerogative of the judge.

2. The testimony that Officer Hardey gave at the last hearing was the truth. It doesn't matter whether or not that testimony is "detrimental to the case" or good for the case. We have an obligation to present the truth to the Court. So it is what it is. The hearing was simply a pre-trial conference. As you heard the Judge say, it was highly irregular to hear any testimony at all at that stage of case. We are not trying to "win" the case at this point. That comes much later when we are in front of a jury. And even then it isn't about "winning" or "losing" the case, it is about presenting the facts to the jury and then arguing to them that those facts constitute the commission of a crime.

Also, the fact that the horses are now doing really well in the care of the defendants is certainly NOT "detrimental" to the case. In fact, it is very much the opposite. If the defendants are capable of keeping the horses in good condition, then the fact that they were not doing so just a few weeks before means that they were negligent in their behaviors at that time, which we have to prove to convict them of the animal cruelty crimes we have charged them with.

Now to update you on the current status of the horses. The last time I spoke with the new lead investigator in the case, Bobbi Priestly she had just been out to the ranch with a veterinarian to monitor the horses. I believe that was also part of an "unscheduled" or somewhat "random" checkup on the horses, i.e. not on a previously scheduled Wednesday. I am happy to report that the body scores reported by Officer Priestly and the Vet were actually higher/better than those provided by Officer Hardey at the hearing, i.e. in the 4 ish range. Although I am told that there may be some lingering effects of the abuse, it appears that the horses are recovering to the extent possible and are being well cared for at this time.

To bring you up to date on the process of the case, as I mentioned in Court the other day we have apparently hit a "line in the sand" in the plea negotiations regarding allowing the defendants to keep the horses as part of a plea agreement, i.e. they apparently won't agree to a plea agreement that calls for the surrender of the horses and we are not willing to offer a plea agreement that doesn't call for the surrender of the horses.

The defendant has filed a motion for sanctions for violation of the discovery rules in connection with the posting of the investigative photographs on the internet. The defendant is asking the court to consider dismissing the case altogether, or other sanctions as the court feels are appropriate. We will argue against a dismissal of the case and any other unnecessary sanctions. Following the motions hearing on the 18th, it is my hope that the Court will set the matter for a jury trial. Given the court's docket that will probably be

1080

6/12/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1080

about 5 months from now.

I know that this process is frustrating. I work with victims in the system on a daily basis so I have some idea what you are going through. Please understand that we are doing our best under the rules and the system to protect the horses and to bring to justice those that would neglect animals. As I told you, I am not a "horse person," in that I don't know much about horses or their care. But I am a "dog person," in that I have two dogs that think they are humans and are treated as such or better in my house, so hopefully that counts for something. Also, I have been through this process before in murders, sex assaults, drug cases, etc., so please have some confidence that we can get this thing through the system and before a jury with the strongest case possible.

If you have any other questions or comments, please let me know.

Thank you,

Thom LeDoux
District Attorney 11th JD
719-371-3032
tledoux@da11thjd.org

---

**From:** Gia McNerney [mailto:spamrestricted@yahoo.com]
**Sent:** Monday, June 04, 2012 8:26 PM
**To:** Monte Gore; Shelley Ferraro; aolds@aspencreeklac.com; Ashleigh Olds, DVM; Harmonyhorsewrks@aol.com; joan mcneill; Joe and Ingrid; Landrock, Takeshi; Thom LeDoux; TCourt5096@aol.com; MARY HELEN IRVINE; Mary J. Sosnowski; Dagna Van Der Jagt, Esq.; Bobbi Jo Priestly
**Cc:** Bobbi Gore; mclimans, debra
**Subject:** Re: Ron Swift Trial and Bailey Horse Update

Dear Mr. LeDoux,

Is there someone else that can answer the questions and concerns I have below? I'm still very confused as to why you handled the case the way you did and concerned about this going forward.

This is the second email I've sent and would appreciate a response specific to my questions and concerns below.

Gia McNerney

**From:** Gia McNerney <spamrestricted@yahoo.com>
**To:** Monte Gore <MGore@parkco.us>; Shelley Ferraro <shelley@shelleysdesigns.com>; "aolds@aspencreeklac.com" <aolds@aspencreeklac.com>; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; "Harmonyhorsewrks@aol.com" <Harmonyhorsewrks@aol.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; "TCourt5096@aol.com" <TCourt5096@aol.com>; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Thursday, May 17, 2012 1:11 PM

1081

**Subject:** Re: Ron Swift Trial and Bailey Horse Update

I wanted to comment on Monte's #2 as I completely agree on this matter.

Dear Mr. LeDoux,
I'm also not certain why you did this, I actually had to walk out of the court room toward the end of her testimony. This really appeared to have hurt the prosecution as her testimony was not questioned or made evident.

Mr. LeDoux, why did you not question Officer Hardey on two matters?

1) Why did she do scheduled visits for a criminal case, why weren't they random/unannounced visits?
2) How was she was able to give explicit details on each day she monitored without a notepad in front of her, I find it hard to believe that she could remember such detail within the nature of her job, especially almost a month ago - that is very questionable. She also mentioned she used a weight tape, but stated no numbers and again no notes, does this mean she did not record these weights.

For this critical case, could we please have pictures taken of each of the 6 horses and the place they are being kept (especially the ground they are standing on & hooves) during each visit by the Officer? I think weights should still be taken, but these numbers should be recorded going forward and brought out in court along with the pictures. I think this would be acceptable evidence as to status of the horses.

Thanks,
Gia McNerney

**From:** Monte Gore <MGore@parkco.us>
**To:** Shelley Ferraro <shelley@shelleysdesigns.com>; aolds@aspencreeklac.com; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; Harmonyhorsewrks@aol.com; Gia McNerney <spamrestricted@yahoo.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; TCourt5096@aol.com; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Wednesday, May 16, 2012 10:30 AM
**Subject:** RE: Ron Swift Trial and Bailey Horse Update

A couple of things that need to be addressed in your summation:

1. Judge Green had an excellent explanation as to why the horses were returned to the owners at the previous bond hearing, there was no compelling evidence presented on behalf of the people.

2. Officer Hardey answered specific questions she was asked by the DA. My question would be if he knew what her testimony was going to be, and it would be detrimental to the case, why would you present it?

1082

Monte

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1082

**From:** Shelley Ferraro [mailto:shelley@shelleysdesigns.com]
**Sent:** Tuesday, May 15, 2012 8:24 PM
**To:** aolds@aspencreeklac.com ; 'Ashleigh Olds, DVM'; Harmonyhorsewrks@aol.com; ' Gia
McNerney '; 'joan mcneill'; 'Joe and Ingrid'; Monte Gore; 'Landrock, Takeshi'; 'Thom LeDoux';
TCourt5096@aol.com; 'MARY HELEN IRVINE'; 'Mary J. Sosnowski'; ' Dagna Van Der Jagt, Esq. ';
Bobbi Jo Priestly
**Subject:** Ron Swift Trial and Bailey Horse Update

Today at 1 p.m. at the Park County Court House in Fairplay , Colorado a pre-trial
conference/hearing involving defendants Mr. Ron Swift and Mr. Randall Hatlee was
held. Each of the Defendants is facing several counts of animal cruelty stemming
from an inspection of the Echo Valley Ranch in Park County on which both men
board horses.

After almost one hour of the Court handling a number of other cases, the hearing
got off to a brisk start with Park County District Attorney, Thom LeDoux taking
charge replacing Assistant D.A. Steve Sullivan who had previously been handling
the case. Though he was present, Mr. Sullivan said nothing during the entire event.
Prior to Mr. LeDoux presenting the County's case, Judge Brian Green summarized
the prior bond hearing which occurred on April 10, 2012 and his decision to return
the six horses which were seized from the Echo Valley Ranch on February 23,
2012. During that hearing Judge Green found that the horses had been seized
improperly, for the County had failed to show adequate probable cause justifying
the seizure. The horses were indeed returned (at County expense) to Mr. Swift and
Mr. Hatlee the following day.

Judge Green's review of the prior ruling concluded with him ordering $191.52 be
returned to each Defendant and the balance of their $720 bond be retained by the
County as payment for the horses board while under its care. The Judge also
admonished those in attendance that he'd tolerate no out-bursts or disorder during
the present hearing.

Upon the Judge's request Mr. LeDoux revealed that Timberline Equine Veterinary
Services' (Timberline Vets) records had been subpoenaed and were to be provided
by Friday, May 18, 2012. Seizing the opportunity, Mr. LeDoux requested the Judge
reconsider his decision to return the horses to Echo Valley Ranch. The Judge
declined and instructed Mr. LeDoux to put his request in writing and submit it as a
"Motion to Reconsider." Mr. LeDoux indicated that he would do so immediately.

Mr. LeDoux then requested he be allowed to present a witness (Animal Control
Officer, Cindy Hardy). The Judge noted that the request was highly unusual and
with the consent of the Defendant's counsel (Mr. Darrel Campbell), Mr. LeDoux
called Officer Hardy to the witness stand. The examination of Ms. Hardy did not go
well for the prosecution. Officer Hardy testified that since the return of the horses
she has conducted scheduled animal welfare visits at Echo Valley Ranch every
Wednesday at 10:00 a.m. To no one's surprise, she revealed that on every visit,
like clockwork, when she arrived at the ranch, each of the six returned horses had
ample food and fresh water. In fact on two occasions, she found the Defendants
grooming the horses upon her arrival. The only person in the courtroom to fail to
see her naïveté, was Officer Hardy. Even the Judge appeared to have some

*1083*

6/12/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1083

difficulty not commenting on her unvarnished gullibility. She also testified that the horses appeared to be doing very well and were gaining weight steadily. To complete the absurdity, Mr. LeDoux concluded by asking if Officer Hardy thought the horses should be re-seized. Happily, Officer Hardy said the horses should remain in the Defendant's custody. Her testimony was so helpful to the Defense that when offered to cross-examine her, Mr. Campbell declined and asked no further questions. The Defendant's luck then turned.

Mr. LeDoux revealed that the County intended to amend its criminal complaint and add an additional charge of animal cruelty to the charges of each Defendant. The additional charge was for the alleged abuse of Little Big Man (Spencer). Given a technical defect in the amended complaint containing the additional charges, the Defendants declined to enter a plea and were given until June 18, 2012 to enter it. After more legal wrangling and back and forth between the parties and the Judge, the hearing concluded.

While we were disappointed with Officer Hardy's testimony and some of her opinions, we do however appreciate Mr. LeDoux's effort and representation of the horses, for they have no voice. Thank you Mr. LeDoux.

Gene and Shelley Ferraro

1084

6/12/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1084

## Bobbi Jo Priestly

**From:** Thom LeDoux [tledoux@da11thjd.org]
**Sent:** Tuesday, June 12, 2012 5:26 PM
**To:** Harmonyhorsewrks@aol.com; Bobbi Jo Priestly; Betty L. Royse
**Cc:** eferraro@businesscontrols.com; spamrestricted@yahoo.com; tcourt5096@aol.com; aolds@aspencreeklac.com
**Subject:** RE: Check out Animal Legal Defense Fund : Contact Us

Ms. Wright,

Obviously I want to be able to address all of your concerns. However, you have raised a lot of issues and I want to be able to spend enough time on the case itself as well as on my other current responsibilities. Therefore, some of these responses may seem brief.

1. Thank you for the ALDF information. If I feel like we run into a legal issue that we need some help with we will be sure to use that resource. The current issue relates to the specific Colorado Rules of Criminal Procedure. So given that it is a procedural legal issue and specific to Colorado I am not sure how much the ALDF would be able to help.

2. As to the list of questions. Most of these I do not know the answer to and they are better addressed to the Park County Sheriff's Office, probably Animal Control Officer Priestly. Officer Priestly and I have a meeting scheduled for tomorrow afternoon to prepare for the hearing on the next Monday. So we might have some time to look over your questions and answer some of them.

On question #5 – which is best directed to the DA's office, I think that I have already tried to address this question at length. But again, it wasn't a "defendant-friendly" witness, it was the lead investigator from the PCSO assigned to the case at the time. I don't know anything about the relationship between Ofc. Hardy and the defendants. That is an issue for the Sheriff. As far as I am concerned, if the PCSO has assigned her to the case as the lead investigator she is a "suitable prosecution witness" in that capacity, absent specific compelling evidence to the contrary.

#8c = At this point I don't know how the Routt County information is relevant to our case. If it becomes apparent that it is necessary to present our case, then yes, we will call those witnesses and present those records.

#9 = Because a vet has opined that Maggie's death was the result of a heart condition. We do not have a vet opinion that the heart condition was the direct result of any neglect. If we had such an expert opinion we could revisit the issue. There has to be a direct causation link between the harm and the neglect. If we try to expand that causation link too far it will make the overall case much weaker. I would guess that many if not most horses that die, die of something that COULD have been prevented under different care. On a lesser scale and merely as an example, I doubt there will be a prosecution of the owners of "I'll have another" for neglect even though the injury to that horse could have been prevented had the horse not been raced under such severe conditions. To go back to Maggie, if an investigation can prove that the defendants specifically withheld vet care that they knew was necessary and a vet concludes that the lack of vet care directly caused the death then we will consider charging the death. As of now that is not the state of the evidence or the expert opinion. Again, we can make the case as a whole weaker by being too aggressive with our theories of the case.

#10. We will call the necessary witnesses to present the case. A final determination will be made closer to the jury trial. I would think that it would most likely be: Hardey, Priestly, Horton, Burton, Toll and

1074

6/13/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1074

Olds.

And now some questions for you:
1. It would be helpful if I could compare the photos that were provided by PCSO with the photos that were obtained from other sources. Can you provide this information to me?

2. It appears to my investigator that the slide show and some of the blogs have been taken down. Is this the case? If so, when were they put up and when were they taken down?

Thank you again for your concern and dedication to the well being of these horses.

Thom LeDoux

---

**From:** Harmonyhorsewrks@aol.com [mailto:Harmonyhorsewrks@aol.com]
**Sent:** Monday, June 11, 2012 2:02 PM
**To:** Thom LeDoux; bpriestly@parkco.us
**Cc:** eferraro@businesscontrols.com; mgore@parkco.us; spamrestricted@yahoo.com; tcourt5096@aol.com; aolds@aspencreeklac.com
**Subject:** Check out Animal Legal Defense Fund : Contact Us

Mr. LeDoux and Ms. Priestly,

   **First,** thank you both for taking this equine neglect case to heart and attempting to push it through to trial, despite increasing obstacles. Below is the contact link for the ALDF.

Click here: Animal Legal Defense Fund : Contact Us

From the ALDF Legal Advocates' Manual:

   "In addition to its staff attorneys, ALDF has developed a network of nearly 400 volunteer lawyers all around the country, anxious to be called upon to do research work for briefs, motions and memos, litigate cases as special prosecutors, or provide any other legal help needed. Just contact us with the specifics of what you are looking for, and we'll see if we can find a match of skills in your region an dput you in touch with a volunteer or staffer.

   Telephone Advice and Ideas from Prosecutors

   Animal cases do involve new and sometimes difficult issues from other cases, and sometimes just being able to talk about it with someone who has done it before can provide the insight and confidence needed to go forward. Over the years, ALDF has been fortunate to be able to provide assistance to prosecutors willing to reach out later and help others like them through our Prosecutors Network. Just contact us and we will ensure we put you in touch with one who is currently available to talk and share ideas. *We also have a former prosecutor on our Anti-Cruelty Division staff for those last-minute, short-deadline inquiries.*"

   **Second,** we respectfully submit the attached list of questions concerning this case in hopes that some or all of them will be answered prior to trial (assuming this case reaches trial), and hope they can be useful to you in some way. (See attached "List of Questions for Park County DA").

   **Finally,** in view of the possbility (or already a fact?) of Mr. Campbell filing a motion to dismiss the case for reasons of improper dissemination on the internet of "investigative material," it might be prudent to consult with free expert advice on how to counter this. My fear is being blindsided by the judge once more, as in the case of the remand of the horses to Swift and Hatlee. From my personal viewpoint, *not legally researched by any means,* I have the following comments:

   1. All photos of the Routt County Colt, referred to as Little Big Man, were posted on the internet before he was added to the charges against Swift and Hatlee and so they could not be considered investigative to this

I075

6/13/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1075

case. They were not provided by Park County Animal Control, but by others such as myself, Mrs. Ferraro, Dr. Olds and Routt County Animal Control. Surely there is an argument against those photos being considered investigative.

2. The photos provided to us were (1) intake photos of the horses being admitted to Harmony Equine Center, and (2) April update photos of their 30 day progress at the same place. These photos, to my knowledge, were not taken by Park County Animal Control but by Harmony Equine Center staff, and are not considered investigative since they were taken at the request of concerned citizens raising money for what then appeared to be "adoptable" horses, once rehabilitated. This was before Judge Greene's remand of the horses to Swift. I am sure PCSO AC has taken its own evidentiary photos to be used in prosecuting the case not released to anyone. (If not, we are in serious trouble here). The rehabilitation center would, as a matter of course, take photos of horses being admitted to their care in any event, whether or not a criminal case was involved.

3. The internet is immediate, world-wide, unstoppable and uncontrollable. Social media has made this even more so. I cannot recall any animal neglect and abuse cases where pretrial publicity was not made by newspapers, radio, television, and the internet plus social media. In the Flying AH equine neglect case in Fairplay a few years back, I received photos of the dead animals on the property, the badly disfigured foal ravaged by a dog and images of the other starving horses long before a case was brought against the woman who ran the "rescue." We often receive photos of starving horses here involved in neglect cases long before the matter goes to trial. This is out relief organizations appeal for help - by using the available photos from whatever source to help the jeopardized animals by dissemination of images.

The Bailey horses have no voice. They have no day in court. Now they have no pictures?

Mr. LeDoux, I am not a legal person just like you are not a horse person, so we can at least console ourselves with our mutual ignorance on certain subjects. Maybe two or more heads are better than either of ours in this case, so let me know if I we help in any way to get a dialog going with the ALDF. I feel this case has the potential to be a landmark case and its failure to reach a jury trial is preventable by everyone doing their utmost to help the prosecution. What a discredited message this failed case would send to the mountain horse-owning public and animal lovers and advocates, indicating that starvation and neglect of horses are impervious to the "long arm of the law" because it has been amputated.

Respectfully submitted,

Barbara Wright
Harmony HorseWorks
*Horse Sanctuary & Therapy Center*
*501(c)(3) Nonprofit Corp.*
13639 Elsie Road
Conifer CO 80433
(303) 816-0766
harmonyhorsewrks@aol.com
www.harmonyhorseworks.com
www.barbarawrightart.com
**MAKE ROOM FOR A  HORSE IN YOUR HEART!**

Harmony HorseWorks **is the home of Wright-ESCT™ EQUINE STRESS CONTROL THERAPY used to heal spooky, anxious and nervous horses and Equestrian Performance Coaching (EPC) using PEAT energy psychology for the fearful rider. We are a Colorado non-profit corporation in good standing and a tax exempt 501[c][3] corporation (DLN 17053233026024) since February 23, 2004.  FEIN 20-0763702.**

1076

# EXHIBIT  31

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

    Plaintiffs,

        vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

    Defendants.



----------------------------------------------------

DEPOSITION OF ASHLEIGH OLDS, DVM, DABVP-Equine
March 25, 2014

----------------------------------------------------

                        Deposition location:
                        600 17th Street,
                        Suite 600N
                        Denver, Colorado 80202

ALSO PRESENT:   Randall Hatlee
                Ronald Swift



**AVERY WOODS REPORTING**



455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 30

1    MS. BRONSON: Objection.
2    MR. LEBSACK: Same area?
3    MR. TONDRE: Same area.
4    A. I don't know that I could make a direct
5 comparison.
6    Q. (BY MR. TONDRE) Well, do you recall
7 calling the Bailey Feed Store and asking why
8 Mr. Swift is not recommending you?
9    A. I remember a phone call to the feed
10 store. And the context of the phone call was because
11 Mr. Swift had an unpaid bill to me at my office, and
12 we had sent multiple collection notices to him
13 without receiving payment. And I thought it would be
14 more effective to call him personally and ask if
15 there was any particular reason why he hadn't paid
16 the bill. I asked if he had been satisfied with the
17 services that were provided because I had noticed
18 that he was promoting a different veterinarian on
19 Pinecam, and he answered that everything was fine; he
20 was perfectly happy with my services, and that he
21 would send me a check, which he did not do.
22    Q. Do you remember my question?
23    A. You can rephrase it.
24    MR. LEBSACK: Could you restate it.
25    Q. (BY MR. TONDRE) Did you, during that

Page 31

1 conversation, ask why he was not recommending you?
2    A. No, I did not specifically ask that.
3    Q. What was your involvement with Shelly
4 and Eugene Ferraro prior to you coming into contact
5 with Spencer?
6    A. I have been the veterinarian for the
7 Ferraros for several years.
8    Q. How many horses do they have?
9    A. Currently, they have four horses, one
10 of which is Spencer.
11    Q. What is your impression of their
12 ability to make decisions regarding the care and
13 treatment of horses?
14    MR. LEBSACK: Same objection.
15    A. I think that Shelly takes very good
16 care of her horses. I think that she calls in a
17 timely fashion when she has concerns about her
18 animals.
19    Q. (BY MR. TONDRE) Tell me the regimen you
20 perform in making a diagnosis with respect to a horse
21 you are evaluating.
22    MR. LEBSACK: Object to the form.
23    A. In general, you would obtain as much
24 history as possible on the animal, perform a physical
25 exam of the animal, decide if additional diagnostic

Page 32

1 testing is indicated, and in most cases, you can
2 achieve a diagnosis. In some cases you may have
3 several different possibilities that you might
4 consider, in which case you would pursue additional
5 diagnostic testing or procedures to try to determine
6 the cause. And in some cases, you can't do that, and
7 you instigate treatment and monitor response to
8 treatment.
9    Q. That's basically a SOAP-note approach,
10 isn't it?
11    A. Yeah. In most -- I mean, you can say
12 that in most cases.
13    Q. Is the SOAP-note approach taught in
14 veterinary school?
15    A. Yes.
16    Q. And integral to the SOAP-note approach
17 is the differential diagnosis, correct?
18    A. Well, SOAP is subjective, objective,
19 assessment, plan. So you take all of your subjective
20 and objective information, put it together, and come
21 up with an assessment. So if you want to say
22 differentials could be under the assessment, in some
23 cases assessment could be patient is doing better
24 today; patient is doing worse today; patient is
25 responding well to treatment. And the P part of the

Page 33

1 SOAP is plan, so what is your plan moving forward.
2    Q. Assessment is the diagnosis, correct?
3    A. Assessment is your assessment of the
4 patient.
5    Q. Yeah.
6    A. It's not always a diagnosis. It could
7 be an ongoing -- your interpretation of the
8 subjective and objective findings.
9    Q. But if there are a number of potential
10 causes, that falls under assessment differential
11 diagnosis, correct?
12    A. Yes.
13    Q. And in order to reach an assessment,
14 you first have to go through the subjective or
15 fact-finding from a third-party source since the
16 horse can't talk to you, then you make an objective
17 finding, and from that, you attempt to make a
18 diagnosis, correct?
19    A. I feel like you are trying to put words
20 into my mouth, and that's not really a question. If
21 you want to ask me how I go about it, I would be
22 happy to answer that.
23    Q. Well, what I'm searching for is the
24 standard of care.
25    A. Standard of care is you take all of the

9 (Pages 30 to 33)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119