UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

_____

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**

**MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DAMAGES [#66[**
_____

This case seeks redress for a deliberate attack mounted against Plaintiffs designed to cause seizure of their horses and prosecution of them. It was orchestrated by Ashley Olds, a veterinarian, whose unfounded and unprofessional drive by diagnosis caused an email blast which resulted in the hereinafter described seizure and prosecution. The prosecution resulted in an acquittal. The Park County Sheriff's Office succumbed to the pressure and joined with Dr. Olds' outcryers and e-mailers. The result was a violation of the United States Constitution.

As of 2012 Randy Hatlee at age 52 and Ron Swift at age 70 had established an idyllic existence and an excellent reputation as horsemen. They were caretakers of Echo Valley Ranch near Bailey, Colorado. The ranch is owned by a family in South Carolina.

The ranch is 1600 acres, has two houses, a barn and a group of pens adjacent to the barn.

1

Swift lives in one of the houses. The owners use the other house when they visit.

Hatlee and Swift pursued a commercial horse operation on the ranch. They housed, trained and cared for their own horses, boarded horses for others, taught people to ride, trained horses for others, gave advice about horses to many who inquired.

In early 2012, Mr. Hatlee was also engaged in the chaff hay business. Though it was in its infancy, early results were promising. At that time Mr. Swift was part owner of a feed store.

All of the foregoing was severely affected by the events which began on February 16, 2012. Demand for their services and products disappeared.

Defendants argue that Plaintiffs' economic losses are minimal. In the words of Shakespeare, spoken through Iago, "Good name in man and woman, dear my lord, is the immediate jewel of their souls. Who steals my purse steals trash; 'tis something, nothing; 'Twas mine, 'tis his, and has been slave to thousands; But he who filches from my good name robs me of that which not enriches him, and makes me poor in deed."

In February 2012, Mr. Hatlee was boarding a horse named Bear for his ex-wife at Echo Valley Ranch. This was done in order to accommodate a Routt County court order. In order to check on the horse, Dawn Smith, a Routt County Deputy, visited the ranch on February 13, 2012.

Upon her visit on February 13, 2012, Deputy Smith noted that Bear and seven other horses were thin and that Bear and Maggie were down. Deputy Smith decided to seize Bear and notified Park County animal control of the other 7 skinny horses. Those seven horses were Maggie, Lena, Midnight, Chance, Fiona, River and Echo.

Bear and Maggie were housed in the barn. The other six were housed in pens

immediately adjacent to the barn. While in the pens the six horses were being re-fed in accordance with AAEP guidelines. The re-feeding began for Midnight in November, 2011, for Echo, Fiona and Bear in late December, 2011, and for Chance, Lena and River in early January, 2012

Bear was supposed to be periodically evaluated by a veterinarian. However, due to Routt County's failure to pay the veterinarian, the evaluations ceased in late 2011.

Deputy Smith and Deputy Cindy Hardey of Park County Animal Control notified Messrs. Hatlee and Swift that they were coming to the ranch on February 16, 2012, for Deputy Smith to pick up Bear pursuant to a court order and for Deputy Hardey to conduct a wellness check on the seven skinny horses. Deputy Hardey did not have a warrant.

Deputy Smith contacted Barbara Wright of Harmony Horse Works in Conifer, CO, for assistance in picking up Bear. Ms. Wright arranged for her veterinarian, Ashleigh Olds, to accompany Deputy Smith and transport Bear to Olds' clinic, Aspen Creek Veterinary Hospital.

When they arrived at the ranch Dr. Olds and Deputy Smith were shown Bear who was recumbent in the barn. Without being requested to do so, Dr. Olds accompanied Deputy Hardey on her wellness check of the other seven horses. This was without the consent of Hatlee and Swift and without the request of Deputy Hardey.

Without obtaining a history with respect to the weight loss of the horses and without examination and laboratory testing, Dr. Olds demanded that Maggie be euthanized and that the other six horses be seized by Deputy Hardey. Dr. Olds stated without scientific analysis or basis that the cause of the horses condition was starvation. [There is testimony that she demanded that the entire herd be seized.] Deputy Hardey communicated this demand to her supervisor, Sgt.

Bobbi Priestly. Sgt. Priestly instructed Deputy Hardey to tell Dr. Olds to take Bear and leave, which she did. Captain Bonnelycke told them to get an independent veterinarian to evaluate the seven horses. He did not consider Dr. Olds to be independent, and with good cause since she seemed to have a personal stake.

Three veterinarians, Drs. Horton, Burton and Questen have testified that it is unreasonable for a veterinarian to reach a diagnosis without a history, a differential diagnosis and testing to determine the cause by reasoning to the best inference. Support for this approach is found in *Bitler v. A.O. Smith Corp.*, 391 F. 3d 1114 (10th Cir. 2004)

Drs. Horton and Burton stated in a Pinecam posting;

…Contrary to several posts, these horses were not diagnosed with any disease, neurologic or otherwise, to the exclusion of malnutrition. There were simply peculiarities that remained unexplained by starvation alone, and if there was another condition contributing to their weight loss, it certainly should be addressed and not dismissed or overlooked. In fact, it would constitute malpractice not to investigate potential factors, It should be noted that these possibilities were being explored while the horses were already being re-fed according to AAEP guidelines.

Among the possibilities was toxic plant ingestion. The treatment by Hatlee and Swift was exactly correct for toxemia. The treatment is food, water and time. By this time Mr. Hatlee had gotten Bear to rise from his recumbent position and tied him to a truck where he was eating grain. Dr. Olds and Deputy Smith led Bear to Dr. Olds trailer which was 100 yards away. The trailer did not have adequate padding to protect Bear if he fell or a sling to prevent him from falling. There is testimony that it was cruel to transport Bear in that method. Shortly after leaving the ranch Bear fell. When he arrived at Dr. Olds clinic he could not get up and had to be lifted from the trailer. Barbara Wright photographed and videoed the unloading and used them to advocate seizure of the other horses and prosecution of Messrs. Hatlee and Swift.

4

After Dr. Olds left, Sgt. Priestly conferred with Kate Anderson, D.V.M., a Colorado Department of Agriculture Veterinarian, Scott Dutcher, chief investigator with the bureau of Animal Protection, Dr. Britt of Rocky Top Veterinary Services and Deputy Hardey, who described the condition of the horses and the care which was being provided to them. They all agreed that the appropriate thing to do was issue a notice of warning and leave the seven horses in the care of Messrs. Hatlee and Swift, giving them thirty days to demonstrate that the horses were not being mistreated. Deputy Hardey did not believe that leaving the horses with Messrs. Hatlee and Swift would endanger them and, based upon unanimous agreement, issued the warning. Deputy Hardey noted in her report that the horses all had food and water. This caused a doubt with respect to Dr. Olds hasty conclusion that they had been starved.

Failure to seize the horses and charge Messrs. Hatlee and Swift with animal cruelty infuriated Dr. Olds. Shortly after she arrived at her clinic and unloaded Bear, Dr. Olds e-mailed Deputy Hardey and complained to Barbara Wright and Shelly Ferraro that Park County had refused to seize horses that had been starved by Messrs. Hatlee and Swift. Thus began the pressure on Park County to seize the horses and bring criminal charges against Messrs. Hatlee and Swift. Significantly, in her email Dr. Olds stated that the horses had no food and water which is a bald false lie and contrary to the report of Deputy Hardey.

In a February 18, 2012, e-mail to Monika, Barbara Wright states: "We will wait and see what happens after the e-mail blast goes out." On February 19, 2012, Barbara Wright acknowledges receipt of a report on Little Man (Bear) from Dr. Olds Clinic and reports that the Ferraros "are helping with lobbying Officialdom to move on this travesty." The e-mail states that the problems of the horses were caused by starvation and not anything else.

On February 19, 2012, Undersheriff Gore called Deputy Priestly at home and expressed concern regarding calls and e-mails threatening harm to Messrs. Hatlee and Swift and their horses. Gore suggested that the horses be moved to an undisclosed location for their safety. Hatlee and Swift agreed and moved them to Kirsten LeBeau's ranch where they were placed indoors.

An agreement to the mutual benefit of both Hatlee and Swift and the Sheriff's office was signed. The benefit to Hatlee and Swift was continued possession which would allow them to show that the horses were sick, not starved. The benefit to the Sheriff's Office was that it would discharge its responsibility to protect Hatlee, Swift and their horses.

Significantly, while the horses were at the LeBeau ranch, they did not have much of an appetite which indicates that they were sick, not malnourished. Drs. Horton and Burton, the Plaintiff's veterinarians, had toxicity in their differential diagnosis. They expressed to Hardey, Priestly, Gore and Olds that this was a complex case and that they should not jump to conclusions. This is the very advice given in a publication by Dr. Olds clinic.

At no time during the period February 16 through 23, did Hardey consider the horses to be endangered by remaining with the owners.

Hardey claims she decided to seek a warrant to seize the horses because she was told by Horton that "she believes that Swift waited too long to rectify the problem and could have avoided the situation." Discovery has shown that Hardey did not investigate how soon after the problem was noticed that the horses were brought out of the pasture and placed in pens where they could be closely watched and fed.

The facts show that what Hatlee and Swift were doing was the appropriate therapy.

6

In truth, the seizure was sought to appease the protesters. This came after Hardey, Priestly and Wegener had a conference during which they had a telephone conference with Dr. Horton.

The move did not eliminate the threats. The outrage continued. The complainers would accept nothing short of seizure and prosecution. This is exemplified by Shelly Ferraro's e-mail of February 21, 2012, to Priestly which states:

> Why don't you people do yourself a favor instead of continuing to shoot yourself in the foot. The community wants to know that the precious horses are getting intense medical care in a medical hospital. They want to know the horses are getting iv's and are being rehydrated and given electrolytes, water and food. Why do you continue to refuse to help the community in knowing that these little horses are safe and are truly in competent care. It's pretty simple, get over your power trip and settle this horrific situation down, or your just going to continue to get jammed by the public, this isn't going away anytime soon……….if you don't know already this is all over the country and people are watching and ready to take more action.

Priestly forwarded this e-mail to Gore marked "Importance: Hi". Gore immediately contacted Dr. Olds to inquire if she would temporarily take over care of the horses. She responded that she would. After receiving confirmation that Dr. Olds had space available to provide temporary care Hardey commenced preparing her affidavit for a warrant.

In order to obtain a seizure warrant Deputy Hardey prepared an affidavit which omitted the following:

> (1) that there was an agreement to leave the horses in the care and custody of the Plaintiffs for 30 days in order to allow them to demonstrate that the hoses were not neglected but were suffering from an illness;
>
> (2) that the Sheriff's Office had the consent of Hatlee and Swift to inspect the horses and premises every two days;
>
> (3) that two veterinarians and a Department of Agriculture Official agreed that the agreement was reasonable;
>
> (4) that the horses were well treated at the facility where they were housed;

    (5) that he horses were not in danger where they were housed;

    (6) that the horses were under the care of Dr. Horton, a veterinarian;

    (7) that Dr. Horton told Deputy Hardey that the case was not clear cut and much diagnostic work needed to be done to reach a scientific conclusion. Dr. Horton's differential diagnosis included 10 potential causes.

    (8) that animal control personnel were checking the horses every two days;

    (9) that C.R.S. 18-9-202(b)1.8 provides that an animal can be impounded if it will be endangered if it remains with the owner; and

    (10) that the true intent of the requested warrant was to silence the demands of Dr. Olds and others.

    (11) That she had not investigated when the problems with the horses was noticed and when they were brought in and placed in pens.

Hardey denies knowing that false statements and material omissions were unconstitutional. She was either plainly incompetent or a knowing violator of the law. Therefore, she is clearly not entitled to qualified immunity. *Malley v Briggs*, 475 U.S. 335, 345 (1986). She was either untrained or a knowing prevaricator. The fact that she was not disciplined or criticized supports the inference that she was not violating her training but was in fact untrained. Wagener says it was Priestly' duty to train her and Hardey denies being trained by Priestly. Failure to train regarding these two fundamental principles would be expected to result in Fourth Amendment violations.

Deputy Hardey also knew that C.R.S. §18-9-202(b)1.8 authorized seizure of an animal only if it is endangered if it remains with the owner and knew that the horses were not endangered if left with Messrs. Hatlee and Swift. Deputy Hardey failed to include these facts in her affidavit in support of issuance of a warrant to seize the horses.

Hence, Deputy Hardey violated both the Fourth Amendment to the United States Constitution and the Colorado statute.

As noted by the trial judge, had the omitted matters been disclosed, the warrant would not have been issued.

The warrant was issued and the horses were seized on February 23, 2012 and Hatlee and Swift were charged with animal cruelty.

In her victory lap on February 24, 2012, the day after Park County seized the horses, Dr. Olds, in an e-mail to Monika proudly crows:

> Thank you for all your help. Barb at Harmony really got the publicity going and everyone else helped keep the fire on. I don't know if this would have been taken seriously without all the public pressure. Hopefully the end result will be that justice is served and the horses are homed where they will be FED!

The new age vigilanteism by e-mail worked. It was sparked by Dr. Olds report that there was no doubt that the horses had been starved. The publicity caused Gore to take over supervision of the case from Bonnelycke, thus silencing his insistence on an independent opinion.

On April 7, 2012, a fundraiser was held for the seized horses. Deputy Hardey, Sgt. Priestly, Captain Bonnelycke and Undersheriff Gore attended the fundraiser, with Sheriff Wagener's approval. Sheriff Wegener admits that they were trying to appease the group that was complaining about the way the Sheriff's office was handling the case. They went so far as to give investigative materials to Wright who disseminated them nationwide.

On April 10, 2012, the trial judge, after an evidentiary hearing, ordered the horses returned to their owners because he concluded that the animal control officers did not have probable cause to believe that the horses were endangered by remaining with Hatlee and Swift. This sparked another public outcry.

To this point the case had been handled by DDA Steve Sullivan. Because of complaints about Sullivan, the prosecution was taken over by the DA, LeDoux. The DA was up for re-election in 2012 and was openly opposed by the Sheriff's office which complained that the DA was not prosecuting cases which the Sheriff's office worked up. Sheriff Wegener wanted to get rid of LeDoux because he was making decisions that some cases brought to him were not prosecuted because he believed non-prosecution was in the interests of justice. Wegener was crying for LeDoux's political head because, in the interests of justice, he chose not to prosecute certain cases. Wegener wanted to make the decision.

At about the same time Deputy Hardey was replaced as lead investigator by Sgt. Priestly because there was a public outcry that Deputy Hardey was friendly to Mr. Swift.

Early on Captain Bonnelycke was replaced as supervisor of the investigation by Undersheriff Gore when he insisted that before the case went forward it be evaluated by an independent veterinarian. He did not consider Dr. Olds to be independent. A veterinarian was never retained.

On April 11, 2012, the day after the judge ordered the horses returned, Dr. Olds sent Undersheriff Gore an e-mail in which she expressed her dissatisfaction with the way the case was being handled by the district attorney. She states, "I am as appalled as everyone else as to how this can happen. I am very concerned that the case is not being presented to its maximum effectiveness based on the results some of the comments in this last email from Bobbi Priestly…." Gore responds: "I will get with Sgt. Priestly and Lt. Bonnelycke and our county attorney to analyze a strategy for going forward. We are here with you."

Thus the pressure to continue the prosecution began . It was an election year, the

Sheriff's Office was opposing re-election of the DA for not prosecuting cases, the public was questioning the DA's competence, so the DA had no alternative but to continue the prosecution. He could not politically afford to dismiss this high profile case and agreed to continue the prosecution though he knew he could not win it.

On December 3, 2012, after an evidentiary hearing, the trial judge held that the seizure warrant was obtained by Hardey's omissions which were made in bad faith. As a result, all evidence gathered during the seizure period was suppressed.

Captain Bonnelycke was overseer of animal control and professional standards. Sheriff Wegener testified that Captain Bonnelyck, as overseer of professional standards, had a conference with Deputy Hardey to discuss her conduct regarding the omissions of material facts from her affidavit. Captain Bonnelycke testified that Sheriff Wegener's testimony is false.

Deputy Hardey's unconstitutional conduct not only went unpunished but also went uninvestigated. Discovery has demonstrated that Deputy Hardey did not know the definition of probable cause, did not know that false statements in and material omissions from an affidavit in application for a warrant were a violation of the Fourth Amendment and that her method in preparing affidavits was the Reader's Digest approach.

Deputy Hardey was supposed to be trained by Sgt. Priestly but was not.

After a 5 day trial Hatlee and Swift were acquitted. Immediately following the acquittal LeDoux stated to Mr. Hatlee and his attorney, "This is the last time I will be pressured into prosecuting a case I knew I could not win."

## STANDARD FOR DAMAGES

Compensatory damages are mandatory where plaintiff succeeds in establishing liability

11

and shows compensable injury. *Smith v. Wade*, 461 U.S. 30, 52 (1983).

The availability of damages for constitutional rights violations is considered a question of federal law and is governed by federal standards, informed by common law. *Carey v. Piphus*, 435 U.S. 247, 262 (1978). *Piphus* admonishes courts to examine the common law and apply the most analogous common law rule of damages.

Compensatory damages may take the form of actual damages, presumed damages and punitive damages.

In a case where a constitutional law has been violated but it is impossible to show any actual damages and where the court determines, based on common law-principles, that presumed damages are unavailable, plaintiffs may still seek punitive damages, where a need to punish and deter can be shown, as well as nominal damages for violation of the right itself. *Carlson v. Green*, 446 U.S. 14, 22 n.9 (1980). The standard for the award of punitive damages is conduct which exhibits "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade, supra*, at 56. Prosecuting someone for political purposes certainly qualifies.

Here the most analogous torts are wrongful arrest and malicious prosecution. The jury instructions for these two common law torts are substantially identical. See, CJI-Civ. 17.9 and 21.5 (2014). The damages included are physical and mental pain and suffering, fear, anxiety, humiliation, embarrassment, indignity, public disgrace, loss of reputation, costs of defense and losses to his business.

Punitive damages in a §1983 case may be awarded even if actual injury is not shown and presumed damages are unavailable. Punitive damages may be awarded where defendant's conduct exhibits "reckless or callous indifference to the federally protected rights of others."

*Carlson v. Green*, 446 U.S. 14, 22 n.9 (1980); *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Defendants argue that Plaintiffs' claimed damages are not recoverable because the amount is uncertain and speculative. As stated in *Cooper v. Hollis*, 600 P.2d 109 (Colo. App. 1984) "The rule which precludes recovery of uncertain and speculative damages applies only to situations where the fact of damage is uncertain, not where the amount of damage is uncertain.

Lost future profits may be based on estimates by the plaintiff. The estimate may be based upon the judgment of the plaintiff and formulated on a reasonable basis. *Malloy v. Monahan*, 73 F.3d 1012, 1016-17 (10th Cir. 1996).

There can be no doubt that the Plaintiffs did, in fact, sustain damages. From the sampling of e-mails (Exhibit 33) one would certainly expect that Plaintiffs would suffer financial losses, emotional suffering, damage to their reputations and embarrassment. Exhibit 33 is but a small sampling of the product of the e-mail blast.

## PROBABLE CAUSE TO PROSECUTE

The Park County Defendants assert a statement made by the trial judge as preclusive on the issue of probable cause to prosecute. During his ruling holding that the seizure warrant was without probable cause, the judge stated that there was probable cause to take the animal cruelty charges to trial. The statement is not preclusive.

In order for a judicial determination in one case to be preclusive in another case, (1) the issues must be identical; (2) the merits of the prior action have been fully adjudicated; (3) the party against whom the doctrine is invoked was a party or in privity with a party in the prior action; and, (4) in the prior action, the party against whom the doctrine is invoked has had a full and fair opportunity to litigate the issue. *Murdock v. Life Indian Tribe*, 975 F.2d 683, 687 (10th

Cir. 1992. The issue was not tried in the prior action. The issue in the prior case, probable cause to seize the horses, was the only probable cause issue litigated.

In this case the issue is whether, if the horses had been had been left in their custody, Hatlee and Swift could have demonstrated that there was no probable cause to charge them with animal cruelty. However, without this evidence, Hatlee and Swift had no basis on which to convince the District Attorney that he should exercise his discretion to refuse to prosecute.

Plaintiffs were denied this evidence by the breach of their contract with the Sheriff's Office. This breach is fully discussed in Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment Regarding Plaintiffs' Third Claim for Relief. Defendants are liable for all of Plaintiffs' fees incurred in defense of the criminal charges whether it be for violation of the Fourth or the Fourteenth Amendments.

Sheriff Wegener pin pointed the animal cruelty issue when he asked during the telephone conference with Dr. Horton if she thought Swift did not call a vet sooner because he was an older rancher and he thought he could take care of things himself. Dr. Horton told the Sheriff she felt that would fit Swift. Dr. Horton stated that Swift had a lot of confidence in his experience as a horseman, he has some strongly held values as to how they should be doctored and what is appropriate. Wegener testified that this should have been investigated before the horses were seized. It was not. Acting in accordance with ones confidence in his ability is not criminal negligence as required by C.R.S. §18-9-202.

Hatlee and Swift were in the process of arranging to have the horses evaluated at the CSU vet school when they were seized.

The fact that the DA continued the prosecution after the horses were returned does not

excuse Defendants Wegener, Gore, Priestly and Hardey from liability. As stated in *Malley v. Briggs, supra* at 345, a reasonably trained police officer cannot escape liability for an act he knows or should know is unconstitutional because someone else in his chain of authority approved of what he was doing. Furthermore, LeDoux continued the prosecution reasons, not because he believed there was probable cause.

As it turned out, Swift was correct. There was a suspicion that the six horses were suffering from toxemia. As noted by Dr. Questen, (1) the cure for toxemia is food, water and time; (2) the time and feeding of the affected horses done prior to the seizure contributed to their recovery; (3) which continued to progress under the care of Littleton and Olds, aand (4) completed their recovery after they were returned to Echo Valley ranch.

LeDoux told Hatlee and Swift that he would not prosecute if he were convinced that the condition of the horses was due to toxicity. Seizure of the horses wrongfully took this opportunity away from Hatlee and Swift. As they were packing up to leave the courtroom following the acquittal, LeDoux remarked to Hatlee and his lawyer that thiss is the last time he would be pressured into prosecuting a case he knew he could not win.

It is respectfully submitted that the motion regarding damages must be denied.

/s/ Brice A. Tondre
_____
Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado   80226
Telephone:  303-296-3300
Facsimile: 303-238-5310
briceatondrepc@msn.com

ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing was served on counsel for Defendants this 3rd day of January, 2015, addressed as follows:

Timothy P. Schimberg
t_schimberg@fsf-law.com

John Lebsack
jlebsack@wsteele.com

                                                 /s/ Brice A. Tondre
                                                 _____