# EXHIBIT  26

Condensed Transcript

# In the Matter Of:

## HATLEE vs. HARDEY

13-cv-02469-RM-MJW

## JENA QUESTEN

*November 10, 2014*

*VOLUME II*





800.211.DEPO (3376)
*EsquireSolutions.com*

**Page 268**

1    A  I did do those, and I did not see
2  anything abnormal there.
3    Q  Okay.  Just give me an example of how you
4  do a cranial nerve exam?
5    A  So you would look, for example, if the
6  pupils are dilating to lights, if the eyes are tracking
7  normally, if one nostril is drooping and the other's
8  not.
9    Q  See if they had anything to drink?
10    A  Yeah, exactly.
11    Q  Okay.  How about muscle symmetry?
12    A  Yes.
13    Q  How --
14    A  I would look for that and if I noted
15  anything abnormal, I would make a note of that.
16    Q  Is that visual observation as opposed to
17  some test or something?
18    A  Virtual and palpation.
19    MR. SCHIMBERG:  Okay.  I hate to give up.
20  But I'm going to.  Thank you for your time.
21    EXAMINATION
22  BY MR. TONDRE:
23    Q  Dr. Questen, there was a mention in your
24  testimony of the horses being delivered with no
25  halters?

**Page 269**

1    A  Yes.
2    Q  What's the significance of that?
3    A  Well, the significance of that is it's
4  very dangerous for people to be traveling with horses
5  in a horse trailer with no halters.  For example, if
6  they were to have a flat tire or get in an accident or
7  whatever reason, you might have to stop on the side of
8  the road where there's no facilities to contain these
9  animals if you had to get them off the trailer in an
10  emergency, it would be negligent to not be able to
11  control them in some manner.
12    Q  Would you say that transporting those
13  horses without halters would be a violation of the
14  cruelty animals statute?
15    MR. SCHIMBERG:  Objection.  Outside the
16  scope of her endorsements.
17    MR. TONDRE:  I didn't bring up the
18  halters.
19    MR. SCHIMBERG:  I know that.  I'm just
20  entering my objection.  Thanks.
21    A  I -- I wouldn't know anything about that
22  other than I do believe that if somebody driving a
23  truck and trailer gets pulled over, I think that it is
24  a requirement to have a halter in order to lead for
25  that animal.

**Page 270**

1    Q  (BY MR. TONDRE)  Now, you talked about the
2  importance of a history in reaching a diagnosis and a
3  conclusion --
4    A  Yes.
5    Q  -- did you not?
6    Did you see anywhere where Ashleigh Olds
7  or any of the experts that have been hired by the
8  defendants in this case, did a thorough history of how
9  the animal -- how the horses were fed prior to the time
10  they were brought in from the pastures?
11    A  No.
12    Q  Wouldn't that be important to know?
13    A  Yes.
14    Q  Why?
15    A  So that it could help you to make an
16  accurate diagnosis of what's going on with the animals.
17    Q  That's part of the process of reasoning
18  to the best inference; isn't it, Dr. Questen?
19    MR. LEBSACK:  Form.
20    A  Yes.
21    MR. SCHIMBERG:  Join.
22    Q  (BY MR. TONDRE)  And is reasoning to the
23  best inference sort of another name for differential
24  diagnosing?
25    A  Yes.

**Page 271**

1    Q  And if I understood you -- you've come to
2  the conclusion that the most likely cause or the best
3  inference as to what caused the skinniness in the
4  horses was some toxin; is that correct?
5    A  That's correct.
6    Q  And do you stand by all the opinions that
7  you set forth in Exhibits 102, 106, and 107?
8    A  Yes.
9    Q  Now, I want to inquire about -- would you
10  expect those horses to have gained weight if they had
11  been left at Echo Valley for the six weeks that they
12  went to the Littleton Clinic?
13    MR. SCHIMBERG:  Object to form.
14    A  I think they would have been treat --
15  yes.  Yeah.  I think they would have gained weight
16  because nothing much was done other than some
17  antibiotics and some fluids and some food.
18    Q  (BY MR. TONDRE)  Now, you said that you
19  were not -- you were not aware of what was going on --
20  you were asked the question about what was going on in
21  Ashleigh -- Ashleigh Olds' mind other than her calling
22  these horses starved.  And you said you didn't know
23  what was going on in her mind.  Shouldn't it be in her
24  notes, if she was being a careful veterinarian?
25    A  Yes.

Page 272

1        MR. LEBSACK:  Form.
2        Q  (BY MR. SCHIMBERG) In fact, isn't that the
3 standard of care to record in your notes what's going
4 on in your mind about the animal you're treating?
5        A  When you're doing medical records, yes.
6        Q  Now, the reporting statute deals with
7 veterinarians who are in the course of attending or
8 treating an animal.  Was she attending or treating
9 animals at Echo Valley Ranch as near as you could tell?
10        A  No.
11        Q  Now, based upon what you've seen in this
12 case, did Dr. Olds have reasonable cause to know or
13 suspect that the -- than the eight horses were
14 knowingly, recklessly, or with criminal negligence
15 deprived of necessary sustenance?
16        MR. TONDRE:  Form.
17        A  No.
18        Q  (BY MR. TONDRE) Now, it was -- there was
19 talk a bit about transporting the horses.  And the
20 statute provides that it's animal cruelty to -- animal
21 cruelty to carry an animal in or upon -- upon any
22 vehicle in a cruel or reckless manner.
23        Now, how would you classify taking for
24 example, Bear, putting him in a trailer and pulling him
25 away which causes him to fall to the -- to the base of

Page 273

1 the trailer, to the bottom of the trailer, and
2 transport him over very rough roads for a significant
3 distance, would you classify that as cruel to Bear?
4        MR. LEBSACK:  Form.
5        A  I don't know -- I don't have any
6 documentation of the specifics of how that horse was
7 transported; but I know if you have a horse that's
8 ataxic, and having neurological symptoms, is very weak,
9 and having a hard time standing; it would be completely
10 inappropriate to put that horse in a trailer without
11 either slinging them if you're afraid that they cannot
12 stand on their own; or having the back of the trailer
13 very, very padded, so that the animal doesn't injure
14 itself in the course of transport.
15        Q  (BY MR. TONDRE) That would be true with
16 respect to horses in that condition that were taken
17 to -- by Park County when they seized the horses,
18 correct?
19        MR. SCHIMBERG:  Object to form.
20        Q  (BY MR. SCHIMBERG) Did you see any videos
21 which demonstrated the loading of a horse, that it was
22 inappropriate to transport when Park County seized the
23 animals?
24        A  I don't recall seeing videos of the
25 animals being loaded for transport.

Page 274

1        Q  All right.  Did you see in the records
2 that -- was it Chance?
3        MR. SWIFT:  Chance.
4        Q  (BY MR. TONDRE) That Chance was
5 transported laying down in the trailer?
6        MR. SCHIMBERG:  Object to form.
7        A  I don't recall reading or seeing that.
8 Maybe you can --
9        MR. SWIFT:  It's in the Littleton.
10        Q  (BY MR. TONDRE) It says:  Very thin and
11 weak.  Arrived in a trailer.  Got him up with
12 assistance.  He fell again, and come -- in coming out
13 of the trailer, but was helped back up and walked to
14 ICU.
15        Is it appropriate -- is it animal cruelty
16 to transport a horse in that condition?
17        MR. LEBSACK:  Can you tell me which page
18 you just read from, this is from Exhibit?
19        MR. TONDRE:  It's page 3 of 12.
20        MR. LEBSACK:  So Exhibit 110 page 3 of 12
21 for Chance?
22        MR. TONDRE:  For Chance.
23        MR. LEBSACK:  Thank you.
24        A  Certainly without taking special care
25 beyond what's normal and ordinary transporting a horse

Page 275

1 to make sure that animal arrives safely and without
2 being further injured.
3        Q  (BY MR. TONDRE) It would be animal cruelty
4 to do that; wouldn't it?
5        A  Yes, yes.
6        MR. LEBSACK:  Object to form.
7        Q  (BY MR. TONDRE) Let me read you something
8 from Olds' disclosure document page 29.  Dr. Olds in an
9 email to Monika Courtney writes:  Thank you for all of
10 your help.  Barb at Harmony really got the publicity
11 going in this, and everyone else helped keep the fire
12 on.  I don't know if this would have been taken
13 seriously without all the public pressure.  Hopefully,
14 the end result will be that justice is served and the
15 horses are homed where they will be fed.
16        Is that appropriate conduct for a
17 veterinarian?
18        MR. LEBSACK:  Form.
19        A  That did not sound appropriate.
20        Q  (BY MR. TONDRE) Is that one of the emails
21 that you were referring to that caused you to testify
22 that -- or to write in your report that she acted
23 inappropriately?
24        A  Yes.
25        Q  And would it add to that to know that



Page 276

1 Barb at Harmony HorseWorks was the person that arranged
2 for Ashleigh Olds to go pick up Bear?
3        A  Can you ask the last one again?  Now, I
4 am getting the feel of it now.
5           (Whereupon, the question at page
6 275, line 25, was read by the reporter.)
7        MR. LEBSACK:  Form.
8        A  I'm not sure how to answer your question.
9        Q  (BY MR. TONDRE) Well, she's thanking Barb
10 with the help for the publicity, right?
11        A  Correct.
12        Q  And does it add to your belief that it's
13 inappropriate when the person advocating the publicity
14 is the one that was involved with Ashleigh Olds in
15 picking up the horse?
16        A  I'm not sure because I don't know who
17 would have originally asked her to come pick up the
18 horse.  So I'm not sure how to answer your question.
19        Q  And the first person that -- assume with
20 me that Ashleigh Olds communicated to Barbara Wright
21 that she believed that the horses were starved and
22 that's how the publicity campaign got started.
23        A  Okay.
24        Q  Is that appropriate?
25        MR. LEBSACK:  Form.

Page 277

1        A  That would be inappropriate; but yes, I
2 agree with you so far.
3        Q  (BY MR. TONDRE) Does toxic ingestion cause
4 malnutrition?
5           MR. SCHIMBERG:  Object to form.
6        A  It could.  If it was a toxin that -- that
7 interfered with the horse's ability to absorb
8 nutrients.
9           MR. TONDRE:  That's all I have.  Thank
10 you.
11           FURTHER EXAMINATION
12 BY MR. LEBSACK:
13        Q  I just want to wrap up a few real fast
14 hopefully.
15           When I asked you to look for emails such
16 as that -- that email that was just discussed by
17 Mr. Tondre, I asked you to look at Exhibit 108 which is
18 that big thick part of your file that was copied?
19        A  Yeah.
20        Q  And I wanted to make sure that
21 Exhibit 109 has your treatment notes, right?
22        A  Right.
23        Q  So there wouldn't be any kind of emails
24 in that Exhibit 109?
25        A  There should not be, no.

Page 278

1        Q  Okay.  Could you just flip through there,
2 there is nothing in there that are emails, right?
3        A  Right.
4        Q  Okay.  So if there are emails that you
5 used to form the basis of your opinions, it would be in
6 Exhibit 108, correct?
7        A  It would be.  But this was not prepared
8 by me, this is copies, and this was hole punched and
9 handed to me.
10        Q  I understand.  But if it is a complete
11 copy of your --
12        A  Yes.
13        Q  -- file --
14        A  Yes, yes.
15        Q  -- and I'm assuming that it was because
16 the court reporter copied it, the emails would be in
17 that Exhibit 108?
18        A  Correct.
19        Q  And again about -- about your knowledge
20 about what Dr. Olds may have thought, the only
21 information you have about what Dr. Olds was thinking
22 or what she did, would be documents in that Exhibit 108
23 prepared by Dr. Olds, correct?
24        A  Or comments made by other people that
25 were there at the time.

Page 279

1        Q  That's in that Exhibit 108?
2        A  Correct.
3        Q  You haven't read her deposition, right?
4        A  Right.
5        Q  Mr. Tondre asked if you stand by the
6 opinions in Exhibits 102, 106, and 107 which are your
7 three reports.  You've testified in your deposition
8 about some changes that you need to make in those
9 reports?
10        A  The only change --
11        Q  Yes.
12        A  -- that I would make is that anemia in
13 starved horses is probably slightly more common than
14 the way I originally presented it.
15        Q  Is your interpretation of the vet statute
16 that if a vet is not treating or attending an animal;
17 but nevertheless sees grounds to know or suspect that
18 the animal had been the victim of animal cruelty, that
19 the vet does not have a duty to report?
20        MR. TONDRE:  Objection.  Foundation.
21 That's what the statute says.
22        A  I think that a veterinarian has the duty
23 to report something whether they are there to treat an
24 animal or not.
25        Q  (BY MR. LEBSACK) So it doesn't matter



Page 280

1 whether they are attending or treating; if you see the
2 information that gives you that basis, you should
3 report it?
4       A   Yes.
5       Q   There are circumstances when it's okay to
6 transport a horse down in a trailer; aren't there?
7       A   There can be if you have no choice
8 sometimes.
9       Q   Right.  But in that case, what needs to
10 be done is to provide something on the floor so that
11 the horse --
12      A   Yeah.
13      Q   -- has something to lie on?
14      A   Deep bedding.
15      Q   Right.
16      A   Slinging, something.
17      Q   But if you've -- if you've got no choice
18 and the horse won't stand up, under those
19 circumstances, it's appropriate to transport the horse
20 down in the trailer?
21      A   As long as they are appropriately
22 protected, yes.
23      Q   Okay.
24          MR. LEBSACK:  Let me just take five
25 minutes and I think I'm done but let me just talk to my

Page 281

1 client and I'll double-check.
2          (Recess was taken from 3:02 p.m. to
3 3:04 p.m.)
4       Q   (BY MR. LEBSACK)  Just a couple of
5 questions.  You've talked about the two different kinds
6 of anemia, right, where there's --
7       A   Regenerative and nonregenerative.
8       Q   -- regenerative and nonregenerative.  As
9 far as signs of those two different kinds, what are the
10 signs of one versus the other?
11      A   My understanding from -- because that's
12 been a big sticky thing from the beginning and from
13 what I have read, I've determined that it can be
14 difficult to tell from peripheral blood smear which is
15 generally what a veterinarian is going to need to look
16 at.  It's difficult to even tell from that and the best
17 test to determine that would be a bone marrow.
18      Q   So from the lab tests, you don't
19 necessarily know which one it is?
20      A   Right, it can be hard to tell.
21      Q   And there are signs as far as from a
22 physical exam or looking at horse or anything like
23 that?
24      A   There is nothing on a physical exam that
25 would tell you that.

Page 282

1       Q   Okay.  Is there -- are you familiar with
2 the term microcytic hypochromic anemia?
3       A   Uh-huh.
4       Q   What is that, as you -- as far as you
5 know?
6       A   It's just a classification of a type of a
7 description of an anemia, how the cells look.
8       Q   Is that regenerative or nonregenerative?
9       A   I couldn't tell you off the top of my
10 head.
11      Q   And would a toxin cause regenerative or
12 nonregenerative?
13      A   It would depend on the toxin.
14      Q   It could cause one or the other?
15      A   As far as I know.
16          MR. LEBSACK:  Okay.  All right.  That's
17 all I've got, thank you.
18          FURTHER EXAMINATION
19 BY MR. TONDRE:
20      Q   What kind of bedding should be in a
21 trailer for a horse that's having trouble standing?
22      A   Thick bedding, something very thick to
23 cushion them from the floor of the trailer.  So
24 something ideal would be several bales of straw would
25 be one example.

Page 28

1       Q   How deep should it be?
2       A   The deeper the better to protect that
3 animal.  I mean, it's an 800-pound animal that is being
4 thrown around on a hard metal surface, so at least --
5 if it's shavings, I would say at least as a minimum, 6
6 to 8 inches of shavings; if it's straw, at least a
7 foot, foot and a half of straw, if not more.
8          MR. TONDRE:  Thank you.
9          (Whereupon, at 3:06 p.m. the
10 deposition was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Swift Case 9/11/2012

This case is regarding Ron Swift and Randee Hailes, who own horses housed on a ranch in Bailey, Colorado, called Echo Valley Ranch. In December of 2011, 6 of the approximately 40 horses on the ranch began to lose weight and show signs of severe weakness. Of note is that only those 6 animals of the 40 on the property were affected, and 5 of those were all young horses under 2 years of age, and the sixth being an older mare historically known for being thin in the winter.

Those 6 horses were brought out of the pastures and brought into individual pens near the barn for closer evaluation and increased feeding, throughout the time period from December 1, 2011 through February 12, 2011. Records indicate the condition of the horses was being monitored by Timberline Equine veterinarians Dr. Horton and Burton, who suspected the 6 most severely affected animals were suffering from some sort of toxic ingestion, possibly botulism. Clinical signs of all animals included: thin body condition scores (2 or 3 out of 9), elevated heart rates, abnormal heart rhythms, diastolic heart murmurs, anemia (low red blood cell count) as noted on blood work, and varrying abnormal neurological symptoms including being down and unable to rise, and crossing over of their feet when they walked (conscious proprioceptive deficits). Apparently, other animals in the area were reported to have similar symptoms, including being down and unable to rise, and even death. Botulism is difficult to accurately diagnose in horses, and there is no effective treatment. One of the horses later tested negative for botulism. The condition of Mr. Swift and Mr. Hailee's horses on the ranch was brought to the attention of Animal Control Officers for Park County, as possibly a case of starvation and/or neglect.

Dr. Horton indicated in an email dated February 28, 2012, that she suggested the animals be transferred for advanced diagnostics tests at Colorado State University. When she consulted with the cardiologist Dr. Adams at Colorado State University regarding the clinic signs the horses were displaying, Dr. Adams revealed that there is no known association between low body condition scores and diastolic murmurs in horses. Apparently Mr. Swift had an appointment at Colorado State Teaching Hospital for these advanced diagnostic tests, when the horses were seized by Park County, making the afflicted animals unavailable for advanced testing during the height of clinical signs.

While under the custody of Park County, the horses were under the care of both Littleton Equine Hospital and Ashley Oldes DVM. Records indicate some advanced testing was performed, multiple doses of antibiotics and probiotics were given, as well as generalized supportive care including IV fluids was administered to the horses, but there is no record of a diagnosis for the cause for the high heart rates, murmurs and abnormal rhythms noted on all of the animals. All the animals repeatedly showed some signs of anemia on their blood work, as well as high white blood cell counts. Only the older mare received a definitive diagnosis of advanced kidney disease and intestinal parasites, which could certainly contribute to having a thin body score.

Anemia in animals occurs for one of three reasons: blood loss, blood cell destruction, or lack of regeneration of new blood cells by the bone marrow. It does not appear from the records that the horses suffered any sort of bleeding disorder, therefore we can assume the animals were not anemic from blood loss. Nutritional anemias in animals are rare and not normally associated with an otherwise healthy animal simply having a lack of forage. Disorders that cause red blood cell destruction are termed hemolytic anemias and are usually associated with immunologically mediated mechanisms (such as equine infectious anemia, autoimmune hemolytic anemia, or transfusion reactions), certain bacterial infections (*Clostridium perfringens*), plant or chemical toxicity (red maple leaves, phenothiazine, onions, Hoary Alyssum), or blood parasites (Babesia, Ehrlichia equi).* Although the records are lacking in the specifics of the classification of the type of anemia the horses suffered from, they were treated with antibiotics, indicating that an infection of some kind was suspected (perhaps *Clostridium perfringens*?), and supportive care including IV fluids, such as would be the only treatment option in many cases of toxic ingestion. It is interesting to note that even under the care of animal control, the red blood cell counts were still decreased, and the white blood cell counts increased, indicating clearly that despite additional forage and calories, the animals were still affected by something else causing the anemia, which then led to the continued cardiac abnormalities (high high rates, abnormal rhythms and murmurs). All of which are not normal or customary clinical symptoms associated with starvation.

The animals were later returned to the care of Ron Swift and Randy Hailes, who throughout this time had been working with equine specialists, other veterinarians, and their local county extension agent to determine if botulism or some other toxin could have been the initial cause for the horses condition.

Eventually it was discovered that the toxic weed Hoary Alyssum was pervasive on the property, and more prolific throughout the area due to recent drought conditions. Hoary alyssum is known to be highly toxic to horses (but not to cattle or other ruminants), with a characteristic set of symptoms (not all present in every affected horse and not all horses are equally susceptible). Symptoms include depression, fever, increased heart rate, laminitis, limb edema, diarrhea, dehydration, intravascular haemolysis (red blood cell destruction), hypovolemic shock, anemia, and abortion in pregnant mares (Becker et al. 2004, Hovda and Rose 1993, Knight and Walker 2004, Knight and Gaskill 2011, Martinson et al. 2007).

In conclusion, 1) It would be uncommon in a case of severe neglect and starvation to only have 6 out of 40 animals affected 2) It is common for toxic ingestion to more strongly affect the younger animals who might be less discriminating in their forage choices and have fewer reserves for recovery 3) Starved horses will be weak, but not necessarily show signs of neurological abnormalities and conscious proprioception changes, and most importantly 4) Cardiac abnormalities and anemia are not generally associated with starvation, and in fact in this case, persisted despite having increased calories and forage, therefore, the likelihood of some third other unknown cause, such as a persistent toxin in the animals tissues, or some other undiagnosed disease process, is highly suspect in this case. It is unlikely this was a case of selective neglect and starvation, but much more likely some other reason for the thin body scores, cardiac abnormalities, and anemia, such as ingestion of some sort of toxin or toxine, such as either in the ground, through the hay or feed source, or in the pasture plants. *(Equine Medicine and Surgery, Mosby, 1999).

Ex 102

Addendum 2/1/2013

Additional records were supplied with regards to another animal on the property, known as Bear or Spencer, another 2 year old horse with a similar condition to the 6 horses mentioned above. It would be sensible to say that it is likely this young horse might also have been suffering from a similar toxic ingestion as the other animals, especially in light of the fact (according to Dr. Oldes) he was treated, and responded, in a similar manner as the other animals in question. In the records supplied there was not a description of Bear's cardiac condition, but it does mention treatment with antibiotics, and his blood work was similar to the other horses.

There is often no further treatment for toxic ingestion in horses other than to remove the source of the toxin, provide supportive care, including food and water, and providing protection from (and treatment for) abrasions caused as a result of any neurological conditions, until the body can clear the toxin from the system allowing the animal to recover and assimilate nutrients normally again.

In conclusion, it is likely that Bear, or Spencer, was suffering from the same malady as the other 6 horses, for all the same reasons listed previously.

Rebuttal Report (Case of Swift/Hatlee) to Defendant Olds Expert Witness Disclosures
by Jena Questen DVM 6/29/2014

A) I personally examined all the horses on 4/11/2012, the day they were returned to Mr. Swift and
Mr. Hatlee.
1) The horse Lena still had a cardiac arrhythmia, mild tachycardia, and neurological signs which
were all reported to have resolved after one week of nutritional support.
2)The horse Echo still had tachycardia and mild neurological symptoms, after being reported to
have resolved after one week of normal nutrition.
3) The horse Chance showed moderate neurological symptoms and severe cardiac
abnormalities.
4) All horses were still very thin and many had green diarrhea from free feeding on alfalfa hay.
They did not appear to be rapidly recovering, quickly gaining weight, and overcoming their other
symptoms with just an adequate refeeding program, as asserted by the experts.

  I am confident that three veterinarians (Horton, Burton, and myself) are able to discern
weakness from true neurological symptoms. In summary, it is highly unlikely these horses would
have recovered from these symptoms completely, as reported, and then relapsed in the time
period from February 19, 2012 to April 11, 2012. Therefore these horses were not rapidly
recovering with just refeeding, as described.

B) Dr. Henneke himself, who pioneered the Henneke Body Condition Score (BCS) system,
prepared a statement for consideration when using his system in cases of animal neglect. In this
statement Dr. Henneke makes statements which are of particular interest in this case:
- Do not overreact or act too hastily
-Work with the owner to the extent possible leaving seizure an an absolute last resort
-As an equine neglect investigator, learn as much about nutrition and equine management as
you possibly can.
content/uploads/2012/02/HENNEKE-REPORT.pdf

In this case, not only did the experts making statements not utilize the system properly, as in by
not physically laying hands on the animals but basing their scoring on photos, but also the intent
of the system was not adhered to as Dr. Henneke intended, since a clear picture of the history
and ongoing care of the horses was not adequately taken into consideration.

C) Regarding the bloodwork:
-The type of anemia the horses exhibited was not classified according to the records provided.
Perhaps if it had been it would have been more clear to determine if the cause of the anemia
was related to red blood cell destruction (perhaps from a toxin), versus reduced red blood cell
production (lack of nutrition).
-It was agreed all horses suffered from anemia (low red blood cell count) and elevated white
blood cell count (indicating infection).  However, red blood cell counts in horses suffering from
malnutrition can be either elevated or decreased. It is not usual to expect the horses to show an

Ex 10b

increased in white blood cell counts without an obvious infection (runny nose, cough, high body temperature, etc.) , which none of the horses had.

-None of the experts commented on the high potassium levels which affected *all* the horses. Generally potassium is not affected in cases of starvation, yet this abnormality was consistent in all the bloodwork from the horses in question. Causes of high potassium include: decreased excretion from the kidneys, urinary tract obstruction, or hypoaldosteronism. None of the horses exhibited symptoms related to those diseases. Perhaps the abnormality was related to an increased intake of potassium, possibly from a toxin.
http://ahdc.vet.cornell.edu/clinpath/modules/chem/hyperk.htm

-Bear was found to have high phosphorous on his bloodwork, however, experts opine that laboratory findings in starved horses tends to show low phosphorous levels.

-Experts state that every animal does not always have all of the laboratory abnormalities listed in many of the of the disease processes. Defendant's experts say the horses did not present with a perfect case of toxic ingestion, but, disingenuously fail to point out that they did not present a perfect case of malnutrition, either.

D) The horses were treated with vitamin B, although experts assert they were treated with, and responding to, nothing but adequate nutrition.

E) The statement that young and old animals are subordinate to more dominant animals, which accounts for why some horses received nutrition when others did not, is invalid when considering that the 7 horses in question were in separate pens and being fed individually.

F) It is clearly stated on page 4 of attachment 1 by Dr. Leone, that veterinarians were unable to determine the cause or the solution for the decline of the animal's health. This indicates that it was *not* clearly a case of starvation.

G) This is a complex case with respect to which defendants and their experts jumped to conclusions without using a scientifically valid methodology. The experts attempted to pigeonhole the symptoms of the horses as clearing being starvation, when it was not. As well the horses did not recover as they asserted, with only nutritional support, again supporting some other unidentified cause or factors was at play. What is of importance is that in either case (starvation or toxin) the treatment would be the same, adequate nutrition and supportive care until the animals clear the toxins from their system or they gained weight, which is exactly what was being done by the owners at the time of when the animals were confiscated.

6/29/2014

Swift-Hatlee Case 5/28/2014

I was retained as an expert in People v. Hatlee and Swift in September of 2012, and in this case. My opinions are set forth below. A copy of my report in the criminal case is attached. This statement is regarding Ron Swift and Randy Hatlee, who own horses housed on a ranch in Bailey, Colorado, called Echo Valley Ranch, and veterinarian Dr. Ashley Olds who was on this ranch and visited the animals owned by the before mentioned on February 16, 2012.

In December of 2011, 6 of the approximately 40 horses on the ranch began to lose weight and show signs of severe weakness. Of note is that only those 6 animals of the 40 on the property were affected, and 5 of those were all young horses under 2 years of age, and the sixth being an older mare historically known for being thin in the winter.

Those 6 horses were brought out of the pastures and brought into individual pens near the barn for closer evaluation and increased feeding, throughout the time period from December 1, 2011 through February 12, 2011. Records indicate the condition of the horses was being monitored by and a working diagnosis and treatment plan was in place with Timberline Equine veterinarians Dr. Horton and Burton, who suspected the 6 most severely affected animals were suffering from some sort of toxic ingestion, possibly botulism. Clinical signs of all animals included: thin body condition scores (2 or 3 out of 9), elevated heart rates, abnormal heart rhythms, diastolic heart murmurs, anemia (low red blood cell count) as noted on blood work, and varying abnormal neurological symptoms including being down and unable to rise, and crossing over of their feet when they walked (conscious proprioceptive deficits). Apparently, other animals in the area were reported to have similar symptoms, including being down and unable to rise, and even death. Botulism is difficult to accurately diagnose in horses, and there is no effective treatment. One of the horses later tested negative for botulism.

Routt County Animal Control officer Dawn Smith requested the assistance of Harmony Horse Works, which in turn enlisted the aid of Dr. Olds on February 16th to take into custody one horse on the property which was being monitored by Routt County. While on the property, Dr. Olds observed 7 other horses on the property which she asserted were cases of starvation and animal cruelty. The condition of Mr. Swift and Mr. Hatlee's horses on the ranch was brought to the attention of Animal Control Officers for Park County, as possibly a case of starvation and/or neglect. Dr. Olds demanded the thin horses be immediately seized by Park County. That same day, Dr. Olds also sent emails to various individuals regarding what she had seen on site, in what can perhaps be deduced as an attempt to create a public outcry against the horse owners and the Sherriff's Department for how they were handling the situation.

C.R.S. §12-64-121 states:

(1) A licensed veterinarian who, during the course of attending or treating an animal, has reasonable cause to know or suspect that the animal has been subjected to cruelty in violation of section 18-9-202 C.R.S....shall report or cause a report to be made of the animal cruelty...to a local law enforcement agency or the bureau of animal protection.

For a veterinarian to have reasonable cause to know or suspect that animals have been the victim of cruelty, specifically by way of starvation, he or she must reach a conclusion as to what might have caused the condition of the animals. This requires the standard process of developing a differential diagnosis list, which is derived from performing a complete physical exam and obtaining as thorough a history as possible of the animals and their current care. This information is then used to reach a scientific conclusion as to what is the most likely cause or causes for the condition, and therefore subsequently produce either a diagnosis, or list of working differential diagnosis'. After review of all statements and records, it would appear Dr. Olds violated this fundamental principle of veterinary medicine by failing to 1) perform thorough physical exams on the animals in question 2) obtain a thorough history on the animals from both the owners and the current attending veterinarians at Timberline Equine and 3) not developing a differential diagnosis list with some of the possible medical reasons other than neglect and starvation as possible causes for the condition of the animals, before jumping to the unsubstantiated conclusion that the horses had been starved and demanding the situation be handled as such.

Of the horses in question, one was taken by Dr. Olds for treatment in her clinic, 1 died and the others were left in the custody of Hatlee and Swift. The horse which was taken to Dr. Olds clinic was treated in such a manner as a horse which has been starved, suffering from malnutrition, or another condition known as Equine Winter Starvation Syndrome. The latter is a condition where horses do not have enough additional calories needed to produce the body heat need in plummeting outside temperatures. These horses will lose weight despite having feed, if the feed is not enough in quality or quantity to account for the increased energy demand. What is inconsistent with this working diagnosis is that anemia is not what one would typically consider associated with this condition, nor is an elevated white blood cell count, and in fact, these animals will characteristically have a *decreased* appetite, which are all inconsistencies with what is reported in the medical record for the horse taken to Dr. Olds clinic. This leads one to surmise some other factor or factors were contributing to the condition of the animals, which were not being adequately taken into consideration, and that in fact the animal was likely misdiagnosed. Of concern are the allegations that Dr. Olds office manager declined information from Drs. Burton and Horton regarding the differential diagnosis which might have assisted in determining a more accurate diagnosis.

Ex 107

The concern with this situation is certainly not that a veterinarian was concerned for the welfare of some animals in apparent need of care, but that Dr. Olds was not asked onto the property to evaluate those animals, and in fact, the animals were under the care of Timberline Equine. Without thorough physical exams on each of the afflicted animals, as well as a complete history obtained from the horse owners, and a consultation with the veterinarians who had been in contact with the owners about the horses care, it is against the standard of care to make any assumption about the cause of the condition of the animals, and certainly inappropriate to act in such a manner as to actively demand to have the animals seized for cruelty. At first glimpse of skinny horses it could certainly seem that the animals were not being fed properly, but the flat bed trailer full of hay reported to be parked near the animals, as well as all the unusual clinical signs (specifically the neurological signs) the animals showed, does not support a reasoned scientific conclusion that they were starved. In fact Cindy Hardy reported the horses in question had heated water and hay available in their respective pens. A more thorough history would have revealed that the horse had been getting increased care and attention, hay, and were being fed grain twice daily since December when their condition was initially observed. Also of note is that Dr. Olds' claims the animals were not showing any signs of neurological problems, however, on the video footage taken of the animals to demonstrate their poor condition, neurological abnormalities are present.

Furthermore, Dr. Horton (one of the vets from Timberline Equine) indicated in an email dated February 28, 2012 that she suggested the animals be transferred for advanced diagnostics tests at Colorado State University. When she consulted with the cardiologist Dr. Adams at Colorado State University regarding the clinic signs the horses were displaying, Dr. Adams revealed that there is no known association between low body condition scores and diastolic murmurs in horses. Apparently Mr. Swift had an appointment at Colorado State Teaching Hospital for these advanced diagnostic tests, when the horses were seized by Park County, making the afflicted animals unavailable for advanced testing during the height of clinical signs.

While under the custody of Park County, the horses were under the care of both Littleton Equine Hospital and Ashley Olds DVM. Records indicate some advanced testing was performed, multiple doses of antibiotics and probiotics were given, as well as generalized supportive care including IV fluids was administered to the horses, but there is no record of a diagnosis the cause for the high heart rates, murmurs and abnormal rhythms noted on all the animals. All the animals repeatedly showed some signs of anemia on their blood work, as well as high white blood cell counts. Only the older mare received a definitive diagnosis of advanced kidney disease and intestinal parasites, which could certainly contribute to having a thin body score.

Anemia in animals occurs for one of three reasons: blood loss, blood cell destruction, or lack of regeneration of new blood cells by the bone marrow. It does not appear from the records that the horses suffered any sort of bleeding disorder, therefore we can assume the animals were not anemic from blood loss. Nutritional anemias in animals are rare and not normally associated with an otherwise healthy animal simply having a lack of forage. Disorders that cause red blood cell destruction are termed hemolytic anemia's and are usually associated with immunologically mediated mechanisms (such as equine infectious anemia, autoimmune hemolytic anemia, or transfusion reactions), certain bacterial infections (Clostridium perfringens), plant or chemical toxicity (red maple leaves, phenothiazine, onions, Hoary Alyssum), or blood parasites (Babesia, Ehrlichia equi)." Although the records are lacking in the specifics of the classification of the type of anemia the horses suffered, they were treated with antibiotics, indicating that an infection of some kind was suspected (perhaps Clostridium perfringens?), and supportive care including IV fluids, such as would be the only treatment option in many cases of toxic ingestion. It is interesting to note that even under the care of animal control, the red blood cell counts were still decreased, and the white blood cell counts increased, indicating clearly that despite additional forage and calories, the animals were still affected by something else causing the anemia, which then led to the continued cardiac abnormalities (high high rates, abnormal rhythms and murmurs). All of which are not normal or customary clinical symptoms associated with starvation.

Records were supplied with regards to another animal on the property, known as Bear or Spencer, another 2 year old horse with a similar condition to the 6 horses mentioned above. It would be sensible to say that it is likely this young horse might also have been suffering from a similar toxic ingestion as the other animals, especially in light of the fact (according to Dr. Olds) he was treated, and responded, in a similar manner as the other animals in question. In the records supplied there was not a description of Bear's cardiac condition, but it does mention treatment with antibiotics and his blood work was similar to the other horses. It is likely that Bear, or Spencer, was suffering from the same malady as the other 6 horses, for all the same reasons listed previously.

The animals were later returned to the care of Ron Swift and Randy Hatlee, who throughout this time had been working with equine specialists, other veterinarians, and their local county extension agent to determine if botulism or some other toxin could have been the initial cause for the horse's condition.

I was asked by Mr. Swift to be present on the day the horses were returned to Swift and Hatlee, 4/11/2012 and can personally attest to that, despite receiving treatment for supposed starvation while under the care of animal control, some of the horses were still showing obvious neurological deficits as well as abnormal heart sounds, which are highly inconsistent signs to be associated with starvation.

One of the returned horses, Echo, a 1 year old stud colt, was also apparently suffering from lameness, and bright green loose stool indicating he had recently been eating a diet high in alfalfa hay. The clients reported to me he had not been in suffering from lameness before seizure. It seems that while under the care of Animal Control the horses were fed a large amount of alfalfa hay. It is well known that large amounts of alfalfa hay are too high in protein for the young growing horse. Researcher T. J Hulland at the University of Guelph-Ontario feels that most "contracted tendons" in young horses are the result of contracted muscles in the forearms. The tendons and ligaments themselves are not capable of shortening.

but it is possible for a young horse that is getting too much calcium and protein in the form of straight alfalfa hay to have this tight muscle condition. If the problem is caught early on, dietary changes can often prevent permanent damage. This is done by reducing the protein content of the ration (diluting alfalfa hay with mostly grass hay) and bringing the calcium/phosphorous ratio closer to the ideal 1: 1. It is a reasonable conclusion that this young horse suffered musculoskeletal injury as a result of the refeeding program he was on while under the care of Animal Control.

It was later discovered that the toxic weed Hoary Alyssum was pervasive on the property, and more prolific throughout the area due to recent drought conditions. Hoary alyssum is known to be highly toxic to horses (but not to cattle or other ruminants), with a characteristic set of symptoms (not all present in every affected horse and not all horses are equally susceptible). Symptoms include depression, fever, increased heart rate, laminitis, limb edema, diarrhea, dehydration, intravascular haemolysis (red blood cell destruction), hypovolemic shock, anemia, and abortion in pregnant mares (Becker et al. 2004, Hovda and Rose 1993, Knight and Walker 2004, Knight and Gaskill 2011, Martinson et al. 2007).

Interestingly, many of the symptoms the horses displayed were consistent with the ingestion of the toxic plant, bracken fern. Horses which have ingested bracken fern tend to lose weight, have depression, uncoordinated gait, anemia, and rapid heart rates. The blood tests to determine bracken fern toxicity, low thiamin levels and an elevated serum pyruvic acid level, were not performed on any of the horses involved in this case to my knowledge. (Knight, A Guide to Plant Poisoning, pg 224).

There is often no further treatment for toxic ingestion in horses, especially without a definitive diagnosis, other than to remove the source of the toxin, provide supportive care, including food and water, and providing protection from (and treatment for) abrasions caused as a result of any neurological conditions, until the body can clear the toxin from the system allowing the animal to recover and assimilate nutrients normally again.

In conclusion, 1) It would be uncommon in a case of severe neglect and starvation to only have 6 out of 40 animals affected 2) It is common for toxic ingestion to more strongly affect the younger animals who might be less discriminating in their forage choices and have fewer reserves for recovery 3) Starved horses will be weak, but not necessarily show signs of neurological abnormalities and conscious proprioception changes, and most importantly 4) cardiac abnormalities and anemia are not generally associated with starvation, and in fact in this case, persisted despite having increased calories and forage, therefore, the likelihood of some third other unknown cause, such as a persistent toxin in the animals tissues, or some other undiagnosed disease process, is highly suspect in this case. It is unlikely this was a case of selective neglect and starvation, but much more likely some other reason for the thin body scores, cardiac abnormalities, and anemia, such as ingestion of some sort of toxin or toxins, such as either in the ground, through the hay or feed source, or in the pasture plants. "(Equine Medicine and Surgery, Mosby, 1999), 5) it is unlikely equine winter starvation syndrome might have been a cause for the condition of the horses in light of all the other clinical signs and that animals maintained excellent appetites, 6) it was premature of Dr. Olds and could be considered malpractice to make a conclusion of animal cruelty without further investigation, it was inappropriate conduct to openly discuss the details of the case while the investigation was ongoing, and from review of all the presented information it appears that her methodology was below the standard of care.

*[signature] Jena ___ DVM*

FACTS AND DATA CONSIDERED: Review of medical records, depositions, other records pertaining to the case, and literature on the topics at hand.

CV: attached

PUBLICATIONS: Volume 7, Number 4 of The Aquatic Veterinarian fourth quarter 2013
Orando Goldfish with Buoyancy Disorder

LISTING OF TESTIMONY for Jena Questen, DVM:

2/27/13 Attorney Darrel Campbell
State of CO v. Ronald Swift and
Randall Hatlee

Case numbers 12M43 and
12M44

Venue - Park County Court, Colorado

COMPENSATION: My regular hourly rate is $200 per hour, to date on this case have done 7 hours of work.

Compensation for previous case: $

EXHIBIT  27

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER
and ASHLEIGH OLDS,

Defendants.
------------------------------------------------------------
DEPOSITION OF SVEN BONNELYCKE
October 8, 2014
------------------------------------------------------------

Deposition location:
825 Clark Street
Fairplay, Colorado

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226

                            For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202

                            For the Defendant, Olds.



# AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

SVEN BONNELYCKE - OCTOBER 8, 2014

**Page 2**

1    APPEARANCES (CONTINUED):
2    Timothy P. Schimberg, Esq.
     FOWLER, SCHIMBERG & FLANAGAN, P.C.
3    1640 Grant Street, Suite 300
     Denver, Colorado 80203
4                 For Park County.
5
6    Also present: Ronald Swift.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1         The deposition of SVEN BONNELYCKE,
2    called for examination by the Plaintiffs, was
3    taken in the offices of Park County Human Services
4    Building, 825 Clark Street, Fairplay, Colorado,
5    commencing at 1:02 p.m., on the 8th day of
6    October, 2014, before Linda L. Frizzell of
7    Avery/Woods Reporting Service, Inc., 455 Sherman
8    Street, Suite 460, Denver, Colorado 80203,
9    Registered Professional Reporter, Certified
10   Shorthand Reporter, and Notary Public in and for
11   the State of Colorado, pursuant to the Colorado
12   Rules of Civil Procedure.
13            I N D E X
14   EXAMINATION OF SVEN BONNELYCKE        PAGE
15   BY MR. TONDRE                     4, 54
     BY MR. SCHIMBERG                     51
16
17            (No Exhibits Marked.)
18
19
20
21
22
23
24
25

**Page 4**

1                 SVEN BONNELYCKE,
2    being first duly sworn to state the truth, the whole
3    truth, and nothing but the truth, testified under oath as
4    follows:
5              EXAMINATION
6    BY MR. TONDRE:
7         Q   State your name.
8         A   Sven Bonnelycke.
9         Q   Spell it.
10        A   S-v-e-n, is my first name; Bonnelycke,
11   spelled B-o-n-n-e-l-y-c-k-e.
12        Q   Mr. Bonnelycke, what is your present
13   occupation?
14        A   I am employed by the Park County
15   Sheriff's Office as a captain.
16        Q   And how long have you been employed by
17   the Park County Sheriff's office?
18        A   Park County Sheriff's, I will be employed
19   17 -- it will be 18 years in May of 2015.
20        Q   And what different positions have you
21   held with the Park County Sheriff's Office?
22        A   I started out as a patrol deputy, and
23   then was promoted to a detective corporal. Eventually
24   promoted to a sergeant with detectives and then
25   advanced the rank to staff sergeant or senior sergeant

**Page 5**

1    and then moved to lieutenant and now captain.
2         Q   Any other law enforcement experience?
3         A   Yes, I have a total of 21 years, and I
4    was a deputy sheriff in Delta County. Previous to
5    that, I was an officer with Cedar Ridge Police
6    Department. Prior to that, I was an officer with the
7    Pikes Peak Community College Campus Police, and I
8    started my career as a reserve officer with Florence
9    Police Department.
10        Q   What's your educational background?
11        A   I hold an associate's degree in applied
12   sciences for criminal justice.
13        Q   Post certified?
14        A   I am.
15        Q   When did you become post certified?
16        A   That was in 2002, November. My
17   certification number is B0906.
18        Q   As a captain, what are your duties?
19        A   As a captain, I am primarily an
20   administrative personnel. I oversee two divisions, the
21   animal control division and that of detectives. Also
22   one of my responsibilities as a captain is I am the
23   lead firearms instructor for the agency. I also
24   receive professional standards and oversee evidence
25   control.

2 (Pages 2 to 5)

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 6

1    Q  Was that true in 2012, 2013?
2    A  I'm sorry, for what?
3    Q  Let me -- were you overseeing animal
4  control professional standards and evidence control in
5  2012 and 2013?
6    A  Yes.
7    Q  To whom do you report?
8    A  I report to Undersheriff Monte Gore.
9    Q  What was your first knowledge regarding
10 the case that involved Mr. Swift and Mr. Hatlee?
11   A  The first time I was advised of it was
12 the first day that Cindy Hardey had responded out to
13 the address to help Routt County.
14   Q  And is that something that would normally
15 usually be reported to you?
16   A  Not typically, no.
17   Q  What were the -- what is your
18 understanding of why it was reported to you that first
19 day?
20   A  It was reported to me through Sergeant
21 Priestly, who advised me there was some concerns about
22 the welfare of some horses that were out there.  And
23 there was a concern as to whether or not they wanted to
24 consider the removal of those animals due to their
25 condition.  And based on that, I wasn't comfortable

Page 7

1  until we had an independent veterinarian take a look at
2  them before we made that decision.
3    Q  And who did you have look at them?
4    A  As far as I remember, I don't think we
5  had a third person independent of what was already
6  there out there, and I don't recall as to -- as to why
7  that was.
8    Q  Kate Anderson was involved --
9    A  Okay.
10   Q  -- isn't she a veterinarian?
11   A  I believe so.  I recognize the name.  I
12 think she is, but I don't know for certain.
13   Q  Well, what -- what did you -- what, if
14 anything, did you recommend regarding the animals on
15 that first day?
16   A  The only recommendation I made on that
17 first day is I wanted an independent veterinarian to
18 look at those animals and have an independent opinion
19 made prior to making a decision for removal.
20   Q  Why did you want an independent
21 veterinarian involved?
22   A  From what I remember, the way it was
23 originally reported to me, I believe there was another
24 veterinarian that was involved in that, there seemed to
25 be some concerns, I don't remember what those were, but

Page 8

1  it was enough for me to sit there and say I wanted
2  somebody else coming in and I wanted a different
3  opinion.  It almost seemed as a personal opinion versus
4  more of a veterinarian opinion, a professional opinion.
5    Q  "A personal opinion," was that coming
6  from Ashleigh Olds?
7    A  I couldn't tell you that.  I don't know.
8    Q  Well, what was -- what was the source of
9  your information that led you to believe that the
10 veterinarian involved was a -- that it was a personal
11 opinion?
12   A  All of this information that I got was
13 relayed to me by Sergeant Priestly, and then I presume
14 that was given to her by Cindy Hardey.
15   Q  Well, do you recall what it was about
16 this veterinarian that led you to believe it was a
17 personal matter with her or him?
18   A  I -- I don't know.  I think it was more
19 about the reaction to what was out there, which was
20 enough of a concern for me, I wanted a professional
21 opinion and not something guided by personal belief.
22   Q  Did you make any reports whatsoever
23 regarding your involvement with the case?
24   A  I did not.
25   Q  Now, was it Sergeant Priestly that you

Page 9

1  expressed your desire that -- that the horses be
2  examined by an independent veterinarian?
3    A  It was.
4    Q  What was her response?
5    A  She said okay.
6    Q  Did you follow up on that and see if it
7  was done?
8    A  I believe at one point she came back up
9  and told me what was going on, which caused the removal
10 of the horses not to be done; and I don't recall the
11 basis for that.  But it -- at that time for me to allow
12 it to continue that way, it would have had to have been
13 acceptable.
14   Q  So you don't remember what you were told?
15   A  Not exactly, no.
16   Q  How about what do you remember?
17   A  Pretty much what I just described to you.
18   Q  Well, what -- I mean, on day one, you
19 wanted an independent veterinarian?
20   A  Correct.
21   Q  The next -- on -- on the next day, you
22 were involved, whatever that may have been, you still
23 didn't have an independent veterinarian, right?
24   A  No.  It was the same day, she had come
25 back and explained to me -- on that very first day, it

3 (Pages 6 to 9)

Page 14

1     MR. SCHIMBERG: Object to form.
2     Q (BY MR. TONDRE) -- killed, hurt?
3     MR. SCHIMBERG: Form and foundation. Go
4  ahead.
5     A  I don't recall that in any other case.
6     Q (BY MR. TONDRE) Do you recall whether any
7  effort was made to learn who was making the threats and
8  to make a criminal case against them?
9     A  I was not aware of it, no.
10    Q  You think it should have been done?
11    A  I'm sorry?
12    Q  Do you think -- do you think an
13 investigation should have been launched to determine
14 who was making the threats?
15    MR. SCHIMBERG: Object to form. Go
16 ahead.
17    A  I don't know if I can answer that because
18 I don't really know what was done. That was an aspect
19 of this case that I had no involvement in and that was
20 something that was handled by Undersheriff Monte Gore,
21 not I.
22    Q (BY MR. TONDRE) Okay. Did you ever
23 discuss the fear for the safety of the horses that
24 Mr. Hatlee and Mr. Swift with any member of the animal
25 control portion of the sheriff's office?

Page 15

1     A  I did not, no.
2     Q  Okay. Were you advised that on this
3  first day of your involvement with the case that there
4  was a veterinarian on the Echo Valley Ranch premises
5  that was demanding of Cindy Hardey that she -- that all
6  of the horses be removed?
7     A  I think there was something said about
8  that. And I think that was the reason for Sergeant
9  Priestly coming to me and advising me what was going
10 on.
11    Q  And was that the reason or was that the
12 reason why you believed it was kind of a personal
13 matter with that veterinarian?
14    A  I believe, yes.
15    Q  At any time during the case, during
16 the -- the investigation of the case, did you have any
17 contact with -- well, first of all, do you know
18 Ashleigh Olds?
19    A  I do not.
20    Q  Have you ever had any contact with her?
21    A  I have not.
22    Q  Have you ever had any contact with Eugene
23 or Shelly Ferraro?
24    A  The only contact I've had with either one
25 of those I believe was Eugene.

Page 16

1     Q  And what contact did you have with Eugene
2  Ferraro?
3     A  That was when he came and spoke with
4  Undersheriff Monte Gore.
5     Q  You were present during that discussion?
6     A  I was.
7     Q  How long did that discussion last?
8     A  Roughly 40, 45 minutes.
9     Q  And what do you recall of that
10 discussion?
11    A  The only thing I recall is he was
12 discussing about some information he had apparently
13 uncovered during his investigation of whatever that may
14 have entailed. And I think that he may have provided
15 some information or names that could have been
16 potential witnesses.
17    Q  Do you think it was unusual that he was
18 involved in the investigation?
19    MR. SCHIMBERG: Object to form.
20    A  I think so, to the point where I didn't
21 know what his involvement in the case initially would
22 have been to begin with.
23    Q (BY MR. TONDRE) Did you ever learn what
24 his involvement was?
25    A  The best presumption I was able to make

Page 17

1  is because they had a desire to know what was going on
2  in the case, and they had certain feelings about the
3  case in and of itself because it involved animals.
4     Q  Did he ever express in your presence a
5  dissatisfaction for the way in which the case was being
6  prosecuted?
7     A  I don't recall that.
8     Q  Did he express a concern regarding the
9  way in which the case was being investigated?
10    A  I don't recall that either.
11    Q  Do you recall him expressing any sort of
12 dissatisfaction?
13    A  Not dissatisfaction. I think he -- the
14 way he presented himself that I recall that day is he
15 was trying to help with providing information that
16 could be followed up on.
17    Q  Any contact -- have you had any contact
18 with Barbara Wright?
19    A  No.
20    Q  Does that name mean anything to you?
21    A  It does not.
22    Q  Did -- have you had any contact with
23 Monika Courtney?
24    A  No.
25    Q  Does that name mean anything to you?

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 18

1    A  The name sounds familiar but I don't know
2  from where.
3    Q  Now, were you aware that during the
4  course of the investigation, investigative materials
5  were made to third parties outside the sheriff's
6  department?
7    A  When you say "investigative materials," I
8  don't know exactly what you mean.
9    Q  Evidence that was being gathered during
10  the course of the investigation such as photographs,
11  lab studies, and things of that nature?
12    A  I was aware of some photographs being
13  released.
14    Q  And how did you happen to have that
15  awareness?
16    A  I believe that was something Undersheriff
17  Gore had mentioned and something he had cleared with
18  the district attorney's office.
19    Q  Now, did that fall within your
20  responsibility with respect to evidence control?
21    A  If it had been booked into evidence and
22  there was a procedural issue with regards to chain of
23  custody and that; yes, it would have.
24    Q  Would photographs fall within a chain of
25  custody issue?

Page 19

1    A  If they were booked into our evidence
2  control, yes.
3    Q  Do you know whether they were?
4    A  I do not.
5    Q  How would we find that out?
6    A  We would have to refer to records to see
7  if they were booked into evidence and compare the date
8  of the -- when they were booked in until the date of
9  the release of the photographs.
10    Q  Who makes the decision whether to book
11  them in to evidence?
12    A  That would be up to the individual
13  officer or deputy.
14    Q  Now, did you attend a fundraiser in
15  Evergreen on April the 7th, 2012?
16    A  I did.
17    Q  Why did you go to that?
18    A  The undersheriff had requested that I
19  attend because I was the commander of the division and
20  that it was a fundraiser to help with veterinary bills
21  and things along those lines; and based on that, I did.
22    Q  Did you understand it was related
23  directly to the case that was under investigation by
24  the Park County Sheriff's Department?
25    A  Well, I don't know if it was directly

Page 20

1  related to the investigation, but I'm assuming that
2  based that it was a fundraiser, that the money would go
3  toward the vet bills; then yes, it would have some sort
4  of tie into the investigation.
5    Q  Who did you talk to at that fundraiser?
6    A  Very minimal people.  And then the people
7  that I did talk to was more along the lines of
8  niceties, things such as hey, how are you doing, nice
9  to meet you, that kind of a thing.
10    Q  Do you remember seeing some of the
11  photographs that were furnished by or under the
12  direction of Monte Gore?
13    A  Well, I don't know what photographs
14  Undersheriff Monte Gore released.  I do remember seeing
15  photographs, but I don't think those were photographs
16  directly related to the animals in question.
17      There was a lot of photographs of horses
18  and things of that nature; where those came from, I
19  don't know.  Assuming from either books or internet or
20  something along those lines.
21    Q  Did you see a slide show while you were
22  there?
23    A  I don't recall a slide show.
24    Q  Did you talk to anybody whose name you
25  would remember?

Page 21

1    A  No.
2    Q  Did you contribute any money to the
3  cause?
4    A  I did not.
5      MR. SCHIMBERG:  Geez.  I'm teasing you.
6    Q  (BY MR. TONDRE) How long were you there
7  did you say?
8    A  Maybe right around an hour or so.  Maybe
9  a little over that, but not much more than that.
10    Q  Were any speeches or presentations made
11  when -- while you were there?
12    A  Not that I recall.
13    Q  What was going on?
14    A  It was just a bunch of people eating
15  dinner, drinking, some drinking alcoholic beverages,
16  others not.  Communication, talking, understanding this
17  was a fundraiser, a lot of things that I did see were
18  in the back, that were -- I don't remember if they were
19  pottery, some sort of horse memorabilia, that were
20  up for -- I don't know if it was up for auction or up
21  for sale, that was pretty much it.
22    Q  Is that a usual and customary thing for
23  the sheriff's department to do is to stand -- attend
24  parties that are being thrown by proponents of the
25  arrest and conviction of people of whom the sheriff's

6  (Pages 18 to 21)

SVEN BONNELYCKE - OCTOBER 8, 2014

**Page 22**

1   department is investigating?
2          MR. SCHIMBERG:  Object to form and
3   foundation.
4          MR. LEBSACK:  Form.
5      A   It's not a custom for a sheriff's office
6   to attend parties and functions.  Now, whether they are
7   directly related to an investigation, I personally
8   never attended a party, so to speak, for an
9   investigation.  I have attended other functions that
10  related around things that involved one of my victims
11  such as wakes, funerals, things of that nature, or just
12  general family get-togethers.
13     Q   (BY MR. TONDRE)  Did Undersheriff Gore tell
14  you why he wanted you to go to the fundraiser?
15     A   As a representative of the commander of
16  that division.
17     Q   Did he express why it was in his
18  judgment, appropriate to attend a fundraiser?
19     A   No.
20     Q   Did you think that was an appropriate
21  thing to do?
22     A   I saw no harm in it, nor did I see that
23  being in any way, shape, or form subjective to the
24  investigation.
25     Q   Do you think it would be inappropriate to

**Page 23**

1   do that in order to appease the people who were crying
2   for the conviction of Mr. Hatlee and Mr. Swift?
3          MR. SCHIMBERG:  Object to form and
4   foundation.
5      A   I don't believe our attendance there was
6   simply to appease people who had a certain interest or
7   disagreement with Mr. Hatlee or Mr. Swift or the
8   investigation itself.
9      Q   (BY MR. TONDRE)  Well, if that was the
10  case, that he wanted you all there for appeasement, do
11  you think that is appropriate?
12         MR. SCHIMBERG:  Object to form.
13         MR. LEBSACK:  Same.
14     A   If it was stated in such a manner, then I
15  would have disagreed with it.  But this was not a
16  forced issue.  We had the opportunity to go or not go,
17  it was our decision.  I opted to go.
18     Q   (BY MR. TONDRE)  If you had been told that
19  you were being asked to go in order to appease these
20  people that were throwing the fundraiser and that they
21  were the people who were pushing the sheriff's
22  department to convict or arrest and -- and pursue the
23  conviction of Mr. Hatlee and Mr. Swift, would you have
24  gone under those circumstances?
25         MR. SCHIMBERG:  Object.  Object to form.

**Page 24**

1      A   Under those circumstances, I probably
2   would not likely have attended, and I don't believe
3   that this would have been an issue of them trying to
4   push us to try to pursue Mr. Hatlee or Mr. Swift and if
5   it had been the case, I would have objected and not
6   gone.
7      Q   (BY MR. TONDRE)  So you didn't have any
8   information that a group of people were advocating in a
9   rather strenuous manner the charging and prosecution of
10  Mr. Hatlee and Mr. Swift?
11     A   My knowledge of this case is extremely
12  limited.
13     Q   I'm going --
14     A   Even more so -- even more so to the point
15  where whatever pressures there may have been or may not
16  have been with regards to this particular group and
17  with respect to this case is beyond my knowledge.
18     Q   Okay.  Was there some disagreements
19  ongoing between the sheriff's department and the
20  district attorney's office regarding the district
21  attorney's failure to prosecute cases that the
22  sheriff's department thought should be prosecuted?
23     A   We have had some professional
24  disagreements along those lines, yes.
25     Q   Were those professional disagreements

**Page 25**

1   ongoing in 2012?
2      A   I believe they were.
3      Q   And do you recall that the sheriff's
4   department adv-- -- adv-- -- actively supported the
5   opponent of Mr. LeDoux in the November 2012 election?
6      A   I was.
7          MR. SCHIMBERG:  Object to form.
8          THE DEPONENT:  Oh.
9          MR. SCHIMBERG:  That's okay.
10     Q   (BY MR. TONDRE)  Were you one of the people
11  who was joining in that adversary -- that advocacy
12  program?
13         MR. SCHIMBERG:  Object to form.
14     A   I did not nor do I not.  It was a
15  political matter and I don't involve myself in that.
16     Q   (BY MR. TONDRE)  Did you harbor a belief
17  that the district attorney's office was not prosecuting
18  some cases that should be prosecuted?
19     A   I believe that there were some cases that
20  they should have prosecuted and for whatever reason,
21  refused not -- refused to do so.
22     Q   Did you ever have any discussions with
23  Mr. LeDoux regarding any aspect of the Hatlee and Swift
24  case?
25     A   I did not.

7  (Pages 22 to 25)

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 26

1    Q  Did you have any discussions with him
2  regarding the Hat- -- between him and the sheriff's
3  department being reported to you by anyone in the
4  sheriff's department?
5    A  I'm sorry, could you repeat that -- I
6  don't quite understand.
7    Q  Well, let me -- let me make it even
8  narrower.  Had you ever heard that anyone from the
9  sheriff's department was pressuring Mr. LeDoux to
10  prosecute the Hatlee and Swift case?
11    A  No.  I've never heard that.
12    Q  Were you aware of the extent of the
13  emails that were flowing into the sheriff's office
14  advocating the investigation and prosecution of
15  Mr. Hatlee and Mr. Swift?
16    A  I recall seeing some, some emails.  But I
17  don't remember there -- there being a huge amount or
18  overabundant amount or anything like that.  But I
19  couldn't tell you what the number to those are.
20    Q  Under what circumstances did you see
21  them?
22    A  I think those were things that the
23  undersheriff may have forwarded to me or responses he's
24  made and just carbon copied me on those.
25    Q  Do you have any responsibility as a

Page 27

1  captain or did you have any responsibility as a captain
2  during 2012 -- '11 and '12 for the training of animal
3  control officers?
4    A  No.  That responsibility fell on other --
5  other areas, not I.
6    Q  Whose area did that fall in?
7    A  That would have been either the
8  Department of Agricultural for the Bureau of Animal
9  Protection or the district attorney's office.
10    Q  Did you have any responsibility for
11  reviewing the competence of animal control officers
12  with respect to constitutional issues?
13    A  The only time I would actually review, as
14  you put it, the competence, would be if there was a
15  complaint that was filed in that regard.
16    Q  Did you ever have a complaint regarding
17  Cindy Hardey particularly with respect to the Hatlee
18  and Swift case?
19    A  I did not.
20    Q  Did you become aware that the -- the
21  Judge Green found that she had acted in bad faith in
22  securing a seizure warrant?
23    MR. SCHIMBERG:  Object to form.  Go
24  ahead.
25    MR. LEBSACK:  Same.

Page 28

1    A  I was made aware of that judgment by
2  Judge Green only when this litigation came about.
3    Q  (BY MR. TONDRE)  When you say "this
4  litigation," you're talking about the suit in which the
5  sheriff has been sued?
6    A  That is correct.
7    Q  And what were the circumstances that
8  brought it to your attention at that point in time?
9    A  There was a -- there was a brief
10  discussion that Judge Green had made or rendered the
11  judgment.  That the affidavit that was filed by Cindy
12  Hardey, deputy at the time, was done in bad faith
13  because there was some information that was left out of
14  the affidavit itself.  And that he felt that based on
15  that, he's not sure if the judge that reviewed the
16  affidavit originally could have made a full judgment as
17  to whether or not to authorize that affidavit or turn
18  it down.
19    MR. SCHIMBERG:  Let me caution you,
20  Captain, that if -- if there's -- when he asks you a
21  question, if it involves a -- a conversation in my
22  presence, that's subject to attorney/client privilege.
23  I just wanted to --
24    THE DEPONENT:  Oh.
25    MR. SCHIMBERG:  -- make sure you knew you

Page 29

1  didn't have to go there.
2    Excuse me, Counsel.
3    MR. TONDRE:  That's fine.
4    Q  (BY MR. TONDRE)  So the matter of -- of the
5  affidavit and the circumstances of it's being dealt
6  with by the judge were not something that you were
7  aware of during the course of the underlying case; is
8  that correct?
9    A  That is correct.
10    Q  Never heard a word about the -- the order
11  seizing the horses being overturned?
12    A  I do recall that.  And that's the reason
13  why we had to give the horses back.
14    Q  But you knew nothing more than it had
15  been overturned?
16    A  That's it, that's it.
17    Q  You weren't told the circumstances of it
18  being overturned?
19    A  No.
20    Q  Fred Wegener testified that you had a
21  conference with Cindy Hardey to discuss with her
22  conduct relating to the affidavit; is that true or
23  false?
24    MR. SCHIMBERG:  Object to form.
25    A  That is false.

8  (Pages 26 to 29)

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 30

1     Q (BY MR. TONDRE) As a captain in charge of
2   professional standards, if it had been brought to your
3   attention under your supervision had
4   authored and submitted an affidavit in bad faith, would
5   you have convened an invest- -- a professional
6   standards investigation?
7         MR. SCHIMBERG: Object to form.
8     A  That would depend on what is meant by
9   "bad faith." There's a difference between bad faith by
10  leaving out information accidently or with intent.
11    Q (BY MR. TONDRE) Would you expect an animal
12  control officer to know that it's a violation of the
13  fourth amendment to omit material information from the
14  affidavit?
15    A  I expect my animal control officers, as
16  much as my other deputies that fall under my purview
17  and charge of command, that they are not allowed to
18  omit information with the intent of some sort of
19  harmful or benefit to their side of the case. There
20  are times when people forget because of the amount of
21  abundant information that is in the investigation that
22  they can't get all the information in there and forget
23  certain aspects of it. There's a difference between
24  forgetfulness and intent.
25    Q  Would you expect an animal control

Page 31

1   officer to know the definition of -- the legal
2   definition of probable cause?
3     A  I do.
4     Q  And if the animal control officer doesn't
5   know the definition of legal -- the legal definition of
6   probable cause -- let me start over.
7         If a Park County Sheriff's Department
8   animal control officer does not know the legal
9   definition of probable cause, whose fault is that?
10        MR. SCHIMBERG: Object to form. Go
11  ahead.
12    A  There -- the best way I could answer that
13  is there's a difference between knowing exactly what
14  the legal definition is verbatim and understanding the
15  intent behind that, what it means. I don't think that
16  there's anybody that you can go up to and say give me
17  the legal definition of probable cause but they
18  understand what it is.
19    Q (BY MR. TONDRE) Can you give me the legal
20  definition of probable cause?
21    A  I personally verbatim cannot.
22    Q  What's your understanding of the
23  definition of probable cause?
24    A  Probable cause is more than a reasonable
25  suspicion.

Page 32

1     Q  That's your -- the total extent of your
2   understanding?
3     A  No. I can give a long rendition of what
4   probable cause is, but I couldn't give you a legal
5   definition of it.
6     Q  Is a feeling enough?
7     A  A feeling is not enough, but it can be a
8   basis to move into something more than that, and a
9   feeling in and of itself is not probable cause nor is
10  it really the guideline for a reasonable suspicion
11  either.
12    Q  Would you expect an animal control
13  officer to know that a thorough investigation must be
14  made before a decision as to probable cause is reached?
15    A  I'm sorry, are you asking that they have
16  to conduct a thorough investigation before probable
17  cause can be reached?
18    Q  Right.
19    A  A thorough investigation isn't
20  necessarily the ultimate thing to have to be done
21  before probable cause can be determined. Probable
22  cause can be determined long before a thorough
23  investigation is done.
24    Q  Have you read Cortez versus McCauley?
25    A  Which is a recent case, but I don't know

Page 33

1   the name in and of itself but I do understand that that
2   is a part of it, yes.
3     Q  Yeah. Do you think that any reasonable
4   police officer, law enforcement officer, should know
5   the teaching of Cortez versus McCauley?
6     A  Well, it certainly makes a determination
7   how investigations are conducted, absolutely.
8     Q  Have you heard of the concept of -- of
9   approaching seizure warrants in the fashion -- in the
10  Reader's Digest fashion?
11    A  I'm sorry, I don't understand what your
12  question is. I'm --
13        MR. SCHIMBERG: I'll object to form.
14    Q (BY MR. TONDRE) What I'm asking, Captain,
15  is whether you've heard of the Reader's Digest approach
16  to search warrant -- affidavit seizure warrant
17  affidavits?
18    A  My understand- -- what I'm understanding
19  is you're asking is it an actual creating an affidavit
20  for a search warrant that you reduce the information in
21  a Reader's Digest within so many pages; if that's what
22  you're asking yes, I've heard of that before.
23    Q  Okay. And what have you heard about it?
24    A  And this is -- that is something
25  typically that is very common that when you actually --

9 (Pages 30 to 33)

Page 38

1          MR. SCHIMBERG: Form.
2          A   I don't disagree with that. But I also
3   think that's a matter of thoroughly investigating,
4   putting the information in the affidavit, try to get
5   all the information, relevant facts in the affidavit,
6   when you have a tendency to not put the information in
7   there, there's a difference between forgetting a piece
8   of information or intent -- or with intent of not
9   putting the information in there.
10         Q   (BY MR. TONDRE) Would you agree that if
11  you know -- if you know about information, failure to
12  put it in is intentional?
13         MR. SCHIMBERG: Object to form.
14         A   If it was such information that you
15  wouldn't normally forget and then not put it in, yes.
16         Q   (BY MR. TONDRE) Would you expect an
17  officer who has only been involved with a case for less
18  than a week have a better memory than someone who has
19  been involved with the case for a month?
20         A   Well, I wouldn't necessarily agree with
21  that, and I wouldn't necessarily agree with that for
22  the fact that for me having -- and I presume you are
23  speaking of me, having the knowledge that I have, is
24  based off of my understanding of the case, and so much
25  time after the case has transpired versus actually

Page 39

1   physically being there in the midst of the case as it's
2   evolving. So I don't necessarily agree with that.
3          Q   You think your memory would be just as
4   good at a later time as it would be at the time of
5   the -- the information coming to your attention?
6          A   No. I know my memory wouldn't be,
7   depending on if there has been a certain amount of time
8   that has passed, I would have to do a lot of review to
9   get myself back up to remember certain events, yes.
10         Q   That's an obligation to remember what you
11  may have forgotten; isn't it?
12         A   Yes.
13         MR. SCHIMBERG: Object to form.
14         Q   (BY MR. TONDRE) When Mr. Hatlee and
15  Mr. Swift were acquitted of the charges against them,
16  what was the reaction of the people within the
17  sheriff's department?
18         A   I'm not sure what their reaction is. I'm
19  sure they were not pleased with the decision.
20         Q   The system reached its conclusion,
21  correct?
22         A   Correct.
23         Q   You're familiar with the term or the
24  statement that -- the one of Shakespeare makes, first
25  let us kill all the lawyers, correct?

Page 40

1          A   I'm not -- I'm not a Shakespeare
2   aficionado, no.
3          Q   You haven't heard the statement?
4          A   Well, I have heard statements along those
5   lines, but not by Shakespeare.
6          Q   Do you believe it will be a better system
7   if you didn't have lawyers and judges to disagree with
8   the decision of the police department?
9          A   I believe that the system that we have is
10  the best system in the world. So I don't argue with
11  the system. I may not -- I may not agree with some of
12  the way things go, but that's not my job. My job is to
13  be an officer and to investigate and to report that to
14  the attorneys that have to prosecute.
15         Q   And if the prosecutor prosecutes and the
16  accused defends and the jury says not guilty, then
17  justice has been done; hasn't it?
18         A   I have no arguments with that process
19  whatsoever. I respect that decision. I may not agree
20  with it totally. But I respect it.
21         Q   Was -- based on your perception of Monte
22  Gore's involvement in this investigation, was
23  he inv- -- involved in it more than he would normally
24  be?
25         A   Yeah, he was.

Page 41

1          Q   And do you have any understanding as to
2   why he was involved more than normally?
3          A   I think Undersheriff Gore was involved
4   when it did come to the amount of unhappiness by the
5   public. And I think at that point, also being the
6   public information officer, he stepped in and then
7   worked a little bit more directly with the animal
8   control division and allowed them to do what they were
9   supposed to do; and he would handle things on his level
10  with dealing with the public.
11         So he is normally -- not normally this
12  heavily involved in a criminal investigation, but yet
13  again he is still a law enforcement officer and he is
14  the undersheriff and he can make the decision if he
15  wants to go in and work the case.
16         Q   What is your understanding -- well, was
17  it usual for him to go out and supervise the seizure of
18  the horses?
19         A   It's not a norm, but he's done -- he's
20  done something along those lines before.
21         Q   What's your understanding of why he did
22  it here?
23         MR. SCHIMBERG: Object to form,
24  foundation. Go ahead.
25         A   I'm not sure if I have an understanding

11  (Pages 38 to 41)

SVEN BONNELYCKE - OCTOBER 8, 2014

---

Page 42

1  other than the fact that he received a lot of
2  complaints and then, based on that, was involved and
3  then directly started working hand in hand with animal
4  control.
5      Q  (BY MR. TONDRE) Isn't that your job?
6      A  But he's also my boss.
7      Q  Did he tell you he was taking control
8  from you?
9      A  No.  He didn't have to tell me, I saw it
10  firsthand so I stood aside.
11      Q  Were you in any way involved in the
12  decision to take Cindy Hardey off the case?
13      A  I was not.
14      Q  Did you know what happened?
15      A  My understanding is that there was some
16  concerns that were given to the undersheriff that they
17  thought that she may have had some personal friendship,
18  I don't know if that was with Mr. Hatlee or Mr. Swift;
19  but in the light of that, they didn't want there to be
20  a view that we would allow her to continue and not be
21  objective in the investigation.
22      Q  Now, when did you learn that that was the
23  case?
24      A  I think it was right about the same time
25  they actually made that decision or shortly thereafter.

---

Page 43

1      Q  Who made that decision?
2      A  I believe that was a decision that came
3  from Undersheriff Gore.
4      Q  Did you have any information that led you
5  to believe that she was friendly to Swift or Hatlee?
6      A  I personally did not, no.  No.
7      Q  All right.  Now, by the time that
8  happened, she had -- it had already been adjudged that
9  she had filed a bad faith affidavit, right?
10      MR. SCHIMBERG:  Object to form.
11      A  Honestly, I do not know.  I don't know
12  where that falls in the time line.
13      MR. TONDRE:  Let's take a few minutes.
14      (Recess taken from 1:59 p.m. to
15  2:08 p.m.)
16      Q  (BY MR. TONDRE) Okay.  I'm going to
17  hypothecate some facts to you, Captain, which I want
18  you to accept as true.  The beginning of the
19  investigation by Cindy Hardey was on February the 16th,
20  2012.  The protective agreement that was entered into
21  between the sheriff's office and Mr. Hatlee and
22  Mr. Swift was entered into on February 19th, three days
23  later.  And the seizure warrant affidavit was signed on
24  February the 22nd, 2012.  We have three days between
25  each event.

---

Page 44

1      Would you expect on February 22nd
2  that Cindy Hardey would, without a doubt, remember
3  entering into -- or giving a notice of warning on
4  February 19th?
5      MR. SCHIMBERG:  Object to form.  Go
6  ahead.
7      A  I would like to think she would have
8  remembered, yes.
9      Q  (BY MR. TONDRE) And would you think on
10  February 22nd, she would remember a protective
11  agreement she entered into on February 19, 2012?
12      A  Again, I would like to think that she
13  would have remembered, yes.
14      Q  And would you think that during that
15  short time span she would know the contents of those
16  two documents?
17      A  I would hope so, yes.
18      Q  And would you think she would remember a
19  conversation that she had the morning of the day she
20  signed the affidavit for search -- for seizure warrant?
21      A  I would like to think so, yes.
22      Q  Now, as the professional standards person
23  as it relates to animal control officers, would you
24  expect to be told that one of your officers had been
25  found in bad faith by a judge?

---

Page 45

1      MR. SCHIMBERG:  Object to form.
2  Foundation.  Characterization, go ahead.
3      A  I would like to be informed of any --
4  anything that my officers are doing or, in this
5  particular case, if there was something of fact like
6  that that happened.
7      Q  (BY MR. TONDRE) But you weren't, were you?
8      A  No.  I was not.
9      Q  Someone made the decision to keep you out
10  of that equation, right?
11      MR. SCHIMBERG:  Object to form.
12  Foundation.
13      A  I don't think it was a matter of them
14  intently keeping me out of the loop so to speak; I
15  think it might have been something that they felt,
16  well, there's nothing we can do about it now and then
17  felt that there was no wrongdoing.
18      Q  (BY MR. TONDRE) Isn't it true, that a law
19  enforcement agency has a duty and an obligation to
20  supervise and discipline its officers?
21      A  Yes, I do.
22      Q  Was there any investigation made to
23  determine whether Cindy Hardey had committed an act
24  which -- which justified discipline?
25      A  Not by I.

---

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 46

1    Q  Well, do you know of anybody who did make
2  such an investigation?
3    A  Not that I'm aware of.
4    Q  And who had the authority to make that
5  investigation other than you?
6    A  That typically will be ordered by the
7  sheriff for, let's say, an internal investigation under
8  professional standards, but I would not be the only
9  person who would probably conduct an investigation.  It
10  could be the undersheriff himself that could have done
11  it.  But it will be a higher-ranking member.
12    Q  Have you ever heard that an investigation
13  was made by anyone?
14    A  No.
15    Q  Would you expect as the person in charge
16  of that officer to be told if the officer was
17  investigated?
18    A  I would.
19    Q  Did you ever discuss the issue regarding
20  the insufficiency of the affidavit because of omissions
21  with Detective Priestly?
22    A  With Sergeant Priestly?
23    Q  Sergeant Priestly.
24    A  Okay.  Now I just side-tracked myself by
25  asking you that question.  Ask me again, please.

Page 47

1    Q  Did you ever discuss with Sergeant
2  Priestly the question of the sufficiency or
3  insufficiency of the seizure warrant affidavit?
4    A  I think after we found out about the
5  judgment by the Court, we did talk about it and then
6  the fact that the information that wasn't in there
7  wasn't something that was typically put into an
8  affidavit to begin with.
9    Q  So it was the conclusion of you as a
10  professional standards person and Sergeant Priestly, as
11  a supervisor of Officer Hardey, and you as supervisor
12  of Sergeant Priestly, that it was a typical, usual, and
13  customary practice of the sheriff's office to not
14  include things of the nature that were omitted from the
15  affidavit in this case --
16    MR. SCHIMBERG:  Object to form.
17    Q  (BY MR. TONDRE) -- is that correct?
18    MR. SCHIMBERG:  And foundation.
19    A  That is not correct.  That decision does
20  not stop with me.  That is a decision made by the
21  sheriff.  And if there's an investigation to be
22  conducted, it is he who orders it.
23    Q  (BY MR. TONDRE)  It was your judgment from
24  talking to -- you -- you and Sergeant Priestly came to
25  the decision that it was the practice of the office not

Page 48

1  to include things such as those omitted by Officer
2  Hatlee -- Hardey.
3    A  It --
4    MR. SCHIMBERG:  Hold on.  Object to form
5  and foundation.  Do you want me to ask him to leave so
6  I can tell you what the nature of my objection is?  So
7  you don't, rightfully, accuse me of trying to educate
8  him.
9    MR. TONDRE:  Okay.  I'm interested.  I'm
10  curious.
11    MR. SCHIMBERG:  Do you want me to say it
12  now or have him leave?
13    MR. TONDRE:  Or we can leave.
14    MR. SCHIMBERG:  No, no, no.  I want -- I
15  want to share with you the nature of my objection
16  because I'm close to telling him he doesn't have to
17  answer based upon his prior testimony.  I'm trying to
18  be real fair about it.
19    MR. TONDRE:  All right.  Have him leave.
20  I'm puzzled.
21    MR. SCHIMBERG:  Yeah.  Maybe we can clear
22  it up.
23    MR. TONDRE:  Don't go away.
24    THE DEPONENT:  I will be right out the
25  door but not in earshot.

Page 49

1    MR. SCHIMBERG:  See you tomorrow.
2    (Captain Bonnelycke has left the
3  room.)
4    MR. SCHIMBERG:  My foundation objection,
5  Brice, is that he's told you he didn't see the
6  affidavit.  So you're asking him basically to -- when
7  you say for the things that were left out, he doesn't
8  have that knowledge of what elements you're talking
9  about.
10    MR. TONDRE:  But he just testified to the
11  contrary of that, Tim.
12    MR. LEBSACK:  I don't think he did.
13    MR. SCHIMBERG:  I don't think so.
14    MR. TONDRE:  Well --
15    MR. SCHIMBERG:  That's my -- that's my
16  only thing.  If you want to walk him through the
17  litany, that -- that at least educates him.  But to ask
18  it as broadly as you did, he doesn't have that
19  foundation.
20    MR. TONDRE:  Well, I can solve that
21  simply by asking him whether he discussed the specific
22  omissions with Sergeant Priestly, that should satisfy
23  your objection.
24    MR. SCHIMBERG:  Yeah, I think that would
25  be fine.

Page 50

1    MR. TONDRE:  Yeah.
2    MR. LEBSACK:  Bring him back?
3    MR. TONDRE:  Yeah.
4    MR. SCHIMBERG:  That's the way to deal
5  with it, because --
6    THE COURT REPORTER:  That was all on the
7  record, right?
8    MR. SCHIMBERG:  That's fine.  Brice, will
9  pay for that.
10    MR. TONDRE:  Yeah.
11    MR. SCHIMBERG:  Those two or three pages
12  on him.
13    (Captain Bonnelycke returns.)
14    Q  (BY MR. TONDRE)  All right.  We've -- I
15  think we've clarified the question.
16    A  Okay.
17    MR. SCHIMBERG:  Is that sun bothering
18  you?
19    THE DEPONENT:  No.
20    Q  (BY MR. TONDRE)  The question is:  Did you
21  discuss with Sergeant Priestly the specific omissions
22  or the omissions that were specifically discussed by
23  the judge?
24    A  I think we did have a discussion that the
25  information pertaining to the actual state notice of a

Page 51

1  warning and the agreement was not in the affidavit.
2    Q  Anything else?
3    A  I don't believe there was anything else
4  other than those two items.
5    Q  And did you believe that those were not
6  material omissions?
7    A  I -- I don't think I believe they were
8  material omissions based on what I was advised, that
9  that was not a standard that was entered in affidavits.
10  And based on this case, after this, we reversed that
11  and decided from here on out that has to be added
12  obviously for the court judgment.
13    MR. TONDRE:  No further questions.
14    MR. LEBSACK:  I don't have any questions.
15    MR. SCHIMBERG:  I do.
16  Got to prove that I was here today
17    MR. TONDRE:  I object.
18    MR. SWIFT:  Me too.
19    MR. SCHIMBERG:  What's yours?  Form, and
20  yours is foundation, I bet.
21    EXAMINATION
22  BY MR. SCHIMBERG:
23    Q  All right.  Here we go.  I want to go
24  back to the conversation you had with Mr. Tondre
25  regarding Mr. Ferraro.

Page 52

1    A  Okay.
2    Q  That's the context.
3    MR. TONDRE:  I withdraw my objection.
4    Q  (BY MR. SCHIMBERG)  Okay.  I want to make
5  sure I understand.  Did Mr. Ferraro have any role in
6  the investigation performed by the Park County
7  Sheriff's Office in regards to Swift and Hatlee?
8    MR. TONDRE:  Objection.  Foundation.
9    A  No.
10    Q  (BY MR. SCHIMBERG)  Okay.  Did he share
11  with you in that meeting over at the sheriff's office
12  that he had on his own, done some investigation?
13    A  Yeah.
14    Q  Okay.  Was he ever asked to perform any
15  investigation on behalf of your office?
16    A  No.
17    Q  Okay.  I think Mr. Tondre's question
18  could have been interpreted a couple different ways,
19  and that is why I home in on this.  He asked you:
20  Well, was it unusual that he was part of the
21  investigation?  Did you take that to mean that he was a
22  part of the Park County's office investigation?
23    A  No.
24    Q  Okay.  Did Mr. Ferraro clothe himself
25  with some sort of experience or skill in the field of

Page 53

1  investigation?
2    A  I think -- if I remember correctly, I
3  think that he may have discussed in some of his past
4  experiences or his ability to conduct investigations.
5  But I don't remember what those are.
6    Q  Was he ever allowed to interject himself
7  into the investigation?
8    A  No.
9    Q  Okay.  Now, my next question goes to this
10  fundraiser.  Mr. Tondre is very artful in how he
11  characterizes the folks that held the fundraiser.  Did
12  you have any awareness of any particular motive or
13  political purpose of the group that you -- that held
14  the fundraiser that you attended?
15    A  Well, I'm not aware of any political
16  motivation.  I took it as people who were trying to
17  raise funds that went towards veterinary help and
18  assistance from what we put into the animals at that
19  point.
20    Q  Okay.  The way the questions were asked
21  of you, these people were characterized as desirous of
22  prosecution of Mr. Swift and Mr. Hatlee.  Were you
23  aware of any such characterization when you attended?
24    A  No.  I don't think I've ever seen
25  anything like that.

14  (Pages 50 to 53)

EXHIBIT 28

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

 COPY

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.
-----------------------------------------------------
DEPOSITION OF BOBBI PRIESTLY
June 24, 2014
-----------------------------------------------------

                        Deposition location:
                        825 Clark Street Road
                        Fairplay, Colorado

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226

                                For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202

                                For the Defendant, Olds.

## AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

Page 22

1  form of the question.
2     Q (BY MR. TONDRE) Yes.
3        MR. SCHIMBERG: Legal conclusion. You
4  can answer as an animal control.
5     A  **Sufficient evidence and facts based on --**
6  **well, it would be sufficients -- sufficient facts**
7  **based -- that there's a crime that has been committed,**
8  **it would be sufficient fact that there has been a crime**
9  **or -- that's what probable cause is.**
10    Q (BY MR. TONDRE) Is it --
11    A  **Sufficient facts.**
12    Q  I'm sorry, I interrupted you.
13    A  **Go ahead.**
14    Q  Is it enough to have a feeling that a
15  crime was committed?
16       MR. SCHIMBERG: Object to form.
17    A  **No.  Go ahead.**
18    Q (BY MR. TONDRE) Are you familiar with the
19  holdings in the 10th Circuit Court of Appeals requiring
20  the requirement that a thorough investigation be made
21  before seeking a search and seizure warrant?
22       MR. SCHIMBERG: Object to form. Go
23  ahead.
24    A  **Yes.**
25    Q (BY MR. TONDRE) Did you provide any

Page 23

1  training to Cindy Hardey regarding search and seizure?
2     A  **Did I provide any training?**
3     Q  Yes, ma'am.
4     A  **No.**
5     Q  She prepared two affidavits, one to
6  search for hay and one to seize horses in the Swift and
7  Hatlee case. Did you review those before she submitted
8  them to the Court?
9     A  **I did not review those -- those**
10 **particular affidavits.  I did not.**
11    Q  So if she said she did, you're ly- --
12 she's lying, right?
13       MR. SCHIMBERG: Object to form. Go
14 ahead.
15    A  **I wouldn't say she's lying.  I**
16 **normally -- I think I -- I was in Lake George when she**
17 **prepared those, investigating another case.**
18    Q (BY MR. TONDRE) Let me see. You're in
19 the -- you're in the business of deciding credibility
20 of informants, aren't you?
21    A  **Am I in the business?**
22    Q  Well, it's involved in your commission,
23 isn't it, determining the credibility of informants?
24       MR. LEBSACK: Object to the form.
25       MR. SCHIMBERG: I'll join.

Page 24

1     A  **Informants, I -- I don't understand the**
2  **question.**
3     Q (BY MR. TONDRE) People who give you
4  information that you use to -- to obtain a search or
5  seizure warrant, you're -- you're responsible for
6  determining their credibility before you use their
7  statement, aren't you?
8        MR. SCHIMBERG: Same objection. Go
9  ahead.
10    A  **We investigate facts, yes.**
11    Q (BY MR. TONDRE) And you have to make a
12 determination whether the person that's furnishing you
13 with information is telling you the truth or not, don't
14 you?
15    A  **Yes.**
16    Q  Now can you give me any explanation for
17 why Cindy Hardey would say that you reviewed the search
18 and seizure warrants when you didn't?
19       MR. LEBSACK: Object to the form.
20       MR. SCHIMBERG: Well, hold on, Brice.
21 You know, I have an objection; but you're going to
22 accuse me, rightly so, of trying to steer the witness.
23 So do you want Bobbi to leave the room while I make my
24 objection or does it matter that much?
25       MR. TONDRE: It doesn't matter to me.  I

Page 25

1  mean --
2        MR. SCHIMBERG: I think it misstates
3  Ms. Hardey's testimony; therefore, I object.
4        MR. TONDRE: Oh.
5        MR. LEBSACK: Same objection.
6     Q (BY MR. TONDRE) Ms. Hardey testified in a
7  deposition last Friday, and she also testified three
8  times in court. You're aware of that, right?
9     A  **Yes.**
10       MR. SCHIMBERG: That's probably a good
11 point. I was saying misstated her depo testimony of
12 last Friday.
13    Q (BY MR. TONDRE) In court she testified she
14 was asked this question:
15       And apparently you reviewed that search
16 warrant with your supervisor Officer Priestly; is that
17 correct?
18       Yes.
19       Is that a lie?
20       MR. SCHIMBERG: Object to form.
21    A  **I don't think that's a lie.  I don't**
22 **think she remembered -- I mean we always have**
23 **supervisors and let -- if I may?  If I may clarify?**
24       MR. SCHIMBERG: Yes, go ahead.
25       MR. LEBSACK: Well --

7 (Pages 22 to 25)

Page 42

1  Q  And what decision did she make?
2  A  We -- we spoke about the conditions of
3  the horses.  I -- I mean, she -- she told me that she
4  had -- and I talked with Mr. Swift like I said, and she
5  decided that based on the fact, that she was going to
6  go ahead and issue a warning at this point.
7  Q  Did she tell you she was of the opinion
8  the horses were not endangered by leaving them in
9  place?
10  A  I don't remember that she specifically
11  said that.
12  Q  Well, if she thought they were in danger
13  being at Echo Valley Ranch, wasn't she obligated to
14  have them moved?
15  MR. SCHIMBERG:  Object to form.
16  A  I know she --
17  MR. SCHIMBERG:  Go ahead.
18  A  I know she was very concerned about
19  Maggie and thought she should be euthanized.  I
20  remember that.  So I don't know, I -- I guess if you
21  could restate the question.
22  Q  (BY MR. TONDRE) Did she say the horses
23  were in danger, yes or no?
24  MR. SCHIMBERG:  Asked and answered.
25  A  Some of them.

Page 43

1  Q  (BY MR. TONDRE) Which ones?
2  A  Well, obviously, Spencer or Bear was
3  leaving because he was in danger.
4  Q  By whose account?
5  A  Well, they had a warrant and -- Dawn
6  Smith, Ashleigh Olds.  Maggie -- she thought Maggie
7  needed to be euthanized, she was concerned about -- she
8  said the babies looked really, really bad.  So I mean,
9  I don't know, I can't -- I can't speak for what Cindy
10  specifically thought.
11  Q  Let me see if I understand.  Cindy
12  thought Maggie should be euthanized?
13  A  Yes.
14  Q  And what veterinary school did she go?
15  MR. LEBSACK:  Objection to form.
16  MR. SCHIMBERG:  Join.
17  A  She didn't go to any veterinarian school
18  that I'm aware of.
19  Q  (BY MR. TONDRE) Well, she was aware and
20  you were aware, aren't you, that it was Dr. Horton's
21  judgment that she shouldn't be euthanized, that she was
22  getting better?
23  MR. LEBSACK:  Objection to the form.
24  MR. SCHIMBERG:  Join.
25  Q  (BY MR. TONDRE) Isn't that right?

Page 44

1  A  I don't know what her opinion was, sir.
2  Q  Isn't that a relevant bit of information?
3  MR. SCHIMBERG:  Object to form.
4  Argumentative.
5  A  I don't --
6  Q  (BY MR. TONDRE) Don't you make decisions
7  regarding what is relevant bits of information with
8  respect to an investigation?
9  A  I -- I go by facts, sir.
10  Q  And you decide which facts are relevant,
11  don't you?
12  A  I do.
13  MR. SCHIMBERG:  It doesn't have to be
14  now, Brice, whenever there is a good break point.
15  MR. TONDRE:  Well, I'm about to launch
16  into an areas that's going to take some time.  So why
17  don't we take a break now.
18  MR. SCHIMBERG:  Thanks.  Appreciate it.
19  (Recess was taken from 11:07 a.m. to
20  11:20 a.m.)
21  Q  (BY MR. TONDRE) All right.  Let's go.
22  During the course of telephonic
23  contacts with Cindy Hardey on February 16th, 2012,
24  did you have occasion to contact Dr. Kate
25  Anderson?

Page 45

1  A  Yes, I made a call to Dr. Anderson.
2  Q  Who is Dr. Anderson?
3  A  She is the veterin- -- she's one of the
4  veterinarians for the State of Colorado and she is the
5  head of PACFA.
6  Q  Head of what?
7  A  PACFA.
8  Q  What is that?
9  A  Pet Animal Care Facilities Act.
10  Q  Why did you call Dr. Anderson -- well,
11  wait a minute, did you call Dr. Anderson?
12  A  I did.
13  Q  Why did you call her?
14  A  I called to get -- to get her advice and
15  see what she thought as a veterinarian we should do.
16  Q  And you explained to her the facts as you
17  understood them, right?
18  A  I explained that we were told that the
19  horses on the Echo Valley Ranch were under veterinary
20  care, that's what I was told by Mr. Swift when I spoke
21  with him, and asked her what she thought we should do
22  involving the six horses on the property and on Maggie.
23  MR. SCHIMBERG:  Listen to his question.
24  A  Okay.
25  Q  (BY MR. TONDRE) My question is:  You

12 (Pages 42 to 45)

Page 46

1  explained the facts as you understood them to
2  Dr. Anderson, correct?
3      A  Yes.
4      Q  And she told you that if a veterinarian
5  was caring for the horse that was down, and testings --
6  tests was -- tests were being run, she was comfortable
7  with just monitoring the situation for now?
8      A  Yes.
9      Q  And what did you tell her about the
10  situation as you understood it?
11      A  I told her that Mr. Swift told me that
12  the horses on the ranch were under veterinary care.
13      Q  Well, you wrote that the -- that she
14  stated: If the owner had its veterinarian caring for
15  the horse that was down --
16      A  Yes.  That was the -- that was Maggie.
17      Q  Yeah.  Did you talk to the veterinarian
18  that was caring for Maggie?
19      A  No.
20      Q  Why not?
21      A  She was out doing -- I don't know, she
22  wasn't where the cell phone was.  You had to go up a
23  way from the horses to talk on the cell phone.
24      Q  Well, is it your understanding that the
25  veterinarian was at the ranch?

Page 47

1      MR. LEBSACK:  Can I ask which
2  veterinarian are you talking about?  "The
3  veterinarian."  It's not clear to me, could you clarify
4  that question.
5      Q  (BY MR. TONDRE) What -- what veterinarian
6  are you talking about?
7      A  I'm talking about -- are you talking
8  about Dr. Anderson?  I was talking to her on the
9  telephone, and you were talking about the veterinarian
10  who was at the ranch, I don't know which veterinarian
11  you're talking about --
12      Q  Well --
13      A  -- either.
14      Q  -- you said she stated that:  If the
15  owner had his veterinarian caring for the horse that
16  was down.
17  Who is his -- who do you have reference
18  to when you say "his veterinarian"?
19      A  The only veterinarian that I knew of was
20  Dr. Horton.
21      Q  Do you know Dr. Horton?
22      A  Do I know her?
23      Q  Yeah.
24      A  I spoke with her on the telephone once,
25  yes.

Page 48

1      Q  Once in your lifetime?
2      A  Yes.
3      Q  Did you try and call her on February the
4  16th?
5      A  No.
6      MR. SCHIMBERG:  Mr. Tondre, would it be
7  appropriate if we allowed Ms. Priestly to have the
8  exhibit that you're reading from so she can refresh if
9  she needs to.
10      MR. TONDRE:  Yeah, sure.
11      MR. SCHIMBERG:  Okay.  And you're
12  entitled to ask your questions the way you want but --
13      MR. TONDRE:  I think it's Exhibit 65.
14      MR. LEBSACK:  66.
15      MR. TONDRE:  66.  Yeah, it may be
16  helpful.
17      A  Thank you.
18      Q  (BY MR. TONDRE) What did you understand
19  your role to be in this whole scenario that was
20  enveloping or -- or developing in -- on February 16th?
21      A  What was my role?
22      Q  Yes.
23      A  I'm an animal control officer for the
24  Park County Sheriff's Office and Cindy's supervisor.
25      Q  Okay.  And she was looking to you for

Page 49

1  advice as to what to do with the situation, correct?
2      MR. SCHIMBERG:  Object to form.
3      A  She was telling me what the situation
4  was.
5      Q  (BY MR. TONDRE) Was she asking your
6  advice?
7      A  In some situations.
8      Q  All right.  Now, did you ask for any
9  advice from Ashleigh Olds?
10      A  I did not speak with Ashleigh Olds.
11      Q  Do you know -- did you know Ashleigh Olds
12  at that point in time?
13      A  No.
14      Q  Had you ever called Dr. Anderson before
15  during a wellness check?
16      A  In which case?
17      Q  Any case.
18      A  Oh, yes, absolutely.
19      Q  Is this a common thing you do, call
20  Dr. Anderson and say what do you think, Doc?
21      A  Absolutely.
22      Q  And why do you do that?
23      A  Because we always have a veterinarian's
24  opinion on cases before we do anything.
25      Q  What -- who made the decision to issue a

13 (Pages 46 to 49)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

Page 70

1    MR. TONDRE:  Foundation.
2    A  It's a small community.  I have no idea.
3 Dawn Smith knew.  I don't know.
4    Q  (BY MR. TONDRE) Ashleigh Olds knew?
5    MR. LEBSACK:  Object to form.
6    A  Yeah.
7    Q  (BY MR. TONDRE) Ann Murdock appeared on
8 Channel 7 news.  Are you aware of that?
9    MR. LEBSACK:  Object to the form.
10    A  I don't know who Ann Murdock is.
11    Q  (BY MR. TONDRE) Veterinarian in the
12 Ashleigh Olds' clinic.
13    A  No.
14    Q  You didn't see -- you didn't see the
15 Channel 7 news report?
16    A  No, sir.  I did not.
17    Q  Did you hear about it?
18    A  I'm sure I did.  I mean, there was a lot
19 of press.  I -- I -- I don't know which one
20 specifically you're talking -- I don't watch the news,
21 so...
22    Q  Well, in any event, to your knowledge,
23 nobody in the sheriff's department publicized the
24 decision; is that correct?
25    MR. SCHIMBERG:  Object to form.

Page 71

1    Q  (BY MR. TONDRE) And I'm talking about --
2 let's -- let's concentrate on February 16th, 17th, and
3 18th.  Did anybody to your knowledge in the sheriff's
4 department publicize the decision to leave the horses
5 at Echo Valley Ranch?
6    A  I believe we did a press release.  I
7 don't know which day that was.
8    MR. SCHIMBERG:  Then don't guess.  Answer
9 his question based upon what you know.
10    A  Not that I'm aware of.
11    Q  (BY MR. TONDRE) According to your report,
12 page 89, on February 19th, you received a call from
13 Undersheriff Gore at your residence; undersheriff
14 advised you that he had received several telephone
15 calls from the public information officer for the State
16 of Colorado's Department of Agriculture office.  He was
17 concerned for the safety of the owners and horses, the
18 owners of the horses and the horses themselves.
19    Do you remember any more particularly
20 what sort of communications he had received that caused
21 him to be concerned about the -- the safety of the
22 owners and their horses?
23    A  No.
24    Q  Were there death threats?
25    A  No.  Not that I -- I don't -- I don't

Page 72

1 remember specifically.
2    A  Did Dr. Horton ask you about death
3 threats?
4    A  I know she -- if I can look at my report?
5    Q  Yeah, you can find it on page 91.
6    A  Yes.
7    Q  That was a conversation you had with her
8 on February 21st, correct?
9    A  That's correct.
10    Q  And on February 21st, she told you she
11 was in no hurry to jump to a conclusion in the case as
12 it is not a clear-cut case at all, right?
13    A  Yes, those were her words.
14    Q  Now what did you learn from Dr. Horton
15 about death threats she had received?
16    A  I wasn't really paying that much
17 attention, I was taking notes feverishly about what she
18 said.  She was talking to the sheriff particularly
19 about that.  And he was speaking to her about that.
20    Q  Are death threats a crime in Park County?
21    A  Yes, sir.
22    Q  Was anybody prosecuted for any of those
23 death threats?
24    A  She doesn't live in Park County, that is
25 why he told her to contact law -- to contact law

Page 73

1 enforcement officers in her county, which I believe are
2 Jefferson County.
3    Q  Now were there any death threats made --
4 well, let me make it more generic than that.  Were
5 there any threats made to persons involved with the
6 Bailey feed store?
7    MR. SCHIMBERG:  Object to form.
8 Foundation.  Go ahead.
9    A  Not to me, sir.
10    Q  (BY MR. TONDRE) What did Undersheriff Gore
11 suggest be done about the matters that were causing him
12 to be concerned about the safety of the owners and
13 their horses?
14    A  His suggestion was to remove the horses
15 from the situation so that people did not go and take
16 matters into their own hands, which he expressed some
17 concern that that might be a possibility.
18    Q  Did he say why he was concerned that
19 vigilante justice may take hold?
20    MR. LEBSACK:  Object to the form.
21    MR. SCHIMBERG:  Object to the form.
22 Characterization.  Go ahead and answer the question.
23    A  He -- he just said with all of the calls
24 and emails that we were getting he was concerned about
25 the safety of the horses and the owners; and he did not

Page 74

1  want people to take matters into their own hands; so he
2  thought for the safety of everybody, that it would be
3  in the best interests to remove them from the situation
4  and put them in -- in protective custody, per se.
5      Q  (BY MR. TONDRE) Would you agree taking
6  matters into their own hands would constitute vigilante
7  justice?
8          MR. LEBSACK: Object to the form.
9          MR. SCHIMBERG: Object to form. Go
10 ahead.
11     A  I would not agree that that was a
12 statement that was used.
13     Q  (BY MR. TONDRE) What does the term
14 vigilante justice mean to you?
15     A  People with axes and guns showing up on
16 somebody's property and taking things by force.
17 A lynch mob, per se, I guess, would be what I --
18 screaming, you know, like, kind of like in the movies
19 thing.
20     Q  In this day of the internet, it can take
21 on a different scope, can't it?
22         MR. SCHIMBERG: Object to form. Go
23 ahead.
24         MR. LEBSACK: Same.
25     A  Sure. Sure.

Page 75

1      Q  (BY MR. TONDRE) Now, what was it about the
2  situation that prevented the sheriff's office from
3  being able to protect the owners and their horses?
4          MR. SCHIMBERG: Object to form.
5  Foundation.
6      A  I -- I guess I don't understand the
7  question.
8      Q  (BY MR. TONDRE) Well, is this a county
9  where you can rely on your law enforcement people to
10 protect you from -- obviously concerns for your safety?
11         MR. SCHIMBERG: Object to form.
12 Foundation.
13     A  Sure.
14         MR. SCHIMBERG: Argumentative.
15     A  Sure, if you call. I mean, that's what
16 we do. I don't do that, the deputies do that, but
17 sure.
18     Q  (BY MR. TONDRE) Well, what did they do to
19 protect Hatlee and Swift other than say get out of
20 town, folks?
21     A  It was a preventative measure.
22     Q  Well, is this a place where threats are
23 okay?
24         MR. SCHIMBERG: Object to form,
25 foundation.

Page 76

1      A  Oh, absolutely not.
2      Q  (BY MR. TONDRE) Is it a crime to make
3  threats?
4          MR. SCHIMBERG: Object to form. Go
5  ahead. Asked and answered.
6      A  If -- if they're not substantiated, yes, it's
7  against the law to do that.
8      Q  (BY MR. TONDRE) And how do you
9  substantiate them, isn't there a little matter called
10 investigation?
11     A  I'm not a deputy, sir; but yeah, I would
12 say it has to live up to the threshold, so I don't know
13 how to answer that question.
14     Q  Are you aware of any investigation of any
15 of these threats of bodily harm that were being made?
16         MR. SCHIMBERG: Object to form.
17 Foundation. Go ahead.
18         MR. LEBSACK: Same.
19     A  Am I aware of any investigation?
20     Q  (BY MR. TONDRE) Yeah.
21     A  I don't know what Jefferson County did,
22 so -- no. I'm not aware of any.
23     Q  How about the ones that were made in Park
24 County?
25         MR. SCHIMBERG: Same objection. Go

Page 77

1  ahead.
2      A  Not aware of any in Park County. So...
3      Q  (BY MR. TONDRE) Did you ever become aware
4  of the names of any of the people who were making these
5  threats?
6      A  No.
7      Q  You know Shelley Ferraro?
8      A  Yes.
9      Q  How do you know her?
10     A  She adopted the horse called Bear.
11     Q  You know anything else about her?
12     A  She is married to Gene Ferraro. She was
13 in court and she -- I believe she testified at one of
14 the hearings.
15     Q  Are you aware of the postings she was
16 making on Pinecam?
17     A  I'm not because I'm not a member of that.
18 I don't even --
19     Q  Are you aware of any threats she made
20 with respect to the -- directed at Dr. Horton?
21     A  No.
22     Q  Turn to page 91.
23     A  I'm there.
24     Q  "Dr. Horton then asked about death
25 threats and harassing phone calls. She stated that she

20  (Pages 74 to 77)

Page 82

1    A  Yes, sir.
2    Q  When?
3    A  It appears it was on the 17th or 16th.
4    Q  4 p.m. in the afternoon, right?
5    A  Yes.
6         MR. SCHIMBERG:  Excuse me.  Bathroom
7    break when we're done with this category?
8         MR. TONDRE:  It's lunchtime.
9         MR. SCHIMBERG:  I could do two things at
10   once.
11        MR. TONDRE:  Let me --
12        MR. SCHIMBERG:  I don't care.
13        MR. TONDRE:  Let me -- let me finish this
14   and then we'll go.  If I can find my -- there's too
15   many boxes.  No.  Let's break for lunch.
16        (Luncheon recess was taken from
17   12:24 p.m. to 1:36 p.m.)
18   Q  (BY MR. TONDRE) All right.  Let's go.
19        When we broke, we were talking about
20   moving the horses.  What I understand your
21   testimony to be is that the decision to move the
22   horses for the safety of their owners and the
23   horses was a decision of Mr. Gore?
24   A  Yes.
25   Q  And tell me, did you have any involvement

Page 83

1    in the discussions relating to the movement of the
2    horses?  I realize you had conversation with Mr. Gore
3    but what -- what did you do after that?
4         MR. SCHIMBERG:  Can -- can I ask you a
5    question, Brice?
6         MR. TONDRE:  Yeah.
7         MR. SCHIMBERG:  Maybe it's just me.  Are
8    we talking about from Echo Valley Ranch?
9         MR. TONDRE:  To LeBeau.
10        MR. SCHIMBERG:  Okay.
11        MR. TONDRE:  Yeah.
12        MR. SCHIMBERG:  All right.  That's what I
13   wanted to make sure, thanks.
14   A  All right.  Did I --
15   Q  (BY MR. TONDRE) Yeah, what -- after you
16   spoke with Mr. Gore and he expressed a concern for the
17   safety of the owners and the horses --
18   A  Uh-huh.
19   Q  -- and suggested that they be moved, did
20   you -- did you become involved in the efforts to get
21   them moved?
22   A  I contacted Cindy --
23   Q  Okay.
24   A  -- and talked to her and told her that --
25   that that was a recommendation made by the

Page 84

1    undersheriff, and -- and -- and then she contacted, I
2    believe Ron Swift.
3    Q  Did you -- did you prepare the agreement?
4    A  I did.
5    Q  Okay.  And how did you get that to her?
6    A  I met -- I met them at Kirstin LeBeau's
7    place that evening.
8    Q  All right.  And what was occurring when
9    you arrived at Kirstin LeBeau's place?
10   A  I arrived there prior to them.
11   Q  And you awaited their arrival?
12   A  Yes.
13   Q  And what did you observe when they
14   arrived?  Did you observe the unloading of the horses?
15   A  A couple of them, yes.
16   Q  Do you recall which ones?
17   A  No.
18   Q  Did you have anybody with you when you
19   went to the ranch, I mean, to the LeBeau place?
20   A  Yes.
21   Q  Who did you have with you?
22   A  My youngest daughter was with me.
23   Q  Why would you have your daughter with
24   you?
25   A  She came with me to help.

Page 85

1    Q  To help with what?
2    A  To help with the -- we, Kirstin was
3    moving horses from her ranch, so she came with me just
4    to assist.  She's going to veterinarian school.
5    Q  Not employed by the sheriff's department?
6    A  She is not.
7    Q  And she was going to veterinary school at
8    the time?
9    A  No.  She is going -- she just graduated
10   this year.
11   Q  Graduated from what?
12   A  From high school.  From Cripple Creek
13   High School.
14   Q  So she was a sophomore in high school
15   when you took her out to LeBeau's place?
16   A  Yes.
17   Q  Didn't have anybody from the sheriff's
18   office that could help?
19   A  No.
20   Q  What sort of help were you proposing to
21   give?
22   A  Well, I wasn't sure what we were going to
23   need.
24   Q  Well, what did it turn out that you
25   needed?

Page 86

1    A   We helped Kirstin and them move all of
2  their horses.  They had a bunch of horses out in the
3  pasture, and we had to move -- it was dark, so we all
4  got out and moved her large herd of horses from the
5  pasture -- from the arena out to the pasture.  So we
6  were all walking out there, moving horses.
7    Q   Was -- was Cindy Hardey there?
8    A   Not at that time, no.
9    Q   Did she get there later?
10   A   Yes.
11   Q   What time did she get there?
12   A   I don't recall.
13   Q   What did she do when she got there?
14       MR. SCHIMBERG:  I'm going to object for
15  the record, go ahead.
16   A   She was with Mr. Swift and Mr. Hatlee.
17   Q   (BY MR. TONDRE)  Oh, she arrived with them?
18   A   Yes.
19   Q   So as far as the sheriff's office was
20  concerned, it was you and Cindy Hardey?
21   A   Yes.
22   Q   All right.  Did you make any assessment
23  of the conditions of the horses at that time?
24   A   No.
25   Q   Did you notice anything about the horses

Page 87

1  that indicated to you that they might be having
2  neurological problems?
3    A   No.
4    Q   Did you notice the younger horses' back
5  legs were moving strangely?
6    A   They were quivering when they came off of
7  the trailer, one of them particularly.
8    Q   How many -- how many -- how many of them
9  had quivering legs?
10   A   I noticed one.
11   Q   Well, you wrote on the notice that the
12  younger horses', that's with an "s," back legs were
13  quivering when they walked, that's the one in your
14  report?
15   A   It might have been a typo.  I only recall
16  one at this time.
17   Q   Did it cross your mind that's a
18  neurological problem?
19   A   No.
20   Q   What did -- what did you do then to find
21  out what might be causing that quivering?
22   A   I -- I didn't do anything.  I don't know.
23  Can you clarify?
24   Q   I don't know how I can be any clearer.
25  My question is:  What did you do to determine what

Page 88

1  might be causing the quivering of the back legs?
2    A   Nothing.
3    Q   Did you think that was a concern?
4    A   No.
5    Q   You think they're just normal?  Do legs
6  quiver normally?
7    A   Sometimes when they get off trailers,
8  yes.
9    Q   Oh, okay.  Did Mr. Hatlee discuss with
10  you the quivering of the back legs?
11   A   He may have said something.
12   Q   What do you think he may have said?
13   A   I remember him saying -- I remember him
14  saying watch Echo walk.
15   Q   Did you ask him what's causing that?
16       MR. SCHIMBERG:  Object to form.
17   A   Not that I remember.
18       MR. SCHIMBERG:  Go ahead.
19   A   Not that I remember.
20   Q   (BY MR. TONDRE)  Do you -- do you remember
21  him telling you that there's a suspicion that it's a
22  neurological problem caused by some kind of toxic
23  condition?
24   A   No.
25   Q   You say, this is on page 89:  "The horses

Page 89

1  were moved to a private ranch in Park County and housed
2  in an enclosed barn.  The horses were provided with
3  veterinarian care by Timberline Equine Veterinary
4  Services while at this location."  What's -- what's the
5  basis for your statement?  How did you know that?
6    A   Because that's what I was told.
7    Q   Other than this visit to LeBeau's on the
8  19th, did you at any other time prior to the seizure of
9  the horses go to the LeBeau place?
10   A   Reference this case?
11   Q   Yes.
12   A   No.
13   Q   You say:  "Hatlee was concerned about one
14  of the young colts named 'Chance.'"  Did you look at
15  that colt?
16   A   Yes.
17   Q   And what did he tell you caused him
18  concern?
19   A   I don't recall.
20   Q   You say:  He told you that the colt had
21  been collapsing frequently and that he was unable to
22  rise on his own.
23       Do you remember that?
24   A   I do.
25   Q   Do you remember being concerned that the