EXHIBIT 34

The horse named Lena put on 38 pounds during that week. On Feb. 23, it weighed 690 pounds, and on March 1, it weighed 728 pounds.

The horse named Fiona put on 35 pounds during that week. On Feb. 23 it weighed 505 pounds, and on March 1 it weighed 540 pounds.

The horse named Echo put on 22 pounds that week. On Feb. 23, it weighed 405 pounds, and on March 1 it weighed 427 pounds.

The horse named Chance put on 21 pounds during that week. It weighed 465 on Feb. 23 and 486 on March 1.

---

Top

○ Aquaria
Posts Semi-Regularly
Joined: Apr 13, 2011 5:52 pm
Posts: 290

Post subject:                                                                                     Posted: Apr 20, 2012 8:41 am

gla58 wrote:
> Yes, the court date, does anyone know when the court date/time is for this case?

This article states May 15th:

http://www.thedenverchannel.com/news/30... etail.html

Quote:
> He will be back in court on May 15 on the misdemeanor animal cruelty charge

Everybody is a genius. But if you judge a fish by its ability to climb a tree, it will live its whole life believing that it is stupid.

---

Top

○ TimberlineEquine
New Poster
Joined: Feb 18, 2012 10:15 am
Posts: 1

Post subject:                                                                                     Posted: Apr 26, 2012 9:31 am

In response to the barrage of misinformation regarding the horses at Echo Valley Ranch and Timberline Equine's role in same, we would like to set the record straight for all who are interested in the facts.

We have a considerable amount of experience with Animal Control agencies in multiple counties and states, and our focus in this case and in all Animal Control cases has been since the start of our involvement and will continue to be providing appropriate veterinary care to the horses. We endeavor to educate and gain compliance from owners for the sake of the horses, we do not punish or libel them. Our concern is the horses. Legal matters are for prosecutors, judges and juries.

Firstly, there are at least 3 distinct cases which have been conflated by many posters. 1. Horses seized by order of Routt County Animal Control. 2. One horse that treated for an unrelated illness. 3. Horses seized by Park County Animal Control.

Case 1: 2 Routt County Animal Control horses. Timberline has no current knowledge of these horses. We have neither examined those horses, nor even seen them "in passing" since mid 2011, at which time they were in normal body condition.

Case 2: An underweight horse that exhibited sudden onset of paralysis.
Contrary to a grossly exaggerated description of a horse that was near death and covered with body sores, this horse actually regained the ability to stand on her own. Sadly, she later suffered a sudden and unpreventable cardiovascular death. Post mortem examination was conducted by Colorado State University and the some of the report was released by the Park County Sheriff's Department. The pathologists at CSU examined and commented upon the sores as hair loss and small areas of abrasion and inflammation. To have assumed a diagnosis of simple malnutrition in this horse would not only have constituted malpractice, as neurologic signs such as paralysis are not explained by malnutrition alone, but would have entirely missed the catastrophic lesion that caused her death. This horse's paralysis and cause of death were unrelated to the horses that comprise case 3.

Case 3: Six underweight horses seized by Park County Animal Control
Early on, there were several posts here on Pinecam claiming that Timberline had examined these horses and said that they were "fine" and that their condition was okay for their breed in the winter months. This is patently false. The horses were not examined (or even seen in passing) by Timberline Equine until after they had been placed in protective custody. They were at that point examined and given appropriate body condition scores according to the customary Henneke scale. At the time we examined them, they were already in the process of being appropriately re-fed. Peculiarities in the physical findings in addition to body condition scores necessitated further and more thorough investigation.

Botulism was considered initially as a potential cause in cases 2 and 3, but it was quickly ruled out clinically, and later by laboratory testing.
Contrary to several posts, these horses were not diagnosed with any disease, neurologic or otherwise, to the exclusion of malnutrition. There were simply peculiarities that remained unexplained by starvation alone, and if there was another condition contributing to their weight loss, it certainly should be addressed and not dismissed or overlooked. In fact, it would constitute malpractice not to investigate potential contributing factors. It should be noted that these possibilities were being explored while the horses were already being re-fed in accordance with AAEP guidelines.

An internal medicine specialist, cardiologist, toxicologist, the State Veterinarian's office, among other experts, were contacted by Timberline Equine in an attempt to shed light on these peculiarities, which are not typically associated with malnutrition, even extreme malnutrition.

One post claimed that a treating vet would be "defending" the owners. If this post indeed was intended to mean Timberline, we would like to make it clear that we are on the side only of the horses and the facts. We are not attorneys and do not defend anyone.

Some have claimed there were dead and or dying horses lying about the ranch. We did not observe any dead horses on our visits to the ranch. The only horse to our knowledge that was down was case 2.

It must also be understood that it is a violation of the ethics of our profession to improperly disclose client or patient information (read our professional ethics here http://www.aaep.org/ethics_prof_guide.htm and here
http://www.avma.org/issues/policy/ethics.asp). Therefore, no specific patient information has been or will be made public without permission from an owner or as required by law. We are simply not permitted to ignore our professional ethics because of

public interest. The proper authorities have had and will continue to have our full cooperation. Although we understand the community's concern and interest, we can no more make public these records than your doctor can post your medical records without your permission.

Lastly, to those of you who have let cooler heads and reason prevail, we thank you. This case has been the subject of gross exaggeration, misinformation and rumor. If this case goes to trial, all of the facts of the case will come out. We can assure you with absolute certainty that if and when these details are made public that they will corroborate and confirm everything that we have stated here.

---

**JHiller**
Pinecam Hall of Fame poster!
Joined: Oct 8, 2005 1:07 pm
Posts: 24353

Posted: Apr 26, 2012 8:42 am
Post subject:

I am grateful and appreciative of the information you have chosen to professionally disclose here.

I hate to tell you it won't matter a hill of beans as some of these people don't read, don't comprehend and already have appointed themselves judge jury and hangman.

As far as they are concerned the horses were starved, intentionally, one died and that's all they need to know and the rest of this thread is a waste of anyone's time.

If anything but a guilty verdict is handed down and the sentence isn't to their liking, and it won't be, they will cry corruption. It is truly bizarre.

---

**Lazierfan**
Pinecam Hall of Fame poster!
Joined: Nov 26, 2002 3:51 pm
Posts: 12410
Location: Geology is not a real science!!!

Posted: Apr 26, 2012 9:08 am
Post subject:

Hail Timberline.

---

**wildGoose2**
Pinecam Hall of Fame poster!
Joined: Oct 5, 2005 6:47 pm
Posts: 11348

Posted: Apr 26, 2012 9:14 am
Post subject:

Thank you, Timberline!

---

**homeagain**
Stratospheric Poster!
Joined: Feb 23, 2006 10:47 am
Posts: 6295

Posted: Apr 26, 2012 9:24 am
Post subject:

TimberlineEquine wrote:
In response to the barrage of misinformation regarding the horses at Echo Valley Ranch and Timberline Equine's role in same, we would like to set the record straight for all who are interested in the facts.

We have a considerable amount of experience with Animal Control agencies in multiple counties and states, and our focus in this case and in all Animal Control cases has been since the start of our involvement and will continue to be providing appropriate veterinary care to the horses. We endeavor to educate and gain compliance from owners for the sake of the horses, we do not punish or libel them. Our concern is the horses. Legal matters are for prosecutors, judges and juries.

Firstly, there are at least 3 distinct cases which have been conflated by many posters. 1. Horses seized by order of Routt County Animal Control. 2. One horse that treated for an unrelated illness. 3. Horses seized by Park County Animal Control.

Case 1: 2 Routt County Animal Control horses. Timberline has no current knowledge of these horses. We have neither examined these horses, nor even seen them "in passing" since mid 2011, at which time they were in normal body condition.

Case 2: An underweight horse that exhibited sudden onset of paralysis.
Contrary to a grossly exaggerated description of a horse that was near death and covered with body sores, this horse actually regained the ability to stand on her own. Sadly, she later suffered a sudden and unpreventable cardiovascular death. Post mortem examination was conducted by Colorado State University and the some of the report was released by the Park County Sheriff's Department. The pathologists at CSU examined and commented upon the sores as hair loss and small areas of abrasion and inflammation. To have assumed a diagnosis of simple malnutrition in this horse would not only have constituted malpractice, as neurologic signs such as paralysis are not explained by malnutrition alone, but would have entirely missed the catastrophic lesion that caused her death. This horse's paralysis and cause of death were unrelated to the horses that comprise case 3.

Case 3: Six underweight horses seized by Park County Animal Control
Early on, there were several posts here on Pinecam claiming that Timberline had examined these horses and said that they were "fine" and that their condition was okay for their breed in the winter months This is patently false. The horses were not examined (or even seen in passing) by Timberline Equine until after they had been placed in protective custody. They were at that point examined and given approriate body condition scores according to the customary Henneke scale. At the time we examined them, they were already in the process of being appropriately re-fed. Peculiarities in the physical findings in addition to body condition scores necessitated further and more thorough investigation.

Botulism was considered initially as a potential cause in cases 2 and 3, but it was quickly ruled out clinically, and later by laboratory

EXHIBIT 35

AGREN BLANDO COURT REPORTING & VIDEO INC

**ORIGINAL**

1

DISTRICT & COUNTY COURT, COUNTY OF PARK,
STATE OF COLORADO

CASE NO. 2012 M 000043, DIV. A
CASE NO. 2012 M 000044, DIV. A

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

    Plaintiff,

v.

RANDALL J. HATLEE, and RONALD L. SWIFT,

    Defendants.

---

    The above-entitled matter came on for hearing on Monday, December 3, 2012 at 9:56 a.m. before the HONORABLE BRIAN LOUIS GREEN, County Judge.

APPEARANCES:

FOR THE PLAINTIFF:                  THOMAS K. LEDOUX

FOR THE DEFENDANT:                DARRELL LEE CAMPBELL

ALSO PRESENT:                        RANDALL J. HATLEE
                                        RONALD L. SWIFT
                                        CINDY HARDY

AGREN BLANDO COURT REPORTING & VIDEO INC

81

1   were not evident to her?

2   A.   I'm not aware of that, no.

3   Q.   And she made -- and then it also went on in
4   her report, she said she -- "she" meaning Dr. Horton --
5   never saw them at all when she was out there on the
6   11th of February.  Well, let me just ask you:  When she
7   gave you that opinion, did she give you any facts to
8   indicate that she knew when the horses were brought in?

9   A.   No.

10  Q.   Did you ask her when she knew -- what
11  information she had about the horses being brought in?

12  A.   No.

13  Q.   Did you -- at the time you listened to her
14  opinion and made the decision to seize these horses,
15  were you aware of when she was -- what information she
16  had to indicate that the defendants were aware of the
17  horses losing weight and they didn't bring them in in
18  time?

19  A.   No.

20  Q.   So at this point, when you signed the
21  affidavit, you had no idea when the defendants had
22  recognized that the horses were losing weight.

23  A.   No.

24  Q.   And so when Dr. Horton said they should have
25  recognized it and they didn't, you had no time frame

1    there. You didn't know how many weeks they'd been
2    brought in or if it was just a few days before the
3    notice of warning, do you?
4         A.   No.
5         Q.   And, in fact, isn't it true that in your
6    conversations with the defendants, Mr. Swift had told
7    you that as soon as he noticed they were losing weight,
8    he brought them in?
9         A.   Yes.
10             MR. LEDOUX:  Objection, Your Honor.
11   Again, I don't understand the relevance of this line
12   of questioning. I don't think it goes to any of the
13   issues -- it's not relevant. I think we're talking
14   about the affidavit at this point. It's not relevant
15   to an omission that I'm aware of yet from the
16   affidavit.
17             THE COURT:  I'm going to overrule. The
18   knowledge possessed by the officer at the time the
19   affidavit was submitted is relevant to whether that
20   information should have been presented to the reviewing
21   judge. Go ahead, Mr. Campbell.
22        Q.   (By Mr. Campbell)  So and he -- the defendant
23   told you he brought them in immediately when he saw
24   they were losing weight.
25        A.   Yes.

1   correct that when you advised the Court about what
2   Dr. Horton had told you, you said that she said she
3   believes --
4       A.   Yes.
5       Q.   Did you take that as a diagnosis?
6       A.   No, I took it as her opinion.
7       Q.   Okay.  And then you also said that -- when
8   you say "I believe if Swift had noticed the horses
9   condition sooner, he would have been -- they wouldn't
10  be in the condition today."  That's how you concluded
11  your affidavit, isn't it?
12      A.   Yes.
13      Q.   So you have a belief, but you have no idea
14  how long -- when the horses were brought in and whether
15  they were brought in -- what time span occurred between
16  when they were noticed to be losing weight and when
17  they were brought in, do you?
18      A.   Correct.
19      Q.   And you didn't mention that in your
20  affidavit, did you?
21      A.   No.
22      Q.   Nor did you mention the fact that the blood
23  test showing anemia could be a result of any other
24  factors that would cause malnutrition other than the
25  owners not feeding the horses; is that right?

AGREN BLANDO COURT REPORTING & VIDEO INC

135

1 seizure of the horses and -- is that correct?
2   A.  Yes.
3   Q.  And apparently you reviewed that search
4 warrant with your supervisor, Officer Priestly; is that
5 correct?
6   A.  Yes.
7   Q.  And you also reviewed it with Deputy District
8 Attorney Steve Sullivan?
9   A.  Yes.
10  Q.  And then you presented it to a judge.
11  A.  Yes.
12  Q.  Which judge was that?
13  A.  One out of Canon City.
14  Q.  Okay.  Do you remember the judge's name?
15  A.  I do not.
16      THE COURT:  We've incorporated the prior
17 hearings. It was Judge Alderton out of Chaffee County.
18      MR. LEDOUX:  His handwriting is even worse
19 than the defendants and yours.
20  Q.  (By Mr. Ledoux)  Okay.  So Judge Alderton
21 signs the search warrant; is that correct?
22  A.  Yes.
23  Q.  Now, did you, at any time, or while you were
24 authoring the affidavit, did you intentionally leave
25 details out of the affidavit in an effort to mislead

1  MR. LEDOUX: I'll assume from that that the
2  Court's going to deny the motion to suppress. If it's
3  granting a portion of it, obviously, I'll need an
4  opportunity to offer evidence and make further record.
5  THE COURT: Well, you can listen to my ruling
6  and then decide if you can convince me to put on
7  additional evidence and reconsider. But at this point
8  it's fairly simple in my eyes, and it all boils down to
9  fairness. And, obviously, a person's perception of
10 what is fair depends on where they're sitting.
11 Obviously, Mr. Swift and Mr. Hatlee want to be treated
12 fairly by law enforcement and by the Court. Law
13 enforcement wants to be treated fairly and not have the
14 fruits of their investigations thrown out on a
15 technicality.
16 This case has a serious problem, and that
17 problem is that the affidavit for a search warrant
18 asking the Court to authorize the seizure of the horses
19 never once mentions that the horses are endangered if
20 they're left with the defendants or with their current
21 custodian. And it goes back to my prior ruling in the
22 case regarding the return of the horses. The Statute
23 regarding seizure of animals I think is treated too
24 casually by animal control and by the courts up till
25 now. And I'm glad I wasn't the judge presented with

1   ability to analyze whether or not the request to seize
2   the horses was something that should be granted.
3              MR. LEDOUX: And so the Court's finding that
4   even though they don't constitute immunity, they
5   somehow are material and adverse.
6              THE COURT: They are a material omission from
7   the information presented to the Court that would
8   essentially blindfold the Court on determining whether
9   to grant the request.
10             MR. LEDOUX: And if the Court would be
11  willing to expand upon that, the defendant in the
12  motion to suppress did not explain how those admissions
13  would be material and adverse and hasn't argued to the
14  Court in any way. So I'm requesting, if the Court
15  would be willing in our analysis of whether or not to
16  appeal the Court's decision, we can be clear about how
17  the Court is finding that those items are material and
18  adverse.
19             THE COURT: All right. The ruling,
20  specifically, is that the failure to notify the Court
21  of the 30-day warning notice provided to the defendants
22  was a material omission from the document, which
23  prevents the officer from benefitting from the good
24  faith mistake exception in relying on the Court
25  authored seizure of the horses.

1          MR. LEDOUX: I guess my --

2          THE COURT: The officer did not include any

3    information in her request for seizure to show that the

4    animals were endangered. The seizure should not have

5    been granted in the first place. I'm not allowing good

6    faith exception, because the officer did not include

7    material evidence for the Court to review.

8          MR. LEDOUX: I guess my question is, if an

9    investigative officer, in any other investigation, at

10   some point thinks to themselves, "I don't think this

11   person I'm investigating committed this crime," an

12   extension of the Court's ruling would be that that

13   conclusion by the officer would have to be included in

14   any subsequent affidavits filed in that investigation

15   even if the investigating officer subsequently came to

16   a different conclusion based on evidence obtained in

17   the investigation. And I don't think that's the state

18   of the law, so I just --

19         THE COURT: I don't agree that that's an

20   accurate extension of my ruling.

21         MR. LEDOUX: Okay. And my other question is,

22   the Court is referencing the seizure Statute. The

23   search warrant granted in this case was a search

24   warrant, to the extend they're different, and I believe

25   that they are, was a search warrant based on the fourth

# EXHIBIT 36

## DECLARATION OF JENA QUESTEN, D.V.M.

I am a doctor of veterinary medicine who has been retained to provide expert opinions in this case. My opinions are set forth in Exhibits 102, 106 and 107 of my deposition.

As noted, it is my opinion that the horses which are the subject of this case were suffering from toxemia. The cure for toxemia is food water and time. The time and feeding of the subject horses prior to their seizure contributed to their recovery which continued to progress under the care of Littleton Equine and Olds. Their recovery was completed after they were returned to Echo Valley ranch.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____

_____

JENA QUESTEN, D.V.M.