# EXHIBIT 43

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 13-cv-02469-RM-MJW

---

RANDALL J. HATLEE and
RONALD L. SWIFT,

    Plaintiffs,

        vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

    Defendants.

---

DEPOSITION OF ALLYSON RENÉ HORTON, DVM
March 27, 2014

---

Deposition location:
9998 Havekost Road,
Conifer, Colorado 80433

ALSO PRESENT:  Jennifer R. Edwards, Esq.
              (For Dr. Horton)
              Randall Hatlee
              Ronald Swift
              Ashleigh Olds, DVM

Page 114

1  A. Yes.
2  Q. Do you know why he was not sent to CSU?
3  A. To the best of my knowledge, it
4  revolved around the seizure of the horses and their
5  transport to another facility under the care of
6  Dr. Toll.
7  Q. Okay. Let me ask you about that. The
8  heart murmur and the tachycardia. Heart murmur, is
9  that something that you observe by using a
10 stethoscope?
11 A. Yes.
12 Q. And are you familiar with the term
13 "physiologic heart murmur"?
14 A. Yes.
15 Q. Was this heart murmur that you observed
16 in these horses, was this a physiologic heart murmur?
17 A. I don't believe so.
18 Q. What's your basis for saying that?
19 A. I consulted Dr. Adams at the cardiology
20 service at Colorado State University because these
21 heart murmurs were diastolic. Normally physiologic
22 murmurs are systolic. And particularly, heart
23 murmurs associated with malnutrition are systolic.
24 So I asked if they had any known association between
25 diastolic murmurs and malnutrition. They said there

Page 115

1  were none.
2  Q. This was who?
3  A. Dr. Adams.
4  Q. At CSU?
5  A. Yes.
6  Q. And do you have any record of that
7  conversation with him or her?
8  A. Her. I believe I actually just read
9  that in that email to Mr. Hatlee.
10 Q. Okay. That's Exhibit 2.
11 A. Yes.
12 Q. And that's where you refer to Dr. Adams
13 in there?
14 A. Yes.
15 Q. Okay. So this email is dated
16 February 28th, right?
17 A. Yes.
18 Q. So if it wasn't associated with low
19 body condition, do you have any opinions on what was
20 causing the heart murmurs that you observed?
21 A. I don't have a definitive answer.
22 Q. What are the possibilities?
23 A. It could have been as a result of the
24 altered viscosity of the blood from the anemia.
25 Q. Okay.

Page 116

1  A. But I -- that is a supposition and
2  nothing more.
3  Q. So if we go back and just go through
4  the links. If -- starvation or malnutrition can
5  cause anemia, right?
6  A. Prolonged, yes.
7  Q. And then anemia can result in this kind
8  of heart murmur.
9  A. Again, those are usually diastolic
10 murmurs, but altered viscosity of blood can result in
11 heart murmurs.
12 Q. The kind that you observed, the kind
13 of --
14 A. I do not have that answer.
15 Q. Okay. I thought you just said that,
16 that a --
17     MR. TONDRE: Objection, argumentative.
18 Q. (BY MR. LEBSACK) That the change in the
19 viscosity of the blood can cause the kind of heart
20 murmur that you observed.
21 A. It -- theoretically I can get there,
22 but I have no proof that's what caused those
23 heart murmurs.
24 Q. Okay. But the kind of heart murmurs
25 that you observed, one explanation of that is a

Page 117

1  change in the viscosity of the blood?
2      MR. TONDRE: Objection, foundation.
3  Q. (BY MR. LEBSACK) Right?
4  A. A possible explanation.
5  Q. And one cause of a change in viscosity
6  of blood is anemia?
7  A. Yes.
8      MR. TONDRE: Objection, foundation.
9  Q. (BY MR. LEBSACK) And one cause of
10 anemia is starvation?
11     MR. TONDRE: Foundation.
12 A. Potentially.
13 Q. (BY MR. LEBSACK) Tachycardia is also
14 something you observed?
15 A. Yes.
16 Q. Right. And that is in layman's terms
17 an elevated heart rate?
18 A. Correct.
19 Q. Did you form any opinions as to why
20 these horses had tachycardia?
21 A. Certainly anemia can explain that.
22 Q. Okay. So do you know eventually what
23 happened to these horses in regard to the problems
24 that they had with heart murmurs? Did the murmurs go
25 away?

Page 178

1  Q.  And I cannot remember the name of this
2  exhibit number, but it's the one with Ms. Edwards'
3  email?
4      MR. SCHIMBERG:  Did you get one?
5      MR. LEBSACK:  I put one on your chair.
6  You have one now.
7      MS. EDWARDS:  Well, I would like to
8  have all of them.  That would be 9.
9      THE DEPONENT:  That's 9.
10     MS. EDWARDS:  Actually, I have two
11 copies of that one.  I got really lucky.
12     MR. SCHIMBERG:  Can I have one?
13     MS. EDWARDS:  Yeah.
14  Q.  (BY MS. BRONSON) So this is an email,
15 and I'm -- you said that you don't think you received
16 this?
17  A.  I have not read this before today.
18  Q.  Okay.  It starts that, "I spoke
19 directly with Drs. Burton and Horton this morning and
20 found the rumors that are being spread about them
21 treating horses are just that."  Then skip down.
22 "They assured me they would have reported it as
23 cruelty if they had ever seen horses like those we
24 saw pictured."  Do you recall that conversation?
25  A.  I believe -- no.  I believe that

Page 179

1  conversation was with Dr. Burton.
2  Q.  Okay.  Is that your opinion that you
3  would have reported it as cruelty if you had ever
4  seen horses like those that were pictured?
5  A.  I have a legal obligation to report
6  abuse if I see it.  If I can expound without getting
7  in too much trouble, normally when we see horses that
8  are malnourished, our first attempt is to educate and
9  get compliance from the owner.  If that does not
10 succeed or if the horses continue to deteriorate, and
11 it's clear it's not a medical condition, then yes,
12 absolutely.  I would report and I have reported
13 clients to animal control.
14  Q.  So would you have reported these
15 animals as cruelty had you seen them --
16     MR. TONDRE:  Objection, foundation.
17  Q.  (BY MS. BRONSON) -- prior to them being
18 put in to protective custody?
19  A.  That would not have been my first
20 action.  My first action would have been to contact
21 the owners and to investigate what was going on.
22  Q.  So you don't necessarily agree with
23 this statement?
24  A.  I do.  I do, but I -- it's a
25 generalization.

Page 180

1  Q.  And I have just one -- actually one
2  more question.  Do you belong to any veterinarian
3  professional associations?
4  A.  To the best of my knowledge, my
5  membership in the American Veterinarian Medical
6  Association and the American Association of Equine
7  Practitioners is current.
8  Q.  Do you get the benefit of legal counsel
9  from these associations or those associations?
10 A.  It is available.  If you know -- AVMA
11 has a personal liability insurance trust available to
12 members that will cover if you have met the standard
13 of care.
14 Q.  Is that -- are you using that service
15 for this case?
16 A.  No.
17     MS. BRONSON:  That is all I have.
18     MR. SCHIMBERG:  Thanks, Doctor.
19     THE DEPONENT:  You're welcome.
20     MS. BRONSON:  Thank you.
21     MR. TONDRE:  Anybody want to take a
22 break?
23     MR. SCHIMBERG:  Yep.
24     MR. TONDRE:  Okay.  Let's take a break.
25     (Whereupon, a recess was taken from

Page 181

1  3:10 p.m. to 3:16 p.m.)
2            EXAMINATION
3  BY MR. TONDRE:
4  Q.  Dr. Horton, you have a legal obligation
5  to report a situation of abuse of animals if you have
6  reasonable cause to believe it occurred, correct?
7  A.  Yes.
8  Q.  And you as a professional can't jump to
9  a conclusion; you have to follow your professional
10 guidelines in determining whether you have reasonable
11 cause, correct?
12 A.  Yes.
13 Q.  And one name for that is a differential
14 diagnosis, isn't it?
15 A.  Yes.
16 Q.  Do veterinarians follow what I call the
17 SOAP note process?
18 A.  Subject, objective, assessment, plan.
19 Q.  Right.
20 A.  Some.
21 Q.  Do you?
22 A.  Not anymore.
23 Q.  When did you quit?
24 A.  End of senior year.
25 Q.  Well, let me see.  When you go out to

Page 202

          MS. BRONSON: Object to form.
     A. A variety of explanations. It would be that these horses were lower in the hierarchy and were -- only got whatever hay that the others didn't want, the poor quality hay that may have toxic weeds in it. It could be that they just happened to get the parts of the hay that had the toxic weeds in it. I don't have a definitive explanation. I have possibilities.
     Q. (BY MR. TONDRE) Did you make an assessment with respect to the 30-plus unaffected horses?
     A. I'm not sure I understand what you are asking for.
     Q. Well, did you assess any horses other than these six?
     A. I assessed a horse on February 11th that I'm not at liberty to discuss. At that time out in the pasture, I noticed the horses that were around us. Most were in acceptable body condition score.
     Q. Just visually?
     A. Just visually.
     Q. When did Chance first exhibit any signs of losing weight?
     A. I don't know.

Page 203

     Q. When did Echo first exhibit any signs of losing weight?
     A. I don't know.
     Q. When did Fiona first exhibit any signs of losing weight?
     A. I don't know.
     Q. When did River first exhibit any signs of losing weight?
     A. I don't know.
     Q. When did Lena first exhibit any signs of losing weight?
     A. I don't know.
     Q. When did Midnight first exhibit any signs of losing weight?
     A. Midnight had exhibited a previous episode of weight loss that was resolved with extracting a tooth. That was approximately a year before.
     Q. When?
     A. It was in the preceding year.
     Q. Okay. And that was being caused by teeth?
     A. She was unwilling to eat because of pain from a loose incisor.
     Q. Did you have to call a dentist?

Page 204

     A. I am the dentist.
          MR. SCHIMBERG: You are looking at her.
     Q. (BY MR. TONDRE) I'm curious, what did you do to her teeth? Fit her with dentures?
     A. No. She simply -- she had one incisor that was loose and painful, and we pulled it. And I don't recall if on that date we floated her teeth or not. Horses' teeth are somewhat different than people's teeth. They can develop sharp points that are irritating to the cheek on the uppers and the tongue on the lowers, and they will often interfere with the horse being able to eat comfortably. I don't recall if we did that procedure or not on that day, but we did pull a loose and painful incisor, and when she recovered from the sedation, she ate.
     Q. Had she lost a considerable amount of weight before you performed that procedure?
     A. A noticeable amount.
     Q. What was her body score?
     A. I don't recall.
     Q. Got a guess?
     A. A guess?
     Q. I don't -- don't guess. If you --
          MS. EDWARDS: Object to form.
     A. Yeah, not less than four.

Page 205

     Q. (BY MR. TONDRE) All right. How long had she had that condition with her tooth before you were called out to look at it.
     A. The owners reported a few days.
     Q. She lost considerable weight in a few days?
     A. She did.
          MS. BRONSON: Object to form.
     Q. (BY MR. TONDRE) One of the things I think I heard in responses with respect to -- is that tests were negative for botulism. Did I hear that wrong?
     A. You did not.
     Q. How do you know whether -- what test is there for botulism?
     A. You can -- the test for the toxin -- I'm not really well versed on the intricacies of what tests are available. I, after speaking with Dr. Heckendorf, Dr. Gehring, and Dr. Toppin, it was the consensus that the test is not particularly useful because horses are so exquisitely sensitive to the toxin that they can be fatally effected by nearly undetectable levels.
     Q. So the test is by no means absolute, correct?

Page 206

1  A. That's correct.
2  Q. So you can't say that it's negative;
3  you can just say that it's not positive, right?
4  A. That would be for the lab to answer.
5  Q. In any event, it's not 100 percent
6  sure; is that correct?
7  A. Not in my mind.
8  Q. If I wanted to ask somebody from a lab
9  how reliable this test is, who would you suggest I
10 talk to?
11    A. The botulinum toxin laboratory that CSU
12 sent the samples to.
13    Q. Okay. One word I haven't heard
14 mentioned today is malabsorption. What is that?
15    A. Malabsorption is a disorder where
16 nutrients are present in the digestive tract, but due
17 to disease, damage, other problems, the gut is not
18 able to take up the nutrients in the ingesta.
19    Q. Is malabsorption a potential result of
20 ingestion of toxins?
21       MS. BRONSON: Object to form.
22    A. There are -- there are toxins that
23 through a variety of actions on the gut will result
24 in nutrients not being absorbed.
25    Q. (BY MR. TONDRE) What's the difference

Page 207

1  between starvation and malnutrition?
2       MR. LEBSACK: Objection to the form.
3       MS. BRONSON: Asked and answered.
4    A. Starvation has negative connotations
5  that nutrition is being denied; the animal is not
6  being given food. Malnutrition can result from
7  improper food or an inability to utilize the food.
8    Q. (BY MR. TONDRE) What was your
9  impression of the feeding program when you analyzed
10 the horses on February 20, 2012.
11      MR. LEBSACK: Objection to the form.
12      MS. BRONSON: Join.
13   A. What I observed --
14   Q. (BY MR. TONDRE) Yes, ma'am.
15   A. -- when I did that exam is that the
16 horses were being given unfettered access to
17 free-choice hay of good quality, and I was satisfied
18 that that was an acceptable feeding program at the
19 time. That was a good transition program for them.
20   Q. Do you know what the feeding program
21 was at Echo Valley Ranch on February 15, 2012?
22   A. Roughly. I don't know specifics.
23   Q. What do you understand -- and what is
24 the basis of your knowledge?
25   A. I was told by Mr. Swift that horses --

Page 208

1  these horses had been brought in separated from the
2  herd because they had been noticed to have lost
3  weight; that they had been given extra feed in the
4  manner of hay and concentrates like grain.
5    Q. Was that appropriate?
6    A. It wasn't inappropriate. It was a good
7  place to start.
8    Q. If a horse has ingested toxins, how
9  long does it take those toxins generally to clear the
10 system?
11      MS. BRONSON: Object to form,
12 foundation.
13   A. Depends on the toxin.
14   Q. (BY MR. TONDRE) Is there a range of
15 expectations.
16   A. It's extremely variable.
17   Q. Is there any medication you can give to
18 treat toxins?
19   A. Depends on the toxin.
20   Q. Will they ultimately clear?
21   A. Depends on the toxin. Some will. Some
22 won't.
23   Q. You mentioned Anthony P. Knight and his
24 book on weeds.
25   A. Yes.

Page 209

1    Q. Did I understand you to say you talked
2  to him?
3    A. Yes.
4    Q. Well --
5    A. Well, I should clarify the "we." The
6  practice talked to him. I believe it was actually
7  Dr. Burton personally who spoke to him.
8    Q. Do you know -- do you have an
9  understanding as to what they discussed, or should I
10 defer that question to Dr. Burton?
11   A. She did relate to me their
12 conversation, but perhaps it would be best if you
13 asked her directly.
14   Q. Well, since we are not going to talk to
15 her today, tell me generally what you recall.
16   A. We inquired as to whether he had any
17 idea what toxins might be at play. He suggested
18 sage. He agreed with us that hoary alyssum was not a
19 good fit. He suggested that we go out and walk the
20 pasture and look for what's out there, but that if --
21 if whatever toxic weed was in the hay, that it was
22 long gone and we would never find it.
23   Q. So if, for example, bracken fern was in
24 the hay, it wouldn't lose its potency because it is
25 no longer growing?

Page 210

1 A. It does not lose its potency when it's
2 dried.
3 Q. Maybe you answered this and I just
4 don't remember. Do you have any knowledge of any
5 testing that was done on the hay at --
6 A. I don't.
7 Q. You said that the horses might have
8 benefitted if you had been called earlier. How much
9 earlier?
10 A. I don't know that I could give a time
11 frame. But I think it would have been prudent once
12 horses started to drop below a body condition score
13 of three that that probably should have been a red
14 flag.
15 Q. And what would you have recommended?
16 A. I don't know.
17 Q. And you don't know when they started
18 dropping their weight?
19 A. No.
20 Q. So you really can't comment on that,
21 can you?
22 MR. LEBSACK: Objection to the form.
23 A. No.
24 Q. (BY MR. TONDRE) Is it professionally
25 reasonable to -- or let me rephrase it.

Page 211

1 In your opinion, would it have been
2 professionally reasonable to, without doing any
3 testing or creating differential diagnosis, to reach
4 the conclusion that the cause of the condition was
5 starvation?
6 MR. LEBSACK: Objection to the form.
7 MS. BRONSON: Object to form.
8 A. I -- I would have trouble answering the
9 question in that form.
10 Q. (BY MR. TONDRE) Okay. Well, let me ask
11 it this way: Confronted with six horses that had
12 diminished body weight, is it professionally
13 reasonable to reach a conclusion without considering
14 all the possibilities for the condition?
15 MR. LEBSACK: Objection to the form.
16 MS. BRONSON: Object to form.
17 A. No. You have a duty to the horses to
18 establish that there is not a medical reason for
19 their weight loss.
20 Q. (BY MR. TONDRE) Now, I have here an
21 email which you sent to Officer Hardey. It's Park
22 City -- or Park County defendants document
23 No. 000300.
24 MR. LEBSACK: What is the date of it?
25 MR. TONDRE: Dated February 16, 2012.

Page 212

1 MR. LEBSACK: It's Exhibit 6.
2 MR. TONDRE: Oh, thank you.
3 Q. (BY MR. TONDRE) This email is based
4 upon your visit to the farm on -- what was it,
5 January something or other?
6 A. February 11, 2012.
7 Q. February 11, five days before the visit
8 by Dr. Olds and Dawn Smith?
9 A. Yes.
10 MS. BRONSON: Object to form.
11 Q. (BY MR. TONDRE) And you had the
12 opportunity to evaluate the horse at that point in
13 time, correct?
14 A. The horse we evaluated was not one of
15 the six that was later removed.
16 Q. I understand. But in your analysis of
17 that horse, you came to a differential diagnosis,
18 correct?
19 MS. EDWARDS: Object. Privileged.
20 A. Yeah. I'm afraid --
21 MR. TONDRE: It's not privileged
22 anymore.
23 MS. EDWARDS: I'll instruct you not to
24 to answer.
25 Q. (BY MR. TONDRE) Get Exhibit 6 before

Page 213

1 you.
2 A. I have it.
3 Q. Did you write that?
4 A. Yes.
5 Q. And you sent it to Cindy Hardey?
6 A. Yes.
7 Q. And at Cindy Hardey's request?
8 A. Yes.
9 Q. And you sent it on the day of the visit
10 to -- the date that Dr. Olds visited?
11 A. That's the date on the exhibit.
12 Q. All right. You state in this email,
13 "Horses are exquisitely sensitive to botulism or --
14 MS. EDWARDS: I wish I had a copy of
15 it.
16 MR. SCHIMBERG: Here.
17 Q. (BY MR. TONDRE) -- "making it all but
18 impossible to definitely confirm due to low levels of
19 toxin in the blood and GI contents. The only
20 treatment for botulism is nursing care, time, and
21 hope."
22 What did you base that statement on?
23 MR. LEBSACK: Well, I'm going to wonder
24 why I wanted to ask about this, but I couldn't.
25 MS. EDWARDS: No. Absolutely. No. I

Page 218

1 foundation.
2  A. Widely accepted as a neurologic sign.
3 There are other conditions that can produce quivering
4 and trembling. That's certainly not exclusive.
5  Q. (BY MR. TONDRE) Did you think that
6 drawing blood from the six horses was an important
7 diagnostic thing to do?
8  A. For botulinum testing?
9  Q. For anything, just to diagnose the
10 condition that the horses were in.
11  A. I think that the complete blood count
12 and the chemistry panels were useful. I did not
13 think that the botulinum testing was useful at all.
14  Q. You were in no hurry to jump to a
15 conclusion regarding the six horses, were you?
16  A. I try never to rush to a conclusion,
17 but in that case, I could not even if I wanted to.
18 My experience told me that the signs that I was
19 seeing in some of those horses could not be explained
20 simply by inadequate food intake.
21  Q. You believed that at that juncture the
22 case of those six horses was at a fork in the road,
23 correct?
24   MR. LEBSACK: Objection to form.
25   MS. EDWARDS: Objection.

Page 219

1  A. I'm not sure...
2  Q. (BY MR. TONDRE) You believed that those
3 six horses needed to have further diagnostic testing
4 before reaching a conclusion, correct?
5  A. I believe further investigation was
6 needed.
7  Q. Is it your practice to do visual body
8 scoring?
9  A. That is part of how we body score a
10 horse.
11  Q. Just part?
12  A. It depends on whether they have a
13 winter coat or not.
14  Q. You said you received a call from
15 Mr. Swift in which he informed you that Bear was
16 having difficulty rising?
17  A. Yes.
18  Q. Do you recall approximately when that
19 was?
20  A. That was in the fall that preceded
21 February of 2012, so the fall of 2011.
22  Q. Can you pinpoint it any better than
23 that?
24  A. I'm afraid I can't.
25  Q. What was the weather like?

Page 220

1  A. It was clear, bright, sunny day.
2  Q. What was that winter like?
3  A. I don't recall.
4  Q. Did you get any information from
5 Mr. Swift other than that Bear was having difficulty
6 rising?
7  A. No.
8  Q. Was it at that point you said you
9 wouldn't provide any services because you hadn't been
10 paid by Routt County?
11  A. No. No. At first he did not identify
12 the horse as Bear. But later in the conversation, it
13 came up, and we did not refuse treatment. I believe
14 I said something to the effect that he needs to be
15 seen by someone, and it was not requested of us that
16 we come examine him.
17  Q. Look at Exhibit No. 12. You say in the
18 one, two, three -- fifth paragraph, "We have worked
19 with many animal control offices in many states, and
20 we have never experienced such lack of
21 professionalism. It is a disappointment that your
22 office is willing to sacrifice what could be a solid
23 working relationship that could benefit not just the
24 Hatlee horses but others as well."
25   How many different jurisdictions have

Page 221

1 you worked with regarding animal control?
2  A. I have been licensed in good standing
3 in three states: California, Oregon, and Colorado.
4 In California, I worked with Stanislaus County Animal
5 Control and Lassen County Animal Control. In Oregon,
6 I worked primarily with Deschutes County Animal
7 Control, and in Colorado, I have worked primarily
8 with Jefferson County Animal Control.
9  Q. And what is it about the animal control
10 in Routt County that caused you to say it lacked
11 professionalism?
12  A. They reneged on their commitment to us.
13  Q. You think that placed the horses in
14 danger?
15  A. Well --
16   MS. BRONSON: Object to form.
17  A. -- I think it means that we are
18 unwilling to work with them in the future. They also
19 failed to respond to any of our communications
20 regarding that.
21  Q. (BY MR. TONDRE) Is it any excuse that
22 Dawn Smith was on medical leave?
23  A. No. She should have made some other
24 officer aware of her caseload, and somebody should
25 have been picking up the slack.

Case 1:13-cv-02469-RM-MJW   Document 92-2   Filed 01/26/15   USDC Colorado   Page 9 of 9

ALLYSON HORTON, DVM Vol. II           June 04, 2014
HATLEE vs. HARDEY                         300–303

Page 300

1  make sure that she continued to eat and drink,
2  defecate, and urinate.
3      Q   Did that appear to be done between the
4  11th and the 13th?
5      A   Absolutely.
6      Q   How would you characterize the care that
7  was provided to Maggie by these owners?
8      A   Heroic.  The effort that was put into
9  caring for her was extraordinary.
10          MR. TONDRE:  That's all I have.  Thank
11 you, Doctor.
12              FURTHER EXAMINATION
13 BY MR. LEBSACK:
14     Q   I just have a few questions.  I think you
15 said that these decubital -- is that how you pronounce
16 it?
17     A   Yes.
18     Q   -- these decubital ulcers that you see on
19 the photos on Exhibit 18 --
20     A   Uh-huh.
21     Q   -- they are worse than when you saw
22 Maggie on the 13th; is that right?
23     A   They -- they seem a little more
24 extensive, yes.
25     Q   Extensive in --

Page 301

1      A   Area.
2      Q   -- in area.  They're still in the same
3  places --
4      A   Still in the same places.
5      Q   -- as they were but now they're bigger,
6  correct?
7      A   Correct.
8      Q   Were there any decubital ulcers that you
9  see on these photos in areas that you did not see them
10 when you were there on the 13th?
11     A   I did not note.  But they are in
12 locations that I would expect for them to occur.
13     Q   But they're -- in the course of three
14 days, they got somewhat bigger?
15     A   Correct.
16     Q   Are these the same thing as what we call
17 bed sores in humans?
18     A   Pretty much.
19     Q   Are they developed the same way as humans
20 get bed sores?
21     A   In her case, partially.  They're not
22 strictly from pressure.  What you see and the reason
23 that these became more extensive over those few days is
24 she began to try to move.  She was rubbing on the
25 floor, the bedding, the padding; decubital ulcers in

Page 302

1  people are typically pressure sores because people
2  cannot move and gradually circulation decreases to
3  those areas and the wounds can be very, very deep and
4  very severe.
5          These aren't -- and these are not even
6  truly ulcers, these are what are technically known as
7  erosions, they're only -- except in very small areas,
8  only the very superficial layers of skin have been
9  affected.  The epidermis rather than the dermis.
10     Q   When Ms. Bronson was asking you
11 questions, she asked you about euthanasia, and she
12 asked you about a discussion on the 11th?
13     A   Uh-huh.
14     Q   Was there any discussion of euthanasia
15 after that with Maggie?
16     A   Yes.
17     Q   When was that?
18     A   I don't recall the date, but I believe it
19 happened in person, so I would assume it was on the
20 13th.  Helen approached me in private and said that,
21 you know, and asked me should she put this horse down;
22 and I told her no and that if she wanted to do that she
23 would have to call someone else because I wouldn't do
24 it.
25     Q   And what was the reason that you said

Page 303

1  that?
2      A   Because we did not know why this horse --
3  what condition we are dealing with.  She seemed to be
4  improving.  And I thought depriving -- depriving her of
5  her life at that point was simply wrong.
6      Q   Any other conversations about euthanizing
7  Maggie that you can recall?
8      A   Not offhand.
9      Q   When Ms. Bronson was asking you
10 questions, you read from part of the necropsy report;
11 and I'd like you to refer to that same paragraph and
12 you read the sections about the -- the alopecia?
13     A   Yes.
14     Q   And then you started to read the sentence
15 that says, "Throughout the gastrointestinal tract --
16     A   Yes.
17     Q   -- there is only minimal ingesta --
18     A   Yes.
19     Q   -- with the most content being present
20 within the distal cecum."
21     A   Yes.
22     Q   That means that there was only minimal
23 food in the digestive tract?
24     A   Correct.  She did not have a lot of what
25 we would call gut fill.

