# EXHIBIT 44

DISTRICT & COUNTY COURT, COUNTY OF PARK,
STATE OF COLORADO

CASE NO. 2012 M 000043, DIV. A
CASE NO. 2012 M 000044, DIV. A

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

 Plaintiff,

v.

RANDALL J. HATLEE, and RONALD L. SWIFT,

 Defendants.

---

 The above-entitled matter came on for hearing on Monday, December 3, 2012 at 9:56 a.m. before the HONORABLE BRIAN LOUIS GREEN, County Judge.


APPEARANCES:

| | |
|---|---|
| FOR THE PLAINTIFF: | THOMAS K. LEDOUX |
| FOR THE DEFENDANT: | DARRELL LEE CAMPBELL |
| ALSO PRESENT: | RANDALL J. HATLEE<br>RONALD L. SWIFT<br>CINDY HARDY |

1  of Dr. Britt's opinion about what should be done with
2  the horses at this point?
3      A.  I remember my conversation with Britt after
4  the state notice of warning.
5      Q.  Let me ask you, with Dr. Anderson, you were
6  aware that she was indicating that under the
7  circumstances, instead of seizing the horses at this
8  point, she recommended that they actually stay with the
9  owners, didn't she?
10     A.  Yes.
11     Q.  She recommended that they stay and maintain
12 supervision by their own veterinarian.
13     A.  Yes.
14     Q.  ANd she was in agreement with the idea that
15 there should be -- that 30 days was acceptable.
16     A.  Yes.
17     Q.  And she understood at that point that you
18 folks were agreeing to allow these -- the defendants to
19 care for their animals for 30 days and if they gained
20 weight, you weren't going to charge them; is that
21 correct?
22     A.  Yes.
23     Q.  And Dr. Anderson thought it was a good idea?
24     A.  Yes.
25     Q.  Because the main issue was, you were trying

AGREN BLANDO COURT REPORTING & VIDEO INC

58

1    A.    No.

2    Q.    So at that point is it fair to assume that
3   you believe the animals were in the same condition they
4   were on the 16th?

5    A.    Yes.

6    Q.    And you saw them on the 19th; is that
7   correct?

8    A.    Yes.

9    Q.    And you didn't do any type of body condition
10  scoring at that point?

11   A.    No.

12   Q.    All right. And to your recollection, then,
13  the horses seemed to -- appeared to be in the same
14  condition?

15   A.    Yes.

16   Q.    The purpose of the protective custody was to,
17  in your view, the horses needed more specialized care
18  than they were being provided with the defendants?

19   A.    No.

20   Q.    Why did you think they had to go into
21  protective custody?

22   A.    Because the owners were getting threats.
23  There were people calling our Sheriff's Office
24  threatening to do things to them on their property, so
25  I felt it was best for the owners and the horses to

Court Reporting Videography Digital Reporting Transcription Scanning Copying
Denver (303) 296-0017 Boulder (303) 443-0433 Colorado Springs (719) 635-8328 Greeley (970) 356-3306

1   move into protective custody.
2       Q.   Did you discuss any other options available
3   to protect the owners, such as a detail or anything to
4   protect their property from the public?
5       A.   No.
6       Q.   You said this was -- this agreement included
7   Kirsten Leboux who owned this place where the horses
8   were transported. Before selecting Leboux, did you try
9   to -- isn't it correct that there was an attempt to
10  place the horses in Pueblo?
11      A.   I don't know if it was in Pueblo, but there
12  was another facility, yes.
13      Q.   It was an out of town rescue facility --
14      A.   Correct.
15      Q.   -- though, correct?  And isn't it correct
16  that when you -- did you make the call down there to
17  find out?
18      A.   I did.
19      Q.   You did, and isn't it correct that rescue
20  facility didn't want to take the horses?
21      A.   They had something going on with all their
22  horses. They did not have room at the time, but if I
23  needed to bring the horses down there, they would find
24  somewhere to quarantine them.
25      Q.   Okay.  And that's what I wanted to say.  They

AGREN BLANDO COURT REPORTING & VIDEO INC

60

1  didn't want to put these horses with the general
2  population with their horses -- other horses that were
3  already in the rescue system; is that right?
4      A.  Well they had -- I don't remember what
5  disease going on with their horses.  They did not want
6  to get Swift and Hatlees horses sick, so they were not
7  willing to take in horses.
8      Q.  So the Pueblo rescue was not -- or the other
9  rescue was not concerned about the defendant's horses
10 being in need of quarantine?
11     A.  Well, what I mean by quarantine, I meant the
12 horses that -- this other facility had something going
13 on with their horses and they did not want to get Swift
14 and Hatlees horses sick, so they were just going to
15 quarantine them somewhere else if we needed them to
16 take them.
17     Q.  In your discussions with the defendants,
18 either on the 16th or the 19th, did they tell you that
19 they believed the horses were sick?
20     A.  Yes.
21     Q.  And, in fact, you didn't have any evidence to
22 the contrary that they weren't sick at this point.  You
23 didn't have any test results.
24     A.  Correct.
25     Q.  In your experience, you're an animal control

1  officer, if horses are suspected of being sick and have
2  an infectious disease, what are you supposed to do?
3      A.   Call the vet.
4      Q.   And what do vets do at that point?
5      A.   They take blood work.
6      Q.   If they're infectious, are they required to
7  be in quarantine?
8      A.   Yes.
9      Q.   And, in fact, in this case, in protective --
10 the defendants in this case had the animals away from
11 all the other horses on the ranch, didn't they?
12     A.   Yes.
13     Q.   And that was the situation you found on
14 February 16th too; is that right?  They were up in the
15 barns.
16     A.   Well, they had -- they weren't away from
17 all -- there was other horses up there with them, yes.
18     Q.   But they had all the pasture horses remain in
19 the pasture.
20     A.   Some of the pasture horses were in pasture,
21 yes.
22     Q.   And you saw some 20 horses and you didn't
23 find anything wrong with those horses.
24     A.   Correct.
25     Q.   So, in fact, the defendants were taking the

1  appropriate action to keep what they believed were sick
2  horses away from the other general population of the
3  horses, weren't they?
4      A.   Yes.
5      Q.   But you felt they needed to put them even
6  further away.
7      A.   For protective custody.
8      Q.   And this was to protect the defendants --
9      A.   Yes.
10     Q.   -- from the public.
11     A.   And their horses.
12     Q.   Did you think that you could provide better
13 care if they were in protective custody?
14     A.   I don't think I was looking for care of the
15 horses.  I was just trying to remove the horses from
16 the property and to protect them and the owners.
17     Q.   Now, if you look at Exhibit G.  You indicated
18 in this agreement -- now, let me ask you first:  Did
19 you consider Exhibit G a legal binding agreement?
20     A.   Yes.
21     Q.   And one of the parties to that was the Park
22 County Sheriff; is that correct?
23     A.   Yes.
24     Q.   And you -- at least it's your understanding
25 you had the approval of the Sheriff's Office, because

1    your superior approved this; is that right?

2        A.   Yes.

3        Q.   In fact, Sergeant Priestly prepared Exhibit
4    G?

5        A.   Yes.

6        Q.   Let's look at the third -- the last written
7    paragraph.  Isn't it correct that you included language
8    in that protective agreement talking about test results
9    that you were expecting on the Drone mare that had
10   passed?

11       A.   Yes.

12       Q.   And this was a Drone mare that -- Maggie, I
13   think they call it -- that was down when you saw the
14   horses on the 16th.

15       A.   Yes.

16       Q.   And at that point, you saw that that Drone
17   mare was emaciated, in your opinion, too; is that
18   correct?

19       A.   Yes.

20       Q.   And you understood that she hadn't been
21   eating.

22       A.   Correct.

23       Q.   And the six horses that you were seizing,
24   also, in your opinion, weren't eating.  Or you had been
25   told that by the owners; is that right?

1      A.   Yes.

2      Q.   That they had been feeding them and they
3  couldn't get the young -- the six horses to eat to keep
4  weight on.

5      A.   Yes.

6      Q.   And when you went in there on the 16th you
7  saw hay, you saw food, and you saw water in the pens
8  where they were maintained; is that right?

9      A.   Yes.

10     Q.   So let me ask you:  Now, if we look back to
11 Exhibit G, you're talking about -- you indicate that if
12 test results from the necropsy on the Drone mare
13 indicates starvation was a factor in the mare's death
14 chart, charges may be filed against the horse owners
15 and "at risk" horses may be impounded at a later date
16 if no other contributing factors are present other than
17 neglect.  That was the agreement you had with the
18 defendants; is that right?

19     A.   Yes.

20     Q.   Is there anything in your agreement that
21 talks about that they no longer would have the 30 days
22 to put weight on their horses?

23     A.   No.

24     Q.   Did you discuss with them the fact that that
25 30-day warning was no longer applicable?

65

1   A.   No.

2   Q.   Did you think the 30-day warning was still
3   applicable?

4   A.   Yes.

5   Q.   So you thought that they would have the right
6   to put weight on the horses for the next 30 days?

7   A.   Yeah.

8   Q.   And this was just part of it.

9   A.   Yes.

10  Q.   Under your agreement, isn't it correct that
11  you agreed that you would not -- that they would be
12  charged with the "at risk" horses may be impounded if
13  there were tests that came back that showed that
14  starvation was what caused the -- neglect and
15  starvation caused the condition; is that right?

16  A.   Yes.

17  Q.   You didn't receive any tests -- you didn't
18  have any tests at that point that indicated starvation
19  is what caused it, did you?  You didn't have any blood
20  tests that said that?

21  A.   No.

22  Q.   Did you intend to follow this -- when you
23  signed on behalf of the Sheriff's Department, was your
24  intention to follow the terms of this agreement?

25  A.   Yes.

1   were not evident to her?

2   A.   I'm not aware of that, no.

3   Q.   And she made -- and then it also went on in
4   her report, she said she -- "she" meaning Dr. Horton --
5   never saw them at all when she was out there on the
6   11th of February.  Well, let me just ask you:  When she
7   gave you that opinion, did she give you any facts to
8   indicate that she knew when the horses were brought in?

9   A.   No.

10  Q.   Did you ask her when she knew -- what
11  information she had about the horses being brought in?

12  A.   No.

13  Q.   Did you -- at the time you listened to her
14  opinion and made the decision to seize these horses,
15  were you aware of when she was -- what information she
16  had to indicate that the defendants were aware of the
17  horses losing weight and they didn't bring them in in
18  time?

19  A.   No.

20  Q.   So at this point, when you signed the
21  affidavit, you had no idea when the defendants had
22  recognized that the horses were losing weight.

23  A.   No.

24  Q.   And so when Dr. Horton said they should have
25  recognized it and they didn't, you had no time frame

1   there. You didn't know how many weeks they'd been
2   brought in or if it was just a few days before the
3   notice of warning, do you?
4   　　A.　No.
5   　　Q.　And, in fact, isn't it true that in your
6   conversations with the defendants, Mr. Swift had told
7   you that as soon as he noticed they were losing weight,
8   he brought them in?
9   　　A.　Yes.
10  　　　　MR. LEDOUX: Objection, Your Honor.
11  Again, I don't understand the relevance of this line
12  of questioning. I don't think it goes to any of the
13  issues -- it's not relevant. I think we're talking
14  about the affidavit at this point. It's not relevant
15  to an omission that I'm aware of yet from the
16  affidavit.
17  　　　　THE COURT: I'm going to overrule. The
18  knowledge possessed by the officer at the time the
19  affidavit was submitted is relevant to whether that
20  information should have been presented to the reviewing
21  judge. Go ahead, Mr. Campbell.
22  　　Q.　(By Mr. Campbell) So and he -- the defendant
23  told you he brought them in immediately when he saw
24  they were losing weight.
25  　　A.　Yes.

1  correct that when you advised the Court about what
2  Dr. Horton had told you, you said that she said she
3  believes --
4       A.   Yes.
5       Q.   Did you take that as a diagnosis?
6       A.   No, I took it as her opinion.
7       Q.   Okay. And then you also said that -- when
8  you say "I believe if Swift had noticed the horses
9  condition sooner, he would have been -- they wouldn't
10 be in the condition today." That's how you concluded
11 your affidavit, isn't it?
12      A.   Yes.
13      Q.   So you have a belief, but you have no idea
14 how long -- when the horses were brought in and whether
15 they were brought in -- what time span occurred between
16 when they were noticed to be losing weight and when
17 they were brought in, do you?
18      A.   Correct.
19      Q.   And you didn't mention that in your
20 affidavit, did you?
21      A.   No.
22      Q.   Nor did you mention the fact that the blood
23 test showing anemia could be a result of any other
24 factors that would cause malnutrition other than the
25 owners not feeding the horses; is that right?

1    A.    Correct.

2    Q.    When you submitted this affidavit, you were
3  aware that there were no tests, blood tests or anything
4  that would substantiate the emaciated conditions of the
5  horses and that's caused by starvation; is that right?

6    A.    Correct.

7    Q.    And the opinion -- I just want to clarify --
8  when you went to the Court on the 22nd, your key fact
9  was Dr. Horton's statement, wasn't it?

10    A.    Yes.

11    Q.    And when you said "neglect" it was because
12  they didn't bring the horses in soon enough.

13    A.    Correct.

14    Q.    If you would look at Exhibit K.

15    MR. CAMPBELL:  And for the record, Your
16  Honor, this is in the Court file already.  It's the
17  summons and complaint issue.

18    Q.    This is one for let's see, Ron Swift; is that
19  correct?

20    A.    Correct.

21    MR. CAMPBELL:  And it's already in the
22  record, but I'd ask for the admission of -- move for
23  the admission of Defendant's Exhibit K, which is the
24  summons and complaint. The original one that's already
25  signed.