EXHIBIT  15

FRED WEGENER - JULY 24, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
and RONALD L. SWIFT,

Plaintiffs,

 COPY

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
and ASHLEIGH OLDS,

Defendants.

------------------------------------------------------------
DEPOSITION OF FRED WEGENER
July 24, 2014
------------------------------------------------------------

Deposition location:
9998 Havekost Road
Conifer, Colorado  80433

APPEARANCES:

Brice A. Tondre, Esq.
BRICE A. TONDRE, P.C.
215 South Wadsworth Boulevard, #500
Lakewood, Colorado  80226

For the Plaintiffs.

John Lebsack, Esq.
WHITE and STEELE, P.C.
Dominion Towers
600 17th Street, Suite 600N
Denver, Colorado  80202

For the Defendant, Olds.



# AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

FRED WEGENER - JULY 24, 2014

Page 6

1    Q   When did you become post certified?
2    A   1988.
3    Q   Now directing your attention to the year
4  2012, what was -- what were involved with your duties
5  as sheriff?
6    A   Keep the peace, run the jail, I was
7  also -- I'm also the -- by default, the fire marshal
8  for any unincorporated area of the county not covered
9  by fire protection district, civil service, law
10  enforcement. That's pretty much it probably.
11    Q   Whom did you supervise?
12    A   The undersheriff.
13    Q   Anyone else?
14    A   No.
15    Q   Who was in charge of training at Park
16  County in 2012?
17    A   Training, just training in general or --
18    Q   Well, let me -- let me -- yeah, it's a
19  broad question.
20        What sort of training does the
21  sheriff's -- did the sheriff's office provide to its
22  employees during the year 2011, 2012, that area?
23    A   Oh. Well, they get -- you know,
24  firearms, they get arrest control, they get
25  Intoxilyzer, I think I had Tasers at 2012, so they

Page 7

1  would have gotten Taser, those that want to be
2  certified. They get any legal updates from the
3  district attorney's office, they'll come in and do
4  that, and I think that was in 2012, they did a class,
5  it was '11 or '12.
6        Then they get whatever specialized
7  training they'll get through their sergeants, they may
8  apply for -- oh, if they are going to an armor school
9  or they're going to go to a -- nonlethal shotgun course
10  or weapon course or baton school or something like
11  that, they may apply and they may do that, but that
12  would be out of county.
13    Q   Is the training provided to animal
14  control officers different than the training provided
15  to other deputies?
16    A   Yes. The deputies probably only get --
17  you know, they'll get, you know, your criminal code
18  and -- and that sort of training. The code enforcement
19  officers get that; but then they also go to the state,
20  they become animal protection agents; so they'll get
21  training there, and they will get specialized training
22  through their supervisor. Sergeant Priestly, she has
23  been through various courses. So they'll get training
24  through her. So --
25        But they'll still get the arrest control

Page 8

1  and the firearms through the department.
2    Q   Now, was Cindy Hardey in 2011 and 2012 an
3  employee of the sheriff's office?
4    A   Yes.
5    Q   Who was responsible for training her in
6  the preparation of search warrant affidavits?
7    A   Her supervisor would have covered that
8  during her FTO.
9    Q   And that would be Sergeant Priestly?
10    A   Correct.
11    Q   Does -- did the sheriff's office in 2012
12  have an internal affairs section?
13    A   Yes.
14    Q   And who was involved in that?
15    A   It would -- well, it depends on what
16  subdivision the complaint is out of. So it's like --
17  I'll have either Captain Bonnelycke or Captain Muldoon
18  will take care of those -- like I said, depending upon
19  what division they come from.
20    Q   Who would be responsible for conducting
21  an internal affairs investigation of an animal control
22  officer?
23    A   It would either have been Captain Muldoon
24  or Captain Bonnelycke.
25    Q   All right. And what precipitates an

Page 9

1  investigation by internal affairs?
2    A   Some sort of complaint about a violation
3  of policy.
4    Q   What was your involvement during the
5  months of February and March of 2012 in the
6  investigation leading up to the seizure of horses from
7  Mr. Hatlee and Mr. Swift?
8    A   Probably minimal. I got the -- Sheriff
9  Wiggins sent me the email about an issue regarding some
10  horses that were being kept out at Echo Valley Ranch.
11  And so I just directed Bobbi to look into it, whatever
12  help they needed.
13    Q   Do you remember any other involvement?
14    A   I remember we had some issues with the
15  folks that were getting a little excited about us
16  making sure we're doing a proper investigation. So the
17  undersheriff took care of doing media releases and
18  whatnot, trying to work on appeasing those folks.
19    Q   What's the policy or what was the policy
20  in 2012 in the Park County office in -- regarding any
21  disclosure of investigative materials to third parties?
22    A   When they do their press release --
23  especially if there's an active investigation going on,
24  they are supposed to run that by the DA's office so we
25  don't run into issues of something's disclosed that's

FRED WEGENER - JULY 24, 2014

**Page 10**

1  going to be used in preparation for prosecution.
2  Q  Now, when do you first recall -- well,
3  let me -- do you recall there being a concern for the
4  safety of the horses of Mr. Hatlee and Mr. Swift at
5  some point in the investigation?
6  A  Concern for the safety of the horses?
7  Yeah, and I'm trying to remember; it had something to
8  do with a threat that somebody had made. So they were
9  a little worried about that. I'm trying to remember,
10  it was an email that they had got from somebody.
11  But the tone of it was such that it -- I
12  guess, that it raised folks' concern about somebody
13  doing something stupid.
14  Q  Did you become aware that the horses were
15  moved because of the fear of criminal conduct from some
16  of these so-called concerned citizens?
17  A  Yeah, that's correct.
18  Q  What investigation was made into the
19  threats that were being made?
20  A  I think they -- well, I think they took
21  precautions just to make sure that it doesn't -- that
22  it didn't materialize.
23  Q  Well, isn't it a crime to threaten bodily
24  harm or injury to property?
25  A  Well, if -- yes, it would be menacing,

**Page 11**

1  correct.
2  Q  What investigation was made into making a
3  case of menacing against the threatening, concerned
4  citizens?
5  A  You know, I -- I don't know. I mean I
6  don't know if it ever rose to the level that they could
7  actually get a case to the DA. That's about all I
8  could say about that.
9  Q  Are you aware that -- that one of your
10  deputies did recommend prosecution?
11  A  Yeah, if there was something to
12  prosecute, I'm sure he could have, yes.
13  Q  All right.
14  A  But do I have personal knowledge? No, I
15  don't remember if they did that, no.
16  Q  All right. Now during 2012, was there
17  any sort of controversy between your office and the
18  district attorney's office?
19  MR. SCHIMBERG: Object to form. Go
20  ahead.
21  A  I'm trying to remember, that was after
22  the election, there was -- yeah, there probably was. I
23  had sent a letter to the DA trying to -- I don't know,
24  offer him an olive branch of peace after the election
25  was over because we had supported another candidate in

**Page 12**

1  the election. He won, so it's pretty much all over,
2  so...
3  Q  (BY MR. TONDRE) Wasn't there public
4  accusations by you or someone in your office that the
5  DA was not adequately prosecuting cases that your
6  department made?
7  A  Well, I think there was -- yeah, there
8  were accusations made that we had seen a lot of cases
9  that we couldn't figure out why they didn't -- or at
10  least an attempt to prosecute them. But that's all you
11  can do.
12  Q  Who was making those accusations?
13  MR. SCHIMBERG: Object to form. Go
14  ahead.
15  A  Well, I think the undersheriff had made
16  some accusations to -- from -- from our office.
17  Q  (BY MR. TONDRE) How about you?
18  A  No. I -- I wouldn't make them in the
19  public, I'd just call him up and ask him.
20  Q  Did you privately complain to the
21  district attorney's office?
22  A  Yes.
23  Q  Do you recall approximately when that
24  was?
25  A  2012. I couldn't give you -- I don't

**Page 13**

1  know exactly when.
2  Q  2012 was an election year for the
3  district attorney, correct?
4  A  Correct.
5  Q  And the election would have been in
6  November 2012, right?
7  A  Yes. Correct.
8  Q  So the accusations, if you want to call
9  them that, were occurring in the year 2012, correct?
10  A  Correct.
11  Q  Had they been occurring before that?
12  A  Yes.
13  Q  And did this dissatisfaction by the
14  sheriff's office reach the public media?
15  A  Well, in our community, probably.
16  Q  Were you involved in any respect in the
17  decision to seize the horses?
18  A  No. Huh-uh. Not to -- not to seize
19  them. I usually leave all the animal control stuff to
20  that division there. They're very good at what they
21  do.
22  Q  So that would be left to Sergeant
23  Priestly?
24  A  Sergeant Priestly and her supervisors,
25  uh-huh.

FRED WEGENER - JULY 24, 2014

Page 30

1  would anyone had been included in the discussion other
2  than Ms. Hardey and Captain Bonnelycke?
3       **A   He could have brought her supervisor in**
4  **or he could have talked to her directly.**
5       Q  Do you have any sort of regular periodic
6  meetings in your -- in your office in which the overall
7  operation of the sheriff's department is -- is
8  discussed?
9       **A   Back in 2012, I think we would have had**
10  **probably monthly staff meetings.**
11       Q  Who would that include?
12       **A   Anybody from the rank of sergeant on up.**
13       Q  Are there written minutes kept of those
14  meetings?
15       **A   No.**
16       Q  Are they recorded in any fashion?
17       **A   No.**
18       Q  What -- what subjects are discussed
19  generally?
20       **A   The day-to-day operations of the**
21  **sheriff's office.**
22       Q  If the undersheriff was concerned about
23  the safety of Mr. Swift, Mr. Hatlee, and their horses,
24  would that be a subject as a result of, quote, you would
25  concerned citizens?  Would that be a subject you would

Page 31

1  expect to be discussed at the monthly staff meetings?
2       **A   No.**
3       Q  Why not?
4       **A   Because that would be something that if**
5  **it was going on, would -- they would come right to me**
6  **on, wouldn't wait for me to --**
7       Q  Did they come to you and say we're
8  concerned about the safety of Mr. Hatlee -- Mr. Hardey
9  (sic), Mr. Swift, and their horses?
10       **A   Boy -- I'm sorry.  Were they concerned**
11  **about the horses and something getting at the horses,**
12  **yes, they did come to me about that.**
13       Q  All right.  And what was your solution?
14       **A   They were going to move the horses.**
15       Q  Why not just arrest the people that
16  are -- who were menacing?
17       MR. SCHIMBERG:  Object to form.
18  Foundation.
19       **A   At the time, we didn't have a -- an**
20  **individual that I think that they directly said was**
21  **going to do something.  More along the lines of they**
22  **had kind of a feeling given the attitude of the**
23  **individuals that something might transpire.**
24       Q  (BY MR. TONDRE)  Well, they had direct
25  threats on the internet.  You didn't know that?

Page 32

1       **A   Direct -- you mean direct threats to**
2  **Mr. Swift or Mr. Hatlee?**
3       Q  No.  Direct threats to the sheriff's
4  department and hey, if you guys don't do something,
5  we're going to take it into our hands.  That was the
6  nature of the threat.
7       MR. SCHIMBERG:  I missed the question
8  though, Brice, I'm sorry.
9       Q  (BY MR. TONDRE)  Are you in the business of
10  just protecting animals and not people?
11       MR. SCHIMBERG:  Object to form.
12  Argumentative, go ahead.
13       **A   No.  We protect people too.**
14       Q  (BY MR. TONDRE)  All right.  Why didn't you
15  investigate threats of bodily and property injury when
16  they -- when they were brought to the -- directly to
17  the attention of the sheriff's office.
18       **A   Well, we did do an investigation.**
19       Q  And who did you investigate?
20       **A   That's what I am trying to figure out.  I**
21  **mean, did an investigation on -- on the horses, I**
22  **guess, I don't know what the threat is that you're**
23  **talking about.**
24       Q  On February the 19th, 2012, this is
25  page 89 of the sheriff's office discovery.

Page 33

1       MR. SCHIMBERG:  Should we take just a
2  second to grab it so we can see it?  What exhibit is
3  that, Mr. Tondre?
4       MR. LEBSACK:  66.
5       MR. SCHIMBERG:  That sounds right to me.
6  Let's just see how good my -- page what?
7       MR. TONDRE:  Page 89.
8       MR. SCHIMBERG:  Thanks.  See you needed
9  your glasses.
10       THE DEPONENT:  I thought I was going to
11  need them.
12       Q  (BY MR. TONDRE)  What I'm referring to
13  Sheriff Wegener, is paragraph No. 4 which says: "On
14  February 19, 2012, I received a telephone call from
15  Undersheriff Gore at my residence."  This is Bobbi
16  Priestly speaking.  "The undersheriff advised me that
17  he had received several telephone calls from the Public
18  Information Officer for the State of Colorado
19  Department of Agriculture's office.  He was very
20  concerned for the safety of the owners of horses and
21  the horses themselves.  The undersheriff stated he had
22  been on the telephone all morning and the emails and
23  telephone calls were very concerning to him."
24       Were you aware that Undersheriff
25  Gore was concerned about the safety of the owners

FRED WEGENER - JULY 24, 2014

Page 34

1 and the horses?
2      MR. LEBSACK: Object to the form.
3      MR. SCHIMBERG: Join.
4      **A   That's what it says.**
5      Q (BY MR. TONDRE) No. But is this something
6 you as sheriff in February 19, 2012, was aware of?
7      **A   That they said yeah, they were concerned.**
8 **That's why they -- in the next paragraph why they**
9 **agreed to move the horses.**
10      Q   That's an unhealthy atmosphere to have
11 going on in your jurisdiction, isn't it, people --
12 people have to be in fear of their lives because of
13 some threats?
14      MR. SCHIMBERG: Object to form.
15 Argumentative.
16      **A   Yeah, I don't -- I don't see that, I'm**
17 **sorry.**
18      Q (BY MR. TONDRE) You don't see that it's
19 something you should be concerned about?
20      **A   No. I'm sorry. Where does it say that**
21 **there was a threat? I guess I'm missing that.**
22      Q   Well, I don't know how else you can read
23 it. He was concerned for the safety of the owners and
24 the horses themselves.
25      **A   Okay.**

Page 35

1      Q   That doesn't tell you there's a threat
2 going on?
3      **A   Well, it says -- then it says in the next**
4 **paragraph they acted upon it and moved the horses.**
5      Q   So you moved the -- you moved the victim,
6 you don't -- you don't go after the perpetrator, is
7 that the practice in Park County?
8      MR. SCHIMBERG: Object to form.
9      **A   No. I mean, if there had been a threat**
10 **against somebody, if you're going to go shoot them or**
11 **you are going to go punch them out or whatever, then we**
12 **acted upon it.**
13      Q (BY MR. TONDRE) Did you check and see
14 what -- what the nature of the communications were that
15 led Undersheriff Gore to be concerned?
16      **A   I'm sure if -- if there was some sort of**
17 **a specific threat, they would have acted upon it.**
18      Q   How specific does it have to be, you have
19 to fire a shot?
20      **A   No. I mean you have to make a threat**
21 **against somebody.**
22      Q   Well, are you -- are you aware that they
23 made a threat -- that Shelley Ferraro made a threat
24 against Dr. Horton?
25      **A   No. I'm not.**

Page 36

1      Q   So -- look at -- you can't look at it. I
2 got it.
3          I want you to take a look at Exhibit 67
4 and 68. First of all -- take a look at them. Familiar
5 yourself -- familiarize yourself with them, and my
6 question to you is: Were you aware of those as they
7 were being entered in to?
8      **A   I have been handed what I believe is the**
9 **notice of warning.**
10      Q   Right.
11      MR. SCHIMBERG: That's 67.
12      **A   And then 68 is the last page with the**
13 **signatures.**
14      MR. LEBSACK: Actually --
15      MR. SCHIMBERG: Actually 68, take a look,
16 Sheriff. It's -- it's not related to 67. Excuse me,
17 Mr. Tondre. If you don't want me telling him that.
18      Q (BY MR. TONDRE) No. 67 and 68 --
19      **A   Are different?**
20      MR. SCHIMBERG: Yeah.
21      Q (BY MR. TONDRE) Yeah.
22      **A   Oh, okay.**
23      Q   One is the notice of warning and 68 is
24 the agreement to move the horses.
25      **A   Okay. Okay.**

Page 37

1      Q   And did you -- are you aware -- were you
2 aware of Exhibit No. 67 before it was done?
3      **A   No.**
4      Q   When did you become aware of it?
5      **A   Right now.**
6      Q   Okay. And were you aware of Exhibit
7 No. 68 at the point in time when it was done?
8      **A   Only -- I've never seen it. I just**
9 **remember them telling me that there was an agreement.**
10      Q   Okay.
11      **A   That must be it.**
12      Q   Now, Exhibit No. 67, purports to be
13 signed on behalf of PCSO, which I assume is the Park
14 County Sheriff's Office. Did Cindy Hardey have
15 authority to enter -- or to issue that notice of
16 warning?
17      **A   Well, she is an agent for the state. Now**
18 **where do you see that she signed it on behalf of the**
19 **Park County Sheriff's Office?**
20      Q   Down under signature box.
21      MR. SCHIMBERG: Issuing agency.
22      **A   Yeah.**
23      Q (BY MR. TONDRE) Is that a warning that was
24 issued on behalf of the Park County Sheriff's Office?
25      **A   Yes. They do.**

10  (Pages 34 to 37)

FRED WEGENER - JULY 24, 2014

Page 38

1    Q  All right.  And she had the authority of
2  the Park County Sheriff's Office to enter into that
3  notice of warning?
4    A  Yes.
5    Q  Now --
6    A  It would have been from training she
7  received.
8    Q  Exhibit No. 68.  It says this is an
9  agreement between Ronald Swift, Kirsten LeBeau, and the
10  Park County Sheriff's Office regarding six horses that
11  were involved in a current case.  And it is signed by
12  Deputy Hardey and Mr. Hatlee and Mr. Swift.
13      Did Cindy Hardey have the authority to
14  enter into that agreement?
15    A  Yes.
16    Q  How many conversations did you
17  participate in which Dr. Horton was a party?
18    A  All right.  I give.  Who's Dr. -- what
19  was it?
20    Q  Horton?
21    A  Who's Dr. Horton?
22    Q  Dr. Horton is a veterinarian who provided
23  veterinary services to Mr. Hatlee and Mr. Swift.
24    A  None that I recall.
25    Q  Let me show you page 78 out of your

Page 39

1  discovery.  Is it in that book?
2    MR. SCHIMBERG:  Yeah, it's part of
3  Exhibit 66.
4    Q  (BY MR. TONDRE)  Okay.  The last paragraph.
5  "On February 21, 2012, at approximately 10:30 a.m., I
6  received a call from Dr. Horton, DMV.  Dr. Horton
7  called and stated she had some preliminary results on
8  the necropsy that was done on 'Maggie.'  I recorded a
9  portion of the conversation, see attached audio disk,
10  Undersheriff Monte Gore and Sheriff Fred Wegener were
11  both in the office for the conversation with
12  Dr. Horton."
13    A  Okay.
14    Q  Do you remember that?
15    A  No.  I don't.
16    Q  So you -- you can't testify that you were
17  there for that, can you?
18    A  I can remember -- and I just --
19  apparently, I don't remember Dr. Horton.  If she says I
20  was there, I guess I was there.  So...
21    Q  Well, just keep in mind that's --
22  question whether she's telling the truth or not.
23    MR. SCHIMBERG:  Object.  Object to form.
24    Q  (BY MR. TONDRE)  Do you ever remember -- do
25  you ever remember asking Dr. Horton or any veterinarian

Page 40

1  any questions about Mr. Swift?
2    A  No.  I -- I don't recall.
3    Q  Now, you -- you stated earlier that
4  you've known Mr. Swift for quite some time; is that
5  right?
6    A  Yes.
7    Q  And how have you known him?
8    A  Just casual acquaintance, he used to own
9  Pizza Et Cetera on top of the hill.
10    Q  Do you know anything about his
11  capabilities as a horse rancher?
12    A  No.  I don't.
13    Q  Did you ever have a question in your mind
14  as to whether Mr. Swift had not called a veterinarian
15  because he had a high opinion of his ability to deal
16  with problems in horses?
17    MR. SCHIMBERG:  Object to form.
18    A  Boy, repeat that question again.
19    Q  (BY MR. TONDRE)  My question:  Did the
20  thought ever cross your mind during the course of this
21  investigation early on that Mr. Swift felt he didn't
22  need to call a vet because of his high ability in
23  dealing with problems in horses?
24    A  So you're asking me to speculate on his
25  ability to deal with horses?

Page 41

1    Q  No.  No.  What I'm -- what I'm asking you
2  is whether you had in your mind a thought that maybe
3  Mr. Swift didn't call a veterinarian with respect to
4  the horses because he had a high ability of his -- his
5  qualifications to take care of the issue?
6    A  No.
7    Q  Does the sheriff's office have a website
8  where if someone wants to send you an email they could
9  send it directly to you?
10    A  Yes.
11    Q  Do you recall receiving in mail -- emails
12  directed to you during the course of the Hatlee and
13  Swift matter?
14    A  Directed -- who.  No.  I don't -- I don't
15  recall.
16    Q  All right.  What -- I realize it's been a
17  while, but what's -- what's your sense as you sit here
18  today as to what was going on publicity wise in
19  connection with this case?  Was it heated?  What -- how
20  would you characterize it?
21    A  You know, I've -- we've had the -- we had
22  the buffalo case where they -- folks went down and shot
23  all the buffalo on this guy's property.  And
24  everybody -- there's outcry on cruelty to animals.
25    This rose to that same level, where I had

11  (Pages 38 to 41)