EXHIBIT 16

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER,
and ASHLEIGH OLDS,

Defendants.



---

DEPOSITION OF MONTE GORE
June 24, 2014

---

Deposition location:
825 Clark Street Road
Fairplay, Colorado

APPEARANCES:

   Brice A. Tondre, Esq.
   BRICE A. TONDRE, P.C.
   215 South Wadsworth Boulevard, #500
   Lakewood, Colorado  80226

                              For the Plaintiffs.

   John Lebsack, Esq.
   WHITE and STEELE, P.C.
   Dominion Towers
   600 17th Street, Suite 600N
   Denver, Colorado  80202

                              For the Defendant, Olds.



**AVERY WOODS REPORTING**
455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

Page 2

```
 1   APPEARANCES (CONTINUED):
 2   Timothy P. Schimberg, Esq.
     FOWLER, SCHIMBERG & FLANAGAN, P.C.
 3   1640 Grant Street, Suite 300
     Denver, Colorado 80203
 4           For Park County.
 5
 6   Also present: Ronald L. Swift; Randy Hatlee; and Bobbi
     Priestly
 7
```

Page 3

```
 1           The deposition of MONTE GORE, called
 2   for examination by the Plaintiffs, was taken in
 3   the offices of Park County, 825 Clark Street,
 4   Fairplay, Colorado, commencing at 3:31 p.m., on
 5   the 24th day of June, 2014, before Linda L.
 6   Frizzell of Avery/Woods Reporting Service, Inc.,
 7   455 Sherman Street, Suite 250, Denver, Colorado
 8   80203, Registered Professional Reporter, Certified
 9   Shorthand Reporter, and Notary Public in and for
10   the State of Colorado, pursuant to the Federal
11   Rules of Civil Procedure.
12              I N D E X
13   EXAMINATION OF MONTE GORE           PAGE
14   BY MR. TONDRE                         4
15              INITIAL
     PREVIOUSLY MARKED EXHIBITS:        REFERENCE
16
     66  Park County Records               8
17
```

Page 4

```
 1              MONTE GORE,
 2   being first duly sworn to state the truth, the whole
 3   truth, and nothing but the truth, testified under oath as
 4   follows:
 5              EXAMINATION
 6   BY MR. TONDRE:
 7       Q  State your name, please, sir.
 8       A  Monte Kevin Gore.
 9       Q  And your occupation, Mr. Gore?
10       A  I'm the undersheriff of the Park County
11   Sheriff's Office.
12       Q  What are the duties of the undersheriff?
13       A  Basically, I'm second in command, and I
14   supervise all the divisions under -- in the Park County
15   Sheriff's Office.
16       Q  What -- what is involved in your
17   supervision of the animal cruelty division?
18       A  That's one of the divisions under my
19   command, but primarily I leave the animal control
20   issues to Captain Bonnelycke and Sergeant Priestly.
21       Q  What's your educational background?
22       A  Excuse me?
23       Q  What's your educational background?
24       A  I graduated with honors from St. John's
25   University with a 4.0 GPA. I graduated from the
```

Page 5

```
 1   Colorado Law Enforcement Officer -- or Law Enforcement
 2   Academy with a GPA of 4.0. I'm a graduate of the US
 3   Department of Justice National Institute of Corrections
 4   Academy. I'm a graduate of the County Sheriffs' of
 5   Colorado Command School. Let me see.
 6           I'm graduate of Basics SWAT school. I'm
 7   a graduate of advanced SWAT school. I'm a graduate of
 8   the FBI National Academy out of Quantico and graduated
 9   with a 4.0 GPA. I have --
10       Q  How long have you been with the Park
11   County Sheriff's office?
12       A  Since September 1st of 2000.
13       Q  St. John's, is that in New York?
14       A  No. Louisiana.
15       Q  Oh, okay. Has your entire career been in
16   law enforcement?
17       A  It has.
18       Q  What was your first law enforcement job?
19       A  Detention deputy sheriff for the Otero
20   County Sheriff in La Junta.
21       Q  And how long were you in that position?
22       A  From 1981 to I believe May of 1984.
23       Q  And what was next?
24       A  I tested for and placed number one for
25   the Weld County Sheriff's office and worked there from
```

## Page 6

1  1984 until I think 1988.
2  Q  19 what?
3  A  '8.
4  Q  '88. What was your position at Weld
5  County?
6  A  I was hired into the jail, and I think I
7  was promoted several times to the rank of proficient
8  correctional officer 2.
9  Q  What was your next position?
10  A  Moved to the mountains and got a job for
11  the Summit County Sheriff's Office in Breckenridge,
12  Colorado, in 1988 -- excuse me, 19- -- hold on. '84.
13  Q  '88?
14  A  Hold on. Otero, 1981-'84. '84 to '88.
15  Yeah, 1988, moved up through the ranks to captain. And
16  was recruited by the Park County Sheriff's Office in
17  2000, they were starting a jail; and tested for the
18  position of jail administrator, captain; was selected
19  in that testing procedure; and have been with Park
20  County since September 2001 to present.
21  Q  Are you post certified?
22  A  I am.
23  Q  When did you become post certified?
24  A  1992. I also have probably thousands of
25  hours in training as far as an incident management,

## Page 7

1  leadership, law enforcement as a PIO, management,
2  strategic planning, leadership. Pretty much the whole
3  gamut.
4  Q  What -- what was involved in -- did you
5  have to -- did you have to attend any sort of course of
6  study in order to obtain your post certification?
7  A  Yes.
8  Q  What -- what did you attend?
9  A  The law enforcement training academy in
10  Golden.
11  Q  When did you do that?
12  A  1992.
13  Q  And that was what, nine months, six
14  months?
15  A  Something along those lines.
16  Q  And when did you become undersheriff?
17  A  Towards the end of 2005.
18  Q  Until you became post certified, you were
19  involved with jail facilities?
20  A  Correct. And I also went to a detention
21  officer academy, I think in 1991 or 1981.
22  Q  What involvement did you have in the
23  decision to file animal cruelty charges against
24  Mr. Hatlee and Mr. Swift?
25  A  I don't think I had any involvement of --

## Page 8

1  in the filing of the charges.
2  Q  What, if any, involvement did you have in
3  the drafting of the affidavit that Cindy Hardey did in
4  order to obtain a -- a seizure and search warrant?
5  A  None.
6  Q  As you know, there was some testimony
7  this morning about a telephone call you made to Bobbi
8  Priestly on February the 19th. We're going to hand you
9  an exhibit that has been marked Exhibit 66, you can
10  look at this if it makes any difference to you or not.
11  But on page 89 of that exhibit, it says:
12  "On February 19, 2012 I received a telephone call from
13  Under sheriff Gore at my residence. The Under sheriff
14  advised me that he had received several -- several
15  telephone calls from the Public Information Officer for
16  the State of Colorado's Department of Agriculture
17  Office."
18  It's the -- the fourth paragraph on that
19  page.
20  MR. SCHIMBERG: Yeah, just so you know,
21  Brice, because you were reading, we were getting our
22  way to 89.
23  A  Yeah, if you can start over again.
24  MR. TONDRE: Sure.
25  MR. SCHIMBERG: Or just focus us.

## Page 9

1  Q  (BY MR. TONDRE) Read -- read that
2  paragraph to yourself, and then I'll ask you some
3  questions about it.
4  MR. SCHIMBERG: Where were you reading?
5  A  Beginning: "On February 19th"?
6  Q  (BY MR. TONDRE) "On February 19th, 2012 I
7  received a telephone call."
8  MR. SCHIMBERG: Thanks.
9  A  Okay.
10  Q  (BY MR. TONDRE) Do you recall making
11  that -- or did you make the telephone call referenced
12  there?
13  A  Yes.
14  Q  And do you recall from whom you received
15  telephone calls that promoted you to make this call?
16  A  I was inundated with telephone calls.
17  I'm not specifically sure who all called me.
18  Q  How about emails, were you receiving
19  emails also?
20  A  I was.
21  Q  Did you have -- would they come to the
22  general sheriff's number or was there an animal control
23  number; do you know?
24  A  As I recall, Sergeant Priestly informed
25  me that the animal control folks were being inundated

Page 10

1  with calls. And were -- were for the most part
2  dysfunctional dealing with the amount of telephone
3  calls that they were receiving. So I took that as the
4  PIO for the department, I took -- started taking those
5  calls.
6      Q  What's a PIO?
7      A  Public information officer.
8      Q  Oh, okay. Now, you say you were
9  inundated. You got any estimate as to how many emails
10 and telephone calls you received?
11     A  A bunch. More than I've ever received on
12 any other case.
13     Q  Did you get any sense of what the -- I
14 take it the callers and the writers weren't calling to
15 thank you for anything, were they?
16     A  You know, I ended up listening to a lot
17 of folks. People were very upset over the situation.
18 I diffused a lot of the folks and talked to them, spent
19 hours on the phone. And as a result of some of that
20 communication, I did become concerned -- as I recall,
21 the most significant thing that I became concerned
22 about was that there was talk or information or
23 statements that there might -- that there was possibly
24 going to be a -- an attempt at horse rescue at the Echo
25 Valley Ranch.

Page 11

1      Q  Did you make any effort to identify the
2  makers of those calls?
3      A  A lot of the folks made anonymous calls
4  and left messages. A lot of the information that I
5  received, I didn't -- as I recall, I didn't get a
6  serious-type threat. It was more concern that we
7  needed to avoid a potential problem.
8         That's when I contacted Sergeant Priestly
9  and suggested that she contact Mr. Swift and Hatlee and
10 see if we could move the horses to an undisclosed
11 location. And I thought that that would diffuse the
12 situation.
13     Q  Did it?
14     A  It did. Most certainly.
15     Q  Wasn't there an outcry about moving the
16 horses rather than seizing them?
17        MR. SCHIMBERG: You know, let me object
18 to form. Go ahead and answer.
19     A  I'm not sure I understand your question,
20 Mr. Tondre.
21     Q  (BY MR. TONDRE) Well, what I'm searching
22 for is did -- did you receive any complaints that --
23 complaints about the fact that the horses had been
24 moved to a secret location rather than seized by the
25 county?

Page 12

1      A  I believe that's correct. I think, I --
2      Q  Now, when did you first -- well, let me
3  ask this: Do you have any knowledge of how the word
4  got out regarding the incident -- the incident that
5  occurred on February 16th, particularly the welfare
6  check, the well-being check of -- made by Officer
7  Hardey?
8      A  As I recall, I think that there was a --
9  a news story on Channel 7.
10     Q  To your knowledge, did anybody in the
11 sheriff's office contact the Channel 7 folks?
12     A  No.
13     Q  Did you ask Cindy Hardey to tell
14 Mr. Hatlee and Mr. Swift if the news people contact
15 them to just say no comment?
16     A  No.
17     Q  Do you have any impression as to how the
18 newspeople got ahold of the information that there had
19 been a warning given to Hatlee and Swift?
20     A  Not that I recall.
21     Q  Is it fair to say the only people that
22 had knowledge of what went on out there were Hatlee,
23 Swift, the sheriff's people and -- and Ashleigh Olds?
24        MR. LEBSACK: Objection to form.
25     A  In what -- the new one went -- what

Page 13

1  happened -- what happened when?
2      Q  (BY MR. TONDRE) On February 16th, the
3  visit when it was decided to give a warning to Hatlee
4  and Swift?
5      A  So Hatlee and Swift were given a warning
6  and why -- do I have any recollection how that
7  occurred?
8      Q  No, no, no. What I'm searching for is:
9  Do you know of any person who had knowledge of what
10 occurred out on Echo Valley Ranch that day other than
11 Mr. Swift, Mr. Hatlee, the sheriff's department people,
12 and Ashleigh Olds?
13     A  I don't believe so.
14     Q  All right. At some point in time, you
15 issued a press release. Do you recall that?
16     A  I do.
17     Q  Do you recall why you issued the press
18 release?
19     A  Well, I think we were being inundated
20 with -- with calls from media, and I think we responded
21 to -- to that. That's typically what we do.
22     Q  Now were you concerned for the safety of
23 Mr. Hatlee and Mr. Swift?
24     A  I was concerned about the safety for
25 everybody involved. And when I say that, that would be

Page 14

1  Hatlee, Swift, and any would-be horse rescuer.
2      Q  To your knowledge, was there ever a -- an
3  investigation made with respect to any of the
4  threatened conduct?
5      A  As I recall, the information that I
6  received was more along the lines of people being
7  upset. People wanting to do a horse rescue, people
8  were upset with -- with the sheriff's office. I don't
9  think that there was a serious enough threat that would
10 have reached the threshold of menacing.
11     Q  Do you have a deputy by the name of Jeff
12 DeBerry?
13     A  I do.
14     Q  Do you know if he investigated a menacing
15 claim?
16     A  To my knowledge, Jeff DeBerry
17 investigated a harassment report and this was sometime
18 later. One of the attendees at -- at one of the
19 hearings, I think after the hearing, had stopped by
20 Mr. Swift's door and made some disparaging comments.
21         I think a call was made wanting this
22 person -- I think her name was Mary Ellen Irvine,
23 investigated for harassment; and I think Jeff DeBerry
24 investigated that case.
25     Q  Do you know what the result of the

Page 15

1  investigation was?
2      A  I was informed that Steve Sullivan, the
3  deputy DA, felt that this was more tit for tat going on
4  and didn't want to look at the -- or didn't want to
5  pursue the case after it was presented to him by Jeff
6  DeBerry.
7      Q  The district attorney was running for
8  election at that time, wasn't he?
9      A  That's correct.
10     Q  Do you know if there were any other
11 investigations for harassment or menacing in connection
12 with this matter?
13     A  At the same court hearing, I know I was
14 contacted by Mr. Kerrigan. Him and I had somewhat of a
15 heated conversation. This was an emotionally charged
16 situation on both sides. And I think he had pointed to
17 a vehicle that had come to court, it was driven by Gene
18 Ferraro, and it was missing a front license plate.
19         And he wanted to have that investigated.
20 And I called local authorities, and I believe
21 Mr. Ferraro was given a summons.
22     Q  This was over not having a front license
23 plate?
24     A  That's correct.
25     Q  Let me make sure I understand.

Page 16

1  Somebody -- somebody reported Gene Ferraro for not
2  having a front license plate?
3      A  Mr. Kerrigan who is a friend of
4  Mr. Hatlee and Swift.
5      Q  I see. How much contact did you have
6  with Gene Ferraro during the course of this matter?
7      A  You know, I had -- I think they met at my
8  office on one occasion. And I think that there were a
9  lot of emails that went back and forth over the course
10 of time with Mr. Ferraro. And I think I talked to him
11 at the horse function in Evergreen.
12     Q  The fundraiser?
13     A  The fundraiser.
14     Q  I'll come to that in a minute.
15        MR. SCHIMBERG: Figured. I think we know
16 each other's outlines now.
17     A  You come to that on a lot of occasions.
18     Q  (BY MR. TONDRE) Did -- how would you
19 characterize Mr. Ferraro's demeanor in connection with
20 this matter?
21     A  As we went through this process, people
22 were initially angry, they were frustrated; and I think
23 that they kind of lashed out. They did not trust the
24 sheriff's office. As I communicated with these folks,
25 eventually, I think we gained some credibility with

Page 17

1  them. And I would characterize them and everybody
2  pretty much as -- I see them as stakeholders. They
3  were on opposite sides, they were very passionate about
4  this case. And they were very interested in this case.
5      Q  In an email, sent -- well, first of all,
6  do you know Barbara Wright?
7      A  Yes.
8      Q  And how do you know her?
9      A  She is one of the horse advocates.
10     Q  Did you know of her before this Hatlee
11 and Swift case?
12     A  I did not.
13     Q  In an email she said the Ferraros are
14 helping with lobbying officialdom to move on this
15 travesty. Would you characterize the Ferraros as
16 "lobbying officialdom"?
17     A  As I recall at the onset, I think the
18 Ferraros were very upset. They felt there was a
19 travesty going on here. They didn't trust the
20 sheriff's office.
21        As we continued to move forward, and I
22 think, eventually, we were able to communicate on a --
23 on a better basis.
24        MR. SCHIMBERG: Listen to the question,
25 would you.

Page 18

1    A  Okay. I'm sorry, what -- would you
2 repeat the question.
3        MR. TONDRE: You answered it.
4        MR. SCHIMBERG: Wait for the next one.
5    A  Okay.
6    Q  (BY MR. TONDRE) Did you have occasion to
7 meet Monika Courtney during the course of this matter?
8    A  I believe I did.
9    Q  And was she urging you to do anything?
10    A  I think that there was communication from
11 her.
12    Q  Is it fair to say these folks were
13 pushing the sheriff's office to do things that they
14 perceived were not being done?
15    A  I think initially there was criticism of
16 the sheriff's office.
17    Q  And when did that change, after you
18 charged Hatlee and Swift?
19    A  As I recall, it continued for some time
20 even after that.
21    Q  I want you to take a look at page 135 of
22 Exhibit No. 66. What I'm particularly interested in
23 Mr. Gore is the last sentence that says: "Monte Gore
24 has the identity of this lady and she told me she told
25 him the same story - that there were as many as 30

Page 19

1 starving horses on the Echo Valley Ranch property."
2        Do you have any knowledge of this person
3 that's being referred to in that email?
4    A  I'm not sure during this time. I know I
5 received numerous emails from different folks giving
6 information typically like this that there was more
7 starving horses or -- or other issues.
8    Q  Well, to your knowledge, did -- well, it
9 says: "Monte Gore has the identity of this lady." Do
10 you have the identity of any person who said there was
11 30 starving horses out at Echo Valley Ranch?
12    A  I can't remember.
13    Q  Did you -- did either Agent Hardey or
14 Agent Priestly discuss with you this purported
15 communication from an anonymous phone caller who
16 Barbara Wright represented to be Kirt Van Poolen?
17    A  As I would receive this information, I
18 would pass it on to Sergeant Priestly for followup.
19    Q  Did it come to your attention that this
20 was potentially a false report?
21    A  No.
22    Q  Do you believe there was any substance to
23 it?
24    A  I think people were reporting on tidbits
25 of information. Obviously we have to follow up on the

Page 20

1 information, but I didn't feel on a case like this that
2 there would be an intent to falsify a report.
3    Q  According to page 136, Mr. Ferraro was
4 leaving -- left a message on the phone of Maarten Van
5 Poolen, threatening him with a felony if he destroyed
6 evidence. Do you see that?
7    A  You say that's in the last paragraph?
8    Q  Yeah.
9    A  Okay. I've finished reading it.
10    Q  Did -- were you aware that
11 Mr. and Mrs. Ferraro were attempting to gather evidence
12 in connection with the case?
13    A  I do remember something along the lines
14 that they were attempting to gather information on the
15 case.
16    Q  Did you find that a little bit troubling
17 having people running around messing around in your
18 investigation?
19    A  It certainly was not appropriate.
20    Q  What impression did you get of Gene
21 Ferraro -- I take it you had some personal meetings
22 with him?
23    A  You know, we met in my office, I think on
24 one occasion with several different folks. There was a
25 lot of email communication going back and forth at this

Page 21

1 time.
2    Q  Did you get the impression that he felt
3 he was a better investigator than what the sheriff's
4 department had?
5    A  I -- I recall, I think, him stating that
6 he was a good investigator. And I think -- well, I do
7 recall something to that effect.
8    Q  Do you recall him saying that he was
9 developing some witnesses who would testify that Hatlee
10 and Swift were staging their place for the weekly
11 welfare visits?
12    A  I vaguely remember something along those
13 lines.
14    Q  When the horses were seized on
15 February 23, 2012, you were present during the course
16 of loading the horses right?
17    A  That's correct.
18    Q  And what took the undersheriff to a
19 seizure like that?
20    A  As I recall, we had a lot of stuff going
21 on in the office that day. And I think I was asked by
22 Sergeant Priestly to accompany them out there to serve
23 the -- the seizure warrant.
24    Q  Did you participate in the actual loading
25 of the animals?