EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER
and ASHLEIGH OLDS,

Defendants.



---

DEPOSITION OF SVEN BONNELYCKE
October 8, 2014

---

Deposition location:
825 Clark Street
Fairplay, Colorado

APPEARANCES:

   Brice A. Tondre, Esq.
   BRICE A. TONDRE, P.C.
   215 South Wadsworth Boulevard, #500
   Lakewood, Colorado  80226

                                     For the Plaintiffs.

   John Lebsack, Esq.
   WHITE and STEELE, P.C.
   Dominion Towers
   600 17th Street, Suite 600N
   Denver, Colorado  80202

                                     For the Defendant, Olds.



AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

Page 38

    MR. SCHIMBERG: Form.

    A  I don't disagree with that. But I also think that's a matter of thoroughly investigating, putting the information in the affidavit, try to get all the information, relevant facts in the affidavit, when you have a tendency to not put the information in there, there's a difference between forgetting a piece of information or intent -- or with intent of not putting the information in there.

    Q  (BY MR. TONDRE) Would you agree that if you know -- if you know about information, failure to put it in is intentional?

    MR. SCHIMBERG: Object to form.

    A  If it was such information that you wouldn't normally forget and then not put it in, yes.

    Q  (BY MR. TONDRE) Would you expect an officer who has only been involved with a case for less than a week have a better memory than someone who has been involved with the case for a month?

    A  Well, I wouldn't necessarily agree with that, and I wouldn't necessarily agree with that for the fact that for me having -- and I presume you are speaking of me, having the knowledge that I have, is based off of my understanding of the case, and so much time after the case has transpired versus actually

Page 39

physically being there in the midst of the case as it's evolving. So I don't necessarily agree with that.

    Q  You think your memory would be just as good at a later time as it would be at the time of the -- the information coming to your attention?

    A  No. I know my memory wouldn't be, depending on if there has been a certain amount of time that has passed, I would have to do a lot of review to get myself back up to remember certain events, yes.

    Q  That's an obligation to remember what you may have forgotten; isn't it?

    A  Yes.

    MR. SCHIMBERG: Object to form.

    Q  (BY MR. TONDRE) When Mr. Hatlee and Mr. Swift were acquitted of the charges against them, what was the reaction of the people within the sheriff's department?

    A  I'm not sure what their reaction is. I'm sure they were not pleased with the decision.

    Q  The system reached its conclusion, correct?

    A  Correct.

    Q  You're familiar with the term or the statement that -- the one of Shakespeare makes, first let us kill all the lawyers, correct?

Page 40

    A  I'm not -- I'm not a Shakespeare aficionado, no.

    Q  You haven't heard the statement?

    A  Well, I have heard statements along those lines, but not by Shakespeare.

    Q  Do you believe it will be a better system if you didn't have lawyers and judges to disagree with the decision of the police department?

    A  I believe that the system that we have is the best system in the world. So I don't argue with the system. I may not -- I may not agree with some of the way things go, but that's not my job. My job is to be an officer and to investigate and to report that to the attorneys that have to prosecute.

    Q  And if the prosecutor prosecutes and the accused defends and the jury says not guilty, then justice has been done; hasn't it?

    A  I have no arguments with that process whatsoever. I respect that decision. I may not agree with it totally. But I respect it.

    Q  Was -- based on your perception of Monte Gore's involvement in this investigation, was he inv- -- involved in it more than he would normally be?

    A  Yeah, he was.

Page 41

    Q  And do you have any understanding as to why he was involved more than normally?

    A  I think Undersheriff Gore was involved when it did come to the amount of unhappiness by the public. And I think at that point, and also being the public information officer, he stepped in and then worked a little bit more directly with the animal control division and allowed them to do what they were supposed to do; and he would handle things on his level with dealing with the public.

So he is normally -- not normally this heavily involved in a criminal investigation, but yet again he is still a law enforcement officer and he is the undersheriff and he can make the decision if he wants to go in and work the case.

    Q  What is your understanding -- well, was it usual for him to go out and supervise the seizure of the horses?

    A  It's not a norm, but he's done -- he's done something along those lines before.

    Q  What's your understanding of why he did it here?

    MR. SCHIMBERG: Object to form, foundation. Go ahead.

    A  I'm not sure if I have an understanding

Page 42

1 other than the fact that he received a lot of
2 complaints and then, based on that, was involved and
3 then directly started working hand in hand with animal
4 control.
5     Q (BY MR. TONDRE) Isn't that your job?
6     A But he's also my boss.
7     Q Did he tell you he was taking control
8 from you?
9     A No. He didn't have to tell me, I saw it
10 firsthand so I stood aside.
11     Q Were you in any way involved in the
12 decision to take Cindy Hardey off the case?
13     A I was not.
14     Q Did you know what happened?
15     A My understanding is that there was some
16 concerns that were given to the undersheriff that they
17 thought that she may have had some personal friendship,
18 I don't know if that was with Mr. Hatlee or Mr. Swift;
19 but in the light of that, they didn't want there to be
20 a view that we would allow her to continue and not be
21 objective in the investigation.
22     Q Now, when did you learn that that was the
23 case?
24     A I think it was right about the same time
25 they actually made that decision or shortly thereafter.

Page 43

1     Q Who made that decision?
2     A I believe that was a decision that came
3 from Undersheriff Gore.
4     Q Did you have any information that led you
5 to believe that she was friendly to Swift or Hatlee?
6     A I personally did not, no. No.
7     Q All right. Now, by the time that
8 happened, she had -- it had already been adjudged that
9 she had filed a bad faith affidavit, right?
10     MR. SCHIMBERG: Object to form.
11     A Honestly, I do not know. I don't know
12 where that falls in the time line.
13     MR. TONDRE: Let's take a few minutes.
14     (Recess taken from 1:59 p.m. to
15 2:08 p.m.)
16     Q (BY MR. TONDRE) Okay. I'm going to
17 hypothecate some facts to you, Captain, which I want
18 you to accept as true. The beginning of the
19 investigation by Cindy Hardey was on February the 16th,
20 2012. The protective agreement that was entered into
21 between the sheriff's office and Mr. Hatlee and
22 Mr. Swift was entered into on February 19th, three days
23 later. And the seizure warrant affidavit was signed on
24 February the 22nd, 2012. We have three days between
25 each event.

Page 44

1 Would you expect on February 22nd
2 that Cindy Hardey would, without a doubt, remember
3 entering into -- or giving a notice of warning on
4 February 19th?
5     MR. SCHIMBERG: Object to form. Go
6 ahead.
7     A I would like to think she would have
8 remembered, yes.
9     Q (BY MR. TONDRE) And would you think on
10 February 22nd, she would remember a protective
11 agreement she entered into on February 19, 2012?
12     A Again, I would like to think that she
13 would have remembered, yes.
14     Q And would you think that during that
15 short time span she would know the contents of those
16 two documents?
17     A I would hope so, yes.
18     Q And would you think she would remember a
19 conversation that she had the morning of the day she
20 signed the affidavit for search -- for seizure warrant?
21     A I would like to think so, yes.
22     Q Now, as the professional standards person
23 as it relates to animal control officers, would you
24 expect to be told that one of your officers had been
25 found in bad faith by a judge?

Page 45

1     MR. SCHIMBERG: Object to form.
2 Foundation. Characterization, go ahead.
3     A I would like to be informed of any --
4 anything that my officers are doing or, in this
5 particular case, if there was something of fact like
6 that that happened.
7     Q (BY MR. TONDRE) But you weren't, were you?
8     A No. I was not.
9     Q Someone made the decision to keep you out
10 of that equation, right?
11     MR. SCHIMBERG: Object to form.
12 Foundation.
13     A I don't think it was a matter of them
14 intently keeping me out of the loop so to speak; I
15 think it might have been something that they felt,
16 well, there's nothing we can do about it now and then
17 felt that there was no wrongdoing.
18     Q (BY MR. TONDRE) Isn't it true, that a law
19 enforcement agency has a duty and an obligation to
20 supervise and discipline its officers?
21     A Yes, I do.
22     Q Was there any investigation made to
23 determine whether Cindy Hardey had committed an act
24 which -- which justified discipline?
25     A Not by I.

Page 46

1  Q  Well, do you know of anybody who did make
2  such an investigation?
3  A  Not that I'm aware of.
4  Q  And who had the authority to make that
5  investigation other than you?
6  A  That typically will be ordered by the
7  sheriff for, let's say, an internal investigation under
8  professional standards, but I would not be the only
9  person who would probably conduct an investigation. It
10 could be the undersheriff himself that could have done
11 it. But it will be a higher-ranking member.
12 Q  Have you ever heard that an investigation
13 was made by anyone?
14 A  No.
15 Q  Would you expect as the person in charge
16 of that officer to be told if the officer was
17 investigated?
18 A  I would.
19 Q  Did you ever discuss the issue regarding
20 the insufficiency of the affidavit because of omissions
21 with Detective Priestly?
22 A  With Sergeant Priestly?
23 Q  Sergeant Priestly.
24 A  Okay. Now I just side-tracked myself by
25 asking you that question. Ask me again, please.

Page 47

1  Q  Did you ever discuss with Sergeant
2  Priestly the question of the sufficiency or
3  insufficiency of the seizure warrant affidavit?
4  A  I think after we found out about the
5  judgment by the Court, we did talk about it and then
6  the fact that the information that wasn't in there
7  wasn't something that was typically put into an a
8  affidavit to begin with.
9  Q  So it was the conclusion of you as a
10 professional standards person and Sergeant Priestly, as
11 a supervisor of Officer Hardey, and you as supervisor
12 of Sergeant Priestly, that it was a typical, usual, and
13 customary practice of the sheriff's office to not
14 include things of the nature that were omitted from the
15 affidavit in this case --
16 MR. SCHIMBERG: Object to form.
17 Q  (BY MR. TONDRE) -- is that correct?
18 MR. SCHIMBERG: And foundation.
19 A  That is not correct. That decision does
20 not stop with me. That is a decision made by the
21 sheriff. And if there's an investigation to be
22 conducted, it is he who orders it.
23 Q  (BY MR. TONDRE) It was your judgment from
24 talking to -- you -- you and Sergeant Priestly came to
25 the decision that it was the practice of the office not

Page 48

1  to include things such as those omitted by Officer
2  Hatlee -- Hardey.
3  A  It --
4  MR. SCHIMBERG: Hold on. Object to form
5  and foundation. Do you want me to ask him to leave so
6  I can tell you what the nature of my objection is? So
7  you don't, rightfully, accuse me of trying to educate
8  him.
9  MR. TONDRE: Okay. I'm interested. I'm
10 curious.
11 MR. SCHIMBERG: Do you want me to say it
12 now or have him leave?
13 MR. TONDRE: Or we can leave.
14 MR. SCHIMBERG: No, no, no. I want -- I
15 want to share with you the nature of my objection
16 because I'm close to telling him he doesn't have to
17 answer based upon his prior testimony. I'm trying to
18 be real fair about it.
19 MR. TONDRE: All right. Have him leave.
20 I'm puzzled.
21 MR. SCHIMBERG: Yeah. Maybe we can clear
22 it up.
23 MR. TONDRE: Don't go away.
24 THE DEPONENT: I will be right out the
25 door but not in earshot.

Page 49

1  MR. SCHIMBERG: See you tomorrow.
2  (Captain Bonnelycke has left the
3  room.)
4  MR. SCHIMBERG: My foundation objection,
5  Brice, is that he's told you he didn't see the
6  affidavit. So you're asking him basically to -- when
7  you say for the things that were left out, he doesn't
8  have that knowledge of what elements you're talking
9  about.
10 MR. TONDRE: But he just testified to the
11 contrary of that, Tim.
12 MR. LEBSACK: I don't think he did.
13 MR. SCHIMBERG: I don't think so.
14 MR. TONDRE: Well --
15 MR. SCHIMBERG: That's my -- that's my
16 only thing. If you want to walk him through the
17 litany, that -- that at least educates him. But to ask
18 it as broadly as you did, he doesn't have that
19 foundation.
20 MR. TONDRE: Well, I can solve that
21 simply by asking him whether he discussed the specific
22 omissions with Sergeant Priestly, that should satisfy
23 your objection.
24 MR. SCHIMBERG: Yeah, I think that would
25 be fine.