EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.



---

DEPOSITION OF BOBBI PRIESTLY
June 24, 2014

---

Deposition location:
825 Clark Street Road
Fairplay, Colorado

APPEARANCES:

   Brice A. Tondre, Esq.
   BRICE A. TONDRE, P.C.
   215 South Wadsworth Boulevard, #500
   Lakewood, Colorado  80226

                                For the Plaintiffs.

   John Lebsack, Esq.
   WHITE and STEELE, P.C.
   Dominion Towers
   600 17th Street, Suite 600N
   Denver, Colorado  80202

                                For the Defendant, Olds.

Page 82

1  A  Yes, sir.
2  Q  When?
3  A  It appears it was on the 17th or 16th.
4  Q  4 p.m. in the afternoon, right?
5  A  Yes.
6      MR. SCHIMBERG: Excuse me. Bathroom
7  break when we're done with this category?
8      MR. TONDRE: It's lunchtime.
9      MR. SCHIMBERG: I could do two things at
10 once.
11     MR. TONDRE: Let me --
12     MR. SCHIMBERG: I don't care.
13     MR. TONDRE: Let me -- let me finish this
14 and then we'll go. If I can find my -- there's too
15 many boxes. No. Let's break for lunch.
16     (Luncheon recess was taken from
17 12:24 p.m. to 1:36 p.m.)
18  Q  (BY MR. TONDRE) All right. Let's go.
19 When we broke, we were talking about
20 moving the horses. What I understand your
21 testimony to be is that the decision to move the
22 horses for the safety of their owners and the
23 horses was a decision of Mr. Gore?
24  A  Yes.
25  Q  And tell me, did you have any involvement

Page 83

1  in the discussions relating to the movement of the
2  horses? I realize you had conversation with Mr. Gore
3  but what -- what did you do after that?
4      MR. SCHIMBERG: Can -- can I ask you a
5  question, Brice?
6      MR. TONDRE: Yeah.
7      MR. SCHIMBERG: Maybe it's just me. Are
8  we talking about from Echo Valley Ranch?
9      MR. TONDRE: To LeBeau.
10     MR. SCHIMBERG: Okay.
11     MR. TONDRE: Yeah.
12     MR. SCHIMBERG: All right. That's what I
13 wanted to make sure, thanks.
14  A  All right. Did I --
15  Q  (BY MR. TONDRE) Yeah, what -- after you
16 spoke with Mr. Gore and he expressed a concern for the
17 safety of the owners and the horses --
18  A  Uh-huh.
19  Q  -- and suggested that they be moved, did
20 you -- did you become involved in the efforts to get
21 them moved?
22  A  I contacted Cindy --
23  Q  Okay.
24  A  -- and talked to her and told her that --
25 that that was a recommendation made by the

Page 84

1  undersheriff, and -- and -- and then she contacted, I
2  believe Ron Swift.
3   Q  Did you -- did you prepare the agreement?
4   A  I did.
5   Q  Okay. And how did you get that to her?
6   A  I met -- I met them at Kirstin LeBeau's
7  place that evening.
8   Q  All right. And what was occurring when
9  you arrived at Kirstin LeBeau's place?
10  A  I arrived there prior to them.
11  Q  And you awaited their arrival?
12  A  Yes.
13  Q  And what did you observe when they
14 arrived? Did you observe the unloading of the horses?
15  A  A couple of them, yes.
16  Q  Do you recall which ones?
17  A  No.
18  Q  Did you have anybody with you when you
19 went to the ranch, I mean, to the LeBeau place?
20  A  Yes.
21  Q  Who did you have with you?
22  A  My youngest daughter was with me.
23  Q  Why would you have your daughter with
24 you?
25  A  She came with me to help.

Page 85

1   Q  To help with what?
2   A  To help with the -- we, Kirstin was
3  moving horses from her ranch, so she came with me just
4  to assist. She's going to veterinarian school.
5   Q  Not employed by the sheriff's department?
6   A  She is not.
7   Q  And she was going to veterinary school at
8  the time?
9   A  No. She is going -- she just graduated
10 this year.
11  Q  Graduated from what?
12  A  From high school. From Cripple Creek
13 High School.
14  Q  So she was a sophomore in high school
15 when you took her out to LeBeau's place?
16  A  Yes.
17  Q  Didn't have anybody from the sheriff's
18 office that could help?
19  A  No.
20  Q  What sort of help were you proposing to
21 give?
22  A  Well, I wasn't sure what we were going to
23 need.
24  Q  Well, what did it turn out that you
25 needed?

Page 90

1 horse was having a neurological problem?
2 A No. No.
3 Q Who made the decision to seize the
4 horses?
5 A Who made the decision to seize them?
6 Q Yes, ma'am.
7 A That would have been Cindy Hardey.
8 Q Did she consult you?
9 A Of course.
10 Q But you relied on her to make the
11 decision?
12 A Yes.
13 Q Did you participate in the seizure of the
14 horses?
15 A Yes.
16 Q Who was present during the seizure?
17 A Myself, Cindy Hardey, Undersheriff Go- --
18 Gore, sorry; Kirstin LeBeau, Marteen Van Poolen; and
19 one of their daughters, I don't remember which one of
20 their daughters, the oldest daughter.
21 Q Why was Mr. Gore there?
22 A To serve --
23 MR. SCHIMBERG: Object to form. Go
24 ahead.
25 A To serve the search warrant.

Page 91

1 Q (BY MR. TONDRE) Why couldn't you serve it?
2 A I'm not a certified peace officer.
3 Q Did he do anything other than serve the
4 search warrant?
5 A He talked to Kirstin LeBeau. I -- I
6 don't know, I wasn't paying particular attention to
7 what Mr. Gore was doing, I was loading horses.
8 Q Did he participate in the loading of the
9 horses?
10 A He may have helped some, yes.
11 Q Was it your judgment that Chance was fit
12 to travel?
13 A Yes.
14 Q How did you get Chance into the trailer?
15 A Marteen and Kirstin helped us load him
16 into the trailer.
17 Q Why didn't you use the Anderson lift that
18 was right there?
19 A Because he was walking.
20 Q You didn't have any trouble getting him
21 into the trailer?
22 A He stepped into the trailer. And then
23 he -- and then he collapsed, but he was walking, so we
24 didn't need to lift him into the trailer.
25 Q That's all preserved on video, isn't it?

Page 92

1 A I believe so, yes.
2 Q I would like you to take a look at page
3 135 of Exhibit 66.
4 A 135.
5 Q Yes, ma'am.
6 A I'm there.
7 Q Now how did you happen to receive the
8 information that's contained on page 135?
9 A An email.
10 Q Directed to you?
11 A Yes.
12 Q Who's the phone call with?
13 A The phone call that's in reference to the
14 email.
15 Q The phone call that's referenced in the
16 email?
17 A The phone calls about Barbara Wright and
18 Mrs. Van Poolen.
19 Q Did you know Barbara Wright at this time?
20 A I have to look at the date. I -- no.
21 Q Did you know Ms. Van Poolen?
22 A I knew her as Kirstin LeBeau.
23 Q Is it your understanding that this was a
24 telephone communication between Kirstin LeBeau and
25 Barbara Wright?

Page 93

1 A Yes.
2 Q And this is being -- is reported by
3 Barbara Wright; is that correct?
4 A That is correct.
5 Q All right. Did you ever -- did you ever
6 interview Kirstin LeBeau regarding the subject matter
7 of this purported conversation with Barbara Wright?
8 A May I take a minute to read it to refresh
9 my memory?
10 Q What?
11 A May I look at this whole thing?
12 Q Absolutely.
13 A Okay. Thank you.
14 I did speak with Kirstin about this.
15 Q Tell me what you asked her about.
16 A I asked her if she had spoken -- because
17 we didn't know who the anonymous party was, and I asked
18 her if she had spoken with this person about -- about
19 these photographs and asked her if she was willing to
20 talk to me about that.
21 Q Was she the anonymous person?
22 A Well, I wasn't sure. That's what I
23 wanted to talk to her and -- and -- and I -- she agreed
24 to speak with me about that.
25 Q Did she tell you she was the anonymous

Page 114

1 horses were returned?
2   A  10, 11.
3   Q  Did you find --
4       MR. SCHIMBERG: If you're guessing, tell
5 him you are guessing.
6   A  He asked me to estimate.
7       MR. SCHIMBERG: Okay. I missed that.
8   Q  (BY MR. TONDRE) Did you find anything
9 wrong when you were out there?
10  A  I'm sorry? Can you repeat that, I didn't
11 hear that.
12  Q  Were you critical of anything that was
13 going on out there?
14      MR. LEBSACK: Objection to form.
15  A  There -- the first couple of times I went
16 out there, I wasn't critical but there was a large
17 amount of manure and stuff in there but that was
18 understandable. The snow was melting.
19      No. I would say they -- you know, they
20 did what they were supposed to do.
21  Q  (BY MR. TONDRE) Did you see 30 starving
22 horses out there?
23  A  No.
24      MR. SCHIMBERG: You going to offer me one
25 of those?

Page 115

1       MR. HATLEE: Go get your own.
2       MR. SCHIMBERG: Thank you.
3   Q  (BY MR. TONDRE) There came a time when
4 Cindy Hardey was replaced as lead investigator in the
5 case, why was that?
6       MR. SCHIMBERG: Object to form,
7 foundation. Go ahead.
8   A  After the first bond hearing, I knew
9 there was a rela- -- not a relationship is not the
10 right word. A friendship or acquaintance, I just
11 didn't realize how far back it went. And the
12 undersheriff requested that I take over as lead
13 investigator because of not- -- so Cindy wasn't put in
14 a situation where she had to make decisions or do
15 things that would be difficult.
16      And based on my experience as the
17 supervisor, that's -- that's the reason.
18  Q  (BY MR. TONDRE) What was the relationship?
19  A  Cindy testified on the stand that she had
20 known Ron since she was a little girl.
21  Q  And?
22  A  Well, it kind of makes things a little
23 difficult if you have a personal relationship with
24 somebody.
25  Q  Well, she didn't have any trouble filing

Page 116

1 a bad faith affidavit against him, did she?
2       MR. SCHIMBERG: Object to form,
3 foundation, and argumentative.
4       MR. LEBSACK: Same.
5   Q  (BY MR. TONDRE) Did you do that because
6 you -- was that done because there were complaints
7 about her being too close to Mr. Swift?
8   A  No.
9   Q  It wasn't, huh?
10      MR. SCHIMBERG: Asked and answered.
11  Q  (BY MR. TONDRE) Asked and answered. All
12 right. Let me find the right page.
13      How did you -- how did the subject of
14 her -- well, you said it happened during -- during a
15 hearing that she was asked how long she knew Mr. Swift.
16 Was she asked what her opinion was of Mr. Swift?
17  A  I -- I -- I don't recall.
18  Q  You ever go out to dinner or lunch with
19 Wright or the Ferraros?
20  A  No.
21  Q  How many times would you estimate you
22 talked to Ashleigh Olds regarding the Hatlee and Swift
23 case?
24      MR. LEBSACK: Objection to form.
25      MR. SCHIMBERG: Join.

Page 117

1   A  On -- can you clarify? Are we talking
2 email, telephone?
3   Q  (BY MR. TONDRE) No. I'm -- I'm talking
4 about face-to-face or telephone conversations as
5 opposed to email blasts.
6   A  Okay. I don't know.
7   Q  The -- was there any evidence that the
8 six horses were endangered being housed at the LeBeau
9 facility?
10  A  Was there any danger?
11  Q  Were -- were the horses endangered while
12 they were at the LeBeau facility?
13  A  No.
14  Q  I may have asked this and I'm not sure.
15 Did you have a chance to go out to the LeBeau facility
16 before you went for the seizure?
17  A  No.
18      MR. TONDRE: Okay. I didn't think so.
19      Let's take a few minutes. I want to talk
20 to my clients but I'm about done.
21      (Recess was taken from 2:39 p.m. to
22 2:49 p.m.)
23  Q  (BY MR. TONDRE) Okay. Just a couple more
24 and we'll be done. How many horses were in the trailer
25 with Chance?