Swift-Hatlee Case 5/28/2014

I was retained as an expert in People v. Hatlee and Swift in September of 2012, and in this case. My opinions are set forth below. A copy of my report in the criminal case is attached. This statement is regarding Ron Swift and Randy Hatlee, who own horses housed on a ranch in Bailey, Colorado, called Echo Valley Ranch, and veterinarian Dr. Ashley Olds who was on this ranch and visited the animals owned by the before mentioned on February 16, 2012.

In December of 2011, 6 of the approximately 40 horses on the ranch began to lose weight and show signs of severe weakness. Of note is that only those 6 animals of the 40 on the property were affected, and 5 of those were all young horses under 2 years of age, and the sixth being an older mare historically known for being thin in the winter.

Those 6 horses were brought out of the pastures and brought into individual pens near the barn for closer evaluation and increased feeding, throughout the time period from December 1, 2011 through February 12, 2011. Records indicate the condition of the horses was being monitored by and a working diagnosis and treatment plan was in place with Timberline Equine veterinarians Dr. Horton and Burton, who suspected the 6 most severely affected animals were suffering from some sort of toxic ingestion, possibly botulism. Clinical signs of all animals included: thin body condition scores (2 or 3 out of 9), elevated heart rates, abnormal heart rhythms, diastolic heart murmurs, anemia (low red blood cell count) as noted on blood work, and varying abnormal neurological symptoms including being down and unable to rise, and crossing over of their feet when they walked (conscious proprioceptive deficits). Apparently, other animals in the area were reported to have similar symptoms, including being down and unable to rise, and even death. Botulism is difficult to accurately diagnose in horses, and there is no effective treatment. One of the horses later tested negative for botulism.

Routt County Animal Control officer Dawn Smith requested the assistance of Harmony Horse Works, which in turn enlisted the aid of Dr. Olds on February 16th to take into custody one horse on the property which was being monitored by Routt County. While on the property, Dr. Olds observed 7 other horses on the property which she asserted were cases of starvation and animal cruelty. The condition of Mr. Swift and Mr. Hatlee's horses on the ranch was brought to the attention of Animal Control Officers for Park County, as possibly a case of starvation and/or neglect. Dr. Olds demanded the thin horses be immediately seized by Park County. That same day, Dr. Olds also sent emails to various individuals regarding what she had seen on site, in what can perhaps be deduced as an attempt to create a public outcry against the horse owners and the Sherriff's Department for how they were handling the situation.

C.R.S §12-64-121 states:

(1) A licensed veterinarian who, during the course of attending or treating an animal, has reasonable cause to

know or suspect that the animal has been subjected to cruelty in violation of section 18-9-202 C.R.S....shall

report or cause a report to be made of the animal cruelty...to a local law enforcement agency or the bureau of

animal protection.

For a veterinarian to have reasonable cause to know or suspect that animals have been the victim of cruelty, specifically by way of starvation, he or she must reach a conclusion as to what might have caused the condition of the animals. This requires the standard process of developing a differential diagnosis list, which is derived from performing a complete physical exam and obtaining as thorough a history as possible of the animals and their current care. This information is then used to reach a scientific conclusion as to what is the most likely cause or causes for the condition, and therefore subsequently produce either a diagnosis, or list of working differential diagnosis'. After review of all statements and records, it would appear Dr. Olds violated this fundamental principle of veterinary medicine by failing to 1) perform thorough physical exams on the animals in question 2) obtain a thorough history on the animals from both the owners and the current attending veterinarians at Timberline Equine and 3) not developing a differential diagnosis list with some of the possible medical reasons other than neglect and starvation as possible causes for the condition of the animals before jumping to the unsubstantiated conclusion that the horses had been starved and demanding the situation be handled as such.

Of the horses in question, one was taken by Dr. Olds for treatment in her clinic, 1 died and the others were left in the custody of Hatlee and Swift. The horse which was taken to Dr. Olds clinic was treated in such a manner as a horse which has been starved, suffering from malnutrition, or another condition known as Equine Winter Starvation Syndrome. The latter is a condition where horses do not have enough additional calories needed to produce the body heat need in plummeting outside temperatures. These horses will lose weight despite having feed, if the feed is not enough in quality or quantity to account for the increased energy demand. What is inconsistent with this working diagnosis is that anemia is not what one would typically consider associated with this condition, nor is an elevated white blood cell count, and in fact, these animals will characteristically have a *decreased* appetite, which are all inconsistencies with what is reported in the medical record for the horse taken to Dr. Olds clinic. This leads one to surmise some other factor or factors were contributing to the condition of the animals, which were not being adequately taken into consideration, and that in fact the animal was likely misdiagnosed. Of concern are the allegations that Dr. Olds office manager declined information from Drs. Burton and Horton regarding the differential diagnosis which might have assisted in determining a more accurate diagnosis.

EXHIBIT B

The concern with this situation is certainly not that a veterinarian was concerned for the welfare of some animals in apparent need of care, but that Dr. Olds was not asked onto the property to evaluate those animals, and in fact, the animals were under the care of Timberline Equine. Without thorough physical exams on each of the afflicted animals, as well as a complete history obtained from the horse owners, and a consultation with the veterinarians who had been in contact with the owners about the horses care, it is against the standard of care to make any assumption about the cause of the condition of the animals, and certainly inappropriate to act in such a manner as to actively demand to have the animals seized for cruelty. At first glimpse of skinny horses it could certainly seem that the animals were not being fed properly, but the flat bed trailer full of hay reported to be parked near the animals, as well as all the unusual clinical signs (specifically the neurological signs) the animals showed, does not support a reasoned scientific conclusion that they were starved. In fact, Cindy Hardy reported the horses in question had heated water and hay available in their respective pens. A more thorough history would have revealed that the horse had been getting increased care and attention, hay, and were being fed grain twice daily since December when their condition was initially observed. Also of note is that Dr. Olds claims the animals were not showing any signs of neurological problems, however, on the video footage taken of the animals to demonstrate their poor condition, neurological abnormalities are present.

Furthermore, Dr. Horton (one of the vets from Timberline Equine) indicated in an email dated February 28, 2012 that she suggested the animals be transferred for advanced diagnostics tests at Colorado State University. When she consulted with the cardiologist Dr. Adams at Colorado State University regarding the clinic signs the horses were displaying Dr. Adams revealed that there is no known association between low body condition scores and diastolic murmurs in horses. Apparently Mr. Swift had an appointment at Colorado State Teaching Hospital for these advanced diagnostic tests, when the horses were seized by Park County, making the afflicted animals unavailable for advanced testing during the height of clinical signs.

While under the custody of Park County, the horses were under the care of both Littleton Equine Hospital and Ashley Olds DVM. Records indicate some advanced testing was performed, multiple doses of antibiotics and probiotics were given, as well as generalized supportive care including IV fluids was administered to the horses, but there is no record of a diagnosis the cause for the high heart rates, murmurs and abnormal rhythms noted on all the animals. All the animals repeatedly showed some signs of anemia on their blood work, as well as high white blood cell counts. Only the older mare received a definitive diagnosis of advanced kidney disease and intestinal parasites, which could certainly contribute to having a thin body score.

Anemia in animals occurs for one of three reasons: blood loss, blood cell destruction, or lack of regeneration of new blood cells by the bone marrow. It does not appear from the records that the horses suffered any sort of bleeding disorder, therefore we can assume the animals were not anemic from blood loss. Nutritional anemias in animals are rare and not normally associated with an otherwise healthy animal simply having a lack of forage. Disorders that cause red blood cell destruction are termed hemolytic anemia's and are usually associated with immunologically mediated mechanisms (such as equine infectious anemia, autoimmune hemolytic anemia, or transfusion reactions) certain bacterial infections (*Clostridium perfringens*), plant or chemical toxicity (red maple leaves, phenothiazine, onions, Hoary Alyssum), or blood parasites (Babesia, Ehrlichia equi)." Although the records are lacking in the specifics of the classification of the type of anemia the horses suffered from, they were treated with antibiotics, indicating that an infection of some kind was suspected (perhaps *Clostridium perfringens*?), and supportive care including IV fluids, such as would be the only treatment option in many cases of toxic ingestion. It is interesting to note that even under the care of animal control, the red blood cell counts were still decreased, and the white blood cell counts increased, indicating clearly that despite additional forage and calories the animals were still affected by something else causing the anemia, which then led to the continued cardiac abnormalities (high high rates, abnormal rhythms and murmurs). All of which are not normal or customary clinical symptoms associated with starvation.

Records were supplied with regards to another animal on the property, known as Bear or Spencer, another 2 year old horse with a similar condition to the 6 horses mentioned above. It would be sensible to say that it is likely this young horse might also have been suffering from a similar toxic ingestion as the other animals, especially in light of the fact (according to Dr. Olds) he was treated, and responded, in a similar manner as the other animals in question. In the records supplied there was not a description of Bear's cardiac condition, but it does mention treatment with antibiotics, and his blood work was similar to the other horses. It is likely that Bear, or Spencer, was suffering from the same malady as the other 6 horses, for all the same reasons listed previously.

The animals were later returned to the care of Ron Swift and Randy Hatlee, who throughout this time had been working with equine specialists, other veterinarians, and their local county extension agent to determine if botulism or some other toxin could have been the initial cause for the horse's condition.

I was asked by Mr. Swift to be present on the day the horses were returned to Swift and Hatlee, 4/11/2012 and can personally attest to that, despite receiving treatment for supposed starvation while under the care of animal control, some of the horses were still showing obvious neurological deficits as well as abnormal heart sounds, which are highly inconsistent signs to be associated with starvation.

One of the returned horses, Echo, a 1 year old stud colt, was also apparently suffering from lameness, and bright green loose stool indicating he had recently been eating a diet high in alfalfa hay. The clients reported to me he had not been suffering from lameness before seizure. It seems that while under the care of Animal Control the horses were fed a large amount of alfalfa hay. It is well known that large amounts of alfalfa hay are too high in protein for the young growing horse. Researcher T. J. Hulland at the University of Guelph-Ontario feels that most "contracted tendons" in young horses are the result of contracted muscles in the forearms. The tendons and ligaments themselves are not capable of shortening

EXHIBIT B

but it is possible for a young horse that is getting too much calcium and protein in the form of straight alfalfa hay to have this tight muscle condition. If the problem is caught early on, dietary changes can often prevent permanent damage. This is done by reducing the protein content of the ration (diluting alfalfa hay with mostly grass hay) and bringing the calcium/phosphorous ratio closer to the ideal 1:1. It is a reasonable conclusion that this young horse suffered musculoskeletal injury as a result of the refeeding program he was on while under the care of Animal Control.

It was later discovered that the toxic weed Hoary Alyssum was pervasive on the property, and more prolific throughout the area due to recent drought conditions. Hoary alyssum is known to be highly toxic to horses (but not to cattle or other ruminants), with a characteristic set of symptoms (not all present in every affected horse and not all horses are equally susceptible). Symptoms include depression, fever, increased heart rate, laminitis, limb edema, diarrhea dehydration, intravascular haemolysis (red blood cell destruction), hypovolemic shock, anemia, and abortion in pregnant mares (Becker et al. 2004, Hovda and Rose 1993, Knight and Walker 2004, Knight and Gaskill 2011, Martinson et al. 2007).

Interestingly, many of the symptoms the horses displayed were consistent with the ingestion of the toxic plant, bracken fern. Horses which have ingested bracken fern tend to lose weight, have depression, uncoordinated gait, anemia, and rapid heart rates. The blood tests to determine bracken fern toxicity, low thiamin levels and an elevated serum pyruvic acid level, were not performed on any of the horses involved in this case to my knowledge. (Knight, A Guide to Plant Poisoning, pg 224).

There is often no further treatment for toxic ingestion in horses, especially without a definitive diagnosis, other than to remove the source of the toxin, provide supportive care, including food and water, and providing protection from (and treatment for) abrasions caused as a result of any neurological conditions, until the body can clear the toxin from the system allowing the animal to recover and assimilate nutrients normally again.

In conclusion, 1) It would be uncommon in a case of severe neglect and starvation to only have 6 out of 40 animals affected 2) It is common for toxic ingestion to more strongly affect the younger animals who might be less discriminating in their forage choices and have fewer reserves for recovery 3) Starved horses will be weak, but not necessarily show signs of neurological abnormalities and conscious proprioception changes, and most importantly 4) cardiac abnormalities and anemia are not generally associated with starvation, and in fact in this case, persisted despite having increased calories and forage, therefore, the likelihood of some third other unknown cause, such as a persistent toxin in the animals tissues, or some other undiagnosed disease process, is highly suspect in this case. It is unlikely this was a case of selective neglect and starvation, but much more likely some other reason for the thin body scores, cardiac abnormalities, and anemia, such as ingestion of some sort of toxin or toxins, such as either in the ground, through the hay or feed source, or in the pasture plants. *(Equine Medicine and Surgery, Mosby, 1999), 5) it is unlikely equine winter starvation syndrome might have been a cause for the condition of the horses in light of all the other clinical signs and that animals maintained excellent appetites, 6) it was premature of Dr Olds and could be considered malpractice to make a conclusion of animal cruelty without further investigation, it was inappropriate conduct to openly discuss the details of the case while the investigation was ongoing, and from review of all the presented information it appears that her methodology was below the standard of care.

*signature: Jena Questen, DVM*

FACTS AND DATA CONSIDERED: Review of medical records, depositions, other records pertaining to the case, and literature on the topics at hand.

CV: attached

PUBLICATIONS: Volume 7, Number 4 of The Aquatic Veterinarian fourth quarter 2013
Orando Goldfish with Buoyancy Disorder

LISTING OF TESTIMONY for Jena Questen, DVM:

2/27/13 Attorney Darrel Campbell
State of CO v. Ronald Swift and
Randall Hatlee

Case numbers 12M43 and
12M44

Venue - Park County Court, Colorado

COMPENSATION: My regular hourly rate is $200 per hour, to date on this case have done 7 hours of work

Compensation for previous case: $

EXHIBIT B