---

JENA QUESTEN VOLUME II
HATLEE vs. HARDEY
November 10, 2014
180

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER
and ASHLEIGH OLDS,

Defendants.

------------------------------------------------------
DEPOSITION OF JENA QUESTEN
VOLUME II
November 10, 2014
------------------------------------------------------

Deposition location:
350 Bull Dogger Road
Bailey, Colorado 80421

APPEARANCES:

Brice A. Tondre, Esq.
BRICE A. TONDRE, P.C.
215 South Wadsworth Boulevard, #500
Lakewood, Colorado 80226
                             For the Plaintiffs.

John Lebsack, Esq.
WHITE and STEELE, P.C.
Dominion Towers
600 17th Street, Suite 600N
Denver, Colorado 80202
                             For the Defendant, Olds.

---

JENA QUESTEN VOLUME II
HATLEE vs. HARDEY
November 10, 2014
181

APPEARANCES (CONTINUED):

Timothy P. Schimberg, Esq.
FOWLER, SCHIMBERG & FLANAGAN, P.C.
1640 Grant Street, Suite 300
Denver, Colorado 80203
                             For Park County.


Also present:  Ronald Hatlee, Ronald Swift, and Dr. Olds.

---

JENA QUESTEN VOLUME II
HATLEE vs. HARDEY
November 10, 2014
182

The deposition of JENA QUESTEN, called for examination by the Defendants, was taken in the offices of Bailey Public Library, 350 Bull Dogger Road, Bailey, Colorado, commencing at 12:32 p.m., on the 10th day of November, 2014, before Linda L. Frizzell of Avery/Woods Reporting Service, Inc., 455 Sherman Street, Suite 460, Denver, Colorado 80203, Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public in and for the State of Colorado, pursuant to the Federal Rules of Civil Procedure.

                    I N D E X

EXAMINATION OF JENA QUESTEN                    PAGE
BY MR. LEBSACK                              184, 277
BY MR. SCHIMBERG                                 248
BY MR. TONDRE                               268, 282

                                              INITIAL
DEPOSITION EXHIBITS:                        REFERENCE

   110   Littleton Large Animal                  186
         Hospital Records

                                              INITIAL
PREVIOUSLY MARKED EXHIBITS:                 REFERENCE

   102   Dr. Questen Initial Report              190
         11/2012/Addendum February 1,
         2013

   106   Dr. Questen Rebuttal Report             237
         January 29, 2014

   107   Dr. Questen Report May 28,              205
         2014

---

JENA QUESTEN VOLUME II
HATLEE vs. HARDEY
November 10, 2014
183

                                              INITIAL
PREVIOUSLY MARKED EXHIBITS:                 REFERENCE

   108   Dr. Questen File (Thick)                206

   109   Dr. Questen's File (thin)               277

---

EXHIBIT D

1   come out and look at the horses, should they have done
2   that earlier?
3          A    I don't know.
4                MR. LEBSACK:  Okay.  Those are all my
5   questions.  Thank you.
6                THE DEPONENT:  Thank you.
7                MR. LEBSACK:  Hold on just a second.
8                (Off-record conversation.)
9                         EXAMINATION
10  BY MR. SCHIMBERG:
11         Q    Doctor, I introduced myself to you the
12  first go-around.  I'm Tim Schimberg, and I represent
13  what we've been calling the Park County defendants in
14  this case.  Thank for showing up again today.
15               As I understand it, when you were
16  contacted by Mr. Campbell originally and then
17  subsequently by Mr. Tondre for this case, you were
18  asked to render an opinion as to what may have
19  caused the condition of the horses that we've been
20  talking about as a doctor of veterinarian
21  medicine; is that correct?
22         A    That's correct.
23         Q    Okay.  You don't have any training in law
24  enforcement?
25         A    I do not.



Case 1:13-cv-02469-RM-MJW   Document 137-4   Filed 01/15/16   USDC Colorado   Page 3 of 10

JENA QUESTEN VOLUME II                               November 10, 2014
HATLEE vs. HARDEY                                                  249

```
 1          Q    All right.  And you have had no formal
 2   training in the Constitution of the United States?
 3          A    No.
 4          Q    Okay.  And let me ask you this, when you
 5   were called by -- well, let me ask you:  The day before
 6   the horses were returned to Echo Valley Ranch in April
 7   of 2001, you with me?
 8          A    Yes.
 9          Q    I bounce around, and I don't mean to
10   confuse, so let's make sure we're on the same
11   wavelength.
12          A    Okay.
13          Q    I think you testified earlier today that
14   you received a telephone call from Swift, Hatlee the
15   day before they were returned; did I understand that
16   correctly?
17          A    I believe that is correct.
18          Q    Do you -- from both or one or the other,
19   if you recall?
20          A    I don't exactly recall.
21          Q    Okay.  You're thumbing through your --
22   your file?
23          A    I'm trying to find my notes on that -- on
24   that day.  I think it probably was Mr. Swift.
25          Q    I don't want you to guess and neither
```



Case 1:13-cv-02469-RM-MJW   Document 137-4   Filed 01/15/16   USDC Colorado   Page 4 of 10

JENA QUESTEN  VOLUME II                           November 10, 2014
HATLEE vs. HARDEY                                              250

```
 1  does Mr. Tondre --
 2          A   Yeah, I don't remember.
 3          Q   -- at anything.  But if you want to
 4  refresh your memory, go ahead.
 5          A   It's much harder since I don't have my
 6  original records.
 7          Q   Where are they today?
 8          A   What's that?
 9          Q   Where are they today?
10          A   I don't know, getting in the mail on the
11  way to my house, I guess.
12              MR. SCHIMBERG:  Oh, Linda is squirming
13  down here.
14              THE DEPONENT:  I think I -- I met with
15  both of them.
16          Q   (BY MR. LEBSACK) All right.  For some
17  reason I thought I heard you say that you got a phone
18  call, was that followed up with a person-to-person --
19          A   I think it was.
20          Q   -- meeting?
21          A   Yeah, I think it was.
22          Q   Okay.  The day before the horses were
23  returned or the day of, if you recall?
24          A   It was the day before.
25          Q   Okay.
```



Case 1:13-cv-02469-RM-MJW   Document 137-4   Filed 01/15/16   USDC Colorado   Page 5 of 10

JENA QUESTEN VOLUME II                             November 10, 2014
HATLEE vs. HARDEY                                                251

```
 1          A    The phone call might have been maybe the
 2   day before that.
 3          Q    All right.  Now looking at your notes
 4   there --
 5          A    Uh-huh.
 6          Q    -- do you have, as you sit here today, a
 7   present recollection of actually making those notes as
 8   the three of you were chatting?
 9          A    Yes.
10          Q    Okay.  And the basis of all your
11   information of what had happened up to that point,
12   would have been from Mr. Swift and Hatlee at that
13   point; is that correct?
14          A    That's correct.
15          Q    Okay.  And you tried to be accurate and
16   thorough in those notes that you took there?
17          A    Tried to be, yes.
18          Q    Okay.  That was sort of the baseline of
19   your information?
20          A    It was.
21          Q    Okay.  Now I'm not sure I understand why
22   you were asked to come out to Echo Valley Ranch.  Do
23   you have an understanding of that?
24          A    I don't other than Ron wanted to have
25   another person's -- another person to be there to just
```



Case 1:13-cv-02469-RM-MJW   Document 137-4   Filed 01/15/16   USDC Colorado   Page 6 of 10

JENA QUESTEN VOLUME II                                          November 10, 2014
HATLEE vs. HARDEY                                                            252

```
 1  document the occasion.
 2       Q    Okay.  By "Ron," you mean Mr. Swift?
 3       A    Yes.
 4       Q    Okay.  Do you recall, because I didn't
 5  see any notes, do you recall conversations with either
 6  or both Mr. Swift and Mr. Hatlee after the horses were
 7  returned and after you had an opportunity to take a
 8  look at them?
 9       A    Yes.  At that time -- after that time, I
10  talked to them on a fairly regular basis about how the
11  horses were recovering and went and saw the horses.
12       Q    I'm talking more about the very day that
13  they were returned.
14       A    Okay.
15       Q    Were you -- let's back up.
16       A    Okay.
17       Q    Were you there when the horses were
18  unloaded?
19       A    Yes.
20       Q    Okay.  And do you recall speaking with
21  anyone that was doing the unloading of the horses?
22       A    No.  Because I don't -- I don't think I
23  knew anybody.
24       Q    Okay.  I'm just trying to piece it
25  together.
```



Case 1:13-cv-02469-RM-MJW Document 137-4 Filed 01/15/16 USDC Colorado Page 7 of 10

JENA QUESTEN VOLUME II                                November 10, 2014
HATLEE vs. HARDEY                                                   253

1    A   Yeah.
2    Q   I'm trying to put myself out there in
3 your shoes that day. What do you recall doing first?
4    A   Well, normally I would sit down and --
5 you know, make several pages of notes on a situation;
6 but I felt like it was appropriate in this case because
7 it seemed like it was going to be possibly complicated.
8 And then I just wanted to make sure I brought my camera
9 so that I could take pictures.
10   Q   Okay. And those photographs you've
11 provided to us, since we first got them?
12   A   Yeah.
13   Q   Okay. Do you recall who was there?
14   A   Mr. Swift and Mr. Hatlee. I don't recall
15 who else was there. I know there were people there
16 that I didn't know.
17   Q   All right. And you didn't converse with
18 those people?
19   A   Not that I remember.
20   Q   Okay. Now, what I'm getting at is then
21 the horses are delivered, the other people leave?
22   A   Right.
23   Q   What -- did you have an opportunity then
24 to speak or debrief with either Mr. Swift or
25 Mr. Hatlee?



```
 1          A    Well, I -- it was pretty hectic at that
 2   time.
 3          Q    Uh-huh.
 4          A    Because we had all these horses, there
 5   were no halters; so it was kind of a circus trying to
 6   get halters and trying to get these horses off these
 7   trailers.  And then I was trying to do exams on each of
 8   them before they went to their respective pens.
 9          Q    Okay.
10          A    So it was -- there was a lot going on at
11   the same time.
12          Q    All right.  Fair enough.  And you did
13   your exams before the horses were led to pens?
14          A    That's what I tried to do, yes.
15          Q    Okay.  Now are you recalling that, or are
16   you reading out of your notes?
17          A    No.  I'm recalling that.  I'm not --
18   yeah, uh-huh.
19          Q    Now are these the pens that are by the --
20   the barn and the house?
21          A    Yes.
22          Q    Okay.  You have not been asked to comment
23   upon standards of law enforcement by way of policies
24   and procedures?
25          A    No.
```



Case 1:13-cv-02469-RM-MJW   Document 137-4   Filed 01/15/16   USDC Colorado   Page 9 of 10

JENA QUESTEN VOLUME II                                November 10, 2014
HATLEE vs. HARDEY                                                    255

```
 1              Q    And you haven't been asked to comment
 2   upon the standards of law enforcement in terms of
 3   training of animal control officers?
 4              A    No.
 5              Q    And you don't have such training or
 6   education for animal control officers either by
 7   education or by experience?
 8              A    That's correct.
 9              Q    Have you ever sat on police or law
10   enforcement advisory boards?
11              A    I have not.
12              Q    As we sit here today, it is my
13   understanding you don't have any role of specific
14   participation in the events by Fred Wegener.
15              A    I don't -- I don't think -- maybe you
16   have to ask me that one more time to make sure I'm
17   answering it properly.
18              Q    Why don't you read it back; if you still
19   don't understand it, I will try again.
20              A    Okay.
21                   (Whereupon, the question at page
22   255, line 12, was read by the reporter.)
23              A    No.
24              Q    (BY MR. SCHIMBERG) Okay.  And the same
25   question as you sit here today, do you have any
```



```
 1   information about the specific role or conduct of Monte
 2   Gore --
 3         A    No.
 4         Q    -- and the events?
 5              Same question about Bobbi Priestly?
 6         A    No.
 7         Q    No, you don't?
 8         A    I don't.
 9         Q    Thank you.  And same question of
10   Ms. Cindy Hardey?
11         A    No.  I don't.
12         Q    Okay.  Thank you.  And you haven't been
13   asked by Mr. Tondre to study or investigate the
14   individual conduct of any of those people I just asked
15   you about?
16         A    No.
17         Q    So when some of the horses were returned,
18   I think you report that your personal observation was
19   that some exhibited some mild neurological symptoms; is
20   that correct?
21         A    That's correct.
22         Q    Okay.  Now, beyond the physical
23   observation, visual observation, did you do any testing
24   specifically on neurological symptoms that you
25   perceived?
```

